Case 1:00-cv-00161   Document 34   Filed in TXSD on 06/29/2001   Page 1 of 198

34

# COPY

United States District Court
Southern District of Texas
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

**JUN 2 9 2001**

Michael N. Milby
Clerk of Court

RICARDO PEREZ, JR.          §
      Plaintiff,          §
                       §

vs.          §          CIVIL ACTION NO. B-00-161
                       §

CITY OF LOS FRESNOS, TEXAS          §
JUAN C. SIERRA, SR., GONZALO          §
ACEVEDO, IDA GARCIA, MIGUEL          §
MENDOZA, INDIVIDUALLY AND IN          §
THEIR OFFICIAL CAPACITIES, AND          §
JUAN MENDOZA, JR.,          §
      Defendants.          §

## PLAINTIFF'S RULE 7(a) REPLY
## TABLE OF CONTENTS

I.      NATURE AND STAGE OF PROCEEDINGS          P. 1

II.     BASIS TO DENY QUALIFIED IMMUNITY          P. 2

III.    ISSUES TO BE RULED UPON BY THE COURT          P. 2
      A.      FREE SPEECH VIOLATIONS          P. 2
      B.      DENIAL OF LIBERTY INTEREST          P. 3
      C.      DENIAL OF PROTECTED PROPERTY INTEREST          P. 4

IV.     EVIDENCE IN SUPPORT OF REPLY          P. 5

V.      STATEMENT OF FACTS          P. 6

VI.     SUMMARY OF ARGUMENT          P. 16

VII.    CONCLUSION          P. 19

Case 1:00-cv-00161   Document 34   Filed in TXSD on 06/29/2001   Page 2 of 198

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 2 9 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| RICARDO PEREZ, JR. | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-00-161 |
| | § | |
| CITY OF LOS FRESNOS, TEXAS | § | |
| JUAN C. SIERRA, SR., GONZALO | § | |
| ACEVEDO, IDA GARCIA, MIGUEL | § | |
| MENDOZA, INDIVIDUALLY AND IN | § | |
| THEIR OFFICIAL CAPACITIES, AND | § | |
| JUAN MENDOZA, JR., | § | |
| Defendants. | § | |

## PLAINTIFF'S RULE 7(a) REPLY
## TABLE OF CITATIONS

### CASES

Board of Regents v. Roth, 92 S.Ct. 2707 (1972)
Blackburn v. City of Marshall, 42 F.3d 925 (5th Cir. 1995)
Brawner v. City of Richardson, 855 F.2d 187 (5th Cir. 1988)
Eugene v. Alief Indep. School Dist., 65 F.3d 1299 (5th Cir. 1995)
Perry v. Sinderman, 92 S.Ct. 2694 (1972)
Rosenstein v. City of Dallas, 876 F. 2d 392 (5th Cir. 1989), aff'd, 901 F. 2d 61 (5th Cir. 1989) (en banc)
Schultea v. Wood, 27 F. 3d 1112 (5th Cir. 1994)
Schultea v. Wood, 47 F. 3d 1427 (5th Cir. 1995)
Warnock v. Pecos County, Texas (5th Cir. 1997)
Wilson v. U.T. Health Science Center, 973 F.2d 1263 (5th Cir. 1992)

### STATUTES

Texas Local Government Code sections 22.071, 22.076, 22.077, 341.021

# COPY



34

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**JUN 2 9 2001**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| RICARDO PEREZ, JR. | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-00-161 |
| | § | |
| CITY OF LOS FRESNOS, TEXAS | § | |
| JUAN C. SIERRA, SR., GONZALO | § | |
| ACEVEDO, IDA GARCIA, MIGUEL | § | |
| MENDOZA, INDIVIDUALLY AND IN | § | |
| THEIR OFFICIAL CAPACITIES, AND | § | |
| JUAN MENDOZA, JR., | § | |
| Defendants. | § | |

## PLAINTIFF'S RULE 7(a) REPLY

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, RICARDO PEREZ, JR., Petitioner herein, and makes and files this his

Rule 7(a) Reply, and for good cause would show the Court the following:

I.
## NATURE AND STAGE OF PROCEEDINGS

This is Plaintiff's Rule 7(a) Reply concerning the defense of qualified immunity asserted by

defendants Juan Sierra, Sr., Gonzalo Acevedo, Ida Garcia and Miguel Mendoza. Plaintiff alleges

that he was terminated for exercising his Constitutional right of free speech, that the defendants

discharged plaintiff under circumstances that put his reputation, honor and integrity into doubt

without providing a forum to clear his name, and that defendants took away a property interest in

his position as chief of police. Plaintiff further makes claims under the Texas Whistleblower

Statute, defamation, intentional infliction of emotional distress and civil conspiracy. This cause is

still in the discovery stage. Because of certain state law requirements, an Order of this Court will

be necessary to allow discovery into issues discussed in closed or executive session. TEX GOV.

1

CODE 551.002 et. Seq.

## II.
## BASIS TO DENY QUALIFIED IMMUNITY

The defendant alderpersons are not entitled to qualified immunity for the federal claims

against them because they individually and collectively retaliated against the plaintiff for exercising

his free speech rights when he reported in good faith a matter of public concern.  Defendants

further violated plaintiffs liberty interests by terminating him under circumstances that cast doubt

upon his reputation, honor and integrity with false statements, and failed to provide him a forum

to clear his name.  Defendants further lack qualified immunity because they deprived him of a

property interest in his employment without a due process hearing.  All of these acts of the

defendants were objectively unreasonable and violated rights clearly established in 2000.

## III.
## ISSUES TO BE RULED UPON BY THE COURT

The only issue before the Court today is whether the individual defendants Juan Sierra,

Sr., Gonzalo Acevedo, Ida Garcia and Miguel Mendoza are entitled to qualified immunity.  The

Defendant alderpersons are not entitled to qualified immunity if there was an objectively

unreasonable violation of clearly established constitutional rights for their federal claims.  Eugene

V. Alief Indep. School Dist., 65 F. 3d 1299, 1305 (5th Cir. 1995).  In order to be entitled to

qualified immunity at the Rule 7 reply stage, there must clearly be no basis supporting plaintiff's

claims or there are indisputably meritless legal theories being offered.  Schultea v. Wood, 47 F.

3d. 1427, 1434( 5th Cir. 1995) (en banc).

### A.  FREE SPEECH VIOLATIONS

Speech by a governmental employee is protected if it is a matter of public concern and the

interest in commenting on the concern outweighs the employer's interest in promoting efficient

operation of the department.  Warnock V. Pecos County, Texas, 116 F. 3d 776, 780 (5th Cir.

1997); Brawner v. Richardson, 855 F. 2d 187, 191-92 (5th Cir. 1988).  The 5th Circuit has long

recognized that speech reporting official misconduct or wrongdoing on the part of public officials

involves matters of public concern as a matter of law.  Schultea v. Wood, 27 F. 3d 1112, 1120

(5th Cir. 1994), superceded on other grounds, 43 F. 3d 1427 (5th Cir. 1995); Wilson v. U.T.

Health Science Center, 973 F. 2d 1263, 1269 (5th Cir. 1992).  More particularly, the disclosure of

misconduct by a police officer is a matter of public interest and deserves constitutional protection.

Brawner v. Richardson, 855 F. 2d at 191-92.  As a matter of law, the 5th Circuit has held that the

public's interest in disclosure of misconduct by a police department or its officers outweighs the

City's interest in avoiding controversy, impeding the operations of the department, or affecting

working relationships necessary to the department's functioning.  Brawner v. Richardson, 855 F.

2d at 192.

There is no requirement that the speech be communicated to the public at large.  Schultea

v. Wood, 27 F.3d at 1119.   Whether the speech was a motivating or substantial factor in the

defendant's decision to terminate the plaintiff is an issue that must go to the jury.  Schultea v.

Wood, 27 F. 3d at 1119 n.11.  If there is a fact issue as to the unreasonableness of the defendant's

actions, it must also go to the jury.  Eugene v. Alief Indep. School Dist., 65 F. 3d at 1305.

A lack of contractual right to employment or tenure or other matter giving rise to a

property interest is immaterial to free speech analysis.  Perry v. Sinderman, 92 S. Ct. 2694, 2697-

98 (1972).

B.  DENIAL OF LIBERTY INTEREST

Discharge from public employment under circumstances that put an employee's

reputation, honor or integrity at stake gives rise to a liberty interest under the 14th Amendment to

a procedural opportunity to clear one's name. Rosenstein v. City of Dallas, 876 F. 2d 392, 395 (5th Cir. 1989), aff'd, 901 F. 2d 61 (5th Cir. 1989) (en banc), cert. denied, 498 U. S. 855 (1990); Schultea v. Wood, 27 F.3d 1112, 1117-1118. The loss of employment combined with stigmatizing false allegations can lead to a constitutional deprivation. Schultea v. Wood, 27 F. 3d 1117 n. 7. The hearing afforded must be meaningful. Schultea v. Wood, 27 F.3d 1117 n. 8.

### C.  DENIAL OF A PROTECTED PROPERTY INTEREST

Terminating a person  that has a property interest in their employment without due process violates the person's constitutional rights under the 14th Amendment.  Board of Regents v. Roth, 92 S. Ct. 2707, 2709 (1972).  A property interest can arise from existing rules, statutes, or mutually explicit understanding.  Perry v. Sinderman, 92 S.Ct. 2694 (1972); Blackburn v. City of Marshall, 42 F. 3d 925, 936-937 (5th Cir. 1995).

In Texas, a Type A municipality must have  a Marshall as a municipal officer, among others.  TEX. LOC. GOV. CODE 22.071(a) (Vernon's 1995).  The Marshall is ex-oficio the Chief of Police by statute. TEX. LOC. GOV. CODE 341.021(a) (Vernon's 1995). The office of Marshall can only be done away with by ordinance. TEX. LOC. GOV. CODE 22.076(b) (Vernon's 1995).  The governing body may remove a municipal officer for incompetency, corruption, misconduct, or malfeasance in office after providing the officer with due notice and an opportunity to be heard. TEX. LOC. GOV. CODE 22.077(a) (Vernon's 2000).  The governing body may remove  any officer it elects  if two-thirds of the elected aldermen vote in favor of a resolution declaring a lack of confidence.  TEX. LOC. GOV. CODE 22.077(b) (Vernon's 1995). Thus, by statute, plaintiff was provided certain property interests as the Marshall ex oficio chief of police.

4

IV.

## EVIDENCE IN SUPPORT OF REPLY

As support for its response , Plaintiff incorporates herein for all purposes the following

exhibits:

1.  Affidavit of Ricardo Perez, Jr.

2.  Pam Denny deposition excerpts, Pps. 1, 4, 13, 34, 48, 63, 64, 68, 119-120, 122-123, 125-130, and 133-136,

3.  City of Los Fresnos Agenda for June 27, 2000,

4.  Melanie McCormick incident report

5.  Miguel Mendoza deposition excerpts, Pps. 1, 5, 14, 16, 20-23, 72 81, 84, 87, 107-108, 120, 133, 137-139, 141, 150-152, 157-158, 161-163,

6.  Manuel Abrego deposition excerpts, Pps. 1, 4, 27, 35-37, 47-49, 51, 73-74, 93-95, 100-101, 111, 113, 122,

7.  Juan Sierra, Sr. deposition excerpts, Pps. 1, 4, 28-34, 57-58, 60-61, 69-73,

8.  Gonzalo Acevedo deposition excerpts, Pps. 1, 4, 26-27, 36,

9.  8/14/00 Petition for agenda item signed by 4 defendant alderpersons,

10. Juan Mendoza, Jr. letter,

11. 8/22/00 Petition for agenda item signed by 4 defendant alderpersons,

12. Attorney letters to Los Fresnos City requesting written notice for reasons of termination,

13. Evaluation of Police Chief job performance,

14. 8/29/00 Minutes of town meeting,

15. True and correct copy of Brownsville Hearld article for 8/30/00, Pps. A-1 and A-12,

16. Memo from Mayor Abrego to Chief of Police,

17. 8/25/00 City Attorney letter to Los Fresnos council,

18. 9/26/00 Minutes of town meeting,

19.     True and correct copy of Brownsville Herald article for 9/27/00 and 9/29/00,

20.     Letter to City Attorney from Plaintiff attorney requesting more information,

21.     True and correct copy of Brownsville Herald article for 12/19/00, Pp. A-2,

22.     Excerpts of 1986 Los Fresnos Police Department Internal Affairs Manual,

23.     True and correct copy of Brownsville Herald article for 10/13/00, Pp. A-3,

24.     True and correct copy of Valley Morning Star article for 9/29/00, Pp. A-1,

25.     True and correct copy of Brownsville Herald article for 10/16/00, Pp. A-1,

26.     Luis De la Rosa sworn statement of 6/22/00.

V.
STATEMENT OF FACTS

Plaintiff, Ricardo Perez, Jr., has been a licensed law enforcement officer for over fifteen years and has been in law enforcement for over eighteen years. (Exh 1) He is certified by the Texas Commission on Law Enforcement Standards as a law enforcement officer and is certified as a Police Chief and in Law Enforcement Administration. (Exh 1) He was hired as the Chief of Police for the City of Los Fresnos, Texas on February 22, 2000. (Exh 1) Los Fresnos is a Type A Municipality under Texas law. (Exh 2, p. 34 l. 5-16) Plaintiff was to begin work as the police chief on March 13, 2000. (Exh 1) Plaintiff was never told that he had any probationary period. (Exh 1) Plaintiff was not a beginning police officer as that term is meant under the Texas Civil Service Act, but rather was a newly employed person for the City. (Exh 1)

In early March, 2000, the interim administrator Pam Denny (hereinafter "Denny") called Plaintiff that the Police Department was in disarray having lots of problems with low morale and discipline. (Exh 1) She asked the Plaintiff to start earlier. (Exh 1) Plaintiff started reporting to work one week earlier than planned without pay. (Exh 1) On the first day he reported, Plaintiff walked in the door and had to intervene between two officers who were in a dispute because one

6

had secretly recorded the other. (Exh 1) The Plaintiff later recommended the termination of another officer who pulled his weapon on a dispatcher and a dispatcher who fell asleep on the job. (Exh 1) Morale and discipline in the department were terrible when Plaintiff took over as chief of police. (Exh 1; Exh 2 p. 48 L.2-25)

Shortly before taking office, the Plaintiff was told by the outgoing police chief, Terry Vinson, that he had issued a directive for all officers not to have unauthorized persons ride in the patrol cars without the chief's permission. (Exh 1) Chief Vinson explained that he issued the directive because Ida Garcia (hereinafter "Garcia") frequently rode with officer David Rodriguez. (Exh 1) The Plaintiff was also warned about the relationship between officer Rodriguez and Garcia by the city administrator Denny, and the Mayor at the time, Robert Cepeda. (Exh 1)

Shortly after taking office, Garcia would call the Plaintiff's office and ask why the Plaintiff appointed certain officers to certain tasks or why the Plaintiff was doing some police matters in certain ways. (Exh 1) In one instance around April, 2000, Garcia asked why the Plaintiff had not put officer Rodriguez into a particular training course. (Exh 1) Plaintiff informed Mayor Cepeda of Garcia's calls and he advised Plaintiff that he had previously issued a directive to the Alderpersons not to interfere with the administration of the police department. (Exh 1) He told Plaintiff this had been a big problem before. (Exh 1)

On June 14, 2000, Luis De La Rosa filed a complaint against officer Rodriguez for civil rights violations. (Exh 1) Mr. De La Rosa had filed a complaint against officer Rodriguez with Plaintiff's predecessor about one year and eight months earlier. (Exh 1) Plaintiff found the complaint and that nothing had been done. (Exh 1) Plaintiff brought the complaint to the attention of his supervisor, Denny. (Exh 1) Together, Plaintiff and Denny contacted the city attorney from Atlas & Hall to advise her of the complaints. (Exh 1) This was done on June 15,

2000 and the city attorney advised Plaintiff that he needed to refer the matter to the FBI or he

would be obstructing justice. (Exh 1)  Plaintiff's supervisor Denny agreed. (Exh 1)  Plaintiff then

referred the matter to the FBI and advised officer Rodriguez of the referral on June 19, 2001. *(Exh 1)*

By June 22, 2000, Plaintiff was placed on the agenda for the Council meeting of June 27,

2000 "to address concerns with the duties of Police Chief." (Exh 3)  The meeting was in closed

session. And defendant Garcia was visibly upset after Plaintiff answered all her questions. (Exh 1)

On June 22, 2000, Mr. De La Rosa came to the police station to report that Deputy

Constable Ramiro Sanchez had called him at home trying to convince him to say that Lt. Jimmy

Vasquez forced De La Rosa to say that he had been forced to sign some papers against officer

Rodriguez. (Exh 26)  De La Rosa indicated that Juan Mendoza was present with Sanchez and

wanted to talk to De La Rosa. (Exh 26)   De La Rosa was quite shaken by the call because

Sanchez kept asking him if he was going to be a "paido" or snitch. (Exh 26)  In the criminal

world, snitches are dealt with quite severely. (Exh 1)  Mr. De La Rosa told Plaintiff he wanted to

be left alone. (Exh 26)  Shortly after this, Mr. De La Rosa moved out of the area to an unknown

location.  (Exh 1)

Several Los Fresnos police officers reported to Plaintiff that officer Rodriguez was seen

meeting Garcia quite frequently during July and August, 2000. (Exh 1)  The Los Fresnos police

dispatchers and officer Jimmy Vasquez reported  to Plaintiff that officer Rodriguez would go to

Garcia's house several times per week while on duty. (Exh 1)  Around August 13, 2000,

Alderwoman Melanie McCormick filed a complaint that that she saw Garcia meeting officer

Rodriguez while on duty at the old Zarsky lumber yard late one evening. (Exh 1 and 4)  The

dispatcher on duty that night told Plaintiff that Garcia had called at 11:08 p.m. to find out where

officer Rodriguez was because she had to talk to him. (Exh 1)

CNMPDF - www.fenrir.com

Defendant Garcia is an alderwoman for the City of Los Fresnos. (Exh 1) She is the cousin of Miguel Mendoza, another defendant alderman and defendant Juan Mendoza, Jr. who was the Constable for the area including Los Fresnos during Plaintiff's tenure there. (Exh 5 p. 14 L. 2-5, p. 16 L. 4-5), Alderman Sierra is related by marriage to these defendants. (Exh 5 p. 20 L. 24 - p. 21 L. 4).

Plaintiff also saw Officer Rodriguez meeting with defendant Miguel Mendoza (hereinafter "Mendoza") on a nearly daily basis. (Exh 1) Mendoza and officer Rodriguez had been friends for at least three years. (Exh 5 p. 22 L. 11 - p. 23 L. 6) Officer Rodriguez would often go to Constable Juan Mendoza's (hereinafter "Constable") office while on duty, moreso than any other Los Fresnos police officer. (Exh 6 p. 35 L. 1-24) On several occasions, Plaintiff observed officer Rodriguez' patrol car at Constable Mendoza's office for more than two hours at a time. (Exh 1) The police dispatchers would often advise the Plaintiff that officer Rodriguez would check in that he was at Constable Mendoza's office to meet with him. (Exh 1) Officer Rodriguez would be at Constable Mendoza's office two to three times per week on average. (Exh 1)

Officer Rodriguez complained about the Plaintiff to the city aldermen who fired Plaintiff. (Exh 5 p.72 L. 7-11, p. 120 L. 15-23, p. 138 L. 23 - p. 139 L. 14, p. 150 L. 19 - p. 152 L. 14, p. 157 L. 14 - p. 158 L. 25, p. 161 L. 23- p.163 L. 3; Exh 2 p. 68 L. 4 - p. 69 L. 10; Exh 7 p. 28 L. 5 - p. 33 L. 23, p. 57 L. 23 - p. 58 L. 7; Exh 8 p. 26 L. 7 - p. 27 L. 12)

Defendant Garcia wanted to put the Plaintiff's continued employment on the agenda for the July Council meeting but Mayor Abrego would not agree to place it on the agenda. (Exh 1)

On or before August 14, 2000, defendant Garcia met with the three defendant aldermen to sign a petition to place on the agenda for the August 22, 2000 Council meeting, "to consider and possibly take action concerning the continued employment of the chief of police, including but not

9

limited to a resolution of lack of confidence under the Tex Loc. Govt. Code 22.007(b)".  (Exh 9)

Garcia discussed termination of the Plaintiff with defendant Sierra outside of town meetings.

(Exh 7 p. 34 L. 6-23)  The very next day on August 15, 2000, Constable Mendoza provides a

lengthy letter to the alderpersons attacking the professional competence of the Plaintiff and

declared he had "no confidence" in the chief of police.  (Exh 10 p. 4)  The letter purports to have

been written on August 10, 2000.  Id. p. 1  The August 22, 2000 Council meeting was moved to

August 29th so the same four defendant alderpersons signed a new petition to place on the agenda

consideration of the termination of Plaintiff, thus, meeting outside of scheduled Council meetings

at least twice to discuss the termination of the Plaintiff.  (Exh 11)

Prior to the August 29th meeting, Plaintiff requested in writing for disclosure of the

reasons for his proposed termination.  (Exh 12)    On August 28th, Plaintiff was evaluated

pursuant to city policy and given an outstanding evaluation by his supervisor.  (Exh 13)

At the August 29th meeting, the meeting room was filled with supporters of the Plaintiff

and there was also lots of media attention.  (Exh 1)  The citizens presented a petition supporting

the Plaintiff with over 200 signatures.  (Exh 1)  Plaintiff requested that his employment be

discussed in open session as was his right under the Texas Government Code section 551.074 (b).

(Exh 1)  He also demanded to know what complaints the Council had against him.  (Exh 1)

Several citizens also demanded for the Council to disclose their reasons for considering the

termination of Plaintiff.  (Exh 14)  Both Mayor Abrego and alderwoman Melanie McCormick

stated they knew of no reasons to fire the Plaintiff.  (Exh 14)   During the public comments,

Ramiro Sanchez spoke about a drug bust he was involved in .  (Exh 14)  Sanchez stated that the

alleged drugs were turned over to the Los Fresnos police department and inferred that the

Plaintiff was responsible for their disappearance and the release of a prisoner from the bust.  (Exh

10

14; Exh 6 p. 93 L. 24 - p. 95 L. 3)  Officer Rodriguez was the ranking Los Fresnos police officer

at the drug bust and was responsible for securing the alleged drugs.  (Exh 1)  Ramiro Sanchez

was the chief deputy constable for constable Mendoza at the time and is the current constable.

(Exh 1)  He has been a very close friend of the Mendoza family for 33 years.  (Exh 5 p. 21 L.15-

25).  Before the plaintiff was allowed to respond because the Plaintiff was waiting on reasons

from the Council for his proposed termination, defendant Mendoza moved to table the agenda

item concerning the Plaintiff to the following meeting.  (Exh 14; Exh 2 p. 130 L. 6-19)  No

reasons from the Council were given to the Plaintiff concerning his proposed termination.  (Exh 1;

Exh 14)

The four defendant alderpersons were visibly upset by the support for the Plaintiff and by

the negative press they were receiving.  (Exh 2 p. 122 L. 5 - p. 123 L. 25)  Defendant Garcia was

so upset that she was driven to tears at the end of the meeting.  (Exh 15 p. A-1 and A-12)

The next day, on August 30th, the Mayor  asked the Plaintiff to meet with him, Denny, and

alderman Mendoza.  (Exh 16)  The Mayor asked Plaintiff to discuss his investigation of the drug

bust involving officer Rodriguez and Ramiro Sanchez with alderman Mendoza which Plaintiff

attempted to do.  (Exh 1)  Plaintiff explained that he was not notified of the occurrence until

about an hour and a half to two hours after it was over.  (Exh 1)  Plaintiff also explained that his

second in command was notified that officer Rodriguez was to merely assist the Border Patrol of

a drug bust  involving illegal aliens.  (Exh 1)  Because illegal aliens were involved, the federal

officers would normally assume jurisdiction of the case.  (Exh 1)  Plaintiff also explained to

alderman Mendoza that he found information that photographs had been taken at the station

showing a negative test result for the larger bag of alleged drugs.  (Exh 1; Exh 2 p. 125 L. 8 - p.

128 L. 3)  A fellow officer involved in the bust, officer Losoya, told the Plaintiff that officer

CPDF - www.fox.co.com

Rodriguez took the photographs with the station camera. (Exh 1)  Officer Rodriguez did not include this information on his report. (Exh 1)  Alderman Mendoza was also told by the Plaintiff that the case and the drugs had been turned over to the Cameron County Drug Task Force the next morning as they had taken the case over. (Exh 1; Exh 2 p. 125 L. 8 - p. 128 L. 3)  Alderman Mendoza did not want to hear about the Plaintiff's investigation at the time. (Exh 6 p. 36 L. 8 - p. 37 L. 25; Exh 5 p 81 L. 18-23, p. 84 L. 16-18, p. 87 L. 3-8, p. 133 L. 15 - 18, p. 137 L. 2- p.138 l. 2)

At the August 30th meeting, alderman Mendoza told Plaintiff not to retaliate against any Los Fresnos police officer. (Exh 1; Exh 16)  Plaintiff and other persons at the meeting understood this to mean not to take action against officer Rodriguez. (Exh 1; Exh 2 p. 104 L. 9 - p. 105 L. 7)

At the August 30th meeting, the Mayor gave Plaintiff until September 30, 2000 to meet the residency requirement. (Exh 16)  Alderman Mendoza was present when the deadline was given to the Plaintiff and was aware of it. (Exh 6 p. 51 L. 20-25)  In fact, Plaintiff had rented an apartment right outside Los Fresnos in mid- July, 2000 and stayed there frequently beginning in August. (Exh 1)  However, Plaintiff noticed on at least one occasion in early August that his apartment was being surveilled by an unmarked police vehicle. (Exh 1)  The apartment was in an isolated area on the outskirts of town. (Exh 1)  While performing night patrol in August, Plaintiff noticed that he was being followed by Garcia and then later by Garcia and Constable Mendoza. (Exh 1)  Plaintiff drove by the Mayor's home  and reported that he was being followed by Garcia and Constable Mendoza. (Exh 1)  Within minutes, Constable Mendoza drove by in his Constable vehicle wearing shorts and a t-shirt and with Garcia a passenger. (Exh 6 p. 122 L. 15 - p. 124 L. 9)  The defendants drove by slowly to ensure that they were seen following the Plaintiff. Id. The

12

Plaintiff was in genuine fear for his life because if these acts of intimidation. (Exh 1; Exh 6 p. 47 L. 8- p. 49 L. 2) Plaintiff also complied with the third request not to ride with his second in command, Lt. Jimmy Vasquez. (Exh 1)

Between the August 29th town meeting and September 26, 2000, Plaintiff was approached on at least three to four occasions by persons recognized as citizens of Los Fresnos but whose names or addresses he did not know. (Exh 1) They all asked Plaintiff "what did you do with the drugs?" or "where are the drugs you had?". (Exh 1) One of these persons who Plaintiff did not know told Plaintiff that Ida Garcia told her Plaintiff was involved with the disappearance of the drugs. (Exh 1) Prior to his termination, Plaintiff was told by alderwoman McCormick that defendant Acevedo had told a Mr. Peterson that plaintiff was caught by the Border Patrol with a large quantity of drugs in the trunk of his vehicle. (Exh 1) Plaintiff found out that he was being stigmatized, not publicly by the defendants, but subversively. (Exh 1)

Plaintiff later found out that prior to the August 29, 2000 town meeting the, the defendant alderpersons had been warned by the city attorneys not to fire plaintiff because the plaintiff had strong whistleblower law protections. (Exh 17) The defendant alderpersons were told that some presumptions would be made against the City under the state whistleblower laws within the first ninety days after the plaintiff reported the illegal activity of officer Rodriguez. Id.

The next town meeting was on September 26, 2000, exactly ninety-nine days after plaintiff reported the illegal acts of officer Rodriguez to the FBI, and the four alderpersons voted without comment or reason to terminate the plaintiff. (Exh 18) However, both McCormick and Mayor Abrego stated that they knew of no reasons to terminate the plaintiff. (Exh 18) McCormick reminded the defendants that there had been three separate letters from the City attorneys which Mayor Abrego indicated that the Council had been advised that there would be liability for the

13

City.  Id.  Plaintiffs direct supervisor, Denny admits that plaintiff did nothing wrong as Chief of Police to warrant termination.  (Exh 2 p.136 L.12-24)  Mayor Abrego felt the plaintiff was doing a good job.  (Exh 6 p.27 L.5-19)

It was obvious from the four defendant alderpersons actions they had a meeting of the minds and had agreed on their course of action prior to the September 26, 2000 meeting.  (Exh 2 p.119 L.14-p.120 L.25, p.125 L.8-128 L.3, p.129 L13 -p.130 L.2; Exh 19)  Plaintiff was not given an opportunity to respond to concerns of the Council because no reasons were given prior to his termination.  (Exh 1)

Prior to plaintiff's termination, he recommended that Officer Rodriguez be terminated for numerous and documented violations of department policy.  (Exh 1)  Officer Rodriguez was terminated by Denny.  However, officer Rodriguez was given a meaningful hearing including a detailed notice of the charges against him and he was allowed to present evidence and witnesses before the council, comporting with all requirements of due process.  (Exh 5 p.107 L.3 - p.108 L.11; Exh 6 p.113 L.7-19.)  The same four defendant alderpersons who voted to terminate plaintiff voted to reinstate officer Rodriguez.  (Exh 7 p.69 L.24 - p.70 L.1)  Plaintiff requested a similar hearing and notice of the charges against him pursuant to City policy.  (Exh 1)  The City attorney responded with a letter of vague concerns lacking specific information like names or dates and indicated that the plaintiff could comment on the Council's concerns but that there was to be no due process hearing.  (Exh 1)  Plaintiff then requested more specific information so that he could more meaningfully respond to the concerns..  (Exh 20)  Plaintiff was put on the agenda for the December 19, 2000 meeting which he attended.  (Exh 1)  Plaintiff's attorney repeatedly asked in open session whether the meeting was to be considered a due process hearing.  (Exh 1; Exh 6 p.100 L.6 - p.101 L.9)  The City refused to answer the question.  Id.  Plaintiff demanded

14

more specificity of the charges against him and when plaintiff was told no more information would be given, plaintiff left the meeting on the advise of his attorney. (Exh 1; Exh 6 p.100 L.6 - p.101 L.9) On the drive home, plaintiff picked up a local newspaper, wherein to his dismay, Mayor Abrego was quoted as saying the plaintiff was to receive his due process hearing that evening. (Exh 21)

Plaintiff followed all City procedures in requesting a hearing, but no meaningful hearing was afforded him. (Exh 1) The policy manuals relied upon by the City are not always followed by the City and they were not followed for the plaintiff. (Exh 2 p.63 L.6 - 24, p.64 L.21 - 24)

Plaintiff denies that he was a probationary employee at the time of his termination because he was not a beginning police officer as that term is understood under the Texas Civil Service Act. (Exh 1) Plaintiff's probationary period ended August 13, 2000, as he was a newly employed officer with eighteen years of experience. (Exh 1)

The 1986 Los Fresnos Police Department Internal Affairs manual provides for three exceptions to at-will employment for probationary officers and entitles them to a hearing if they are disciplined for exercising a constitutional right such as free speech, for any reason that puts into doubt the officer's good name, reputation, honor, or integrity, or the action would bar the officer's re-employment by other government employers. (Exh 22) Some of the defendants agree that all three situations applied to the plaintiff. (Exh 2 p.133 L.22 - p.136 L.10; Exh 7 p.71 L.9-24, p. 72 L.12- p.73 L.3)

Defendants have continued a course of action to ruin plaintiff's reputation after his termination. (Exh 1) Shortly after the plaintiff was terminated defendant Sierra publicly proclaimed that there was corruption in the police department while the plaintiff was there and that firing the plaintiff was the first step in cleaning up the corruption. (Exh 23) Sierra also stated

15

the District Attorney's Office was investigating the corruption.  Id.  He added that the Council

had started an investigation months earlier and further elaborated that the Council's motives were

revealed earlier that summer.  Id.  However, defendant Sierra stated to the media prior to the

August 30, 2000 meeting that "personally I don't have a problem with him, but we do have issues

we are concerned with."  (Exh 24)  Defendant Acevedo stated "he has been doing a good job...I

want to know what is wrong."  Id.  Defendant Sierra admits he was confused when made these

allegations of corruption.  (Exh 7 p.60 L.3 - p.61 L.9)  The District Attorney Yolanda Gonzalez

denied that plaintiff was being investigated for any criminal activity.  (Exh 25)  Mayor Abrego

investigated and found absolutely no corruption in the police department while plaintiff was there.

(Exh 6 p. 73 L.9 - p.74 L.21)

VI.

SUMMARY OF ARGUMENT

Plaintiff reported to the FBI in good faith misconduct by one of his police officers.

Plaintiff consulted and was advised by his supervisor and the City Attorney to refer the civil rights

complaints to the FBI.  Within three days that the officer was notified, the City Council was

reviewing the duties of police chief.  Other persons closely allied with the defendant alderpersons

began to interfere with the FBI investigation by calling and intimidating the complainant.  The

officer who was reported has a close relationship with several of the defendant alderpersons and

defendant Juan Mendoza.  The reporting of the officer's misconduct was a matter of public

concern and his speech was protected.  Brawner v. City of Richardson, 855 F.2nd 187 (5th Cir.

1988).  The interest in reporting the misconduct outweighs the City's interest in promoting

efficiency because the City cannot condone its officers involvement in civil rights violations.

Further, Plaintiff's comments to the media that he did nothing wrong and his criticism of the

defendant alderpersons for not disclosing their motives was free speech given constitutional

16

protection. The defendants were visibly upset by the negative press and speech of the Plaintiff.

The right to exercise free speech and report misconduct was clearly established in 1988. Brawner v. City of Richardson, 855 F2nd 187 (5th Cir. 1988). The defendant's acts were objectively unreasonable because the plaintiff had received excellent job evaluations and the defendants did not give him a chance to respond to their concerns. In fact, efforts made by the Mayor and plaintiff to explain certain matters were not welcomed by the defendants to the conspiracy. Further, had plaintiff not reported the misconduct by the police officer, he would have been obstructing justice. The Court may infer that the defendant alderpersons wanted a less aggressive chief of police and this is enough to prove their unreasonableness. Warnock v. Pecos County, 116 F3rd 776, 781 (5th Cir. 1997).

Defendant alderpersons employed a subversive campaign to destroy the reputation and integrity of the plaintiff during his employment with the City. At least two of the defendant alderpersons were spreading rumors regarding drugs in the possession of the plaintiff during his employment. Plaintiff was discharged after a public meeting on August 26, 2000, in which allusions to drugs that disappeared were made against the Plaintiff. The Council failed to give the plaintiff a meaningful opportunity to clear his name. The allegations were false and plaintiff was terminated one month later. Shortly after Plaintiff's termination, at least one city alderman told the press that the Plaintiff was involved in corruption, that terminating Plaintiff was the first step in cleaning the corruption and that the plaintiff was being investigated by the District Attorney's office. This relates back to the cloud of suspicion generated by the defendant alderpersons during plaintiff's employment further stigmatizing the plaintiff. The statements were false as admitted by the defendants. There was no corruption on the part of the Plaintiff or the police department and Plaintiff was never investigated by the District Attorney's office. The right not to be stigmatized

17

in public employment was well established in 1972.  <u>Board of Regents v. Roth</u>, 92 S.Ct. 2707 (1972).  The defendant's false and reckless accusations, combined with their purposeful spreading of malicious rumors demonstrates their actions were unreasonable.

Defendants denied plaintiff due process for his protected property interest in his continued employment.  The right to due process for the denial of a protected property interest was well established in 1972.  <u>Board of Regents v. Roth,</u> 92 S.Ct. 2707 (1972).  Plaintiff's property interest arose from the existing statutes governing municipal officers for a Type A municipalities in the state of Texas.  Every Type A municipality, by law, must have a Marshal as a municipal officer.  TEX. LOC. GOV. CODE 22.071(a).  The marshal is ex-oficio the chief of police.  TEX. LOC GOV. CODE 341.021(a).  A Type A municipality with less than five thousand residents can only do away with the office of marshal by passing an ordinance abolishing the office.  TEX. LOC GOV. CODE 22.076(b).  Los Fresnos, Texas is a Type A municipality with a population of less than 5000 people.  Counsel for Plaintiff has reviewed the Ordinances of the City of Los Fresnos and was unable to find any ordinance doing away with the office of Marshall.  Thus, the Chief of Police is the Marshall for the City of Los Fresnos pursuant to statute.

A Type A municipality may only remove a municipal officer, i.e. the Marshall, after notice and the opportunity to be heard by a resolution declaring the officer incompetent, corrupt, for misconduct, malfeasance, or a lack of confidence.  TEX. LOC. GOV. CODE 22.077. Plaintiff, as the Marshall for the City of Los Fresnos, was entitled to notice of the charges against him and an opportunity to be heard prior to his discharge.  No notice was given the Plaintiff despite his repeated requests for the information so there could be no opportunity to be heard on the allegations against him.

Further, the Internal Affairs manual for the police department cited federal law for

different situations where a disciplined employee would be entitled to notice and a hearing. These included situations where free speech may be involved, where the employee's honor or reputation would be involved, or where the ability to find other government jobs would be effected. The defendants ignored their own policies to terminate the Plaintiff.

VI.

CONCLUSION

The defendant alderpersons are not entitled to qualified immunity. The defendants unreasonably violated well established constitutional rights of the Plaintiff by retaliating against his employment. Defendants voted to terminate Plaintiff from his position as chief of police for reporting an officer for civil rights violations. The Plaintiff had a duty to make the report and was advised to do it by his supervisor and the City attorney. Defendants further discharged Plaintiff under a cloud of suspicion that stigmatized his reputation, honor and integrity. The defendants more forcefully damaged his reputation after his termination by saying they fired him for corruption. Finally, defendants did not give notice or an opportunity to be heard in terminating the Plaintiff. As the ex-oficio town Marshall, Plaintiff was entitled to certain property interests in his employment which required a due process hearing at a minimum. These interests derive from the Texas Local Government Code.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that the Court deny the defendant alderpersons qualified immunity claims, and for such other and further relief, at law or in equity, to which this Plaintiff shows himself justly entitled to receive.

Respectfully submitted,

By: _Ted Rodriguez_

Ted Rodriguez, Jr.
State Bar No. 00788307
Federal I.D. No. 16851

19

**ATTORNEY FOR PETITIONER**

LAW OFFICE OF TED RODRIGUEZ, JR.
2316 N. Bryan Road
Mission, Texas 78572
Phone (956) 519-9195
Fax     (956) 519-9195

## CERTIFICATE OF SERVICE

This is to certify that on the 29th day of June, 2001, a true and correct copy of the foregoing has been forwarded to all counsel of record, as follows:

**VIA Hand delivery**
Honorable J. Arnold Aguilar
**LAW OFFICE OF J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Blvd.
Brownsville, Texas 78520

**VIA Hand delivery**
Honorable Albert Villegas
**VILLEGAS LAW FIRM**
1324 E. Seventh Street
Brownsville, Texas 78520


Ted Rodriguez, Jr.

20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO PEREZ, JR. | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-00-161 |
| | § | |
| CITY OF LOS FRESNOS, TEXAS | § | |
| JUAN C. SIERRA, SR., GONZALO | § | |
| ACEVEDO, IDA GARCIA, MIGUEL | § | |
| MENDOZA, INDIVIDUALLY AND IN | § | |
| THEIR OFFICIAL CAPACITIES, AND | § | |
| JUAN MENDOZA, JR., | § | |
| Defendants. | § | |

## AFFIDAVIT

Before me the undersigned authority, personally appeared Ricardo Perez, Jr., who, being by me duly sworn deposed as follows: "

"My name is Ricardo Perez, Jr., I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated."

"I have been in law enforcement officer for over eighteen years. I am certified by the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOS) and have been certified to be a police chief and for law enforcement administration. I am also a certified jailer. I was hired for the position of police chief for the City of Los Fresnos, Texas on February 22, 2000. I was to begin work on March 13, 2000. I was never told and it was never explained that there was any probationary period for the Chief of Police position. In my training and experience with law enforcement administration and law enforcement personnel courses, a beginning police officer is one who is newly licensed to be a law enforcement officer. Under the Texas Civil Service Act, it is my understanding that beginning police officers are on probation for one year wherever they serve. Once a beginning police officer serves a one year probation, he receives the protections of the Civil Service Act. I was not a beginning police officer when I began with the City of Los Fresnos because I had been a licensed law enforcement officer for over fifteen years."

"In early March of 2000, the interim city administrator, Pam Denny, called me and explained that the Los Fresnos Police Department was experiencing lots of problems with low morale and discipline. She asked if I could start working earlier than my begin date of March 13, 2000. Since I had given two weeks notice to my prior employer, I would go in the afternoons to the city of Los Fresnos beginning one week earlier than planned. I received no pay for this week that I worked for the City of Los Fresnos."

"On the first day I showed up to the Department, I was asked to intervene between two officers who were in a dispute because one was upset the other had secretly recorded him. I also recommended the termination of another officer who pulled his weapon and pointed it at a dispatcher. I also recommended the termination of a dispatcher who fell asleep on the job. Morale and discipline in the Department were almost non-existent when I took over as the Chief of Police."

"Right before I took over as Chief of Police, I met with the out-going Chief of Police, Terry

1

Vinson, to discuss the transition period.  In this meeting, he told me he had issued a directive for all officers not to have unauthorized persons ride in the patrol cars without the Chief's permission. Chief Vinson explained that he issued the directive because Ida Garcia frequently rode with officer David Rodriguez.  I was also warned by the city administrator and the mayor at the time, Robert Cepeda, about the relationship  between officer Rodriguez and Ida Garcia."

"Shortly after I started, Ida Garcia called my office on various occasions to ask me why I had appointed certain officers to certain tasks and why I was performing my administrative job in certain ways.  Around April, 2000, Ida Garcia asked me why I had not put officer Rodriguez into a particular type of training program.  I informed Mayor Cepeda of Mrs. Garcia's calls and he advised me that he had previously issued a directive to the alderpersons not to interfere with the administration of the police department.  He told me this had been a big problem before and that he would take care of it."

"On June 14, 2000, Luis De la Rosa came by my office and filed a complaint against officer David Rodriguez for civil rights violations including physical abuse.  Mr. De la Rosa told me he had filed a complaint over one year ago to Chief Tony Lopez.  After searching for the original complaint, I found it had been filed approximately one year and eight months earlier and also found that nothing had been done.  Mr. De la Rosa told me he wanted to pursue the complaint since he had just had another incident with Officer Rodriguez.  I brought this to the attention of my supervisor Pam Denny.  We contacted the city attorney from Atlas and Hall on June 15, 2000 to advise her of the De la Rosa complaint.  She advised me that I need to refer the matter to the FBI for an external investigation or I would be obstructing justice.  Ms. Denny agreed.  I then referred the matter to the local FBI office and advised Officer Rodriguez of the referral June 19, 2000.  On June 22, 2000,  Mr. De la Rosa, the complainant, called to tell me that Deputy Constable Ramiro Sanchez and Constable Juan Mendoza called him to ask him why he was pressing charges against officer Rodriguez. Sanchez kept asking him if he was going to be a "paido" or snitch.  He stated that he felt threatened by this call.  In my experience in law enforcement and as a jailer, snitches are dealt with very severely by other criminals.  Shortly after this Mr. De la Rosa moved away out of Los Fresnos."

"By June 22, 2000, the Council had placed on the agenda for the town meeting of June 27, 2000 an item to address concerns with the duties of the Police Chief.  I answered all their questions in closed session and Ida Garcia was quite upset after I answered all her questions.  After the meeting, I believe an ambulance was called for her because she was hyperventilating."

"As the Chief of Police for the City of Los Fresnos it was in the course and scope of my duties to receive reports from the various officers within the police department.  Several Los Fresnos police officers reported to me that officer Rodriguez was seen meeting Ida Garcia at various times and days between July and August 2000.  The police dispatchers and Lt. Jimmy Vasquez reported to me that officer Rodriguez would go to Ida Garcia's house several times per week while on duty.  I received numerous reports from numerous sources that officer Rodriguez was seen meeting Ida Garcia quite frequently.  Around August 13, 2000 alderwoman Melanie McCormick filed an incident report that she saw Ida Garcia meeting officer Rodriguez and officer Hector Guevara while on duty at the old Zarsky Lumberyard.  This was at about 11:20 at night.  I checked with the dispatcher on duty that night and the dispatch logs and found that Ida Garcia had called to the dispatch office to find out where officers Rodriguez and Guevara were because she needed to talk to them."

"Ida Garcia and Miguel Mendoza are aldermen for the City of Los Fresnos.  Juan Mendoza, Jr. was the constable for the area encompassing Los Fresnos while I was the Chief of Police there. Miguel Mendoza is Juan Mendoza's brother and Ida Garcia is their cousin.  Ramiro Sanchez was the Deputy Chief Constable under Juan Mendoza."

"I personally witnessed officer Rodriguez meeting with defendant Miguel Mendoza nearly every day. Officer Rodriguez would often go to Constable Juan Mendoza's office while on duty. In the course and scope of my duties as police chief, I found out from other officers that officer Rodriguez met with Constable Juan Mendoza quite frequently. On several occasions I observed officer Rodriguez's patrol car at Constable Mendoza's office for over two hours at a time. On checking with the police dispatchers, officer Rodriguez would check in several times a week that he was at Constable Mendoza's office to meet with him. Officer Rodriguez would be at Constable Mendoza's office at least two to three times per week on average. This was much more frequent than any other Los Fresnos police officer."

"Mayor Abrego told me that Ida Garcia wanted to put the issue of my employment on the agenda for the July city council meeting but Mayor Abrego did not allow her to do so. My termination was set for the August 29[th] meeting. Prior to this time, I requested through my attorney that I be provided the reasons or concerns regarding my employment. At the August 29[th] meeting, the room was filled with people who supported me and there was also lots of media attention. The citizens presented a petition in support of the work I was doing and was signed by over two hundred people. I requested that the issues or concerns with my employment be discussed in open session. I also renewed my demand to know what complaints the council had against me. During the meeting, Ramiro Sanchez talked about a drug bust for which I was not involved. He stated some drugs had disappeared and that the persons arrested had been let go by me. He was obviously blaming me for the disappeared drugs. I was waiting for the council members to tell me their reasons for my proposed termination when Miguel Mendoza moved to end the meeting and continue it in September. There was a large outcry from the citizens. I was not given the chance to respond to Ramiro Sanchez's statements. Defendant alderpersons were shocked and upset by the support of the citizens that showed up there that evening. I criticized the council at the meeting and in the press regarding their failure to provide me with their reasons for my termination."

"I was asked by Mayor Abrego to meet with him and alderman Mendoza the next day on August 30, 2000. The Mayor asked me to discuss my investigation of the drug bust involving officer Rodriguez and Ramiro Sanchez with alderman Mendoza which I attempted to do. Alderman Mendoza seemed upset with me and did not want to hear what I had to say. Despite this, I explained that I was not notified until about an hour and a half to two hours after it was over. I explained that Jimmy Vasquez was notified earlier that officer Rodriguez would be merely assisting the Border Patrol for a drug bust involving illegal aliens. Because illegal aliens were involved, Border Patrol usually took jurisdiction. I also explained to Miguel Mendoza that I found out from another Los Fresnos police officer, Officer Losoya, who was also involved in the bust, that photographs had been taken of the drugs at the Los Fresnos Police Station showing a negative test result for the larger quantity of alleged drugs. Officer Losoya told me that officer Rodriguez took the photographs with the station's digital camera. I also reported to alderman Mendoza that the case and the drugs had been turned over to the Cameron County Drug Task Force the following morning as they had taken the case over. The DA's office advised us to release the prisoners since the Drug Task Force's test of the drugs were negative. Officer Rodriguez failed to put in his report that he tested the larger quantity of drugs and received a negative result. I believe officer Rodriguez was trying to set me up with false allegations of drugs that disappeared."

"At this August 30[th] meeting, Miguel Mendoza warned me not to retaliate against any Los Fresnos police officer because of the council's actions against me. Although he did not say the name, I took this to mean not to take any action against officer Rodriguez".

"At this same meeting, the mayor told me I had until September 30, 2000 to meet the

residency requirement. This was the first time I had been given a date certain to fulfill the residency requirement. Miguel Mendoza was present when the Mayor gave me this deadline and he was aware of it. I had rented an apartment right outside Los Fresnos in mid-July 2000. I could not move in until August because of renovations being made there. I stayed there two to three times per week at the beginning. I bought furniture, curtains, and other household goods. In early August, I noticed that my apartment was being watched by an unmarked police vehicle. My apartment was located in an isolated area on the outskirts of town. On another evening when I was doing night patrol in August, I noticed that I was being followed by Ida Garcia and later by Constable Mendoza and Ida Garcia together. I drove by the Mayor's house and he was outside. I stopped and told him that I was being followed by Ida Garcia and Constable Mendoza. Within a minute or two, Constable Mendoza drove by in his Constable vehicle wearing a T-shirt with Ida Garcia in the passenger seat. They drove by very slowly to ensure that I saw they were following me. It struck me of the danger I could be in and I feared for my life because of their blatant attempts to intimidate me."

At the August 30th meeting, I was also told not to ride with my second in command Lt. Jimmy Vasquez. Although I felt this was a good time for Lt. Vasquez and I to discuss official business, to meet various citizens and to get to know the City better, I complied with the Council's request. After the August 29th town meeting, I was approached by at least three to four citizens of Los Fresnos whose names or addresses I did not know. They would ask me what did you do with the drugs or where are the drugs you had. One of those persons whose name I do not know, told me that Ida Garcia relayed it to her that I was involved with the disappearance of the drugs. Prior to my termination, I was told by Melanie McCormick that Mr. Acevedo told a Mr. Peterson that I had been caught by the Border Patrol with a large quantity of drugs in the trunk of my vehicle. It was obvious that the alderpersons were out to damage my reputation but were doing it quietly through false gossip and rumor.

I found out from Mayor Abrego that the City attorney had warned the alderpersons not to fire me before the August 29, 2000 town meeting because I had a strong whistleblower case. I later found out that the City Attorney had written three letters warning the alderpersons not to fire me. The defendant alderpersons were told that presumptions would be made against the City under the State whistleblower laws if they fired me within ninety days after I reported Officer Rodriguez to the FBI. This is why they waited until September 26, 2000 to fire me."

"I believe the four defendant alderpersons wanted to fire me in August but they did not because of the City Attorney's recommendation and they were shocked by the citizen support for me."

"I was fired on September 26, 2000. I was never given any reason for my termination even though we requested it in writing and at the September 26, 2000 meeting. It was obvious by their unity and silence and their quick vote that the four defendant alderpersons had already agreed to fire me on September 26, 2000. I was not given a chance to respond to the concerns of the Council because no reasons were given to me prior to my termination."

"Prior to my termination, I recommended that officer Rodriguez be terminated for numerous and documented violations of departmental policies that had been investigated in the past. I understand that officer Rodriguez was allowed to bring witnesses and evidence to his re-instatement hearing. I was not given this opportunity. I asked for a similar hearing with notice of the charges against me pursuant to City policy after I was fired. The City Attorney sent a letter with various concerns which were vague and lacked basic information including names or dates. The City Attorney stated that I would be able to merely comment on the Council's concerns but that there would be no due process hearing. I understood this to mean that I could not present evidence or

bring witnesses of my behalf. My attorney asked for more specific information. I could not be sure of which matters the Council had concerns over without more specific information."

"I attended a meeting on December 19, 2000 to discuss the Council's concerns with my termination. My attorney repeatedly asked in open session whether the meeting was to be considered a due process hearing by the City. No one, including the City Attorney, would answer the question. I also asked for more specificity of the charges against me and the City Attorney told me no more information would be given. I left the meeting on the advise of my attorney. On the drive home, I picked up a local newspaper where I saw Mayor Abrego was quoted as saying that I was to receive my due process hearing that evening. I was never given any meaningful hearing."

"After I was terminated, defendant Sierra told the media that there was corruption in the police department while I was there and that firing me was cleaning up the corruption. Mr. Sierra also told the media that I was being investigated by the District Attorney's office and that the Council had started an investigation months earlier. He stated that the Council's motives were revealed earlier that summer, but I still don't know what he is talking about. To the day I was fired, I never received any type of reprimand or other disciplinary action. I emphatically deny that there was corruption at the Los Fresnos Police Department that I was aware of or involved in. I did my best to turn around a Department that was suffering from low morale and discipline. I acted in good faith when I reported officer Rodriguez to the FBI for an external investigation. All of the attempts to have me terminated began to occur right after officer Rodriguez was reported to the FBI.

I was the custodian of records for the Los Fresnos Police Department during my tenure there from March 13, 2000 through September 26, 2000. The attached records were made in the regular course of business of the Los Fresnos Police Department and it was in the regular course of business of the Los Fresnos Police Department for an employee or representative of the Los Fresnos Police Department, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record, and the records were made at or near the time or reasonably soon thereafter. The records attached hereto are true and correct duplicates of the originals.

_____
RICARDO PEREZ, JR.

SWORN TO AND SUBSCRIBED before me on the 28th day of June, 2001

_____
Notary Public, State of Texas
Notary's printed name:

_____
Reynaldo Casarez

My commission expires:
9-20-2001

CVsPDF - www.fastio.com

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

RICARDO PEREZ, JR.     ) (
    Plaintiff      ) (
                    ) (
VS.                 ) (  CIVIL ACTION NO. B-00-161
                    ) (
CITY OF LOS FRESNOS,  ) (
TEXAS, JUAN C. SIERRA,  ) (
SR., GONZALO ACEVEDO,  ) (
IDA GARCIA, MIGUEL    ) (
MENDOZA, INDIVIDUALLY ) (
AND IN THEIR OFFICIAL ) (
CAPACITIES, AND JUAN  ) (
MENDOZA, JR.        ) (
    Defendants     ) (

---

## ORAL DEPOSITION OF
### PAM DENNY
#### APRIL 25, 2001

---

ORAL DEPOSITION OF PAM DENNY, produced as a witness at the instance of the PLAINTIFF, taken in the above styled and numbered cause on APRIL 25, 2001, from 1:01 p.m. to 3:57 p.m., before LOU ZUNIGA, Certified Court Reporter No. 2198, in and for the State of Texas, at the offices of J. Arnold Aguilar, Artemis Square, Suite H-2, 1200 Central Boulevard, Brownsville, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS



1          (Denny Exhibit No. 1 was marked).

2

3                    PAM DENNY,

4    having been duly sworn, testified as follows:

5                    EXAMINATION

6    BY MR. RODRIGUEZ:

3:01   7       Q.   Would you please state your full name for the

3:01   8    record?

3:01   9       A.   Pamela Jean Denny.

.3:01  10      Q.   Is Jean J-e-a-n?

.3:01  11           MR. AGUILAR:   Common question.

.3:01  12      A.   J-e-a-n.

l3:01  13      Q.   And, Ms. Denny -- Denny is your married name?

l3:01  14      A.   Yes.

l3:01  15      Q.   What is your maiden name?

l3:01  16      A.   Macomb, M-a-c-o-m-b.

13:02  17      Q.   Have you gone by any other names other than

13:02  18   Pamela Jean Denny or Pamela Jean Macomb?

13:02  19      A.   Well, Pam Denny.

13:02  20      Q.   Okay.  Ms. Denny, I'm Ted Rodriguez, and you

13:02  21   understand I'm here because I represent Ricardo Perez

13:02  22   in a lawsuit against the City of Los Fresnos and

13:02  23   several of their alderpersons, correct?

13:02  24      A.   Yes.

13:02  25      Q.   Okay.  You have given a deposition before,

HILL & ROMERO
CERTIFIED COURT REPORTERS

3:17   1         MR. AGUILAR:   Did I mention this is a

3:17   2   small town?

3:17   3         Q.   How big is Los Fresnos by the way?

3:17   4         A.   Right now with the 2000 census, it's 4,512

3:17   5   people.

3:17   6         Q.   Okay.   And would that have been pretty close to

3:17   7   the population in September of 2000?

3:17   8         A.   I would say it would probably be a little less.

3:17   9         Q.   Okay.

3:17   10        A.   I would say between 35 and 4,000.

3:17   11        Q.   Okay.   You-all had a big influx of people since

3:18   12   September?

3:18   13        A.   We have had a lot of housing development, new

3:18   14   subdivisions.

3:18   15        Q.   When did the census come out?

        A.   It came out in January, didn't it?

        Q.   Okay.   But it was the census for the year 2000,

correct?

        A.   Uh-huh.

        Q.   Okay.   So the population of Los Fresnos in 2000

is probably about 4,512?

        A.   It probably was.   I don't think it was that

but --

        Okay.   Let's see.   Have we talked about all the

   positions you have had at Los Fresnos since

| | | |
|--|--|--|
|13:42|1|between Tony Lopez and Juan Mendoza?|

13:42  1  between Tony Lopez and Juan Mendoza?

13:42  2     A.  (Moving head up and down).

13:42  3     Q.  Is that a yes or no?

13:42  4     A.  Yes, sir.  I'm sorry.

13:42  5     Q.  Okay.  It's easy to forget.  Is Los Fresnos a

13:42  6  Type A general law municipality?

13:42  7     A.  Yes, sir.

13:42  8     Q.  Okay.  And has it always been a Type A general

13:42  9  law municipality?

13:42 10     A.  I think when it first started, we didn't have

11  enough population.  I think it was a B or -- I think it

12  was B.

      Q.  Okay.

      A.  Before my time.

      Q.  Okay.  So at least for the last 22 years --

      A.  It's been Type A.

      Q.  Okay.  How many city employees does Los Fresnos

have?

      A.  Currently to this day?

      Q.  Yes, ma'am.

      A.  We have approximately 60 to 62.  That's full

part.

      Q.  Okay.  And in about September of 2000 -- what's

eight months ago, seven month ago?

      I would say pretty close to the same.

A.   Yes.

Q.   Okay.  And I will represent to you that at
1st one council member has already been deposed and
id there was a bad morale problem before the chief
t there.

A.   Yes, sir.

Q.   Would you agree with that?

A.   Yes, sir.

Q.   Okay.  Was Terry Vinson causing any problems as
well, in your opinion?

A.   I don't know for a fact.  I don't know.  I
mean, it's been ongoing in our police department for a
long time.

Q.   Tell me what was going on.

A.   Just the friction between the police officers.

Q.   Okay.  Like, for example, what?

A.   They would think one would get to do more than
the other and they didn't have to answer to this.  I
can't give you a specific.

Q.   Did Tony Lopez have problems like that with his
officers --

A.   Yes.

Q.   -- that some felt they were being treated
wrongly?

A.   Yes, sir.

notice of suspension is given to the employee, it must describe the deficiency or infraction involved; is that correct?

A.   Yes, sir.

Q.   Does the city follow these policies?

A.   To a point.

Q.   To a point?  When do they stop following it?

A.   It's not that they stop at any point or not. It's just sometimes they follow it and sometimes they don't.

Q.   Okay.  Basically it depends who is making the complaint, right?

A.   Yes, sir.

Q.   Okay.  So this policy manual that's given out isn't always followed by the city, is it?

A.   No, sir.

Q.   Okay.  And in the case of Rick Perez, it was not followed, was it?

        MR. AGUILAR:  Objection; misstating the witness' -- I'm sorry, misstating the evidence and the witness' testimony.

Q.   Was it?

A.   No, sir.

Q.   Let's go to 7-06.

MR. AGUILAR: I'm sorry. I also meant to object also to the extent it asks for a legal conclusion.

Q. Let's go to 7-06, disciplinary demotion and dismissal. If you will look at the bottom, I guess the little paragraph there, an employee may also be dismissed from city employment at the interest of the discipline, okay? It says, a notice of dismissal must be given to the employee which describes the deficiency or infraction involved. Do you see that there?

A. Yes, sir.

Q. Is that given to all employees who are dismissed?

A. No, sir.

Q. Okay. Is it ever given to an employee who is dismissed?

A. No, sir.

Q. The city doesn't follow this procedure, does it?

A. No, sir.

Q. So a lot of things in this policy manual the city just has in writing but doesn't actually abide by, do they?

A. No, sir.

Q. Did Chief Perez -- did he ever get a written

14:17  1   that he understood the law and he knew how to apply it

14:17  2   to the cases?

14:17  3       A.  Yes, sir.

14:17  4       Q.  Okay.  And there are suggestions that you are

14:17  5   giving him -- and it's really not directed to him, is

6   it --

7       A.  No, sir.

8       Q.  -- your suggestions?  It says, he needs to be

9   allowed to manage the police department without the

10  council micro-managing the department, correct?

        A.  Yes, sir.

        Q.  Okay.  What was the council doing that you felt

was interfering with Chief Perez' managing of the

department?

        A.  I was -- I felt that since I was his

supervisor, they should come to me if they had any

problems with him, but they would go and talk to the

officers.

        Q.  The police officers?

        A.  The police officers.

        Q.  Do you know which officers were being talked to

most?

        A.  Officer Rodriguez --

        David Rodriguez?

        Yes, sir.

| | | |
|---|---|---|
| 15:33 | 1 | attorney before it was actually reported, correct? |
| 15:33 | 2 | A. Yes. But that was in June, I'm sure of. |
| 15:33 | 3 | Q. Okay. Outside of the council meetings, did you |
| 15:33 | 4 | ever talk to anyone about why Chief Perez was being |
| 15:33 | 5 | fired? |
| 15:33 | 6 | A. The council people, is that who you're -- |
| 15:33 | 7 | Q. Yes, them, starting with them. |
| 15:33 | 8 | A. No, I didn't ever talk to them. |
| 15:33 | 9 | Q. Okay. |
| 15:33 | 10 | A. Well, I'm sorry. I did talk to the mayor and |
| 15:33 | 11 | to Ms. McCormick, but they were not aware of -- they |
| 15:33 | 12 | told me they were not aware of what was going on |
| 15:33 | 13 | either. |
| 15:33 | 14 | Q. Okay. In fact, you found it kind of strange |
| 15:33 | 15 | because the four who were trying to get the chief |
| 15:34 | 16 | terminated weren't telling anybody, correct? |
| 15:34 | 17 | A. To my knowledge, that's right. |
| 15:34 | 18 | Q. But it was obvious they were all on the same |
| 15:34 | 19 | page and thinking the same thing regarding terminating |
| 15:34 | 20 | the chief, correct? |
| 15:34 | 21 | MR. AGUILAR: Objection; speculation. |
| 15:34 | 22 | A. To my knowledge. |
| 15:34 | 23 | Q. Okay. From what you could see? |
| 15:34 | 24 | A. From what I heard. |
| 15:34 | 25 | Q. And what you heard? |

15:34  1      A.   Yes.

15:34  2      Q.   Tell me what you heard.

15:34  3      A.   Just that they were the ones that were behind

15:34  4  the firing.

15:34  5      Q.   Okay.  And, in fact, I think on August 14th

15:34  6  when they petitioned to consider the chief's

15:34  7  termination, you had already heard by that time that

15:34  8  they had wanted to fire the chief, correct?

15:34  9      A.   Yes, sir.

15:34 10      Q.   Okay.  And that all four of those people had

15:34 11  wanted to fire the chief?

15:34 12      A.   Yes, sir.

15:34 13      Q.   And do you recall where you heard that from?

15:34 14      A.   Rumors.

15:34 15      Q.   All around the city?

15:34 16      A.   All around the city.

15:34 17      Q.   It was pretty widespread knowledge that those

15:34 18  four folks were going to vote to terminate the chief,

15:35 19  correct?

15:35 20          MR. AGUILAR:   Objection; speculation.   I

15:35 21  don't know how you are getting from rumors to

15:35 22  knowledge, but assuming you are still talking about the

15:35 23  same thing.

15:35 24      Q.   That was your understanding?

15:35 25      A.   Yes, sir.

15:36  1        A.   As far as I know, yes, sir.

15:36  2        Q.   Like what types of things --

15:36  3        A.   That's what I was trying to think, what are you

15:36  4   asking me about?  I can't recall.

15:36  5        Q.   Okay.  The August 29th meeting there was a lot

15:36  6   of press there, correct?

15:36  7        A.   Yes, sir.

15:36  8        Q.   Okay.  And do you remember Ida Garcia at that

15:36  9   meeting?

15:36 10        A.   Yes, sir.

15:36 11        Q.   She was very disturbed and, I think, was crying

15:36 12   there for a while, correct?

15:36 13        A.   Yes, sir.

15:36 14        Q.   She was very --

15:36 15        A.   I think that was after the meeting, though,

15:36 16   wasn't it?

15:36 17        Q.   Okay.  But she was very upset at the showing of

15:36 18   support that the chief had and the negative press she

15:36 19   was getting?

15:36 20             MR. AGUILAR:   Objection; speculation and

15:36 21   mischaracterizing the facts.

15:36 22        Q.   Is that right?

15:36 23        A.   Yes, sir.

15:36 24        Q.   Okay.  And I think the four alderpersons who

15:36 25   were there were all embarrassed by the amount of

15:36  1    support the chief was getting and the fact that they

15:36  2    were not disclosing the reasons for terminating him,

15:37  3    correct?

15:37  4                  MR. AGUILAR:  Same objection.

15:37  5        Q.  It was obvious?

15:37  6                  MR. AGUILAR:  Same objection.

15:37  7        Q.  Is that right?

15:37  8        A.  Yes, sir.

15:37  9        Q.  You saw it; is that right?

15:37 10        A.  Yes, sir.

15:37 11        Q.  Okay.  And you knew they were angry after this

15:37 12    August 29th meeting, correct?

15:37 13                  MR. AGUILAR:  Objection; specificity and

15:37 14    the other objections.

15:37 15        A.  Who?

15:37 16        Q.  The alderpersons, the four alderpersons who

15:37 17    called the meeting.

15:37 18                  MR. AGUILAR:  Same objection; speculation

15:37 19    and mischaracterizing --

15:37 20        A.  I wouldn't say --

15:37 21                  MR. AGUILAR:  Hang on a minute.

15:37 22    Objection; speculation and mischaracterizing the

15:37 23    evidence.

15:37 24        A.  I don't know if it was angry.  I know they were

15:37 25    upset, but I don't know anger, per se.

| | |
|---|---|
| 15:38 | 1 |
| 15:38 | 2 |
| 15:38 | 3 |
| 15:38 | 4 |
| 15:38 | 5 |
| 15:38 | 6 |
| 15:39 | 7 |
| 15:39 | 8 |
| 15:39 | 9 |
| 15:39 | 10 |
| 15:39 | 11 |
| 15:39 | 12 |
| 15:39 | 13 |
| 15:39 | 14 |
| 15:39 | 15 |
| 15:39 | 16 |
| 15:39 | 17 |
| 15:39 | 18 |
| 15:39 | 19 |
| 15:39 | 20 |
| 15:39 | 21 |
| 15:39 | 22 |
| 15:39 | 23 |
| 15:39 | 24 |
| 15:39 | 25 |

straight:  One of their chief complaints was that the chief hadn't moved within 15 minutes of the city, correct?

            MR. AGUILAR:  Objection.

    A.  15 miles.

    Q.  15 miles?

    A.  Yes, sir.

    Q.  But as of August 29th it was very apparent to yourself and to the chief that they wanted to terminate him, correct?

    A.  Yes, sir.

    Q.  Okay.  And it was also apparent the day after when they had the meeting about him retaliating against any officers that they were trying to stop him from taking action against David Rodriguez, correct?

            MR. AGUILAR:  Objection; speculation and multifarious.

    A.  Yes, sir.

    Q.  Do you remember seeing those digital photos that showed a false -- or negative test regarding those drugs?

    A.  I saw photos, yes, sir.

    Q.  Okay.  And that was on the August 30th meeting, correct?

    A.  Yes, sir.

15:39 1     Q.  Between yourself, the mayor, Miguel Mendoza and

15:39 2  Chief Perez?

15:39 3     A.  Yes, sir.

15:39 4     Q.  Okay.  What do you recall about those photos,

15:39 5  about what they showed?

15:40 6     A.  It showed the drugs showed pink.  I can't

15:40 7  recall what it meant.  I think negative.

15:40 8     Q.  Did he explain what it meant?

15:40 9     A.  Yes, sir, he did.

15:40 10     Q.  Did he explain this to Miguel Mendoza?

15:40 11     A.  Yes, sir.

15:40 12     Q.  Okay.  Did he tell you where those photos were

15:40 13  taken or where he got those photos?

15:40 14     A.  Off of the computer.

15:40 15     Q.  Okay.  The chief told you-all that in that

15:40 16  meeting?

15:40 17     A.  Yeah.

15:40 18     Q.  Did he say who took those photos?

15:40 19     A.  I'm not sure who took them.  I mean, there was

15:40 20  two officers there and I don't remember who actually

15:40 21  took them.

15:40 22     Q.  I'm not asking you if you know who took them,

15:40 23  but who did the chief tell you took those photos?

15:40 24     A.  I can't remember either.

15:40 25     Q.  Okay.  But you knew he had investigated and

15:40  1    found out that the two officers -- well, let me ask

15:40  2    you, who are the two officers you are talking about?

15:40  3        A.  Officer David Rodriguez and Officer Gilbert

15:41  4    Losoya.

15:41  5        Q.  Okay.  And so at this meeting you-all had on

15:41  6    August 30th, it was your understanding that one of

15:41  7    those two officers took the photos of those drugs?

15:41  8        A.  Yes, sir.  And I'm trying to remember, but I

15:41  9    can't recall who he said.

15:41 10        Q.  Okay.  Have you ever talked to Losoya or

15:41 11    Rodriguez, David Rodriguez, about those photographs?

15:41 12        A.  No, sir.

15:41 13        Q.  And did Chief Perez explain this part of the

15:41 14    investigation in front of Miguel Mendoza?

15:41 15        A.  Yes, sir.

15:41 16        Q.  Okay.  Did he also explain that the drugs --

15:41 17    the alleged drugs, the big package, was given over to

15:41 18    the Cameron County task force officers?

15:41 19        A.  Yes, sir.

15:41 20        Q.  That they now had jurisdiction of the case?

15:41 21        A.  Yes, sir.

15:41 22        Q.  Did he explain why he released the prisoners

15:41 23    from his custody?

15:41 24        A.  I don't recall if he did or not.

15:42 25        Q.  Okay.  But about the fact that he handed the

15:42 1    drugs over to the custody of the Cameron County task

15:42 2    force, that was explained in front of Miguel Mendoza?

15:42 3         A.   Yes, sir.

15:42 4         Q.   Okay.  And you don't recall Miguel Mendoza's

15:42 5    response to that information?

15:42 6         A.   No, sir, I sure don't.

15:42 7         Q.   Now, at the September 26th meeting there were

15:42 8    also a lot of citizens who showed up in support of

15:42 9    Chief Perez, correct?

15:42 10        A.   Yes, sir.

15:42 11        Q.   And I think about half a dozen citizens spoke

15:42 12   out in favor of Chief Perez, correct?

15:42 13        A.   Correct.

15:42 14        Q.   And Melanie McCormick and Mayor Abrego said

15:42 15   they knew of no reason to fire the chief, correct?

15:42 16        A.   Correct.

15:42 17        Q.   And every citizen who spoke asked the council

15:42 18   members to explain their reasons for terminating the

15:43 19   chief; is that right?

15:43 20        A.   They wanted to know the reasons.

15:43 21        Q.   Okay.  And, in fact, the mayor asked each of

15:43 22   those council members, the four who voted against Chief

15:43 23   Perez, their reasons -- to explain their reasons to

15:43 24   fire Chief Perez, correct?

15:43 25        A.   Yes, sir.

15:43  1          Q.   Did any of them explain their reasons?

15:43  2          A.   No, sir.

15:43  3          Q.   Do you know if any of those four council

15:43  4     members ever met and talked together about terminating

15:43  5     Chief Perez outside of a town meeting?

15:43  6          A.   I was never with them where I would know what

15:43  7     they talked about.  I have seen them together, but I

15:43  8     was not present to know what they were talking about.

15:43  9          Q.   Okay.

15:43 10          A.   So I could not answer you.

15:43 11          Q.   When would you see them together?

15:44 12          A.   Different times.

15:44 13          Q.   Okay.  And it was very apparent at both the

15:44 14     August 29th meeting and the September 26th meeting that

15:44 15     those four council members had all determined -- they

15:44 16     had all in their mind determined to terminate the

15:44 17     chief, correct?

15:44 18               MR. AGUILAR:  Objection; speculation.

15:44 19          Q.   From their actions?

15:44 20               MR. AGUILAR:  Same objection.

15:44 21          A.   Yes.

15:44 22          Q.   And they were very unified in not telling any

15:44 23     of the other council members or the mayor the reasons

15:44 24     for terminating the chief, correct?

15:44 25               MR. AGUILAR:  Objection; speculation and

HILL & ROMERO
CERTIFIED COURT REPORTERS

15:44 1  multifarious.

15:44 2  A.  As far as I know.

15:44 3  Q.  The same four who voted to fire Chief Perez,

15:44 4  they voted to rehire David Rodriguez, correct?

15:44 5  A.  Yes, sir.

15:44 6  Q.  At the August 29th meeting do you recall Ramiro

15:45 7  Sanchez getting up and talking about the drug bust?

15:45 8  A.  Yes, sir.

15:45 9  Q.  Okay.  And based on what he was saying, would

15:45 10  it be fair to assume that he was attacking the chief

15:45 11  about these missing drugs or laying blame on the chief?

15:45 12  A.  Yes.  I don't remember him saying something

15:45 13  about missing drugs, but, I mean, the way he was

15:45 14  talking.

15:45 15  Q.  He was blaming the chief?

15:45 16  A.  He was blaming the chief.

15:45 17  Q.  Okay.  And the chief wasn't given a chance to

15:45 18  respond to that, was he?

15:45 19  A.  No, sir.

15:45 20  Q.  Okay.  Because shortly after that, the council

15:45 21  members moved to adjourn the meeting and postpone the

15:45 22  vote until the next meeting, correct?

15:45 23  A.  Correct.

15:45 24  Q.  Okay.  As we sit here today, the chief never

15:45 25  really has been given a chance to respond to those

### 133

Q. Okay. So is it your understanding of that that written draft will be made that tells a person what they are being -- which departmental rules and regs they are being charged with violating?

A. Yes, sir.

Q. Okay. Do you know if Chief Perez was ever given any written notice of which departmental rules and regulations he violated?

A. I do not know.

Q. Okay. As far as you are sitting here today, he was not given any, was he?

A. Right.

Q. And it says, the case shall be given to the accused employee sufficiently early to have a reasonable time to prepare an answer in defense of the charges, correct?

A. Correct.

Q. Chief Perez was never given this written report or notice or an opportunity to prepare an answer in defense, correct?

A. Correct.

Q. If you will look at the next paragraph, probationary employees?

A. Yes, sir.

Q. Down at the bottom of that first -- a

### 134

probationer may be entitled to a hearing if the discipline is for exercising a constitutional right of free speech. Do you see that there?

A. Yes, sir.

Q. Do you agree that if the policy manual states that he may be entitled to a due process hearing if there's an exercise of his constitutional right such as free speech?

A. Yes, sir.

Q. Was that a yes?

A. Yes, sir.

Q. Okay. No. 2, he may be entitled to due process hearing if the discipline is for any reason which will put doubts in the officer's good name, reputation, honor and integrity. Do you see that there?

A. Yes, sir.

Q. Okay. Again, there were allegations of corruption within the department that were put in the press, correct?

A. Right.

Q. And there were a lot of people I'm sure that were asking you, what did the chief do?

A. Yes, sir.

Q. Why did they want to fire him; is that right?

A. Yes, sir.

### 135

Q. Okay. So there was a lot of speculation going around that would put doubts in Chief Perez' good name, reputation, honor and integrity, correct?

A. Yes, sir.

MR. AGUILAR: Objection; speculation.

Q. Based on what people were coming and asking you, correct?

MR. AGUILAR: Same objection.

A. Yes, sir.

Q. Okay. So the chief should have been given a due process hearing according to this internal affairs manual, correct?

MR. AGUILAR: Objection; calls for a legal conclusion and mischaracterizes the evidence. It's also multifarious.

A. Yes, sir.

Q. Okay. And No. 3 talks about if the disciplinary action would bar the officer's re-employment by other government employers. Again, you don't know if this Form F-5, Miguel Mendoza Exhibit No. 11, was sent to law enforcement agencies when they are checking on an officer's licenses?

A. No, sir, I do not know.

Q. Okay. Well, when you hire folks at Los Fresnos, do you-all do reference checks?

### 136

A. Sometimes they do.

Q. Sometimes they do, sometimes they don't?

A. Yes, sir.

Q. If there's a negative mark like somebody had been terminated somewhere, that's viewed negatively, correct?

A. Right.

Q. Okay. And that would affect your decision on whether to hire a person, correct?

A. Yes, sir.

(Discussion off record).

Q. Okay. Ms. Denny, you had a close working relationship with Chief Perez, correct?

A. Yes, sir.

Q. For the entire time that he was there?

A. Yes, sir.

Q. Did he do anything as a chief of police for Los Fresnos that in your opinion warranted his termination?

A. No, sir.

Q. Okay. Did you find him to be the most professional hard-working chief of police that you-all had, I guess, in recent memory?

A. Yes, sir.

Q. Was he also the most professional chief of

# AGENDA
## CITY OF LOS FRESNOS, TEXAS
## CITY COUNCIL REGULAR MEETING
### 7:30 P.M., TUESDAY, JUNE 27, 2000
### CITY HALL, 200 N. BRAZIL STREET

1.  Call Regular Meeting to order

2.  Invocation and Pledge of Allegiance

3.  Consent Agenda:

    A.  Approval of Minutes from June 13, 2000 Meeting.

    B.  Acknowledgement of bills paid from June 16-23, 2000.

4.  Citizen's forum:

5.  Discussion and possible action on complaint from Resaca Retreat residents about loud music in new city park.

6.  Discussion and possible action on establishing a policy making it mandatory to hire two (2) Los Fresnos Police Officers to be present at city parks when alcoholic beverages will be consumed in parks.

7.  Consider approval or rejection of changing EMS Medical Director, and take action as may be appropriate.

8.  Closed Session: The Board of Alderman may convene in closed session pursuant to Section 551.074, Texas Government Code for discussions regarding the following:

    A.  Personnel – Consider review of the City Attorney and to address concerns with duties of the Chief of Police.

9.  Open Session: The Board of Aldermen will reconvene in open session for further discussion and possible action on the above item #8.

10. Comments by Mayor:

    A.  TML Regional Meeting
    B.  Lot mowing

11. Adjournment

AGENDA CONTINUED:

1.  Items under consent agenda will be voted on in one motion
    unless a council member asks for separate discussion.

2.  The Council reserves the right to retire into executive
    session concerning any of the items listed on this Agenda,
    whenever it is considered necessary and legally justified
    under the Open Meetings Act.

This is to certify that I, _Pam Denny_____, posted this Agenda on
the front glass window of the City Hall, facing the outside at
_5:00  p.m. June 22 ,2000._

                          _____
                          Pam Denny, City Secretary


Persons with any disabilities that would like to attend meetings must notify City
Secretary 24 hours in advance so that the City can make arrangements for that disabled
person.

CVISPDF – www.fastio.com

# LOS FRESNOS POLICE DEPARTMENT
## WITNESS STATEMENT OF EVENTS

CASE#_____     DATE:_____     TIME:_____

**STATE OF TEXAS**                    **COUNTY OF CAMERON**

Before me, the undersigned in and for said County and State, on this the _15_ Day of
_August_, 19 _2000_, A.D. personally appeared _Melanie L. McCormick_
_____, who after being by me duly sworn, deposes and says:

My name is: _Melanie L. McCormick_         Date of Birth: _8-16-66_
My home address is: _119 E. Resaca Dr. Los Fresnos, TX 78566_
I am presently employed with: _San Benito CISD La Paloma Elem._
The address of my employment is: _Rt 1 Box 263-A  San Benito TX 78586_
My telephone number(s) are: Home ( _956_ ) _233-3148_ / Work ( _956_ ) _361-6780_
STAYING AT:_____     DEPARTURE DATE:_____

**(PLEASE TELL IN YOUR OWN WORDS JUST WHAT YOU SAW)**

~~Monday~~ Mom
Sunday
8-13-00

Driving through town I noticed 2 police cars parked next to the old warehouse & the Chamber building. At the light in town I observed Ida Garcia in her Black Suburban ~~heading~~ facing South on FM 1847. She made a right turn then ~~she~~ turned into the parking area where the police cars were. I circled the block and saw the three vehicles parked there. I called P.D. and asked the dispatcher who was on duty & if they were on a break or on patrol. He said that Officer Rodriguez, Guevara & Servantes was on duty & they were on patrol not on break. I explained what I saw & asked him to notate the time that I called & leave a message for the chief (11:20 p.m.) I continued

**(CONTINUED ON OTHER SIDE)**

CutePDF - www.tavira.com

circling the area until they left - approximately 15 minutes. As I was driving North on Alamo in front of the Fire Station, Officer Guevara began following me. (My mother Ruby Milem was driving her car) Officer Guevara pulled us over right past FM248 by Terry Vinson's Home on FM1847. He approached the car & asked for her license. About that time another patrol car pulled up behind him with his lights on. He then said who he was & said he was pulling us over for suspicious driving. I then told him that I had directed her to circle the area where he, Officer Rodriguez & Ida Garcia were parked. He asked if there was a problem with that. I replied, "Yes, while you are on duty, there is." He also stated that he knew it was my mom's car because he checked the plates, but thought the car may be stolen.

x _Melanie L. McCormick_
SIGNATURE

SWORN AND SUBSCRIBED before me on the _15_ day of _August_ 20_00_.

PAMELA DENNY
NOTARY PUBLIC
State of Texas
Comm. Exp. 02/31/2000

_Pamela Denny_
Notary Public, State Of Texas

My commission expires _8-31-2000_

------------------------------------------------------------

CASE #_____ OFFENSE: _____

CID ASSIGNED: _____ TAKEN BY: _____

# LOS FRESNOS POLICE DEPARTMENT
## WITNESS STATEMENT OF EVENTS

CASE#_____  DATE:_____  TIME:_____

STATE OF TEXAS   *Page 2*                    COUNTY OF CAMERON

Before me, the undersigned in and for said County and State, on this the _15th_ Day of
_August_, 19 _3000_, A.D. personally appeared _Melanie L. McCormick_

_____, who after being by me duly sworn, deposes and says:

My name is:_____ Date of Birth:_____

My home address is:_____

I am presently employed with:_____

The address of my employment is:_____

My telephone number(s) are: Home (    )_____ / Work (    )_____

STAYING AT:_____ DEPARTURE DATE:_____

[PLEASE TELL IN YOUR OWN WORDS JUST WHAT YOU SAW]

(Cont) He then let us go. When I got
home I called Pam Denny to get the Mayors
number I then called him & explained
what happened. He asked me to write
a statement

(CONTINUED ON OTHER SIDE)

x _Melanie L. McCormick_
**SIGNATURE**

SWORN AND SUBSCRIBED before me on the __15__ day of __August__ 20 _00_ .

_Pamela Denny_
**Notary Public,State Of Texas**

PAMELA DENNY
NOTARY PUBLIC
State of Texas
Comm. Exp. 08/31/2000

My commission expires: __8-31-2000__

-----------------------------------------------------

CASE #_____OFFENSE: _____

CID ASSIGNED: _____ TAKEN BY: _____

CVISPDF – www.fastio.com

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.          )(
        Plaintiff           )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-00-161
                            )(
CITY OF LOS FRESNOS,        )(
TEXAS, JUAN C. SIERRA,      )(
SR., GONZALO ACEVEDO,       )(
IDA GARCIA, MIGUEL          )(
MENDOZA, INDIVIDUALLY       )(
AND IN THEIR OFFICIAL       )(
CAPACITIES, AND JUAN        )(
MENDOZA, JR.                )(
        Defendants          )(

_____

ORAL DEPOSITION OF
MIGUEL MENDOZA
APRIL 23, 2001

_____

ORAL DEPOSITION OF MIGUEL MENDOZA, produced as

a witness at the instance of the PLAINTIFF, taken in

the above styled and numbered cause on APRIL 23, 2001,

from 9:35 a.m. to 2:16 p.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the offices of J. Arnold Aguilar, Artemis

Square, Suite H-2, 1200 Central Boulevard, Brownsville,

Texas, pursuant to the Texas Rules of Civil Procedure

and the provisions stated on the record or attached

therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS


COPY

1        (M. Mendoza Exhibit No. 1 was marked).

2

3              MIGUEL MENDOZA,

4    having been duly sworn, testified as follows:

5                    EXAMINATION

6    BY MR. RODRIGUEZ:

09:35  7        Q.  Would you please state your full name for the

09:35  8    record?

09:35  9        A.  Miguel Mendoza.

09:35 10        Q.  Do you have any middle initials or middle name

09:35 11    or anything like that?

09:35 12        A.  No.

09:35 13        Q.  Mr. Mendoza, I'm Ted Rodriguez.  I represent

09:35 14    Ricardo Perez in a lawsuit against yourself and the

09:35 15    City of Los Fresnos.  Do you understand that?

09:35 16        A.  Yes.

09:35 17        Q.  Have you ever given a deposition before?

09:35 18        A.  Yes, I have.

09:35 19        Q.  How many times have you given a deposition?

09:35 20        A.  Once -- I don't recall -- approximately three,

09:35 21    four years ago when my grandmother passed away.

09:35 22        Q.  And was that for a lawsuit that was being

09:35 23    filed?

09:35 24        A.  Yes.

09:35 25        Q.  Were you a witness to her death?

09:45  1        A.   It's July 3rd, 1967.

09:45  2        Q.   Tell me about your brothers and sisters.   How

09:45  3   many do you have, and what are their names?

09:45  4        A.   I have three brothers, Ignacio Mendoza, Steve

09:45  5   Mendoza and Juan Mendoza, Jr.

09:45  6        Q.   How old are they?

09:45  7        A.   Okay.   The ages I may not --

09:45  8        Q.   As close as you can --

09:45  9        A.   Ignacio, he's one year apart, so he's 32.

09:45  10       Q.   Okay.

09:45  11       A.   Juan, I believe he just hit 40.   Steve is 39.

09:45  12   They are a year apart.

09:45  13       Q.   And where does Ignacio live?

09:45  14       A.   He lives in Brownsville.   I don't know his -- I

09:45  15   know the street is Indiana, but I don't know the

09:45  16   number.

09:45  17       Q.   How about Steve, where does he live?

09:45  18       A.   He also lives in Brownsville.   I don't know the

09:45  19   street.   I could get there, but I don't know the

09:46  20   street.

09:46  21       Q.   That's okay.   Just whatever city.

09:46  22       A.   He's in Brownsville.

09:46  23       Q.   And Juan lives in --

09:46  24       A.   Juan is in Los Fresnos.

09:46  25       Q.   Okay.   And your sisters?

| | | |
|---|---|---|
| 09:47 | 1 | A.  Yes. |
| 09:47 | 2 | Q.  For Cameron County? |
| 09:47 | 3 | A.  Yes. |
| 09:47 | 4 | Q.  And how are you related to Ida Garcia? |
| 09:47 | 5 | A.  She's my cousin. |
| 09:48 | 6 | Q.  Let's talk a little bit about your education |
| 09:48 | 7 | now.  What's the highest level of education you |
| 09:48 | 8 | received? |
| 09:48 | 9 | A.  I have a Bachelor of Science in criminal |
| 09:48 | 10 | justice. |
| 09:48 | 11 | Q.  From where? |
| 09:48 | 12 | A.  UTB here in Brownsville. |
| 09:48 | 13 | Q.  When did you receive that bachelor's degree? |
| 09:48 | 14 | A.  I received that in August of '99. |
| 09:48 | 15 | Q.  Do you have any other degrees? |
| 09:48 | 16 | A.  Associate's. |
| 09:48 | 17 | Q.  In what? |
| 09:48 | 18 | A.  Also criminal justice.  And that one was a year |
| 09:48 | 19 | before, June of '98. |
| 09:48 | 20 | Q.  And you received that from where? |
| 09:48 | 21 | A.  Also from -- actually, from Texas Southmost |
| 09:48 | 22 | College. |
| 09:48 | 23 | Q.  Okay.  Any other degrees that you hold? |
| 09:48 | 24 | A.  No. |
| 09:48 | 25 | Q.  Do you have a high school diploma from Los |

09:52 1    Q.   So will you provide Mr. Aguilar --

09:52 2    A.   Mr. Aguilar.

09:52 3    Q.   -- and give him permission to provide me a copy

09:52 4    of your homeowner's policy?

09:52 5    A.   Yes.

09:52 6    Q.   Do you have a No. 4 in there?

09:52 7    A.   Yes.

09:52 8    Q.   It asks for a copy -- that's all right.  Let me

09:52 9    read it here.  Mine didn't have it.  A complete copy of

09:52 10   all City of Los Fresnos ordinances, including but not

09:52 11   limited to those affecting, touching or concerning the

09:52 12   office duties or position of the chief of police of Los

09:52 13   Fresnos, the police officers or other city officials.

09:52 14        MR. AGUILAR:  And I think I have already

09:52 15   provided you a copy ordinance No. 297.  I understand

09:52 16   you also wanted a copy of ordinance No. 41, which we

09:53 17   provided you this morning.

09:53 18        MR. RODRIGUEZ:  You provided me a copy of

09:53 19   ordinance 41, which I will mark later on.

09:53 20   Q.   How long have you lived in Los Fresnos, sir?

09:53 21   A.   I was born in San Benito, but raised in Los

09:53 22   Fresnos, so 30 years.

09:53 23   Q.   Okay.  Are you related to any of the other

09:53 24   alderpersons other than Ida Garcia?

09:53 25   A.   No.  I don't know what degree you mean by

09:53  1   relatives.  Juan Sierra, he's not related to me.  He's

09:53  2   related to my wife.  Would that count?

09:53  3        Q.  Tell me about it.

09:53  4        A.  Well, basically he's my wife's cousin.

09:53  5        Q.  Okay.

09:53  6        A.  That's what it boils down to.  But he's not

09:54  7   related to me, so I don't know --

09:54  8        Q.  He's not a blood relative?

09:54  9        A.  No.  Other than that, no.

09:54 10        Q.  What's your wife's name?

09:54 11        A.  Rosario Mendoza.

09:54 12        Q.  Okay.  How about Mr. Acevedo, any relation to

09:54 13   him?

09:54 14        A.  No.

09:54 15        Q.  Ramiro Sanchez, what is your relationship to

09:54 16   him?

09:54 17        A.  Friend.

09:54 18        Q.  Okay.  How long have you known Mr. Sanchez?

09:54 19        A.  I have known him for approximately 20 years.

09:54 20   We grew up in the same neighborhood.

09:54 21        Q.  So you-all have been, I guess, boyhood friends?

09:54 22        A.  He's actually my older brother's because he's

09:54 23   older than I am, but a friend of the family.

09:54 24        Q.  Okay.  He's a good friend of the family?

09:54 25        A.  Yes.

09:54 1     Q.  Okay.  And did he also serve with you as a

09:54 2  constable, a deputy constable?

09:55 3     A.  I believe he was still active, but he had -- I

09:55 4  believe he had been injured on one of the jobs, so I

09:55 5  never actually worked with him.  I knew he was, I

09:55 6  believe, still on the force or workers' comp. or

09:55 7  something.  He was off.  He had been off because of an

09:55 8  injury sustained on a call.

09:55 9     Q.  Okay.

09:55 10    A.  I never actually worked with him.

09:55 11    Q.  And Officer David Rodriguez, any relationship

09:55 12 to him?

09:55 13    A.  No.

09:55 14    Q.  How do you know him?

09:55 15    A.  I know him through the police department,

09:55 16 again, when we had the business, my parents' business.

09:55 17 Some of the officers would stop by for coffee or

09:55 18 whatever, and that's how I got to know him.

09:55 19    Q.  Okay.  How long would you say you have known

09:55 20 him?

09:55 21    A.  I would say about three years.

09:55 22    Q.  He's been a police officer in Los Fresnos for

09:55 23 at least ten years, hasn't he?

09:56 24    A.  I don't know how many years he's had, exactly

09:56 25 how many years, but as far as -- you asked me about --

09:56   1   friendship, you mean?

09:56   2       Q.  Right.

09:56   3       A.  About three years.

09:56   4       Q.  So you'd consider him a friend of yours for

09:56   5   about three years?

09:56   6       A.  About three years.

09:56   7       Q.  Would you have known him before then as an

09:56   8   acquaintance, like you knew who he was?

09:56   9       A.  He knew him because, again, I was a police

09:56   10   officer, and through the radio we get to know the

09:56   11   police officers in the adjoining cities.

09:56   12       Q.  How do you know Albert Villegas?

09:56   13       A.  I know him through Ida Garcia.

09:56   14       Q.  How does Ms. Garcia know him?

09:56   15       A.  I guess --

09:56   16             MR. AGUILAR:  Objection; speculation.

09:56   17   What he's asking about is what you know.  He's not

09:56   18   asking you to guess.

09:57   19             THE WITNESS:  Okay.

09:57   20       A.  I don't know.

09:57   21       Q.  Okay.  She's the one who introduced you to him?

09:57   22       A.  Yes.

09:57   23       Q.  About when was that?  How long ago was that?

09:57   24       A.  Approximately July of last year.

09:57   25       Q.  How did you meet him?  What was the situation

| | | |
|---|---|---|
| 10:58 | 1 | Q. Right. |
| 10:58 | 2 | A. I don't recall the time frame. |
| 10:58 | 3 | Q. Would it have been several hours after the |
| 10:58 | 4 | drugs were seized? |
| 10:58 | 5 | A. No, it was within the hour as far as what I |
| 10:58 | 6 | recall. |
| 10:58 | 7 | Q. And where did your information come from that |
| 10:58 | 8 | the chief was informed? |
| 10:58 | 9 | A. From Officer David Rodriguez. |
| 10:58 | 10 | Q. Okay. And what did David Rodriguez tell you |
| 10:58 | 11 | about when the chief was informed? |
| 10:58 | 12 | A. Again, I don't recall the exact time frame, but |
| 10:58 | 13 | it had been -- would have been within the hour. |
| 10:58 | 14 | Q. Or who informed the chief? |
| 10:58 | 15 | A. That would have to be the dispatcher because |
| 10:58 | 16 | they were out in the field, so they radioed in to have |
| 10:58 | 17 | him summoned or have him informed of what was going on. |
| 10:58 | 18 | Q. Okay. Do you know whether the dispatcher |
| 10:58 | 19 | actually called and informed the chief? |
| 10:58 | 20 | A. No, I don't have that information. |
| 10:59 | 21 | Q. Okay. So based on what Mr. -- Officer David |
| 10:59 | 22 | Rodriguez told you that he informed the dispatcher of |
| 10:59 | 23 | the drug seizure within an hour after it happened; is |
| 10:59 | 24 | that right? |
| 10:59 | 25 | A. Yeah, approximately within the hour. |

HILL & ROMERO
CERTIFIED COURT REPORTERS

11:08  1   anything of that nature.

11:08  2          And Pam Denny again told me -- I asked her

11:08  3   also why are they here, and she told me the same thing.

11:08  4   I said, well, you can dismiss them because -- oh, okay.

11:08  5   She came to me -- she said when I asked her that, well,

11:08  6   the mayor said you were going to be here to talk about

11:08  7   this case.  Again, I never told the mayor that.  I

11:08  8   don't know why he assumed that.  Okay.  So then they

11:08  9   left.

11:08  10         And then the mayor walked in, and we

11:08  11  discussed -- he discussed to Chief Perez why we were

11:08  12  there, which was to assure that he was not going to

11:08  13  retaliate in any shape, manner or form.  And I

11:08  14  reiterated that by saying, this is my concern, and I

11:08  15  just don't want -- I didn't want any problems, you

11:09  16  know.  Don't retaliate towards any officer of this

11:09  17  department.  It's simple.

11:09  18         And then the mayor said, well, there's a

11:09  19  case.  He brought the case, so we can talk about it.

11:09  20  You want to talk about it?  Let's talk about it.  He

11:09  21  kept on pushing it on me, though.  I want you to see

11:09  22  it.  I want you to see it.  Look, look, look.  I didn't

11:09  23  want to.  At that time I go, no.

11:09  24      Q.  What was your concern that he was retaliating

11:09  25  -- or going to retaliate against officers or any

HILL & ROMERO
CERTIFIED COURT REPORTERS

11:12  1      Q.  Why would you think that Chief Perez would

11:12  2   retaliate against those two officers?  I still haven't

11:12  3   been told about that.

11:12  4      A.  Well, again, like I said, I believe -- it's my

11:12  5   opinion that he thought this was one of the reasons why

11:12  6   we were attempting or thinking of dismissing him.  Why

11:12  7   would he bring the case for me to hear if that had no

11:12  8   bearing on what our final answer would be?

11:12  9      Q.  Okay.  He thought -- you felt that Chief Perez

11:12 10   was thinking that --

11:12 11      A.  They are going to fire me for this.

11:12 12      Q.  Because of the 10th Street drug bust and he

11:12 13   wasn't there?

11:12 14      A.  Right.

11:12 15      Q.  Okay.

11:12 16      A.  And that's how I saw it.  It was like, no, I

11:12 17   need to show -- I need to show you.  I don't want to

11:12 18   see that.  I didn't come here for that.

11:12 19      Q.  Okay.  Well, the night before, the specially

11:12 20   called meeting on August 29th the only thing on the

11:12 21   agenda was to consider his continued employment with

11:13 22   Los Fresnos, that was night before, correct?

11:13 23      A.  Correct.

11:13 24      Q.  Okay.  And, in fact, Ramiro Sanchez got up and

11:13 25   made a big thing about this drug bust on 10th Street,

11:15 1   against the officers, correct?

11:15 2        A.   Correct.

11:15 3        Q.   So when he's trying to explain to you what

11:15 4   happened based on his investigation, you are saying you

11:15 5   weren't ready to hear that?

11:15 6        A.   No, I wasn't prepared to discuss that.  To me I

11:15 7   saw it as if they are going to push this on me before I

11:15 8   make any decisions.  I was not there for that.

11:15 9        Q.   Okay.  Well, you understand up to this time

11:15 10  that the chief had been requesting reasons from

11:15 11  you-all, from you in particular, as to why he should be

11:15 12  terminated?

11:15 13       A.   Well, I passed my information -- the

11:15 14  information that I found out about this case, I

11:15 15  informed the mayor.  I told him, look, this is what's

11:16 16  going on.  I'm concerned.  Can you talk to the chief?

11:16 17  Can you ask him?  Well, find out what's going on and

11:16 18  where are the drugs.  I remember talking to the mayor

11:16 19  about that.  So I left it at that.  Again, I felt it

11:16 20  should come from the mayor and not me.  Why do I want

11:16 21  to go in trying to accuse him when I just passed on the

11:16 22  information?  This is what I've got, and I'm very

11:16 23  concerned.  And if they are missing, why are they

11:16 24  missing?  From that point --

11:16 25       Q.   On the September 30th meeting, let's go to that

HILL & ROMERO
CERTIFIED COURT REPORTERS

11:51   1    to the extent you know.

11:51   2      A.   To my knowledge, it was Pam Denny.

11:51   3      Q.   And at the time of his termination, he was

11:51   4    given the documents that described his infractions and

11:51   5    the reasons for his termination?

11:51   6      A.   Again, I assume he did.   Again, I didn't handle

11:51   7    his actual termination.   Pan Denny is the one.

11:51   8    Whatever documents he received for the termination,

11:51   9    they would be from her.

11:51 10      Q.   Okay.   Well, you-all did have a hearing with

11:51 11    David Rodriguez, right?

11:51 12      A.   Yeah.   But, again, I thought you were asking me

11:51 13    beforehand if he received.   I assume he did because we

11:52 14    got copies of what he received.

11:52 15      Q.   Okay.   In fact, he had a full hearing

11:52 16    contesting his termination in front of the city

11:52 17    council, correct?

11:52 18      A.   Correct.

11:52 19      Q.   And so he had notice of the complaints against

11:52 20    him before his hearing?

11:52 21      A.   Yes.

11:52 22      Q.   Okay.   And he was able to bring witnesses and

11:52 23    present an affidavit on his own behalf, correct?

11:52 24      A.   To the best of my knowledge, yes.

11:52 25      Q.   Well, you were at the meeting, weren't you?

11:52  1    A.  Yes.

11:52  2    Q.  Okay.  So he was able to have --

11:52  3    A.  Right.

11:52  4    Q.  -- adequate notice of the charges against him?

11:52  5    A.  Yes.

11:52  6    Q.  And he was able to present evidence on his

11:52  7  behalf?

11:52  8    A.  Yes.

11:52  9    Q.  Okay.  And he was given the opportunity to

11:52 10  respond to the allegations against him, wasn't he?

11:52 11    A.  Yes.

11:52 12    Q.  Okay.  David Rodriguez, you said he's a friend

11:52 13  of yours at least for three years now, correct?

11:52 14    A.  Yes.

11:52 15    Q.  And he goes to the same parties and gatherings

11:52 16  that you do, doesn't he?

11:52 17    A.  No, not -- a friend -- I know him through the

11:53 18  police department and the police department only.

11:53 19  Other than that, we are not at social functions or he

11:53 20  invites me to parties or anything of that nature.  I

11:53 21  don't know him from school.  I just know him through

11:53 22  the police department.

11:53 23    Q.  You haven't been to the same barbecues as him,

11:53 24  same Mendoza family barbecues?

11:53 25    A.  That's only happened -- that's only occurred

HILL & ROMERO
CERTIFIED COURT REPORTERS

12:06 1      A.  At the onset I could understand it.  I mean, I

12:06 2  had no problem with it.  But this was occurring still I

12:06 3  want to say about four months afterwards.  I mean, I

12:06 4  would think you would know the city within really --

12:06 5  the streets within a month, give or take.  After that,

12:06 6  I mean, go out there yourself.  That's how you learn,

12:06 7  you go out there yourself and start meeting people

12:06 8  yourself, learning the streets and getting to know it.

12:06 9  I agree in the beginning yes, I have no problem with

12:06 10 it, but this was happening already several months down.

12:06 11     Q.  Okay.  Were there times where Chief Perez was

12:07 12 out driving by himself that you saw?

12:07 13     A.  I never saw him drive by himself.  I couldn't

12:07 14 say he did because I never saw him.

12:07 15     Q.  And before we went back to this matter, we

12:07 16 talked about David Rodriguez.  You are aware of

12:07 17 tensions between David Rodriguez and Chief Perez,

12:07 18 correct?

12:07 19     A.  Yes.

12:07 20     Q.  What were those tensions?

12:07 21     A.  What I understand from David Rodriguez was he

12:07 22 felt that Chief Perez was out to get him in some way,

12:07 23 that he didn't like him.  In any case -- he felt that

12:07 24 anytime he will bring up a case where he would do a

12:07 25 stop -- any of his duties, he was questioned about it,

HILL & ROMERO
CERTIFIED COURT REPORTERS

12:24  1    to hide?  These digital pictures were never -- never

12:24  2    even came into play until that day.

12:24  3        Q.  You had never asked the chief to see those

12:24  4    pictures?

12:24  5        A.  No.  Again, I never asked him about the case

12:24  6    until that date.  But then he brought the case to me.

12:25  7        Q.  Now, let's sit back and look at what happened.

12:25  8    You've been asking the mayor and Pam Denny about this

12:25  9    drug bust and what happened and what happened and you

12:25 10    weren't happy with the answers they were giving you.

12:25 11        A.  Right.

12:25 12        Q.  So when you finally requested a meeting with

12:25 13    the chief and he wanted to tell you about it himself --

12:25 14        A.  Right.

12:25 15        Q.  -- you didn't want to really hear about it

12:25 16    because you weren't prepared to hear about it, right?

12:25 17        A.  No, because I was not there -- to me I saw it

12:25 18    as an infiltration of -- well, I went there to talk

12:25 19    about something else, yet they took the opportunity to

12:25 20    throw me all this information to try to convince me.

12:25 21    They were trying too hard, in my opinion, to try and

12:25 22    convince me.  I just saw it as, no, I'm not going to

12:25 23    discuss that right now because I'm not prepared to.  If

12:25 24    I asked them questions, they already knew -- he already

12:25 25    knew what -- they already had a plan -- he already had

12:29 1    A.   Yes.

12:29 2    Q.   Okay.  And your chief concern on August 14th

12:29 3  and August 29th when you were considering firing the

12:29 4  chief was the drug bust, correct?  Is that what you're

12:29 5  telling us?

12:29 6    A.   There were others, but that was the main.

12:29 7    Q.   That was the main one?

12:29 8    A.   The main one.

12:29 9    Q.   Okay.  So on August 30th, there was your chance

12:29 10 to hear his side of the story, and you didn't want to

12:29 11 hear it, correct?

12:29 12   A.   I wasn't prepared to hear that information.  I

12:29 13 was not prepared.

12:29 14   Q.   When were you --

12:29 15   A.   I was not there to discuss that.  And I didn't

12:29 16 want to discuss that without all the rest of the

12:29 17 council present because he could tell me something and

12:29 18 it would come around.  I just didn't want any

12:29 19 misinterpretation.  To me I saw it, they are coming to

12:29 20 me by myself, they are attacking me, and I felt I

12:29 21 didn't want to discuss it right then because I wanted

12:29 22 everybody else to be present.

12:29 23   Q.   Was everybody present August 29th at that

12:29 24 meeting?

12:29 25   A.   Yes.

12:29  1       Q.  Why didn't you discuss it there?

12:30  2       A.  I don't know.

12:30  3       Q.  You didn't want to discuss it with them, did

12:30  4  you?

12:30  5       A.  I can't answer that.

12:30  6       Q.  Why can't you answer that?  We asked you to

12:30  7  discuss it there in front of the whole world.

12:30  8       A.  The bottom line is me individually I was not

12:30  9  happy with his performance to date, to that meeting.

12:30  10  What I saw in his mishandling of this case, of the

12:30  11  rapport that he was developing with the adjoining

12:30  12  agencies where he had said and it was clear to us and

12:30  13  he goes, oh, yes, I work well with agencies.  I have no

12:30  14  problems working with any other agencies.  I welcome

12:30  15  them here.

12:30  16      Q.  You are talking about the constable's office,

12:30  17  right?

12:30  18      A.  Constable's office.

12:31  19      Q.  You are talking about your brother?

12:31  20      A.  Right.  There's always -- again, I don't have

12:31  21  facts, but I understand there was always other agencies

12:31  22  who were having some communication problems also.

12:31  23      Q.  And the basis for you saying that Chief Perez

12:31  24  mishandled the drug case came from David Rodriguez,

12:31  25  correct?

| | | |
|---|---|---|
| 12:31 | 1 | A.   Correct. |
| 12:31 | 2 | Q.   That's where you got your information from? |
| 12:31 | 3 | A.   Yes. |
| 12:31 | 4 | Q.   Okay.  And David Rodriguez at this time was |
| 12:31 | 5 | being investigated by the FBI, correct? |
| 12:31 | 6 | A.   Yes. |
| 12:31 | 7 | Q.   You are an officer, right? |
| 12:31 | 8 | A.   Yes. |
| 12:31 | 9 | Q.   Okay. You look for motive, don't you? |
| 12:31 | 10 | A.   Yes. |
| 12:31 | 11 | Q.   Okay.  You didn't think David Rodriguez had a |
| 12:31 | 12 | motive to make up some stuff? |
| 12:31 | 13 | A.   One thing I know -- one thing I know bearing on |
| 12:31 | 14 | -- when I got informed of -- |
| 12:31 | 15 | Q.   Let me go on. |
| 12:31 | 16 | MR. AGUILAR:  Objection.  If he needs to |
| 12:31 | 17 | explain his answer, he can.  Go ahead and explain your |
| 12:31 | 18 | answer. |
| 12:31 | 19 | A.   If I was informed -- when I was informed of the |
| 12:32 | 20 | fact that Ricardo Perez had sent that information to |
| 12:32 | 21 | the FBI, again I was actually happy.  That means that |
| 12:32 | 22 | he's showing us that it doesn't matter who it is, it |
| 12:32 | 23 | could be your brother or your best friend, it doesn't |
| 12:32 | 24 | matter who, he's going to do a good job.  That's it, |
| 12:32 | 25 | period. |

12:34 1   information.  It's just an end run around the last

12:34 2   question, so I would again instruct the witness not to

12:34 3   answer regardless of what the answer would be.

12:34 4       A.  I refuse to answer that question.

12:34 5           MR. RODRIGUEZ:  If it wasn't by the

12:34 6   attorney, I'm entitled to know that.

12:34 7           MR. AGUILAR:  Yes, but it's just an end

12:34 8   run around the first question to try to get the

12:34 9   information of whether it was written -- whether it was

12:34 10  written -- I'm sorry, whether it was written at the

12:34 11  request of an attorney or not is privileged.

12:34 12      Q.  Was this letter written at the request of

12:34 13  someone other than the attorney for the city?

12:34 14          MR. AGUILAR:  Same objection and instruct

12:34 15  the witness not to answer.

12:34 16      A.  I refuse to answer that question.

12:34 17      Q.  Are you refusing to answer the question based

12:34 18  on the advice of your attorney, Arnold Aguilar?

12:34 19      A.  Yes.

12:34 20      Q.  Okay.  It has here, concerns with Chief Ricardo

12:34 21  Perez' performance and concern that, No. 1, he never

12:34 22  actually lived in Los Fresnos.  That was a concern of

12:34 23  yours?

12:34 24      A.  Yes.

12:34 25      Q.  Okay.  And was that a reason to fire him?

12:45 1    units are not equipped with digital cameras.  Did he

12:45 2    ever tell you the photos were taken at the scene?

12:45 3         A.  No.  He told me they were taken at the police

12:45 4    department.

12:45 5         Q.  And who took those photos?

12:45 6         A.  I don't recall.

12:45 7         Q.  He told you David Rodriguez took those photos,

12:45 8    didn't he?

12:45 9         A.  I don't recall him telling me it was David

12:45 10   Rodriguez.

12:45 11        Q.  Okay.  The Polaroid camera that you mention

12:45 12   there in the next thing you have underlined, that was a

12:45 13   Border Patrol camera, correct?

12:45 14        A.  I don't know.

12:45 15        Q.  Or was it City of Los Fresnos?

12:45 16        A.  I don't know whose camera it was.

12:45 17        Q.  Okay.  Well, if it wasn't a Los Fresnos camera,

12:45 18   then why should he have the pictures?

12:45 19        A.  The reason I include that it was our

12:46 20   department's was because, again, Officer Rodriguez had

12:46 21   informed me that our department had indeed taken those

12:46 22   pictures and they were Polaroid pictures.

12:46 23        Q.  Okay.  And that's what David Rodriguez told

12:46 24   you, correct?

12:46 25        A.  Correct.

12:46  1        Q.   Okay.   And did David Rodriguez tell you what he
12:46  2    did with those photographs?
12:46  3        A.   Placed them, from what I understand, in a file,
12:46  4    case file.
12:46  5        Q.   And did you ever see the case file?
12:46  6        A.   Again, I got copies of the case.
12:46  7        Q.   Okay.
12:46  8        A.   Along with copies of the pictures.
12:46  9        Q.   Okay.   There at the bottom, what ultimately
12:46  10   happened to the confiscated drugs, he explained to you
12:46  11   that they tested negative, correct?
12:46  12       A.   Yes.
12:46  13       Q.   And he explained to you that those were turned
12:46  14   over then to the Cameron County drug task force?
12:46  15       A.   Yes.
12:46  16       Q.   So you knew what happened to the confiscated
12:46  17   drugs?
12:46  18            MR. AGUILAR:   Objection; misstating the
12:46  19   witness' testimony.   You can answer if you understand.
12:47  20       A.   Could you rephrase that?
12:47  21       Q.   Yeah.   He told you what happened to the drugs
12:47  22   once they left, I guess, the possession or control of
12:47  23   the Los Fresnos Police Department, correct?
12:47  24       A.   He told me, but, again, I had information that
12:47  25   -- by Officer Rodriguez again that the drugs -- nobody

12:47  1    knew what happened to the drugs.  He had placed them on

12:47  2    there.  And when they -- when they asked about them,

12:47  3    apparently they were discarded or nobody knew where

12:47  4    they were.  They were never sent to the DPS lab.

12:47  5    That's why I was questioning it.

12:47  6        Q.  David Rodriguez told you they were never sent

12:47  7    to the DPS lab?

12:47  8        A.  Right.

12:47  9        Q.  Does he know that for a fact?

12:47 10             MR. AGUILAR:  Objection; speculation.

12:47 11        A.  I don't know.

12:47 12        Q.  But you are relying on what he told you,

12:47 13    correct?

12:47 14        A.  Yes.

12:47 15        Q.  And so if you found out that they were sent to

12:47 16    a lab either in McAllen or in Austin, would you still

12:48 17    feel confident about relying on the information from

12:48 18    David Rodriguez?

12:48 19        A.  I would have felt confident if the chief would

12:48 20    have told me right there and then, look, these were

12:48 21    sent to the DPS lab.  These are the findings that we

12:48 22    got.  But he didn't.  Why didn't he?  He's the chief.

12:48 23    He, him, who is adamant about professionalism, adamant

12:48 24    about all my experience, I know things inside -- I

12:48 25    mean, he was telling me that basically he knew the law

12:53 1    chief out, didn't he?

12:53 2        A.  No.

12:53 3        Q.  And you wanted the chief out?

12:53 4        A.  No.

12:53 5        Q.  Because your brother was trying to convince you

12:53 6    of that, wasn't he?

12:53 7        A.  That's not correct.

12:53 8        Q.  No. 5, why was morale down again when he had

12:53 9    also assured that he took pride in keeping the morale

12:53 10   in positive standings and that he had an open door

12:53 11   policy.  Well, you said you were already impressed with

12:53 12   his open door policy, correct?

12:53 13       A.  Correct.

12:53 14       Q.  Okay.  Who was complaining that the morale was

12:53 15   down?

12:53 16       A.  That was Officer Hector Guevara, David

12:53 17   Rodriguez.  And through Officer Guevara and also --

12:53 18   through Officer Guevara, also informed that several of

12:53 19   the officers -- I don't recall the names.  One of them,

12:53 20   I believe, was Gilbert Losoya.

12:54 21       Q.  When you say through Hector Guevara --

12:54 22       A.  In other words, he told me, this is what's

12:54 23   going on.  There's a lot of tensions going between all

12:54 24   of us, and I'm not the only one.  He mentioned other

12:54 25   ones, but I don't recall their names right now.

12:54  1    Q.  Okay.  And what was Hector Guevara's complaint?

12:54  2    A.  His complaint basically was that he was just

12:54  3  being passed on to work graveyard.  Apparently he was

12:54  4  not offered the opportunity just as everyone else.  He

12:54  5  informed that when he would go to -- when I would go to

12:54  6  the chief about -- asking about something work-related,

12:54  7  he felt he was being not taken serious or just brushed

12:54  8  off.

12:55  9    Q.  Okay.  Any other complaints Hector Guevara

12:55 10  made?

12:55 11    A.  The only thing else I can remember is that he

12:55 12  states that there was just tension -- there was a

12:55 13  division between the officers, several officers were,

12:55 14  what he says, were on the chief's side.  They would

12:55 15  help him.  He felt he was being singled out.  He felt

12:55 16  there was favoritism.  He could not do things other

12:55 17  officers could as far as changing schedules or going on

12:55 18  vacation.

12:55 19    Q.  So really his complaint was the scheduling,

12:55 20  that was the big basis his complaint?

12:55 21    A.  From what I remember, yes.

12:55 22    Q.  Okay.  And David Rodriguez, we have already

12:55 23  talked about his complaint that he felt the chief was

12:55 24  out to get him, right?

12:55 25    A.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

12:58  1    Vasquez?

12:58  2        A.  He said it was Jimmy Vasquez, and he speculated

12:58  3    maybe if Jimmy Vasquez knows, maybe the chief knows.    I

12:59  4    assumed the chief.  He pinpointed basically Jimmy

12:59  5    Vasquez in stating, well, they are trying to get their

12:59  6    statement.  Whether the chief went with Jimmy Vasquez

12:59  7    or whether that even happened, I don't know.

12:59  8        Q.  Right.  You don't know that?

12:59  9        A.  Right.

12:59 10        Q.  Okay.  So really you can't blame this on the

12:59 11    chief if it's true or if it's not true because you

12:59 12    don't have any evidence that the chief was involved in

12:59 13    this at all, correct?

12:59 14        A.  Right.

12:59 15        Q.  Okay.  And as a police officer, you understand

12:59 16    that if there are suspected civil rights violations,

12:59 17    those are usually turned over to federal authorities?

12:59 18        A.  Yes.

12:59 19        Q.  So the chief had received information that

12:59 20    there was a suspected civil rights violation, he was

12:59 21    well within his authority to report this to the FBI?

12:59 22        A.  Yes, he was.

12:59 23        Q.  Okay.  The next page it says, how can he be

12:59 24    trusted when he has deliberately failed to give the

13:00 25    council a true evaluation of his department.  What was

HILL & ROMERO
CERTIFIED COURT REPORTERS

the --

A.   That came about -- I recall one instance when I
-- when David Rodriguez started telling me about the
concerns that he had been singled out, what's going on.
And other dates I would go out again, just see how
things are going.  When I was getting complaints from
Hector Guevara about the other officers telling me that
the morale was down, I went to the chief and told him,
you know, this is what's going on.  Is the morale good
or is it not?  Oh, yeah, everything is good.
Everything is perfect except for David.  We are trying
to work things out.  That was his words.  Then I said,
okay.  Well, maybe these officers, they are just saying
it.  Weeks passed and again I still started hearing the
same things from the same officers.  So then I was
telling them, why is he telling me one thing and the
officers telling me something else?  ·I just raised an
eyebrow.

Q.   Well, he admitted there was some tension
between David Rodriguez and him, right?

A.   Yes.

Q.   And he said he's trying to work it out?

A.   Right.  But he assured me that the morale was
real good, everybody had no problems, everybody was
happy when I had heard from the officers that they

13:01 1    weren't.

13:01 2        Q.  Did you go talk to the other officers other

13:01 3    than Guevara and Rodriguez about the morale?

13:01 4        A.  No.

13:01 5        Q.  So you don't know, as far as everybody else

13:01 6    other than Guevara and Rodriguez, whether they had good

13:01 7    morale?

13:02 8        A.  Other than what I was informed about.

13:02 9        Q.  How long has Hector Guevara been with the Los

13:02 10   Fresnos Police Department?

13:02 11       A.  I don't remember.  I don't know the amount of

13:02 12   years he has.

13:02 13       Q.  Him and Rodriguez have been in the force

13:02 14   together for a long time?

13:02 15       A.  Yes.

13:02 16       Q.  Okay.  They have been through Tony Lopez'

13:02 17   tenure --

13:02 18       A.  Uh-huh.

13:02 19       Q.  -- Terry Vinson's?

13:02 20       A.  Yes.

13:02 21       Q.  Anybody else's tenure?

13:02 22       A.  Adrian Cabrera.

13:02 23       Q.  Okay.  At the bottom there you have some stuff

13:02 24   -- four lines that are, like, scratched out or you

13:02 25   tried to mark through them.  What was said there?

CVISPDF – www.fastio.com

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.          ) (
        Plaintiff           ) (
                            ) (
VS.                         ) (   CIVIL ACTION NO. B-00-161
                            ) (
CITY OF LOS FRESNOS,        ) (
TEXAS, JUAN C. SIERRA,      ) (
SR., GONZALO ACEVEDO,       ) (
IDA GARCIA, MIGUEL          ) (
MENDOZA, INDIVIDUALLY       ) (
AND IN THEIR OFFICIAL       ) (
CAPACITIES, AND JUAN        ) (
MENDOZA, JR.                ) (
        Defendants          ) (

---

ORAL DEPOSITION OF
MANUEL ABREGO
MAY 16, 2001

---

　　　　ORAL DEPOSITION OF MANUEL ABREGO, produced as a

witness at the instance of the PLAINTIFF, taken in the

above styled and numbered cause on MAY 16, 2001, from

9:08 a.m. to 11:59 a.m., before LOU ZUNIGA, Certified

Court Reporter No. 2198, in and for the State of Texas,

at the offices of Los Fresnos City Hall, 209 North

Arroyo, Los Fresnos, Texas, pursuant to the Federal

Rules of Civil Procedure.

HILL & ROMERO
CERTIFIED COURT REPORTERS



MANUEL ABREGO,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. RODRIGUEZ:

Q.   Would you please state your full name for the record?

A.   Manuel Abrego.

Q.   And, Mayor Abrego, my name is Ted Rodriguez. We have met before, correct?

A.   That's correct.

Q.   Have you ever given a deposition before?

A.   Yes, I have.

Q.   Tell me about that time or those times.

A.   It was a civil lawsuit, and I was a witness.

Q.   What kind of lawsuit was it?

A.   A personal.

Q.   Personal injury?

A.   Yes.

Q.   Did somebody fall, or it was a car accident?

A.   Right.  It wasn't a car accident.  Yeah, a tire that blew up.

Q.   Okay.  And you just witnessed the accident?

A.   I didn't actually witness the accident, but I was close by and I had a camera and I took pictures.

Q.   Oh, okay.

09:36  1    or is that just something you had ordered Ms. Denny to

09:36  2    do?

09:36  3        A.   That's something that I instructed Ms. Denny to

09:36  4    do.

09:36  5        Q.   Okay.  And Chief Perez' evaluation, I think he

09:36  6    received an outstanding evaluation, correct?

09:36  7    .   A.   I believe so.  Oh, yes, sir.

09:36  8        Q.   And you had a lot of interaction with Chief

09:36  9    Perez during his tenure as chief of police, correct?

09:36 10        A.   Yes, sir.

09:36 11        Q.   And would the evaluation that you have in front

09:37 12    of you marked Exhibit 5, would that be a fair

09:37 13    evaluation of the chief's work as far as you knew?

09:37 14        A.   In my opinion, yes.

09:37 15        Q.   Okay.  Do you feel the chief was doing a good

09:37 16    job?

09:37 17        A.   Yes, sir.

09:37 18        Q.   I'm talking about Chief Ricardo Perez.

09:37 19        A.   In my opinion, yes.

09:37 20        Q.   Okay.  I want to show you what's here as

09:37 21    Exhibit 6, and I'm looking at Chapter 7, particularly

09:37 22    Chapter 7-03.  The policy manual states that I guess

09:37 23    the city should use transitional steps in disciplining

09:37 24    employees, correct?

09:37 25        A.   Transitional steps?

09:46 1      A.  I don't know how often, but, yes, he was --

09:46 2  let's put it this way:  He was a more frequent visitor

09:47 3  than other patrolmen.

09:47 4      Q.  Okay.  Much more frequent, correct?

09:47 5      A.  Yes.

09:47 6      Q.  And you were made aware of that?

09:47 7      A.  Yes.

09:47 8      Q.  Okay.  In fact, you probably saw it for

09:47 9  yourself?

09:47 10     A.  Yes, I did.

09:47 11     Q.  Los Fresnos isn't that big, is it?

09:47 12     A.  No.

09:47 13     Q.  Okay.  And you would see David Rodriguez', I

09:47 14  guess, police unit parked over there at the constable's

09:47 15  office quite often, correct?

09:47 16     A.  I don't know about quite often, but, yes, I saw

09:47 17  it a lot.

09:47 18     Q.  Okay.  And when I say "constable," I'm talking

09:47 19  about Juan Mendoza, Jr.

09:47 20     A.  Yes, sir.

09:47 21     Q.  Okay.  And would you say you saw David

09:47 22  Rodriguez' patrol car out there much more than the

09:47 23  other police officers within Los Fresnos?

09:47 24     A.  Yes.

09:47 25     Q.  You talked about a meeting that you had with

09:47  1    Miguel Mendoza.  You had Attorney Girault there.  Was

09:47  2    Ricardo Perez there as well?

09:48  3        A.  Yes, he was.

09:48  4        Q.  Okay.  I think because you said you wanted

09:48  5    Miguel to hear you telling Rick Perez what you were

09:48  6    going to tell him, correct?

09:48  7        A.  Yes, sir.

09:48  8        Q.  Okay.  Would this meeting have been on or about

09:48  9    August 30th, the day after one of the town meetings?

09:48  10       A.  I don't remember the exact date, but, yes, it

09:48  11   was a day in which -- right after a meeting.

09:48  12       Q.  Okay.  And was Pam Denny there as well?

09:48  13       A.  No.

09:48  14       Q.  Okay.

09:48  15       A.  I mean, she was in the building, but she wasn't

09:48  16   there --

09:48  17       Q.  In the meeting.  Okay.  And did you-all also

09:48  18   discuss a matter of some drugs or a drug bust and there

09:48  19   was some missing drugs?

09:48  20       A.  Yes.

09:48  21       Q.  Okay.  And that was in front of Miguel Mendoza;

09:48  22   is that correct?

09:48  23       A.  That's correct.

09:48  24       Q.  And my understanding is Miguel Mendoza didn't

09:48  25   want to talk about that case at the time you-all were

HILL & ROMERO
CERTIFIED COURT REPORTERS

09:49  1   having this meeting, correct?

09:49  2       A.   Yes.  At the time we were having the meeting,

09:49  3   right.

09:49  4       Q.   Okay.  He didn't want to talk about it; is that

09:49  5   right?

09:49  6       A.   That's correct.

09:49  7       Q.   Do you know why he did not want to talk about

09:49  8   it?

09:49  9       A.   No.

09:49  10      Q.   Okay.  In fact, I think I've been told that you

09:49  11  were the person who wanted to talk about it and bring

09:49  12  this issue out; is that correct?

09:49  13      A.   That's correct.

09:49  14      Q.   Okay.  And you felt it was important so that

09:49  15  Alderman Mendoza could see that Chief Perez was doing

09:49  16  his job?

09:49  17      A.   Yes.  It was -- that particular issue or that

09:49  18  particular case had tainted the department and it was a

09:49  19  big, big hassle.  I met with the chief, he showed me

09:49  20  step by step what went down, what happened.  I had been

09:49  21  contacted by Mr. Mendoza that obviously -- totally

09:50  22  opposite of what had happened.  So I asked for a

09:50  23  meeting, and we set up a very formal meeting in which

09:50  24  the chief brought the file and went through it step by

09:50  25  step.

47

| | | |
|---|---|---|
| 10:01 | 1 | A.  Yes, sir. |
| 10:01 | 2 | Q.  So there would be nothing wrong with that? |
| 10:01 | 3 | A.  No. |
| 10:01 | 4 | Q.  In fact, I think at the time you met with him |
| 10:01 | 5 | on August 30th, 2000, he had already stopped riding |
| 10:02 | 6 | with Lieutenant Vasquez, correct? |
| 10:02 | 7 | A.  Yes, sir. |
| 10:02 | 8 | Q.  Okay.  Are you aware of any, I guess, |
| 10:02 | 9 | complaints or that you were told that Chief Perez was |
| 10:02 | 10 | being followed by some of the council members or by |
| 10:02 | 11 | Juan Mendoza, Jr.? |
| 10:02 | 12 | A.  I'm aware. |
| 10:02 | 13 | Q.  Okay.  And he was out on night patrol? |
| 10:02 | 14 | A.  Yes. |
| 10:02 | 15 | Q.  And how are you aware of that? |
| 10:02 | 16 | A.  I witnessed it. |
| 10:02 | 17 | Q.  Okay.  What did you see? |
| 10:02 | 18 | A.  Ida Garcia and Juan Mendoza. |
| 10:02 | 19 | Q.  What were they doing? |
| 10:02 | 20 | A.  Going by my house.  The chief was there.  I was |
| 10:02 | 21 | talking to the chief. |
| 10:02 | 22 | Q.  And he had told you, I'm being followed by Ida |
| 10:03 | 23 | Garcia and Juan Mendoza, right? |
| 10:03 | 24 | A.  That's what he said. |
| 10:03 | 25 | Q.  And who comes down the street? |

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:03 1      A.   Ida Garcia and Juan Mendoza.

10:03 2      Q.   Okay.  And Juan Mendoza was in his constable

10:03 3 vehicle; is that right?

10:03 4      A.   Yes, sir.

10:03 5      Q.   Dressed in, I guess, a T-shirt?

10:03 6      A.   That's correct.

10:03 7      Q.   So it didn't appear he was doing any official

10:03 8 duties?

10:03 9      A.   I don't know, sir.

10:03 10      Q.   Okay.  Did the chief ever tell you that there

10:03 11 were other times that he was being followed?

10:03 12      A.   Yes.

10:03 13      Q.   Okay.  Did he tell you how that made him feel?

10:03 14      A.   Yes.

10:03 15      Q.   How did that make him feel?

10:03 16      A.   Very insecure.

10:03 17      Q.   Did he fear for his safety?

10:03 18      A.   Yes.

10:03 19      Q.   You understand when a patrol officer -- or an

10:03 20 officer is patrolling by themselves and they get called

10:03 21 out to places -- did he ever tell you that in the back

10:03 22 of his mind he was worried that he was getting set up

10:03 23 for something?

10:03 24      A.   He mentioned that.

10:03 25      Q.   Okay.  And so you were aware that Chief Perez

10:04 1    truly in his heart feared for his safety, correct?

10:04 2        A.  Yes.

10:04 3        Q.  And that's because he knew he was being

10:04 4    followed by at least one alderperson and Constable Juan

10:04 5    Mendoza, right?

10:04 6            MR. AGUILAR:  Objection; speculation.

10:04 7        Q.  Because he told you that, correct?

10:04 8        A.  Yes.

10:04 9            MR. AGUILAR:  Objection; multifarious,

10:04 10   speculation, and let the record reflect the witness

10:04 11   answered before I had a chance to submit my objection.

10:04 12       Q.  Did -- were you ever told or did you ever

10:04 13   become aware that Chief Perez -- I guess the apartment

10:04 14   or home he had rented, that it was being surveilled or

10:04 15   watched?

10:04 16       A.  No, sir.

10:04 17       Q.  You never heard about that?

10:04 18       A.  No.

10:04 19       Q.  Okay.  Let's go to the second issue here.

10:04 20   Residence, you said that he must live within 15 miles

10:05 21   of the corporate city limits of Los Fresnos.  He needs

10:05 22   to move in by September 30 of 2000, correct?

10:05 23       A.  Now, on that -- the 15 miles status, that was,

10:05 24   I think, when he was hired, and that was prior to my

10:05 25   knowledge.

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:06 1   the witness' testimony, multifarious and doesn't

10:06 2   adequately reflect the evidence and calls for a legal

10:06 3   conclusion.

10:06 4        Q.  Is that correct, Mayor?

10:06 5        A.  I asked the chief if 30 days was fair, and he

10:06 6   said yes, he had already made a deposit and was working

10:06 7   on some curtains and he was ready to move in.

10:06 8        Q.  Okay.  And in here you gave him until September

10:06 9   30 of 2000 to make this move, correct?

10:06 10       A.  Yes.

10:06 11       Q.  And you did this as the mayor of the City of

10:06 12  Los Fresnos, correct?

10:06 13       A.  Yes, sir.

10:06 14       Q.  Do you know when he was fired?

10:07 15       A.  September 26th.

10:07 16       Q.  Okay.  So he still at least had four days as

10:07 17  far as the residency requirement that was being

10:07 18  imposed, correct?

10:07 19       A.  Yes, sir.

10:07 20       Q.  Okay.  And when you talked to the chief about,

10:07 21  you know, is 30 days okay for you to make this move,

10:07 22  was that done in front of Miguel Mendoza?

10:07 23       A.  Yes, sir.

10:07 24       Q.  Okay.  So Miguel Mendoza was aware of that?

10:07 25       A.  Yes, sir.

73

10:31  1      Q.  Okay.  Would it have been also around the time
10:31  2   that the chief reported David Rodriguez to the FBI?
10:31  3      A.  Yes, sir.
10:31  4      Q.  Okay.  And I think as early as June Ida Garcia
10:31  5   was asking about the end of the chief's probation and
10:32  6   making inquiries into maybe terminating him; is that
10:32  7   correct?
10:32  8      A.  I'm not aware of that.
10:32  9      Q.  You are not aware of that?  Okay.  There were
10:32 10   some complaints made about corruption within the police
10:32 11   department by some of the fellow alderpersons.  Do you
10:32 12   remember those complaints?  They put it in the paper
10:32 13   even.
10:32 14      A.  Oh, yes.
10:32 15      Q.  Okay.  Do you know what I'm talking about now?
10:32 16      A.  I don't know if that was Mr. Acevedo or Mr.
10:32 17   Sierra.  It was two different articles.
10:33 18      Q.  Well, they both made allegations that there was
10:33 19   corruption in the police department and City Hall,
10:33 20   right?
10:33 21      A.  That's right.
10:33 22      Q.  You took offense to that, correct?
10:33 23      A.  Yes.
10:33 24      Q.  And you -- obviously I'm sure you investigated
10:33 25   their allegations of corruption, correct?

HILL & ROMERO
CERTIFIED COURT REPORTERS

10:33  1      A.   Yes, sir.

10:33  2      Q.   Did you ever find any corruption within the

10:33  3  police department?

10:33  4      A.   No, sir.

10:33  5      Q.   Have they ever told you what corruption they

10:33  6  meant?

10:33  7      A.   No.

10:33  8      Q.   So as you sit here today, they have never --

10:33  9  and I'm talking about Mr. Acevedo or Mr. Sierra -- have

10:33  10  never told you what corruption they were talking about

10:33  11  when they made these statements to the newspaper?

10:33  12      A.   No, sir.

10:33  13      Q.   And they have never shown you any evidence of

10:33  14  any corruption within the police department or City

10:33  15  Hall; is that correct?

10:33  16      A.   That's correct.

10:33  17      Q.   And in your investigation you have never found

10:33  18  any corruption within the police department or City

10:33  19  Hall; is that correct?

10:34  20      A.   The police department?

10:34  21      Q.   Right.

10:34  22      A.   No, sir.

10:34  23      Q.   Okay.  Or within City Hall?

10:34  24      A.   No.

10:34  25      Q.   Okay.  And you're sure about that?

11:13 1    mischaracterizing the evidence.

11:13 2         A.   I would assume.

11:13 3         Q.   Okay.   In fact, at the August 29th meeting, at

11:13 4    least one alderman was seen crying and another alderman

11:13 5    -- or alderwoman was seen crying and an alderman was

11:13 6    seen threatening -- making threats against a citizen;

11:13 7    is that correct?

11:13 8              MR. AGUILAR:   Objection; multifarious.

11:13 9         Q.   Okay.   I think they were caught kind of

11:13 10   surprised by the amount of support Chief Perez

11:13 11   received; is that correct?

11:14 12             MR. AGUILAR:   Objection; multifarious,

11:14 13   mischaracterizing the evidence.

11:14 14        A.   I don't know.   I would assume.

11:14 15        Q.   Were you surprised by the amount of support

11:14 16   Chief Perez received?

11:14 17        A.   No.

11:14 18        Q.   Why not?

11:14 19        A.   Because I expected the support.

11:14 20        Q.   Because he's a good officer?

11:14 21        A.   Yes.

11:14 22        Q.   And he was doing a good job?

11:14 23        A.   That's right.

11:14 24        Q.   At the August 26th meeting, do you recall

11:14 25   Ramiro Sanchez standing up and making a big speech

11:14  1    about how there was a drug bust and the drugs

11:14  2    disappeared and he doesn't know what happened to them

11:14  3    and those kind of things?  Do you remember that?

11:14  4        A.  Yes, sir.

11:14  5        Q.  Okay.  And he made this when the floor was open

11:14  6    to discuss Chief Perez' continued employment or

11:15  7    termination, correct?

11:15  8             MR. AGUILAR:  Objection; mischaracterizing

11:15  9    the evidence.

11:15 10        A.  I don't know if it was under open forum or

11:15 11    actually when we were discussing the chief.

11:15 12        Q.  If you don't remember, that's fine.  But he was

11:15 13    making allusions to the chief, correct?

11:15 14        A.  Yes.

11:15 15        Q.  It was understood he was being critical of

11:15 16    Chief Perez, correct?

11:15 17        A.  That's correct.

11:15 18        Q.  Okay.  And at that meeting, shortly after that,

11:15 19    the alderpersons decided to, I guess, table the agenda

11:15 20    items and postpone the meeting until the next month; is

11:15 21    that right?

11:15 22        A.  Yes.

11:15 23        Q.  Okay.  So Chief Perez was never given the

11:15 24    opportunity to respond to those allegations that were

11:15 25    brought out in public forum, was he?

11:15 1          MR. AGUILAR:  Objection; mischaracterizing

11:15 2     the evidence.

11:15 3          A.  That's correct.

11:16 4          Q.  Let's go back to Exhibit 13 and look at the No.

11:16 5     2 reason here where a -- I will continue here -- where

11:16 6     a probationer may be entitled to a hearing if the

11:16 7     discipline is for any reason which would put in doubt

11:16 8     the officer's good name, reputation, honor or

11:16 9     integrity.  The things that were being said about the

11:16 10    chief and the shadows being cast upon him, those are

11:16 11    things that put into doubt his good name, reputation

11:16 12    and honor and integrity, don't they?

11:16 13         MR. AGUILAR:  Objection; speculation and

11:16 14    mischaracterizing the evidence.

11:16 15         A.  Yes.

11:17 16         Q.  Okay.  And, in fact, Chief Perez will always

11:17 17    carry the stigma of having been terminated, correct?

11:17 18         MR. AGUILAR:  Objection; speculation,

11:17 19    mischaracterizing the evidence.

11:17 20         A.  Yes.

11:17 21         Q.  And, again, there were allegations of

11:17 22    corruption and incompetency on his part that were

11:17 23    leveled against him, correct?

11:17 24         MR. AGUILAR:  Objection; mischaracterizing

11:17 25    the evidence.

11:24  1   that night?

11:24  2       A.  Yes.

11:24  3       Q.  Okay.  And we're also trying to ask for more

11:24  4   information?

11:25  5       A.  Yes.

11:25  6       Q.  Okay.  Do you remember the meeting of December

11:25  7   19th in open session wherein we were asking the city, I

11:25  8   guess, through Mr. Girault on open record in open

11:25  9   session whether this meeting was to be considered a due

11:25 10   process hearing?

11:25 11       A.  I remember the meeting.

11:25 12       Q.  Okay.  Do you remember myself asking that

11:25 13   question in open session?

11:25 14       A.  Yes, sir.

11:25 15       Q.  Do you remember me asking that question a

11:25 16   number of times without a response from Mr. Girault?

11:25 17       A.  There was a response.  I don't think he

11:25 18   answered your question.

11:25 19       Q.  Right.  He wouldn't admit or deny that it was a

11:25 20   due process --

11:25 21       A.  Yes.

11:25 22       Q.  -- hearing, would he?

11:25 23       A.  That's right.

11:25 24       Q.  Okay.  And I asked point-blank, does the city

11:25 25   consider this a due process hearing?  I asked that

HILL & ROMERO
CERTIFIED COURT REPORTERS

11:25  1   several times, didn't I?

11:25  2        A.  Yes, sir.

11:25  3        Q.  And Mr. Girault never answered the question,

11:26  4   did he?

11:26  5             MR. AGUILAR:  Objection; mischaracterizing

11:26  6   the evidence.

11:26  7        Q.  He never answered -- he never admitted or

11:26  8   denied whether it was a due process hearing, correct?

11:26  9        A.  That's correct.

11:26  10       Q.  Okay.  In fact, it was your understanding that

11:26  11  that was a due process hearing, correct?

11:26  12       A.  At the time of the meeting, no.

11:26  13       Q.  At the time of the August 29th meeting?

11:26  14       A.  No, at the December 19 meeting.

11:26  15       Q.  December 19th.  I'm sorry.  You didn't think it

11:26  16  was going to be a due process hearing?

11:26  17       A.  At the time of the meeting, no, I was -- no.

11:26  18       Q.  I had made a copy -- do you remember speaking

11:26  19  with a Brad Pierce either -- I think the day before

11:27  20  about this meeting on December 19th?

11:27  21       A.  I don't remember speaking -- I mean, he used to

11:27  22  call me all the time.

11:27  23       Q.  Okay.  He's with the Brownsville Herald, I

11:27  24  believe?

11:27  25       A.  Yes.  Was.

HILL & ROMERO
CERTIFIED COURT REPORTERS

11:39  1    they can discuss.

11:39  2        Q.  Okay.  Did you ever hear that there were more

11:39  3    than two meetings talking about what to do with Chief

11:39  4    Perez?

11:39  5        A.  I heard, yes.

11:39  6        Q.  You had heard through some of these people that

11:39  7    we have talked about that that was happening?

11:39  8        A.  Yes.

11:39  9        Q.  And as a reasonable, prudent official of the

11:39 10    City of Los Fresnos, alderpersons should not be doing

11:40 11    that, correct?

11:40 12        A.  Doing --

11:40 13        Q.  Meeting outside of town meetings in groups of

11:40 14    more than two to discuss city business.

11:40 15        A.  No.

11:40 16        Q.  No, they should not be doing that?

11:40 17        A.  They should not.

11:40 18        Q.  Had you ever -- in your experience with the

11:40 19    City of Los Fresnos as an official there when someone

11:40 20    is terminated, the city has traditionally, customarily

11:40 21    given them written notice of their termination,

11:40 22    correct?

11:40 23        A.  I don't know.

11:40 24            MR. AGUILAR:  Objection; specificity,

11:40 25    speculation.

11:44 1    calls for a legal conclusion.

11:44 2        A.  I don't know what -- due process, can you

11:44 3    define that?

11:44 4        Q.  He's entitled to a meaningful hearing, which

11:45 5    means that he's entitled to know the charges against

11:45 6    him and be able to put on evidence in defense of his

11:45 7    position.  Was David Rodriguez given a due process

11:45 8    hearing?

11:45 9        A.  Yes.

11:45 10        Q.  Was Ricardo Perez given a due process hearing?

11:45 11        MR. AGUILAR:  Objection -- I'm sorry,

11:45 12    objection to the last -- the question before last to

11:45 13    the extent it calls for a legal conclusion and

11:45 14    speculation on the part of this witness.  The record

11:45 15    should reflect that he answered before I had an

11:45 16    opportunity to object, and also object on the same

11:45 17    basis to this last question you asked.

11:45 18        Q.  You can answer.

11:45 19        A.  No.

11:45 20        Q.  I hate to go into this, but we were talking a

11:45 21    little bit about corruption before and your

11:45 22    investigation of corruption.  We agreed there was no

11:46 23    corruption within the Los Fresnos Police Department,

11:46 24    correct?

11:46 25        A.  That's correct.

HILL & ROMERO
CERTIFIED COURT REPORTERS

11:55  1    council members who voted against him were just not

11:55  2    satisfied with him?

11:55  3         A.  Yes, sir.

11:55  4         Q.  For whatever reason, correct?

11:55  5         A.  That's right.

11:55  6         Q.  So as of that time, was it your understanding

11:55  7    that there was any discipline being meted out against

11:55  8    him?

11:55  9              MR. RODRIGUEZ:  Objection; leading.

11:55 10         A.  No.

11:55 11              MR. AGUILAR:  I will pass the witness and

11:55 12    reserve all other questions at this time.

11:55 13                        EXAMINATION

11:55 14    BY MR. RODRIGUEZ:

11:55 15         Q.  Mayor, the time that Constable Mendoza and Ida

11:55 16    Garcia passed by in Constable Mendoza's vehicle, his

11:55 17    constable vehicle, you were already at home, correct?

11:56 18         A.  Yes, sir.

11:56 19         Q.  You hadn't come from anywhere anytime recently

11:56 20    before that?

11:56 21         A.  No.

11:56 22         Q.  Chief Perez had driven up to your house; is

11:56 23    that right?

11:56 24         A.  Yes, sir.

11:56 25         Q.  And he told you he was being followed, correct?

CVISPDF – www.fastio.com

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.          ) (
        Plaintiff           ) (
                            ) (
VS.                         ) (    CIVIL ACTION NO. B-00-161
                            ) (
CITY OF LOS FRESNOS,        ) (
TEXAS, JUAN C. SIERRA,      ) (
SR., GONZALO ACEVEDO,       ) (
IDA GARCIA, MIGUEL          ) (
MENDOZA, INDIVIDUALLY       ) (
AND IN THEIR OFFICIAL       ) (
CAPACITIES, AND JUAN        ) (
MENDOZA, JR.                ) (
        Defendants          ) (

_____

ORAL DEPOSITION OF
JUAN SIERRA
APRIL 23, 2001

_____

        ORAL DEPOSITION OF JUAN SIERRA, produced as a

witness at the instance of the PLAINTIFF, taken in the

above styled and numbered cause on APRIL 23, 2001, from

4:58 p.m. to 6:37 p.m., before LOU ZUNIGA, Certified

Court Reporter No. 2198, in and for the State of Texas,

at the offices of J. Arnold Aguilar, Artemis Square,

Suite H-2, 1200 Central Boulevard, Brownsville, Texas,

pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS

**COPY**

4

JUAN SIERRA,

2    having been duly sworn, testified as follows:

3                            EXAMINATION

16:58  4    BY MR. RODRIGUEZ:

16:58  5         Q.   Would you please state your full name for the

16:58  6    record?

16:58  7         A.   Juan Carlos Sierra, Sr.

16:58  8         Q.   Mr. Sierra, I'm Ted Rodriguez.  We met before.

16:59  9    You understand that I represent Ricardo Perez in a

16:59  10   lawsuit against you and the City of Los Fresnos?

16:59  11        A.   Yes, sir.

16:59  12        Q.   Okay.  The attorney sitting here to your left

16:59  13   is Mr. Aguilar, correct?

16:59  14        A.   Correct.

16:59  15        Q.   Have you ever given a deposition before?

16:59  16        A.   Have I been involved in one?

16:59  17        Q.   Have you ever given a deposition like you are

16:59  18   doing today before?

16:59  19        A.   No.

16:59  20        Q.   Okay.  Have you ever been involved in one?

16:59  21        A.   No.

16:59  22        Q.   Okay.  Have you ever been a witness in a case

16:59  23   before?

16:59  24        A.   Yes, just about two weeks ago.

16:59  25        Q.   What kind of case was it?

17:26  1    Q.  You never heard that?

17:26  2    A.  Huh-uh.

17:26  3    Q.  Is that a yes or no?

17:26  4    A.  It's a no.

17:26  5    Q.  Okay.  When did you begin having concerns or

17:26  6    problems with Chief Perez being the chief of police?

17:26  7    A.  I would say around late July or August.

17:26  8    Q.  And why was that?

17:26  9    A.  David Rodriguez approached me at my house, and

17:26  10   he brought me some reports that he had due to the drug

17:27  11   bust that occurred on 10th Street, and 10th Street is

17:27  12   just down the street from my house.

17:27  13   Q.  What do these reports say?

17:27  14   A.  Well, again, I didn't thoroughly go through

17:27  15   them.  I just glanced at them.  But I understand that

17:27  16   the chief -- that there were some drugs there at the

17:27  17   scene and that there was a canine unit there that

17:27  18   alerted to the drugs.  The drugs were taken to PD and

17:27  19   stored, I guess, in the evidence locker, and that the

17:27  20   chief did not show up to the drug scene was one of

17:27  21   them.  Another one was the fact that he had released

17:27  22   the prisoners and dropped charges.  And then, you know,

17:28  23   I asked about the evidence, and he said the evidence

17:28  24   couldn't be found.  It wasn't in the evidence room.

17:28  25   Q.  Who said it wasn't in the evidence room?

HILL & ROMERO
CERTIFIED COURT REPORTERS

17:28    1      A.   David.

17:28    2      Q.   David Rodriguez?

17:28    3      A.   Uh-huh.

17:28    4      Q.   Did he have -- is that a yes?

17:28    5      A.   Yes, sir.

17:28    6      Q.   Okay.  Did he have access to the evidence room?

17:28    7      A.   I don't know if he did or not.

17:28    8      Q.   Okay.  But he said he looked for them and

17:28    9 couldn't find them?

17:28   10      A.   What happened to the drugs?  He said they were

17:28   11 not at PD and they had never been sent to the lab.  I

17:28   12 guess it must be the DPS lab.

17:28   13      Q.   Okay.  What else did he tell you?

17:28   14      A.   He mentioned to me about another man that got

17:28   15 arrested for marijuana and either the chief or Jimmy

17:28   16 Vasquez released him and dropped charges without having

17:28   17 them arraigned or anything.

17:28   18      Q.   But you don't recall as you sit here whether it

17:28   19 was Jimmy Vasquez or the chief?

17:28   20      A.   I can't recall right now.

17:29   21      Q.   Do you remember the name of the man?

17:29   22      A.   No, I don't.

17:29   23      Q.   And David Rodriguez was the one telling you

17:29   24 this?

17:29   25      A.   Yes, sir.

17:29  1    Q.  Okay.

17:29  2    A.  And he had also shown me -- he had a packet of

17:29  3    reports, and he showed me that one report as well.  I

17:29  4    mean, I really don't like rumors or listen to rumors.

17:29  5    I like seeing actual facts in writing.

17:29  6    Q.  And most the facts that you saw in writing were

17:29  7    reports by David Rodriguez, is that fair to say?

17:29  8    A.  Well, from the PD.

17:29  9    Q.  Okay.  And he was the police officer who was at

17:29  10   the scene of the drug bust, correct?

17:29  11   A.  Yes, sir.

17:29  12   Q.  Okay.  So they would have been his reports?

17:29  13   A.  Yeah, exactly.

17:29  14   Q.  Okay.  And when -- let me ask you this:  When

17:29  15   did you find out or hear that Chief Perez had reported

17:29  16   David Rodriguez to the FBI?

17:30  17   A.  It must have been in August.  It must have been

17:30  18   in August when I heard that.

17:30  19   Q.  Okay.  Would it have been after David Rodriguez

17:30  20   came to your house to show you-all the stuff?

17:30  21   A.  Yeah, it was.

17:30  22   Q.  Okay.  Do you know if David Rodriguez already

17:30  23   knew that he had been reported to the FBI?

17:30  24   A.  I don't think he did, sir.

17:30  25   Q.  So when he came to your house, you don't think

HILL & ROMERO
CERTIFIED COURT REPORTERS

17:30  1    David Rodriguez knew he had already been reported to

17:30  2    the FBI?

17:30  3        A.  No, because David Rodriguez didn't mention any

17:30  4    of that to me.

17:30  5        Q.  Okay.  Well, it doesn't mean he didn't know.

17:30  6    He didn't indicate to you whether he knew or not?

17:30  7        A.  No, sir, he didn't.

17:30  8        Q.  How much marijuana was found on that man who

17:30  9    was arrested and let go?

17:30 10        A.  I don't know.  Do I still need this?

17:31 11        Q.  You can put it down.  And when David Rodriguez

17:31 12    came to your house -- had he been to your house before?

17:31 13        A.  Never.

17:31 14        Q.  Okay.  So he came to your house.  And was he

17:31 15    complaining about the chief, or he was complaining

17:31 16    about the drugs being gone?

17:31 17        A.  He was just concerned about the drugs, not the

17:31 18    chief.

17:31 19        Q.  Okay.

17:31 20        A.  I had run into him before at the local

17:31 21    convenience store that's there, Diamond Shamrock.

17:31 22        Q.  You say "him."  Are you talking about David

17:31 23    Rodriguez?

17:31 24        A.  David Rodriguez and Hector Guevara.  And I had

17:31 25    seen their uniform was all straggly.  So I asked them,

HILL & ROMERO
CERTIFIED COURT REPORTERS

17:31 1   why don't you guys have any uniforms?  And they were

17:31 2   like real hesitant to talk to me.  And I think Hector

17:31 3   had to leave on a call, and David stayed there and we

17:31 4   spoke for a few minutes.  And he was very concerned

17:32 5   about the way they were being treated at the police

17:32 6   department by the chief of police.  They felt -- or he

17:32 7   felt, anyway, that his morale was going real low.  And

17:32 8   when I saw the uniform, that was like -- you know, I

17:32 9   had doubts in my mind as to what was going on at PD,

17:32 10  but I never went and talked to the chief or called

17:32 11  anyone to ask for information.

17:32 12      Q.  Are you telling us, then, that David Rodriguez

17:32 13  was in violation of the policies regarding appearance?

17:32 14      A.  No.  I just noticed that he had patches on his

17:32 15  uniform and faded.

17:32 16      Q.  Don't the officers buy their uniforms?

17:32 17      A.  I don't know, sir.

17:32 18      Q.  Okay.  Did you ask him about that?

17:32 19      A.  No, I didn't.

17:32 20      Q.  Okay.  But you assumed that that had something

17:32 21  to do with the chief?

17:32 22      A.  I would assume so, yeah.

17:32 23      Q.  Okay.

17:32 24      A.  Yes.

17:32 25      Q.  Was this an evening, then, when you saw them or

HILL & ROMERO
CERTIFIED COURT REPORTERS

33

17:33   1   during daytime?

17:33   2       A.   No, it was the evening.   At the store, you

17:33   3   mean?

17:33   4       Q.   Right, at the Diamond Shamrock.

17:33   5       A.   Right.

17:33   6       Q.   And then so on this particular occasion,

17:33   7   Diamond Shamrock, David Rodriguez told you the morale

17:33   8   was low.   Did he say why morale was low?

17:33   9       A.   Well -- let's see.   He mentioned to me there

17:33 10   was a lot of friction, a lot of hostility in the police

17:33 11   department between different officers and that he felt

17:33 12   that it had a lot to do with Jimmy Vasquez and the

17:34 13   chief of police.

17:34 14       Q.   Why did he think it had to do with Jimmy

17:34 15   Vasquez and the chief of police?

17:34 16       A.   I can't remember, sir.

17:34 17       Q.   And was that all you and David discussed that

17:34 18   night?

17:34 19       A.   That's it.

17:34 20       Q.   Any other conversations you had with him?

17:34 21       A.   No, not until that second time that he came to

17:34 22   my house and showed me the reports.

17:34 23       Q.   Okay.   Do you know if he went to the other

17:34 24   council members as well?

17:34 25       A.   No, sir, I don't.

HILL & ROMERO
CERTIFIED COURT REPORTERS

17:34  1       Q.   Okay.  Did you ask him?

17:34  2       A.   No.

17:34  3       Q.   Okay.  And obviously that would have caused you

17:34  4    some concern, correct?

17:34  5       A.   That's correct.

17:34  6       Q.   So what did you do as a council members after

17:34  7    that?

17:34  8       A.   I didn't know what to do.  I was concerned

17:34  9    about it.  And it just threw me for a loop because I

17:34  10   have a 13-year-old child and I was thinking to myself,

17:35  11   if this is happening just down the street, what's

17:35  12   happening to the rest of the city?  I left it at that.

17:35  13   I guess several times I must have asked Ida for her

17:35  14   opinion.  That's about it.

17:35  15      Q.   So you discussed your concerns of the chief

17:35  16   with Ida Garcia?

17:35  17      A.   I just told her how I felt.

17:35  18      Q.   Okay.  Exactly what did you tell her about how

17:35  19   you felt?

17:35  20      A.   Well, just the fact that I was concerned about

17:35  21   what needed to be done or what can we do.

17:35  22      Q.   When did you talk to Ida Garcia about this?

17:35  23      A.   I guess shortly after I spoke to David.

17:35  24      Q.   Okay.

17:35  25      A.   I don't know.  Maybe a few days, a week maybe.

HILL & ROMERO
CERTIFIED COURT REPORTERS

57

17:58    1        A.   Not necessarily just Basilio Soto.   Like I

17:58    2   said, I can't remember.

17:58    3        Q.   Tell me who else.

17:58    4        A.   That's the thing, I don't remember.

17:58    5        Q.   Was it more than ten?

17:58    6        A.   There must have been about seven people that

17:58    7   told me.

17:58    8        Q.   Okay.

17:58    9        A.   At different times, not one day, just at

17:58   10   different times.

17:59   11        Q.   Sure.   Any other complaints that citizens made

17:59   12   against Chief Perez to you?

17:59   13        A.   No, sir, just that.

17:59   14        Q.   And do you think it was -- that was something

17:59   15   that the chief should be fired over?

17:59   16        A.   No.   I was just concerned as to why, why all

17:59   17   the time, you know.

17:59   18        Q.   You apparently made a statement to the press

17:59   19   that there was corruption within the police department.

17:59   20        A.   Uh-huh.

17:59   21        Q.   Do you remember that?

17:59   22        A.   Yes, sir.

17:59   23        Q.   What corruption was in the police department

17:59   24   that you heard of or were aware of?

17:59   25        A.   Well, I was just referring, in my personal

HILL & ROMERO
CERTIFIED COURT REPORTERS

17:59  1    opinion, to the drug confiscation that took place on
17:59  2    10th Street, and then the case of the marijuana that
17:59  3    was missing and the charges had been dropped.  I felt
17:59  4    there was corruption there.
17:59  5        Q.  Okay.  And David Rodriguez is the officer who
18:00  6    kept the files on this?
18:00  7        A.  He showed me copies, yes, sir.
18:00  8        Q.  Okay.  And he's a Los Fresnos police officer,
18:00  9    correct --
18:00  10       A.  Correct.
18:00  11       Q.  -- subject to the directives and authority of
18:00  12   the City of Los Fresnos?
18:00  13       A.  Yes.
18:00  14       Q.  Okay.
18:00  15            MR. RODRIGUEZ:  Have we been provided that
18:00  16   stuff?
18:00  17            MR. AGUILAR:  I'm sorry?
18:00  18            MR. RODRIGUEZ:  Have we been provided that
18:00  19   stuff?
18:00  20            MR. AGUILAR:  That stuff?  What stuff?
18:00  21            MR. RODRIGUEZ:  David Rodriguez' files on
18:00  22   those two occasions.  I know I asked questions for this
18:00  23   stuff and your response was, well, that's a lot of
18:00  24   stuff.
18:00  25            MR. AGUILAR:  I remember you asking me a

18:01  1            MR. AGUILAR:   You and I can talk about

18:01  2  that later.

18:01  3       Q.   So the corruption that you claimed was involved

18:02  4  in the Los Fresnos Police Department was the -- I guess

18:02  5  the missing drugs from the 10th Street bust and this

18:02  6  marijuana that -- and the gentleman who was let go; is

18:02  7  that right?

18:02  8       A.   Oh, yes.

18:02  9       Q.   Any other corruption?

18:02 10       A.   No, sir.

18:02 11       Q.   Okay.  And I think there was also a statement

18:02 12  about certain persons on the city council or in the

18:02 13  City Hall there were covering up the corruption?

18:02 14       A.   Uh-huh.

18:02 15       Q.   Is that a yes?

18:02 16       A.   Yes, sir.

18:02 17       Q.   Okay.  Do you remember making that statement?

18:02 18       A.   Yes, I do.

18:02 19       Q.   Okay.  Who were those persons who were covering

18:02 20  it up?

18:02 21       A.   I don't have facts if they were.  I was very

18:02 22  concerned at that time and confused about a lot of

18:02 23  things.  And I mentioned Melanie McCormick, Mayor

18:02 24  Abrego and Pam Denny.

18:02 25       Q.   Okay.  Do you have facts since then?

HILL & ROMERO
CERTIFIED COURT REPORTERS

| 18:02 | 1 | A. No. |

A. No.

Q. Are you less confused now?

A. Am I less confused?

Q. Yeah. You said you were real confused now.

A. Yeah.

Q. So you're less confused now?

A. Uh-huh.

Q. Is that a yes?

A. That's a yes.

Q. Okay. So things are clearer for you today as you sit here?

A. Yes.

Q. Okay. So you are positive the chief was involved in this -- these missing drugs on the 10th Street drug bust?

A. Involved as to -- what do you mean?

Q. I don't know. You fired him. You tell me how you think he was involved.

A. I think he should have been responsible for sending those drugs to the crime lab or DPS lab. I think he should have been there, respond to that call. I'm concerned with the fact that he released a prisoner, dropped charges.

Q. Okay. So you think he should have been there, the drugs should have been sent to the crime lab and

18:18 1        A.   Well, these that I just stated here.

18:18 2        Q.   Well, one of them you said wasn't big enough to

18:18 3    fire the chief, riding around with Jimmy Vasquez.

18:18 4        A.   No.  But the concern about the drugs, yes.

18:18 5        Q.   Okay.  And you wanted to be fair, I'm sure,

18:18 6    right?

18:18 7        A.   Yes, but I had lost confidence in that chief of

18:18 8    police.

18:18 9        Q.   Why?

18:18 10       A.   Because of this.

18:18 11       Q.   But he didn't have anything to do with that, or

18:18 12   how could you tell?  Or were you basing it only on

18:18 13   David Rodriguez?

18:18 14       A.   No, sir.  Again, I feel that being the chief of

18:18 15   police, he has to be responsible for everything that's

18:18 16   going on in the police department.

18:18 17       Q.   And you weren't asked to vote to fire the chief

18:18 18   by Ida Garcia or Miguel Mendoza?

18:18 19       A.   No, sir.

18:19 20       Q.   Or Juan Mendoza or Ramiro Sanchez?

18:19 21       A.   No, sir.

18:19 22       Q.   And you're sure of that as you sit here today?

18:19 23       A.   I am positive.

18:19 24       Q.   Now, the four of you who voted to fire Chief

18:19 25   Perez also voted to rehire David Rodriguez, correct?

18:19  1      A.   Correct.

18:19  2      Q.   Now, prior to the September 26th meeting, the

18:19  3  city attorneys had written you at least three letters

18:19  4  giving you opinions not to fire Chief Perez, correct?

18:19  5      A.   Yes, sir.

18:19  6              MR. AGUILAR:   I'm sorry.  I wasn't paying

18:19  7  attention.  What was that last question?  Was that last

18:19  8  question about the --

18:19  9              MR. RODRIGUEZ:   You're going to object to

18:19 10  that, yeah.

18:19 11              MR. AGUILAR:   I'm sorry.  Objection;

18:19 12  attorney/client.  What I told you earlier, I have to

18:19 13  instruct you not to discuss any advice that was given

18:19 14  to you or discussions you had with the city attorney or

18:20 15  any discussions in executive session.

18:20 16              THE WITNESS:   Okay.

18:20 17              MR. AGUILAR:   It's getting late.

18:20 18              MR. RODRIGUEZ:   Yeah, too late.

18:20 19      Q.   And both the mayor and the mayor pro tem said

18:20 20  they knew of no reason to fire Chief Perez at that

18:20 21  meeting, correct?

18:20 22      A.   At which one?

18:20 23      Q.   The 26th meeting.  The September 26th meeting.

18:20 24      A.   That's what they said.

18:20 25      Q.   And also at the August 29th meeting?

HILL & ROMERO
CERTIFIED COURT REPORTERS

18:20  1       A.   At the August 29th -- I don't think we got that

18:20  2  far.

18:20  3       Q.   Okay.  So was it your understanding that Chief

18:20  4  Perez was still on probation when he was terminated?

18:20  5       A.   Yes, sir.

18:20  6       Q.   And that's why no reason had to be given to

18:20  7  him?

18:20  8       A.   That's what I understand, yes.

18:20  9       Q.   Okay.  I have handed you Mendoza Exhibit No.

18:23 10  13.  I will represent to you these come from the Los

18:23 11  Fresnos PD internal affairs manual.

18:23 12       A.   Okay.

18:23 13       Q.   Okay.  If you will look where it says,

18:23 14  probationary employee.

18:23 15       A.   Yes, sir.

18:23 16       Q.   It says, probationer may be entitled to hearing

18:23 17  if, No. 1, the discipline is for exercise of

18:23 18  constitutional right, such as free speech.  Do you

18:23 19  agree with that?

18:23 20       A.   Yes.

18:23 21       Q.   Okay.  So that if there's a question of

18:23 22  exercising free speech that Chief Perez should have

18:23 23  been entitled to a hearing?

18:23 24       A.   Yes, sir.

18:23 25       Q.   Okay.  No. 2, if the discipline is for any

HILL & ROMERO
CERTIFIED COURT REPORTERS

18:23  1    reason which would put in doubt the officer's good

18:23  2    name, reputation, honor and integrity.  Do you agree

18:23  3    that firing the chief with the allegations of

18:23  4    corruption within the department would put in doubt his

18:23  5    good name, reputation, honor and integrity?

18:23  6        A.  Can you repeat the question?

18:23  7        Q.  Sure.  Do you agree with me that allegations of

18:24  8    corruption within the chief's department when Chief

18:24  9    Perez was there were put into doubt his good name,

18:24 10    reputation, honor and integrity?

18:24 11        A.  If they were?

18:24 12        Q.  Yes.  Allegations were being made about

18:24 13    corruption in the department, Los Fresnos Police

18:24 14    Department?

18:24 15        A.  Right.

18:24 16        Q.  You were making those allegations, right?

18:24 17        A.  Yes.

18:24 18        Q.  Okay.  And so that would go to the chief's

18:24 19    integrity and his reputation, wouldn't it?

18:24 20        A.  Yes.

18:24 21        Q.  So do you agree that this procedure says he may

18:24 22    be entitled to a hearing if the discipline, in this

18:24 23    case termination, would put in doubt his good name or

18:24 24    reputation?

18:24 25        A.  Yes.

HILL & ROMERO
CERTIFIED COURT REPORTERS

18:24  1      Q.   So he should have been entitled to a hearing?

18:24  2      A.   Yes.

18:24  3           MR. AGUILAR:  Objection to the extent it

18:24  4  calls for a legal conclusion.

18:24  5      Q.   And No. 3, if the disciplinary action would bar

18:24  6  the officer's re-employment by other government

18:24  7  employers.  If there's reports made to a law

18:24  8  enforcement organization about him being terminated

18:25  9  that might affect his ability to get hired as a police

18:25  10  officer later, he should be entitled to a hearing,

18:25  11  correct?

18:25  12     A.   Correct.

18:25  13     Q.   Okay.  And you agree with that, correct?

18:25  14     A.   Yes.

18:25  15          MR. AGUILAR:  Objection to the extent it

18:25  16  calls for a legal conclusion.

18:25  17     Q.   You agree with the policy manual that's been

18:25  18  put in front of you marked as Exhibit 13?

18:25  19     A.   Is this from Los Fresnos?

18:25  20     Q.   I'm representing to you that it's from Los

18:25  21  Fresnos.

18:25  22     A.   Yes.

18:25  23     Q.   The chief was never given a hearing, was he?

18:25  24     A.   No.

18:25  25     Q.   I'm going to hand you what's been marked as

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.          ) (
     Plaintiff            ) (
                  ) (
VS.                         ) (    CIVIL ACTION NO. B-00-161
                  ) (
CITY OF LOS FRESNOS,        ) (
TEXAS, JUAN C. SIERRA,      ) (
SR., GONZALO ACEVEDO,       ) (
IDA GARCIA, MIGUEL          ) (
MENDOZA, INDIVIDUALLY       ) (
AND IN THEIR OFFICIAL       ) (
CAPACITIES, AND JUAN        ) (
MENDOZA, JR.                ) (
     Defendants           ) (

---

ORAL DEPOSITION OF
GONZALO ACEVEDO
APRIL 23, 2001

---

      ORAL DEPOSITION OF GONZALO ACEVEDO, produced as a witness at the instance of the PLAINTIFF, taken in the above styled and numbered cause on APRIL 23, 2001, from 2:30 p.m. to 4:48 p.m., before LOU ZUNIGA, Certified Court Reporter No. 2198, in and for the State of Texas, at the offices of J. Arnold Aguilar, Artemis Square, Suite H-2, 1200 Central Boulevard, Brownsville, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS



4

                        GONZALO ACEVEDO,

having been duly sworn, testified as follows:

                            EXAMINATION

BY MR. RODRIGUEZ:

14:30     Q.   Would you please state your full name for the

14:30 record?

14:30     A.   Gonzalo Acevedo.

14:30     Q.   Mr. Acevedo, do you have any middle names or

14:30 any other name you go by?

14:30     A.   It depends on your culture.

14:30     Q.   Well, tell me what --

14:30     A.   In Puerto Rico we use both sir names.  Acevedo

14:30 Fernandez, my father and my mother.  I have never used

14:30 it here for the last 25 years.

14:30     Q.   Okay.  So everybody knows you as --

14:30     A.   Gonzalo Acevedo.

14:30     Q.   There's no middle name --

14:30     A.   No.

14:30     Q.   -- or anything like that?  Okay.  I'm Ted

14:30 Rodriguez.  I represent Ricardo Perez in a lawsuit

14:30 against yourself and the City of Los Fresnos.  Do you

14:31 understand that?

14:31     A.   I understand.

14:31     Q.   Okay.  And I'm going to be asking you some

14:31 questions here today, and the court reporter sitting

                        HILL & ROMERO
                  CERTIFIED COURT REPORTERS

14:57 1    talking with, I have nothing.

14:57 2        Q.  Okay.  And you don't know anything about that

14:57 3    as we are sitting here now?

14:57 4        A.  No.

14:57 5        Q.  Okay.

14:57 6                    (Discussion off record).

14:57 7        Q.  Officer David Rodriguez was terminated around

14:57 8    early September of 2000, correct?

14:57 9        A.  I don't know.

14:57 10       Q.  You don't know anything about that?

14:57 11       A.  No.

14:57 12       Q.  Okay.

14:57 13       A.  Well, I know that he was terminated, sure.

14:57 14       Q.  Okay.

14:57 15       A.  But you are giving me the -- I cannot give you

14:57 16   the exact date.

14:57 17       Q.  Okay.  And I didn't ask for the exact date.

14:57 18   But you are aware he was terminated?

14:57 19       A.  Oh, yes.

14:57 20       Q.  Okay.  And he was given documents describing

14:57 21   his infractions and the reasons for his termination,

14:57 22   correct?

14:58 23       A.  Yes.

14:58 24       Q.  Okay.  In fact, he had a full hearing

14:58 25   contesting his termination in front of the city council

14:58  1    including yourself, correct?

14:58  2         A.  Yes.

14:58  3         Q.  Okay.  And he had notice of the complaints

14:58  4    against him before the hearing, didn't he?

14:58  5         A.  Yes.

14:58  6         Q.  Okay.  And he was able to bring witnesses and

14:58  7    present affidavits and other evidence on his own

14:58  8    behalf; is that right?

14:58  9         A.  That's right.

14:58 10         Q.  Okay.  And this wasn't done for Chief Perez,

14:58 11    was it?

14:58 12         A.  No.

14:58 13         Q.  Chief Perez we give an opportunity to --

14:58 14              MR. AGUILAR:  Let him ask you a question.

14:58 15         Q.  You felt you gave Chief Perez an opportunity?

14:58 16         A.  Well, you were there.

14:58 17         Q.  When was this?  When are you talking about?

14:58 18         A.  The day we met all together and you were there.

14:59 19    We talked about Chief Perez, what was the reason why we

14:59 20    fired him.

14:59 21         Q.  You are talking about two months after he was

14:59 22    fired?

14:59 23         A.  Uh-huh.

14:59 24         Q.  Is that a yes?

14:59 25         A.  Yes.

15:09  1    are with him and the ones that are against him.  So I

15:09  2    -- how can an officer and a good administrator do that?

15:10  3    Then he's no good.  If you are a good administrator,

15:10  4    you should not divide in two sides.

15:10  5        Q.  Who are the officers telling you that the force

15:10  6    had been divided into two sides?  Give me some names.

15:10  7    Give me some names.

15:10  8        A.  Well, Guevara, Rodriguez.

15:10  9        Q.  David Rodriguez?

15:10  10       A.  Yes, David Rodriguez.  Cervantes was on his

15:10  11   side, not on the other side as they say.  There are two

15:10  12   more, but I don't recall the names now.

15:10  13       Q.  Okay.  And about when was it that you went and

15:10  14   you were talking to these officers?

15:10  15       A.  When everyone was complaining about him and

15:10  16   there were complaints about him.

15:10  17       Q.  Okay.  You say everyone was complaining about

15:10  18   him.  You have told me about --

15:10  19       A.  People were complaining, yes.

15:10  20       Q.  You told me about people joking about him being

15:10  21   with Jimmy Vasquez.

15:11  22       A.  Then there was the case of the drugs.

15:11  23       Q.  Okay.

15:11  24       A.  People were talking in town about the case of

15:11  25   the drugs.

CVisPDF – www.fastio.com

August 14, 2000

Mayor Manuel Abrego,

The Alderpersons below request that the following items be added to the next agenda on Tuesday, August 22, 2000.

Item #1: In Executive Session: To deliberate the employment, evaluation, reassignment, duties, discipline or dismissal of the Chief of Police.

In Open Session: Consider and possibly take action concerning the continued employment of the Chief of Police, including, but not limited to a resolution of lack of confidence under the Tex. Loc. Govt. Code 22.007(b).

Item #2: Consideration and possible action on appointment of an Acting Chief of Police and setting salary.

1. Alderwoman _____

2. Alderman _____

3. Alderman _____

4. Alderman _____

5. Alderwoman _____

**1**

CVshPDF – www.fastio.com

THE STATE OF TEXAS   )(

COUNTY OF CAMERON   )(

BEFORE ME the undersigned authority on this <u>10</u> day of <u>August</u> ,

<u>2000</u> personally appeared <u>Juan Mendoza Jr.</u> who after being by

me duly sworn did depose and say:

    On August 10,2000 at about 7:45 AM I stopped by J&B Gro. A few minutes later Ben Champion ( a Los Fresnos PD Jailer) walks in to pick-up an order . Mr. Champion saw me and walks up to me and asks me why Ramiro Sanchez and I were causing problems at the city meeting regarding the jail and prisoners. He further stated that in his opinion, nobody was complaining and that he was running the jail. I informed Mr. Champion that Mr. Sanchez had some legitimate concerns relating to the safety and aesthetics of the exterior prisoner holding pen. I went to tell him that there were several citizens complaining over the facility. Mr. Champion went on to state that " nobody was complaining". I informed Mr. Champion that he was wrong and that there were in fact several concerned citizens from the city of Los Fresnos complaining. I went on to explain to Mr. Champion, that on August 08,2000 on or about 7:25AM just before the city meeting.,Mr. Ramiro Sanchez along with a San Benito newspaper reporter walked across the street from the police station, and knocked on the door of a resident of Ralley and JoyceThiesmeyer. According to Mr. Ramiro Sanchez, they ( Thiesmeyers) were asked their opinion on the out door prisoner holding pin. They (Thiesmeyer's) expressed there outmost dissatisfaction with the current set-up and went on to say that they felt the prisoners had been abusive toward them on occasion. I further informed Mr. Champion that this very important issue was going to be brought up in the next city commission meeting, and that he should make every effort to attend and address his concerns., Mr. Champion informed me that he was very busy with his side job serving civil process documents and that he could not make the meeting. Mr. Champion went on to state " just because the chief is from out of town and you all dislike the man". I informed Mr. Champion that I don't dislike Mr. Perez it is merely a disagreement in his non-proactive and unprofessional style of police administration. I Constable Mendoza have no confidence whatsoever in the leadership,professional and administrative abilities of this chief. For one, many others and I believe that this police administration should have had the ability to foresee the unnecessary and potential safety risk and liability generated by a decision to implement an exterior Federal prisoner holding pen. Such a decision should they have visited each resident or household that resides close to the police station to obtain a response from the citizens of Los Fresnos. Can the police personnel assure the citizens of Los Fresnos that no prisoner would ever escape from the attached police facility, and could they feel safe and secured at all times day or night. How can a jailer assure the citizens that a prisoner(s) will not be disruptive or abusive toward the citizens when the prisoners are outside in the attached jail facility. By having prisoners outside in a fenced facility does not give a good image to the city. At the city meeting Mr. Ramiro Sanchez addressed the chief of police said he had advised him about the problem with the outside facility several months ago and that the chief had promised him something would be done.

The statement of _____ Juan Mendoza Jr. _____ Continuation.

The Chief past the buck by stating that Richard Meyn was handling the matter. I think this is a police matter and should be addressed by the Chief of Police not Mr. Meyn. The revenue the project will generate in this case, the potential risks and eyesore, far outweigh the benefits. We must ask our selves how we would feel living across the street from this accident waiting to happen, and having our children playing in the front yard.

I also feel that Mr. Champion by approaching me with his comments of why Mr. Sanchez and I were causing problems about the jail and the prisoners was inappropriate.

I would like to state that when the Chief was hired, the Chief sent word with officer Jimmy Vasquez Jr.requesting me to go over and meet him. I felt that he should have come to me instead of me going to him. I talked to the Chief and explained to him that in order for him to be successful he needed to be close with the public. That I had citizens coming to me and expressing their concerns. These concerns were the lack of patrol in the certain areas, attitudes of police officers with the public and the lack of neighbor hood crime watch programs. I learned this when I would walk from house to house. I told Chief that he should walk from house to house to meet the public. Six months have gone by and still nothing has been done. I know this because the public still comes to me and they tell me that nothing has been done. I feel that when the public comes to me is because they want for me to do something about their problems, and because I forward the concerns of the public to the police department and they don't do anything about it, I have let the public down.

In addition I would like to state the following concerns for my lack of confidence of the Chief of Police. When the new Chief of Police took over, he communicated to me that he wanted to work together with the Constable's Department. I will admit that in the beginning the Police Department and the Constable Department were working together. But then a change began to take place with the police department. On Police Memorial week, the police department sponsored a ceremony. The Chief organized the ceremony in which he invited other Chiefs and Ranking Police Officers, as special VIP's to sit at the front addressing the public. The Chief failed to invite me to sit with the other VIP's and instead had me marching with other police officers. I believe that being the Constable for the Los Fresnos area, I should have been invited to be part of the ceremony. The Chief also failed to invite the Chief of Rancho Viejo, and the Chief of UT Campus police to sit at the VIP section. After the ceremony was over I went to have lunch and Officer Charles Doran was there. Rio Hondo Constable Roberto Lopez said to Officer Doran that it was wrong for Constable Mendoza not to be invited to sit at the VIP section. Apparently Officer Doran went and told the Chief and Lt. Vasquez about me getting upset. Then I learned that the following day the Chief and Lt. Vasquez went to Pam Denny and told her that I was upset and that Lt. Vasquez had called me to sit at the VIP section, but that I had refused. I went to Pam and I asked her if that was true and Pam said that it was true. I told Pam that it was not true, I was never called to sit at the VIP section.

Page 2 of 4

(Pam)
I did not tell Constable Mendoza that Lt. Vasquez had gone to him and ask him to come up front. I told Const. Mendoza that the Chief of Police had announced it and this was vertified by several citizens that attended the ceremony.

The statement of _____Juan Mendoza Jr._____Continuation.

*lief did*
*of come*
*) me ?*
*k him*
*put it*
*flier*
*until*
*merk*
*onchy*
*alled me*
*home.*

As a matter of fact in the invitation, I was not named to be part of the VIP's for the ceremonies. Nor were Chief Mendoza, Chief Cardoza, and Constable Lopez. I feel that the Chief should have come to me to discuss the over sight over the ceremonies, instead of going to Pam. I feel that the Chief handled it this way to place me in the wrong. Then on the National Nigh Out, I was not asked to participate with the Los Fresnos Police Department. Instead the Chief saw me and told me that he had placed my name on the flier for the National Night Out and handed me that flier. I told the Chief that I was not going to be there because of other commitments and my Deputies had other commitments with the other Constable Departments in Cameron Park and Rio Hondo. The Chief should have removed my name from the flier. I feel that the Chief should have told me ahead of time with his plans with the National Night Out. Instead the Chief past out the flier leaving my name on the flier insinuating that I was going to participate on the National Night Out. I feel the Chief attempted to make me look bad in the eyes of the public.

In another situation as to why I have no confidence on the Chief. I attended the City Meeting on 08/08/00 at 7:30 PM and the Chief announced commendations for one DPS Trooper and Sgt. Javier Garcia of the Los Fresnos Police Department. The commendation was for the outstanding job performance during a major accident that occurred on Highway 100 where a victim had lost her feet, when a driver drove his vehicle into a residence. The Chief was praising how well his man and the Trooper handled the situation. There were other Officers and Deputies involved, that were not recognized by the Chief. Especially my own Deputy Alfredo Zamorano who arrived two minutes after the Police Department called for assistance from other agencies. Deputy Zamorano arrived and right away placed himself at the disposal of the Police Department. Deputy Zamorano was assigned to direct traffic, which he did for, and hour and half. Until the investigation of the accident was completed. Deputy Zamorano did it without asking for relief. I feel that a word should have been at least mentioned about the Officers that were involved in the accident at the City Meeting, even if their roles were not like those that the Chief described in the commendations.

In another situation as to why I have no confidence with the Chief of Police. It was on June 15, 2000. A Los Fresnos Police Officer pursued a motor vehicle from 7th Street until the driver of the motor vehicle lost control and crashed into a tree on private property on 8th Street and FM 1847. The driver of the vehicle then fled. The police department investigated the incident and impounded the motor vehicle, and I am sure were going to follow-up on the case. Then the owner of the vehicle, Oscar Barajas Jr. went to the police department and reported that his motor vehicle was stolen. When a check was done of the vehicle that Mr. Barajas was reporting, and the registration came

Page 3 of 4

The Statement of _____ Juan Mendoza Jr. _____ Continuation.

back to the same as the motor vehicle that crashed into the tree, Mr. Barajas was arrested and placed in jail for traffic warrant and pending investigation into the crash with the tree. When I returned from training Mr. Barajas' father came to me and explained what had happened and that his son did not commit any offense. Mr. Barajas Sr. suspected another individual that apparently took the motor vehicle without consent and ended up crashing with the tree. Mr. Barajas Sr. suspected and named a male subject that is known to me with a history of past arrests by the Los Fresnos Police Department and my Department. For the sake of the case, I can not say the subject's name. Mr. Barajas Sr. explained his suspicions and I forwarded the information to the Chief with one my Deputies, a Deputy Alvarez. Advising him that it was possible they had arrested the wrong man. The Chief responded by saying that they had an eye witness and they were going with that, and if I had any questions to contact the Chief. I believe Mr. Barajas Jr. ended up spending the weekend in jail. On June 22, 2000, Mr. Barajas Sr. and his son Mr. Barajas Jr. came to me and showed me that Mr. Barajas Jr. had a recording that he secretly made from a conversation between him and the suspected subject. I heard the recording and the subject did say that it was him that had taken Mr. Barajas' motor vehicle and crashed into the tree. I decided to follow-up the case myself and I went and located the subject. The subject was willing to give me a statement that it was he that had taken Mr. Barajas' motor vehicle without consent, then eluded the Los Fresnos Police and then crashed with the tree, and then fled. I also spoke with the witness that the police had and he told me that he could only describe the driver from the ear back. The witness said to me that he only assumed that it was Mr. Barajas Jr. because it was his car. Mr. Barajas Jr. gave me his statement as to what had taken place when he discovered his motor vehicle missing and then ended up getting arrested. After a lot of leg work I handed my case which contained my findings to Lt. Jimmy Vasquez, and he said that with the information they would go to the District Attorney's Office to have charges dropped on Mr. Barajas Jr.

For these reasons I feel that I have no confidence in the Chief of Police for the Los Fresnos Police Department. For whatever reason the Chief continues or refuses to give my Department the credit that is do, and the professional courtesy that can be shown to a Department that has helped the Los Fresnos Police Department for years.
THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.

SUBSCRIBED AND SWORN TO AND BEFORE ME THIS _____ DAY OF _____
A. D. 2000.

RUMALDO RODRIGUEZ
NOTARY PUBLIC
State of Texas

NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS

Page 4 of 4

**11**

August 21, 2000

Mayor Manuel Abrego,

The Alderpersons below are requesting a special meeting to be set for Tuesday, August 29, 2000. These are the items to be listed on the agenda.

Item #1: In Executive Session: To deliberate the employment, evaluation, reassignment, duties, discipline or dismissal of the Chief of Police.

In Open Session: Consider and possibly take action concerning the continued employment of the Chief of Police.

Item #2: Consideration and possible action on appointment of an Acting Chief of Police and setting salary.

1. Alderwoman ___*Ida Garcia*___

2. Alderman ___*[signature]*___

3. Alderman ___*Juan Carlos Sierra, Sr.*___

4. Alderman ___*[signature]*___

5. Alderwoman _____

CVISPDF – www.fastio.com

# LAW OFFICE OF ALFRED T. DENHAM

**Alfred T. Denham**          3700 N. 10th Street, Suite 105     **Telephone (956) 994-8800**
**Ted Rodriguez, Jr.**             **McAllen, Texas 78501**              **Facsimile  (956) 994-8808**

August 28, 2000

**Via Fax (956) 233-9879**
Honorable Manuel Abrego
Mayor, Los Fresnos, Texas
200 N. Brazil
Los Fresnos, Texas 78566

|  | RE: | Our Client | : | Chief Ricardo Perez, Jr. |
|---|---|---|---|---|
|  |  | Meeting Date | : | Tuesday, August 29, 2000 |
|  |  |  |  | Termination by City of Los Fresnos |

Dear Mayor Abrego:

Please be advised that I have been employed to represent Chief of Police Ricardo Perez, Jr., concerning recent employment issues that have arisen concerning his employment with the City of Los Fresnos. My client formally requests that the meeting currently scheduled for August 29, 2000, at 7:30 p.m. be done in open session and that formal written charges or complaints against Chief Perez be provided to him at least twenty-four (24) hours in advance of the meeting time. Secrecy is the root of corruption and injustice in a free and open democratic society. The impropriety and unfairness in condemning Chief Perez without notice of the allegations against him reflect poorly upon the city government.

Should the above request not be met, then a formal request is made that the written charges be provided to Chief Perez and that the special meeting be reconvened for two (2) weeks in order to allow Chief Perez to prepare to answer some of the allegations made against him.

If you have any questions or comments, please feel free to contact me.

Sincerely yours,

Ted Rodriguez, Jr.

TRJ:mk
cc:   **Via Fax (956) 233-3379**
       Chief Ricardo Perez, Jr.

# LAW OFFICE OF ALFRED T. DENHAM

| | | |
|---|---|---|
| **Alfred T. Denham** | **3700 N. 10th Street, Suite 105** | **Telephone (956) 994-8800** |
| **Ted Rodriguez, Jr.** | **McAllen, Texas 78501** | **Facsimile  (956) 994-8808** |

August 31, 2000

**<u>Via Fax (956) 233-9879</u>**
Honorable Manuel Abrego
Mayor, Los Fresnos, Texas
200 N. Brazil
Los Fresnos, Texas 78566

**<u>Via Fax (956) 233-9879</u>**
Ms. Melanie McCormick
Mayor Pro Tem, Los Fresnos, Texas
200 N. Brazil
Los Fresnos, Texas 78566

**<u>Via Fax (956) 233-9879</u>**
Ms. Ida Garcia, Alderwoman
Mr. Miguel Mendoza, Alderman
Mr. Juan Carlos Sierra, Sr., Alderman
Mr. Gonzalo Acevedo, Alderman
City Hall
Los Fresnos, Texas 78566

**<u>Via Fax (956) 686-6109</u>**
Honorable David E. Girault
City Attorney, Los Fresnos, Texas
818 Pecan Avenue
McAllen, Texas 78502

**<u>Via Fax (956) 233-9879</u>**
Ms. Pam Denny
City Manager, Los Fresnos, Texas
200 N. Brazil
Los Fresnos, Texas 78566

RE:   Our Client     :   Chief Ricardo Perez, Jr.
         Meeting Date  :   September 26, 2000
                                  Termination by City of Los Fresnos

Dear Mayor, Aldermen, and Alderwomen:

After the specially convened meeting of Tuesday evening, August 29, 2000, my client and I are still completely unaware of any allegations against him which would require his termination. Pursuant to City of Los Fresnos' Personnel Policies, effective 12-14-99:

> "A Notice of Dismissal must be given to the employee which describes
> the deficiency or infraction involved."                    Section 7.06

To this date, no notice of dismissal which describes the deficiencies or infractions involved has been given to Chief Ricardo Perez. This is your formal request to provide the Chief a written notice of the dismissal describing the deficiency or infraction involved. We ask the Notice be provided at least two (2) weeks prior to the next meeting date so that the Chief may be given a reasonable opportunity to address the specific factual complaints against him. Not only is this a written policy of the City, it comports with all fairness and justice required for this kind of action. The ability of a citizen to know the accusations against him is a basic tenet in our American society. Chief Perez has made a commitment to protect and serve the citizens of Los Fresnos. He puts his life on the line every single day along with the officers that serve under him. At a minimum, Chief Perez is entitled to know the complaints and facts supporting those complaints that go to the reasons for his dismissal.

We respectfully request that a written notice describing the complaints and facts supporting those complaints be given to Chief Perez within the next two weeks in order to avoid further legal action in this matter.

As always, I am available for any questions or comments which you may have regarding this matter.

Sincerely yours,

Ted Rodriguez, Jr.

TRJ:mk
cc:   **Via Fax (956) 233-3379**
      Chief Ricardo Perez, Jr.

# LAW OFFICE OF ALFRED T. DENHAM

**Alfred T. Denham**          3700 N. 10ᵗʰ Street, Suite 105          Telephone (956) 994-8800
**Ted Rodriguez, Jr.**          McAllen, Texas 78501          Facsimile  (956) 994-8808

September 29, 2000

**Via Fax (956) 233-9879&**
**CMRRR #7000 060 0025 8237 1588**
Ms. Pam Denny, Interim City Administrator
City of Los Fresnos, Texas
200 N. Brazil
Los Fresnos, Texas 78566

      RE:    My Client      :    Ricardo Perez, Jr., Chief of Police
             Date of Termination  :    September 26, 2000

Dear Ms. Denny:

      Pursuant to Section 7-07 of the City of Los Fresnos *Personnel Policies Manual*, a grievance is herein made because of Ricardo Perez, Jr.'s wrongful termination on September 26, 2000.  At this time, Ricardo Perez, Jr., would like to have his grievance evaluated and the reasons for his termination provided to him.

      Please evaluate this grievance and provide copies of your comments and recommendations if this grievance cannot be resolved.

      Thank you for your time and attention to this matter.  If you have any questions or comments, please feel free to contact me.

Sincerely yours,

Ted Rodriguez, Jr.

TRJ:mk
cc:  **Via Fax (956) 686-6109**
      Honorable David E. Girault
      Honorable Valorie Glass

# LAW OFFICE OF ALFRED T. DENHAM

| | | |
|---|---|---|
| **Alfred T. Denham** | **3700 N. 10th Street, Suite 105** | **Telephone (956) 994-8800** |
| **Ted Rodriguez, Jr.** | **McAllen, Texas 78501** | **Facsimile (956) 994-8808** |

September 25, 2000

**Via Fax (956) 233-9879**
Honorable Manuel Abrego
Mayor, Los Fresnos, Texas
200 N. Brazil
Los Fresnos, Texas 78566

**Via Fax (956) 233-9879**
Ms. Melanie McCormick
Mayor Pro Tem, Los Fresnos, Texas
200 N. Brazil
Los Fresnos, Texas 78566

**Via Fax (956) 233-9879**
Ms. Ida Garcia, Alderwoman
Mr. Miguel Mendoza, Alderman
Mr. Juan Carlos Sierra, Sr., Alderman
Mr. Gonzalo Acevedo, Alderman
City Hall
Los Fresnos, Texas 78566

**Via Fax (956) 686-6109**
Honorable David E. Girault
City Attorney, Los Fresnos, Texas
818 Pecan Avenue
McAllen, Texas 78502

**Via Fax (956) 233-9879**
Ms. Pam Denny
City Manager, Los Fresnos, Texas
200 N. Brazil
Los Fresnos, Texas 78566

| | | | |
|---|---|---|---|
| RE: | Our Client | : | Chief Ricardo Perez, Jr. |
| | Meeting Date | : | Tuesday, September 26, 2000 |
| | | | Termination by City of Los Fresnos |

Dear Mayor, Aldermen, and Alderwomen:

Please be advised that my client, Chief of Police Ricardo Perez, Jr., formally requests that the meeting currently scheduled for September 26, 2000, at 7:30 p.m. be done in open session and that formal written charges or complaints against Chief Perez be provided to him at least twenty-four (24) hours in advance of the meeting time. Chief Perez has asked for formal written reasons for his possible termination on several occasions. To date, my client has not been advised of the complaints against him. This violates the City Personnel Policy and shows the poor leadership of the Council.

Should the above request not be met, then a formal request is made that the written charges be provided to Chief Perez and that the special meeting be reconvened for two (2) weeks in order to allow Chief Perez to prepare to answer some of the allegations made against him.

If you have any questions or comments, please feel free to contact me.

Sincerely yours,

Ted Rodriguez, Jr.

TRJ:mck
cc:   **Via Fax (956) 233-3379**
       Chief Ricardo Perez, Jr.

CVISPDF – www.fasiso.com

# EMPLOYEE PERFORMANCE APPRAISAL

COMPANY NAME *City of Los Fresnos*

EMPLOYEE NAME *Ricardo Perez, Jr.*          DATE *8-28-00*

TITLE *Chief of Police*          DEPARTMENT *Police*

APPRAISAL PERIOD - FROM: *March 13, 2000* TO: *Aug. 28, 2000*

A periodic Employee Performance Appraisal is used by this Company to objectively evaluate an employee's past performance. After the completion of this Appraisal, it should be reviewed and discussed with the employee.

This Appraisal has been divided into four areas:   1) Primary Abilities   2) General Job Skills   3) Management Traits   4) Overall Performance.

The following ranking system should be applied as objectively as possible within each area:

① Outstanding: Excellent performance that far exceeds the job's requirements.

② Very good: Above average performance that exceeds the job's requirements.

③ Average: Acceptable performance that meets the job's requirements.

④ Below average: Minimally acceptable performance that meets some of the job's requirements.

⑤ Unsatisfactory: Unacceptable performance that does not meet the job's requirements.

## AREA 1 - PRIMARY ABILITIES

A. Absenteeism and Tardiness

CIRCLE RANKING

| | | | | | |
|---|---|---|---|---|---|
| 1. Works required days. | ① | 2 | 3 | 4 | 5 |
| 2. Works required hours. | ① | 2 | 3 | 4 | 5 |
| 3. Reports to work on time. | 1 | ② | 3 | 4 | 5 |
| 4. Returns from breaks on time. *N/A - No breaks)* | 1 | 2 | 3 | 4 | 5 |

- Page 1 -

Litho in U.S.A.

## B. Attitude:

CIRCLE RANKING

1. Exhibits a positive attitude.            (1)   2   3   4   5
2. Shows initiative.                        (1)   2   3   4   5
3. Demonstrates dependability.              (1)   2   3   4   5
4. Accepts direction from qualified sources. (1)  2   3   4   5
5. Displays commitment and involvement.     (1)   2   3   4   5
6. Interacts well with co-workers.           1  (2)  3   4   5

## C. Learning Ability:

1. Understands and applies instructions.    (1)   2   3   4   5
2. Knows and applies Company policies.      (1)   2   3   4   5

## AREA 2 - GENERAL JOB SKILLS

### A. Knowledge:

CIRCLE RANKING

1. Knows and understands the specific requirements
   of the job.                              (1)   2   3   4   5
2. Displays the ability to perform the technical skills
   required by this job.                    (1)   2   3   4   5

### B. Quantity and quality of work:

1. Performs an acceptable amount of work.   (1)   2   3   4   5
2. The work performed meets or exceeds company
   standards of acceptability.              (1)   2   3   4   5

### C. Problem solving:

1. Has the ability to analyze problems and reach
   acceptable and workable solutions.       (1)   2   3   4   5

### D. Communication:

1. Has the ability to effectively communicate with all
   levels of employees.                     (1)   2   3   4   5
2. If applicable, has the ability to effectively
   communicate with our customers or clients. (1) 2   3   4   5

3. Communications are timely and intelligent when oral.

① 2 3 4 5

4. Communications are timely and intelligent when written.

① 2 3 4 5

## AREA 3 - MANAGEMENT TRAITS

A. Accomplishments:

*only here 5 mos. so all objective are not met*

CIRCLE RANKING

1. Has attained all the objectives set for the job.

1 ② 3 4 5

2. Has attained all company objectives within the scope of the job. *same as above*

1 ② 3 4 5

B. Decision making:

1. Displays the ability and judgment to make decisions.

① 2 3 4 5

2. Displays the willingness to make decisions.

① 2 3 4 5

3. Takes action based upon decisions made with good judgment.

① 2 3 4 5

C. Leadership:

1. Displays the ability to successfully motivate other employees.

① 2 3 4 5

2. Displays the ability to skillfully teach and develop other employees.

① 2 3 4 5

3. Displays the capacity to issue directives and delegate responsibility and/or authority to other employees.

① 2 3 4 5

4. Displays the talent for controlling others in order to accomplish specific objectives.

① 2 3 4 5

## AREA 4 - OVERALL PERFORMANCE APPRAISAL

The following ranking system should be applied as objectively as possible. Circle the number that best summarizes your overall appraisal of this employee. Whenever you are comparing employees, keep in mind the length of time that he or she has been working on the same job.

① An outstanding, excellent performance that far exceeds the job's requirements.

- Page 3 -

2   A <u>very good</u>, <u>above average</u> performance that exceeds the job's requirements.

3   An <u>average</u>, <u>acceptable</u> performance that meets the job's requirements.

4   A <u>below average</u>, <u>minimally acceptable</u> performance that meets some of the job's requirements.

5   An <u>unsatisfactory</u>, <u>unacceptable</u> performance that does not meet the job's requirements.

The major areas of <u>weakness</u> pinpointed by this appraisal are:

1. _____
2. _____
3. _____

Suggestions for improvement:

_____
_____
_____

The major areas of <u>strength</u> noted by this appraisal are:

1. He knows the law & how to apply it to each case.
2. 
3. _____

Suggestions for the most effective use of these strengths:

Needs to be allowed to manage the Police Dept. without the council micro managing the Dept.

PREPARED BY *Pam Denny*   TITLE *Int. City Admn -*

REVIEWED BY *Mayor Manuel Abrego*   TITLE _____

I have reviewed and discussed this Performance Appraisal with the preparer:

MY COMMENTS: _____

_____

_____   Continued on attached page

DATE *August 29, 2000* [Employee's Signature] *Chief Ricardo Perez Jr.*

- Page 4 -

TOPS   Form No. 3262 ¢

CVISPDF – www.fastio.com

SPECIAL CITY COUNCIL MEETING
7:30 P.M., TUESDAY, AUGUST 29, 2000

Call Special Meeting to Order.

Mayor Abrego asked Ms. Denny if the agenda had been posted, meeting all the requirements under the law, and Ms. Denny replied yes.

Invocation and Pledge of Allegiance.

Mayor Pro Tem McCormick led the audience in the Invocation and Mayor Abrego led them in the Pledge of Allegiance.

Closed Session – The Board of Alderman may convene in closed session pursuant to Section 551.074, Texas Government Code for discussion regarding the following:

Personnel: To deliberate the employment, evaluation, reassignment, duties, discipline or dismissal of the Chief of Police.

Mayor Pro Tem McCormick made a motion to maintain the status of the position of the Chief of Police as Ricardo Perez. Motion died to lack of a second.

Mayor Abrego stated he has been petitioned by Chief Perez that the hearing be public, and that is why they are not going into executive session. And under State law, he has that right.

Mayor Abrego said at this time he will entertain a motion. Alderman Mendoza made a motion to reschedule the meeting until one month from today. Mayor Abrego replied a motion is on the floor, and asked Mr. Mendoza if he had a date? Ms. Denny replied the next regular meeting is on September 26. Alderman Sierra seconded the motion.

Mayor Pro Tem McCormick asked if it is open for discussion, to which Mayor Abrego replied yes.

Mayor Pro Tem McCormick stated she does not believe in tabling this, and she doesn't understand why it was put on the agenda to begin with. In consideration of the citizen's who have come before them tonight, obviously very concerned about the situation at hand, she thinks it is wrong for them not to stand by the meeting. They need to discuss it here and now, otherwise they don't need to make a special meeting. They've all taken time from their jobs and home-life to come and discuss the items at hand. If there are

2102

issues to be discussed, she beseeches the council to discuss them now. Alderman Mendoza and Sierra replied they had no comments.

Mayor Abrego said for the record, he called this special meeting. He was petitioned by four council members, and this is why this is on the agenda.

Mayor Abrego then asked all those in favor of rescheduling the meeting for September 26, 2000, to raise their right hand. Aldermen Acevedo, Mendoza, Sierra and Garcia voted in favor. Mayor Pro Tem McCormick opposed.

Mr. Robert Cepeda, a former city mayor, said he knows there's nothing on the agenda for public comments but asked if the chair would entertain comments? Mayor Abrego replied yes.

Mr. Cepeda began by congratulating the person who made the fliers. Addressing the Council and Mayor, he said he would like to echo the quote that was in the paper: "The Chief is the best thing that has happened to this City." Mr. Cepeda said Chief Perez is an honest man, hardworking, and of impeccable integrity. And he thinks to do this kind of thing, damages our community just when it's starting to come together. He added our police department is one we can be proud of, and it's sad to him there are officers in the department who are meeting with city alderman, and stirring up trouble within the department. Our commitment from the last council, and Mr. Mendoza and Ms. Garcia were members of that council, was they'd support the Chief and not step into his office a day or two after he takes over and begin to harass him. Mr. Cepeda said the Chief needs to be allowed to do his job, and to continue in his position until he decides he wants to move on.

Mayor Abrego thanked Mr. Cepeda for his comments and the citizen's applauded.

Mr. Ramiro Sanchez, a citizen of Los Fresnos asked to speak next, to which Mayor Abrego replied yes. Mr. Sanchez begin by saying about a month ago that he (Mr. Sanchez) worked on a case which he referred to two agencies, and although he has not spoken to him (Mayor Abrego) about it, he wants him to take this into consideration. It was a drug case, ok? There were two people arrested, there were six other people, illegal aliens, arrested. Something was found there that was illegal. Whether it was legal or it was illegal, our kids are receiving this drug. Whether it is a drug or not, can you imagine what it is doing to our kids minds? What is happening to this town? Why did they let this person go? I did that case, and I got burned at it. Our children, one of these days, is going to be receiving that crack, or whatever it is. Whatever it is, if it's detergent, they have done nothing about it. He added he is an upset citizen. Can you imagine what they are selling out in that street as a drug? The other thing Mr. Sanchez would like to let them know, is that this happened on 10th Street, in our backyard. Another thing we've

got, is crime prevention where we don't need it. We don't need it on Whipple Road, we need it 9th, 10th, and 8th Streets. He then asked if he is correct, is that not where they have most of their kids? They have more problems. We got patrol. He's tired. Mr. Sanchez said he walked this community to get these people elected, and he wanted to tell these people, he represents the people who got these people elected. Every single one of them got elected because he walked, and he heard every complaint of every citizen, in our area, that they were tired of being harassed by the police department, that this is not a town that is a speed trap. We've always had a speed trap in this town. Do we want to get back to the speed trap and forget the drugs? Is this what we want? We need to make a decision. He doesn't know, he's just tired. Mr. Sanchez said he has put his life on the line, and went out there and got these people elected. He walked and heard every complaint, of every person in this town, and talked to them. And yet, this is one of the main concerns in our community, was the drugs. What's happening? They are letting them go, two guys were let go. Mr. Sanchez does not know for what reason. They are back on the street. This is Los Fresnos, this is not Brownsville. Mr. Sanchez then said their kids, and his kids, are receiving this drug. There are a lot of things that need to be taken into consideration.

Mayor Abrego thanked Mr. Sanchez and said that is enough. Mr. Sanchez replied oh, it is? Again Mayor Abrego replied yes. Mr. Sanchez said if the newspapers need to get hold of him, or the media, he'll let them know.

Ms. Mercedes Cantu, also a former mayor, then spoke. She said she has always been a strong supporter of the police force and she is very proud of Chief Perez. She feels he has done a wonderful job and has represented the city well. As Mr. Sanchez said, there are drugs, but they are everywhere. A few weeks ago, she read in the paper where this same council approved to allow alcohol in one of the city parks, and it is a drug, and we should have been cautious about allowing alcohol. She added she thinks the Chief is doing a terrific job, and she thinks the city has come forward. She then commended Chief Perez on doing a good job. She said that as a citizen, she feels very proud to have him in our city. She said if they were to walk the streets, 10th Street and wherever Mr. Sanchez mentioned, she thinks they would find very few complaints. She lives on 5th Street and sees the cars patrolling. How this came about, she does not know. She stated she works with law enforcement and many cases have not gone forward because of the lack of evidence. She again commended the Chief on his job and she said she wished this was not happening to our City, and told the Council she wished they would think about what their job to do, for the community is. She then asked if we are going to be changing Chiefs every six months? Nobody will want to come serve the City of Los Fresnos in any capacity, because we are acquiring a record of not being stable. She ended by asking the Council to please reconsider what they are doing.

Mayor Abrego thanked Ms. Cantu and the citizen's applauded.

2104

Mayor Abrego then addressed Mr. Ted Rodriguez, Chief Perez's attorney.  Mr. Rodriguez said there is one point, and if this matter is reconvened, that according to the City's own policies, Section 7.06, if he is going to be considered for dismissal, he must receive a notice of dismissal which describes the deficiency or infraction involved.  He stated they came today, not prepared for any particular specific factual allegation against him, because they do not know what is being complained against Chief Perez. And if the city intends to dismiss Chief Perez, he hopes they will get something in writing setting out the factual basis or complaints against him, so he has an opportunity under due process to address those.

Pastor George Morrison, a former council member, then asked to speak.  He began by asking did not four Alderpersons request, against maybe what the Mayor desires, for this to be on the agenda?  Mayor Abrego replied that is correct.  Mr. Morrison then asked where's the lack of courage?  Where is the representation for our community?  He said quite honestly, he cannot say he voted for all the people on the council, but he expects them to represent him, and expects them to consider his feelings, and not consider a special interest group.  He asked where were his feelings considered?  He sees such a change in this Chief.  He comes to him when he calls.  That wasn't always the case in the past with previous Chiefs.  He understands they've flip-flopped on the decision about alcohol in the park when the Alderman that believed otherwise, was not present.  He thinks it's a good idea they require security at those functions, and he's decided to use the police department for security at their own events.  He said he believes we have a group of men and women that are people of integrity, and he thinks the council is being very foolish in what they are considering to do.  He said he does not think they are considering the best interests of our community, and he hopes they have put a lot of prayer to it, and they start listening to the community, and if they have a God, he wishes they would listen to him, instead of whoever they are listening to.

Again the citizen's applauded.

Mayor Abrego then adjourned the meeting.


MAYOR                                          CITY SECRETARY

*Mayor Manuel Abrego*                          *Pam Denny*

Manuel Abrego                                  Pam Denny

CVISPDF – www.fastio.com

# The Herald

## BROWNSVILLE

WEDNESDAY, AUGUST

# Action on Los Fresnos police chief tabled

## Controversy: Dozens of residents had shown up for the special meeting

BY BRAD PIERCE
THE BROWNSVILLE HERALD

LOS FRESNOS — After walking in to a city hall packed with dozens of supporters of the police chief, aldermen decided to give Ricardo Perez a 28-day

reprieve.

Four aldermen had called the special meeting to discuss the performance of the police chief and possibly fire him.

Though he still has no idea why, Alderman Gonzalo Acevedo, Miguel Mendoza

Juan Carlos Serna and Ida McCown took a support of the at Tuesday's meeting, the police chief, making a any of their questions to answer job. Nobody seconded her also brought it some his Then, Mendoza The meeting began with to move the discussion





INDEX
Business ........ B
Classified ...... D5
Comics ......... D4
Community ..... A4
Editorial ....... A10
Entertainment .. D3
Obituaries
Horoscope
Sports



BRAD DOHERTY/THE BROWNSVILLE HERALD

Margaret Howard lectured Los Fresnos alderwoman Ida Garcia following Tuesday night special session of the Los Fresnos aldermen. The meeting was expected to decide the fate of Police Chief Ricardo Perez but the item was tabled until next month.

# TABLED

FROM PAGE A1

until Sept. 26. Acevedo, Sierra and Garcia supported the motion, following objections by McCormick.

McCormick tried to persuade her fellow aldermen that tabling the matter would be a mistake.

"We need to discuss this here and now," she said, explaining how concerned citizens had taken the time to attend the special meeting to learn why their police chief should be fired.

Before adjourning the meeting, Mayor Manuel Abrego allowed a handful of residents to speak their peace on the matter.

"I think you're being very foolish and not considering the best interest of the community," former alderman George Morrison said.

"The chief is the best thing that's happened to our police department in a long time," former mayor Robert Cepeda said.

"It's sad to me that there are officers in our department meeting with aldermen and stirring up trouble," Cepeda said, referring to personnel problems that even Perez admits to having.

When he took office in January, Perez inherited internal problems from his predecessor, Tony Lopez, that he has since been dealing with, the police chief acknowledged.

Cepeda said the aldermen need to stop interfering and let Perez do his job.

The police chief recently received an "outstanding" rating on a job evaluation conducted by acting city manger Pam Denny and signed off by Abrego.

"I have never been written up and haven't been reprimanded," Perez said. "I have done nothing wrong but work my butt off."

Perez said his attorney, Rodriguez, wrote a letter to the aldermen this week explaining to them that keeping their motives a secret would make the public suspicious.

Rodriguez, speaking to the aldermen on Tuesday, urged them to provide information concerning the exact nature of their dissatisfaction with the chief.

The meeting adjourned and, moments later, residents were shuffling out of city hall complaining about the night being a waste of their time.

"I wish this wasn't happening to our city," former mayor Mercedes Cantu said.

Alderwoman Garcia remained seated in her place after her peers left. She had her hands on her face and appeared to be crying.

"They didn't have the (nerve) to finish what they started," businessman Rick Lundsford said.

CutePDF - www.fenito.com



MEMO TO:            CHIEF RICARDO PEREZ, JR.

FROM:               MAYOR MANUEL ABREGO

DATE:               SEPTEMBER 7, 2000

This memo is written as a follow-up to our conversation on August 30, 2000 regarding your job performance. In that conversation we discussed the following:

1.      Riding with Lt. Vasquez: As of this date you are to only ride with Lt. Vasquez when going to meetings, seminars, investigations or lunch. If there should be other times when you need to ride together, please inform the City Administrator or Mayor, if possible.

2.      Residence: The City has an ordinance, which you were given a copy when you were hired by the City, that states you must live within fifteen (15) miles of the corporate city limits of Los Fresnos. You need to move by September 30, 2000.

3.      Retaliation: There shall be no retaliation towards any officers due to the council actions or from this memo. This does not include prior investigations that were on-going prior to this memo, nor is it intended to restrict your day to day operation of the department.

If you should have any questions concerning this memo or need additional clarification, please contact Mayor Manuel Abrego.


*Mayor Manuel Abrego*  09-7-2000
Mayor Manuel Abrego                      Date


Received By: *Ricardo Perez Jr.* 09/08/00
Chief Ricardo Perez, Jr.                      Date

**CITY OF LOS FRESNOS ❖ 200 N. BRAZIL ❖ LOS FRESNOS, TEXAS 78566 ❖ TEL (956) 233-5768 ❖ FAX (956) 233-9879**

CVISPDF – www.faolio.com

MORR S ATLAS
ROBERT L. SCHWARZ
GARY GURWITZ
E.G. HALL
CHARLES C. MURRAY
A. KIRBY CAVIN
MIKE MILLS
MOLLY THORNBERRY
FREDERICK J. B EL
REX N LEACH
LISA POWELL
STEPHEN L CRAIN
O C. HAMILTON, JR
VICKI M. SKAGGS
RANDY CRANE
DAN R. WORTHINGTON
VALORIE C. GLASS
HECTOR J. TORRES
SOF A A. RAMON
RAMONA K KANTACK
DANIEL G. GURWITZ
DAVID E. GIRAULT
JOSE CANO
ADRIANA H. CARDEN-S
GREGORY S. KAZEN
PATRICIA S. RIM

## ATLAS & HALL, L.L.P.

ATTORNEYS AT LAW

PROFESSIONAL ARTS BUILDING  •  618 PECAN

P. O. BOX 3725

McALLEN  TEXAS  78502-3725

(956) 682-5501

FAX (956) 686-6109

August 25, 2000

Writer's Direct Number:
(956) 632-8222

Hon. Manuel Abrego, Mayor

Hon. Melanie McCormick, Mayor Pro-Tempore

Hon. Gonzalo Acevedo, Alderman

Hon. Ida Garcia, Alderman

Hon. Miguel Mendoza, Alderman

Hon. Juan Sierra, Jr., Alderman

City of Los Fresnos

200 N. Brazil

Los Fresnos, Texas 78566

**CONFIDENTIAL
ATTORNEY-CLIENT
PRIVILEGED COMMUNICATION**

Via Telecopier

Re:    Proposed Meeting of the Board of Aldermen regarding Chief of Police

Dear Ladies and Gentlemen:

Acting City Administrator Pam Denny has requested that we provide you with our concerns regarding the proposed item on the agenda for the special Board of Aldermen meeting scheduled for Tuesday, August 29, 2000. As we understand it, the item relates to possible adverse personnel action against Chief of Police Ricardo Perez.

We would advise against taking any adverse action, such as suspension, demotion or termination, at this time, due to the potential for liability under the Texas Whistleblower Act. Tex. Govt. Code An. §§554.001–.010. The Act provides:

A state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

We understand that an allegation of abuse of a person in custody by a City police officer recently was reported to Chief Perez, and that he has, after reviewing the matter internally and with this firm, referred the matter to the Federal Bureau Investigation for review of possible criminal civil rights violations. As a result, Chief Perez is subject to the protections of the Whistleblower Act.

August 25, 2000
Page 2

To prove a violation of the Act, the employee must prove four elements:

(1)     He reported a violation of law;

(2)     He made the report in good faith;

(3)     He made the report to an appropriate law enforcement authority: and

(4)     He was suspended, terminated, or suffered other adverse personnel action, as
        a result of the report.

Tex. Gov't Code §554.002(a). *See, Wagner v. Texas A&M Univ.*, 939 F. Supp. 1297 (S.D. Tex. 1996). The causation element (item 4 above) is set at a very low standard under the Act and cases interpreting it. The employee need not prove that the report was the *sole* reason for the termination or other action, but only that it was *a* reason or factor in the termination or other action. *City of Ft. Worth v. Zimlich*. 975 S.W.2d 399, 406 (Tex. App.–Austin 1998, no pet ). Additionally, *if the adverse action occurs in the first ninety (90) days after the report, the Act presumes that the action was as a result of the report, and the burden of proof shifts to the governmental entity* to prove that it would have taken the action in the absence if the report. Tex. Govt. Code §554.004(a).

We understand that both the City Ordinance governing the office of Chief of Police and the City of Los Fresnos personnel manual permit the termination of the Chief of Police without cause, the fact that the Chief has referred a matter of a potential criminal violation to another law enforcement agency changes the playing field and brings into play the Whistleblower Act. As a result, we cannot advise the City to undertake a "no fault" or "without cause" action, since it will be extremely difficult to defend in the face of a Whistleblower Act claim. Additionally, to the extent that any action is taken within ninety (90) days following the report of illegal activity by the Chief, even a "for cause" termination may be difficult to defend, since the City must prove that the report played no role in the termination. Finally, even after the ninety (90) day period, the burden of proof on the employee is very, very low, and any termination should be based on carefully documented reasons which are presented before or at the same time as the adverse action is imposed.

Thank you for your attention to this matter. If you should have any questions or comments, please do not hesitate to contact me.

Very truly yours,

ATLAS & HALL, L.L.P.

By:

David E. Girault

DEG
cc:     Pam Denny, Acting City Administrator

CibPDF - www.fastio.com

AGENDA
CITY OF LOS FRESNOS, TEXAS
CITY COUNCIL REGULAR MEETING
7:30 P.M.,  TUESDAY, SEPTEMBER 26, 2000
COMMUNITY CENTER – 204 N. BRAZIL STREET

The Los Fresnos City Council convened in a Regular Meeting on Tuesday, September 26, 2000, at 7:30 p.m.  Mayor Manuel Abrego, Mayor Pro Tem McCormick, Aldermen Juan Sierra, Gonzalo Acevedo, Miguel Mendoza, Ida Garcia, and Interim City Administrator/ City Secretary Pam Denny were present.

Mayor Abrego called the meeting to order at 7:35 p.m. and  Mayor Pro Tem McCormick led the audience in the Invocation and a moment of silence for the family of Mr. Fidencio Solis.  Mayor Abrego led the audience in the Pledge of Allegiance.

<u>Consent Agenda</u>:

  A.  Approval of Minutes from September 12 and September 19, 2000 Meetings.

  B.  Acknowledgement of bills paid from September 15 through 22, 2000.

  C.  Approval to amend Ordinance 249B to increase garbage rates by $1.50 per month.

  D.  Approval to amend Ordinance 276 to increase penalty from 10% to 15% and to increase reconnection fees from $10.00 to $20.00 and $20.00 to $30.00.

Mayor Pro Tem McCormick made a motion to approve the consent agenda as listed.  Seconded by Alderman Acevedo. Motion carried.

<u>Consider approval or rejection of a resolution amending fiscal year 1999/2000 budget and to adopt the 2000/2001 fiscal year budget, and take action as may be appropriate.</u>

Mayor Pro Tem McCormick made a motion to approve the resolution amending fiscal year 1999/2000 budget and to adopt the 2000/2001 fiscal year budget.  Seconded by Alderman Mendoza. Motion carried.

<u>Consider approval or rejection of an ordinance approving the tax roll for the year 2000 and levying municipal ad valorem taxes, and take action as may be appropriate.</u>

CAMPDF - www.tesisi.com

he has been approved he will receive the crown of life which the Lord has promised to those who love him."

Pastor Morrison continued by stating:  "And then I wanted to read my thoughts. I'm afraid a plan for power has been conceived by someone. I wonder, over the last, I'd say four years, we've heard about someone in our community that has taken and encouraged, and pushed, and threatened people to vote certain ways. I wonder if it would be possible, even this evening, for that person if they're in this room, to reveal themselves so that we won't hear about it anymore but will know who the true leader of our town is.  Who is controlling our town and what they expect of us?  Because we feel like we've been handcuffed and like we're under someone's power, and I think that's totally unfair. I'm concerned that for years the council, even the council I was on, has been someone's puppet. The council or citizenry has been, as a businessman in this town told me, been mushrooms. We've been kept in the dark, and we've been, to put it nicely, been fed refuse. Often well meaning power becomes corrupted. I believe the power that has put this council in office has put this community at risk. Because of ill-conceived plans, the council may be leading the larger community into a financial responsibility we'll be unable to bear. Remember we'll all be held accountable for the decisions that are made. Not just this council but this entire citizenry. I also believe that the present council is not a representation of the community as a whole. But of one or more individuals that have their own private agenda.  Present attitudes do not well represent the conservative leadership that brought Los Fresnos to the desirable community it is.  I want you to remember this my fellow citizens … sin or rebellion takes you farther than you intended to go, let's you stay longer than you intended to stay, and makes you pay more than you intended to pay.  Thank you."

Mayor Abrego thanked Pastor Morrison for his comments and the audience applauded.

Ms. Florence Caslow spoke next and said: "I'd like to speak out on behalf of our Police Chief. He's doing a wonderful job. I can't understand.  Before I moved to Los Fresnos, we never heard anything except it's a speed trap.  Anything else was good.  Since I've moved to Los Fresnos it's been one firing right after the other.  Some of 'em I couldn't understand why, they were doing good jobs.  Now it seems like we're getting the reputation of – if somebody don't' like 'em, fire 'em.  And it shouldn't be like that.  This gentleman here, he has the police going around every night.  We can sleep in our beds knowing good well that we're taken of.  If you need anything, all you have to do is come and talk to him.  He's right there.  I'm handicapped, you all may have seen me riding around on my electric cart, up and down the highway.  All of our policemen, if they're around, they help me get across the streets and everything.  And it's all due to this gentleman here.  We have one of the best police forces, I would say, in the State of Texas.  The same with our EMS, and our Fire Department.  And I think myself, he's doing a wonderful job.  I've been in plenty of towns that didn't have what we have.  And I for one, would like to keep it this way.  And he does, he makes sure that everybody can

2021

go to bed every night and be safe without somebody breaking in your house. So that's all I've got to say. Thank you."

Mayor Abrego thanked Ms. Caslow for her comments and the audience applauded.

Mr. Luis Cavazos spoke next. He began by saying: "I'm Luis Cavazos. I'm a taxpayer and I've got some acreage in Olmito. I used to work for the Los Fresnos School District about 30 years ago, and I just don't want the same situation happened to me, happen to the Chief. I don't even know the Police Chief, but I am in support and I hope that y'all give him due process, because if not, the courts will take care of it. And I'm here in his support."

Mayor Abrego and Mayor Pro Tem McCormick both thanked Mr. Cavazos for his comments and again the audience applauded.

Mayor Abrego said: "That concludes the open forum. There's no more is there? Paul, is there anymore?" Mr. Paul Chavez replied: "No sir." Alderman Mendoza said: "Mayor, I have a comment to make before we make motions, or, can I do it now?" Mayor Abrego replied: "Yes." Alderman Mendoza said: "Will you allow me to?" Mayor Abrego again replied "Yes." Alderman Mendoza said: "Ok. Before we begin discussion further this matter, I believe we owe the members of this community an explanation as to why we postponed our meeting last time. Two of the commissioners received a threatening call immediately before our meeting. Because this matter under investigation I cannot comment any further on the details of those telephone calls. But as a result of those calls however, I was concerned for the safety of all persons involved. We had not been provided sufficient law enforcement protection for this special meeting, therefore we felt that for our safety it was best to reset the meeting to a later date when we could adequately provide for the safeguard of the officials and the public alike." He continued by saying: "And basically I just want to say that we will not be persuaded or prevented from doing the job we were elected to do by any threats, or any other form of intimidation. Thank you mayor."

Mayor Abrego stated: "For the record we do have Jimmy Vasquez as Sergeant of Arms here tonight."

<u>Closed session – The Board of Aldermen may convene in closed session pursuant to Section 551.074, Texas Government Code for the following</u>:

    A. Personnel:
       To deliberate the employment, evaluation, reassignment, duties, discipline or dismissal of the Chief of Police.

Mayor Abrego said: "I do have a request/petition by Mr. Rodriguez that this not be a closed session, and they do have that right and therefore this session will be open."

Mayor Pro Tem McCormick said: "Mayor, I'd like to make a motion to keep/remain the Chief of Police employment as is currently."

Mayor Abrego said: "We have a motion on the floor. Is there a second to that motion? Motion dies."

Alderman Mendoza said: Mayor, I make a motion to dismiss Chief of Police Ricardo Perez effective immediately". Mayor Abrego said: "We have a motion on the floor. Is there a second on that motion?" Alderman Acevedo said: "I second the motion." Mayor Abrego said: "We have a second. Discussion."

Mayor Pro Tem McCormick said: "This is the second time that members of this council have requested this to be on the agenda. It was with great disappointment that we had no other choice but to put it on the agenda because we had to follow the law. However, as a voting member of this council, I have sat on this council for three and half years and never in my three and a half years, have I ever been with a group of people who would try to do something by virtue of their position on this council, with not revealing to the other members, at appropriate times, what the charges are. I have been sitting here wondering what exactly are we doing here? Our Chief and his lawyer have made request to find out what is the problem. I have asked in open session. I have begged and pleaded with the members of this council who have brought this, to please reveal to me and to the Mayor, what exactly is the purpose? If there are charges, what are the charges? You wish me to vote on something that I know nothing about except that what is in his records, and what he has done for this community. And as far as I am aware of, there is no reason whatsoever to even consider termination. But to ask me to make a decision with no information is completely and totally immoral, unethical, and flat out wrong. And I ask you, if there is something that needs to be considered, if it's as serious as a termination, that the other council members please give me the opportunity to make an educated decision based on information! I cannot make a decision when I do not know what I'm making a decision on. The Chief has been here for a little less than eight months I believe. I have heard nothing but wonderful, wonderful things from everyone in the community. I have not so much as heard one complaint from anybody. Since this issue was brought up, a month or more ago, I have had phone calls, I have had people stop me at football games, at the mud races, at every place, at grocery stores, gas stations – what's going on, what are y'all doing? And I can't answer that, because I do not know. And as a council member it's unbelievable that I don't know. I can't give any guidance from my experience. I can't give the citizens any information that they have the right to know. They pay the taxes. They pay his salary. There are people that want to know some answers. I am included in that and I think that we all deserve those answers. I think the Chief deserves those answers. If there is something that he has done, put it on

•

2023

the table. Let's look at it. By all means, if it's serious, I am in this position to do what's best for this community. But I can't do it unless I know. If it's something that he can correct, if anything was done, then by all means let him know! Give him the opportunity to make those corrections. I am begging you once again, to <u>please</u> reveal what information you apparently have, so that we can all make an educated and informed decision. And that we can offer what we need to, to this community and to the Chief of Police." Again the audience applauded.

Mayor Abrego asked: "Are there are any more comments? This is a very serious matter and I agree with Ms. McCormick. I think that you guys really need to think about it. The liability for the city is tremendous. And not only that, this man has done a good job for the city. He's represented the city well and I think he deserves to know why he's being let go! We're damaging his reputation. He's has livelihood. He's got a family he's got to support. And without a <u>reason</u>, it's not right! You put yourself in his shoes. We all work. How would you like to be fired without being told why? That's all we ask! Again, I ask if you have a reason or you have a comment. There's four of you that signed this to be put on the agenda. I think that you need to state your comments why. We have a petition here of over two hundred signatures from the community that are concerned and supporting the Chief. And I have them here if you would like to see their names."

Mayor Pro Tem McCormick then said: "I would also like to remind my fellow council members that we <u>do</u> have legal advice on this matter, and it has been addressed to you in three separate letters. And I would like to be you to be looking at that."

Mayor Abrego, addressing the council, asked: "Do you have any comments?" Alderman Mendoza answered "no comments sir".

Mr. Rodriguez said: "Briefly, thank you for having us tonight. Chief Perez has put his life on the line for the City of Los Fresnos along with his fellow officers. All he's asked for, is for the council members, the city of Los Fresnos, to follow it's own <u>written</u> policies and give him a reason why he should be terminated. Two council members sitting here, Ida Garcia and Mr. Mendoza, signed off on this personnel policy that says he's entitled to notice as to why he's being dismissed. I have written this council three different times and made at least one oral request at the last specially called meeting, asking for <u>reasons</u> why Chief Perez would be terminated. To date we have not received <u>any</u> information as to why his termination should be considered. He served his probationary period. He got an <u>outstanding</u> evaluation, which is the top evaluation or appraisal a city employee can get. I would remind the council that your employers are sitting here in front of you! The Chief's employers are sitting here in front of you. He's entitled to the same procedures and the same notice that anybody that's sitting here would expect. And we're asking that four of you, who are asking for this meeting, who asked for the last meeting, who are asking to consider the Chief's termination, to explain to the

2024

citizen's of Los Fresnos and citizen's of this State, because I think Texan's demand fairness, explain to them why this man should be let go from his position, when he's put his life on the line; when he's come in, he's tried to professionalize this department and bring it up to date, and do a good job for all of y'all. For all of y'all. Thank you ma'am."

Pastor Morrison asked: "Mr. Mayor can the citizenry speak?" Mayor Abrego replied: "I'll let you speak." Pastor Morrison said: "If I remember right, Los Fresnos is a Type A City and the Chief is an Officer of the City, and in conjunction to his being an Officer of the City, if I'm correct Ms. Denny, that he has to be given a 30 day notice with reasons for his termination? And if there not, it's sets the city up for a terrific liability, is that correct Ms. Denny?" Ms. Denny replied: "He is not a officer. We passed an ordinance after Chief Lopez left, that makes him not an officer." Pastor Morrison continued: "I just wonder, who is the council? Who do they owe? Who do these four people owe?" Again the audience applauded.

Chief Ricardo Perez spoke next and said: "I would like to thank everyone in my support for being here. I know I've done a good job. The department was set way back. The policies go back 1984-1986 and there were not many people working it, on the policies. Right now the department is in transition, and we're trying to play catch up. We're catching up; seven years or more the department is behind, starting with the policies. We even had policies that govern how officers do their job and a lot of them were outdated and needed to be modified. That's what we are working on right now. When I first got here, I was very excited to work for the city. I was police chief for a school district, at the Edinburg School District, when they had 21,000 students, 5,000 staff. I did a good job there as well, getting numerous awards. Never missed a day of work. My goal was to be Chief of Police for a city, and Los Fresnos was going to be my first city to work for. I tried my best to keep up with the demands of not only the department, but the citizens as well. In a small town, everybody has a complaint, and it is my job to hear them and try to do my best to somehow guide them. If I'm guilty of doing that, then charge me for doing my job. I try to do the best I can for the citizens. So once again, I ask of the council, think about what you are doing! You're ruining my life! I mean, all this is unneeded. And here, eighteen years of hard work, going through training and education, to become a certified police chief for the state. I'm not hired as somebody's friend, or somebody's co-pilot. I'm hired because of my experience and training and education. We need in the department to do the job they're hired for, for the citizen's for which you all pay for. And once again, I am asking to consider what y'all are doing. It's very serious what you are doing. Once again, thank y'all for supporting me, even though whatever the outcome is, I very positive that I've done nothing wrong and the Lord will see it through. Thank y'all very much." At this time, the audience gave Chief Ricardo Perez a standing ovation and applauded.

Mayor Abrego then said: "I got elected in May, and I was very fortunate meeting the Chief, and working with the Chief, and I'd like to say that he went way beyond. And, I'll

CitiPDF - www.textio.com

pick on him a little bit... but some of the things he did were really out of the ordinary! About a month ago we were threatened here on the coast with a hurricane. And this man, took it upon himself, showed up to work Monday morning and stayed all the way through, all night. He didn't tell anyone. He just worked all the way through, here at his office, and didn't go home till Tuesday afternoon! He was literally here for over 24 hours. And that says something about this man, that he's a leader. And it is true, he's brought us out of the dark ages. Our police department, the officers have been re-certified; new policies, new procedures; he's got more certificates than a lot of us put together. Very professional, working over 50, 60 hours a week! Though he doesn't get paid overtime. He's a leader in his own mind. And Chief, I just want you to know, that I really appreciate everything you've done for Los Fresnos. Working with our students at the High School, setting up new programs. The all night ?? was the first ever in Los Fresnos, and I just think that we were going in the right direction. And I appreciate everything you've done!" Chief Perez replied: "Thank you."

Mayor Abrego then said: "Then I'll ask the council, Mr. Acevedo do you have any comments?" Alderman Acevedo replied: "No I don't". Mayor Abrego then said: "Mr. Mendoza?" Alderman Mendoza replied: "No." Mayor Abrego then said: "Mr. Sierra? Alderman Sierra mumbled "no". Mayor Abrego then said: "Ida"? Alderman Garcia whispered: "No."

Mayor Pro Tem McCormick then said: "Please consider, council, the budget that you just passed. Please consider that not only are you taxpayers, and you're not the only taxpayers in this community. Those people sitting out in front of us, plus hundreds of others, pay taxes in this community. You need to consider very thoughtfully, and very seriously, your vote. How it will effect this budget, how it will effect these citizens, how it will effect our police department, and the morale, and our staff here at the city, how it will effect our protection as a police department without leadership, without some continuity, that we so badly needed. The mayor had said a couple of things that reminded me I had written out some things, and I lost it, and that's a teacher for you, isn't it? But he is very professional. Always. I have never seen him not be professional. His people are professional. Professional ... where I didn't see them professional before. I had a lot of complaints about our police department over the last three and half years! And most of you that know me, know that. And they have come so far, and so beyond, what I ever dreamed that one person could do in such a short amount of time. You know when people go yeah, it's a speed trap...I said you go to Los Fresnos, you look at our officers, you look how they stand, you look how they walk, you look how they ride around this community and patrol your neighborhoods, keep you safe, visit with your children! Police officers didn't stop and say hello to my children or the children down my street. They do now! They wave, their friendly! They patrol our community. They protect everything this community is about ... and he's the reason! He is the reason. His

leadership style is that by doing, not by saying. He's shows them by his attitude and by what he does and by his commitment. And if any of you have been around any children, or even in a work force, you know that people learn best by seeing and doing. And he does that. Please consider ... carefully ... what the effect this will have financially, what this will have with the morale in this community before you make your decision. And again, I am asking you to please state what it is, what charge it is, you have against the Chief."

Mayor Abrego then said: "Ms. Denny, you've been the immediate supervisor of your department heads here in the city, do you have anything in his file?" Ms. Denny replied: "No sir, I sure don't." Mayor Abrego then asked: "Do you have a recommendation?" Ms Denny replied: "I recommend not to fire him."

Mayor Abrego said: "We have our legal counsel here Mr. Crane and Ms. Glass, do any comments?" Mr. Crane replied: "Mayor, board, we have sent to each of you, I believe, three different letters, three different dates, marked Attorney/Client Privilege. We have provided advice and recommendation in each of those three letters. And we have, at this point and time, have no reason that we know of at this point and time, to alter our advice and recommendation as pertained in those letters."

Mayor Abrego replied: "Thank you. And for the record, I have covered it with all five council members individually." Anymore discussion? If not, I'll ask, we have a motion on the floor, the motions still stands?" Alderman Mendoza replied: "Yes sir". Mayor Abrego asked: "The second still stands?" Alderman Acevedo replied: "Yes sir". Mayor Abrego then said: "I'll ask for a roll call vote. Mr. Gonzalo Acevedo, how do you vote on this motion?" Alderman Acevedo replied: "Motion to, to dismiss the Chief". Mayor Abrego replied: "Ok. Mr. Mendoza?" Alderman Mendoza replied: "Motion to dismiss."

At this point a citizen in the audience said: "We can't hear." Mr. Mendoza, repeated louder: "Motion to dismiss!" Another citizen interjected: "You need to give a reason!" Mayor Abrego then said: "Please! Ms. McCormick?" Mayor Pro Tem McCormick answered: "I vote no because I do not know any information on why these charges, or this motion…" at which point the audience began applauding. Mayor Abrego then asked: "Mr. Sierra?" Alderman Sierra replied: "I make the motion to dismiss as well." Mayor Abrego replied: "We have a motion, are you voting yes?" Alderman Sierra replied: "Yes". Mayor Abrego then said: "Ms. Garcia?" Alderman Garcia replied: "Dismiss."

Mayor Abrego said: "Motion carries. I respect the wishes of the council, I don't necessarily agree with it. Ms. Denny, I do want the office of the Police Chief secured. I want all investigations to continue. I want complete cooperation with the F.B.I, D.A.,

and all other agencies to continue.  Any investigation that will stop, I want to be notified.  That being said and done, we're going to recess for 15 minutes."

<u>Consideration and possible action on appointment of an Acting Chief of Police and setting salary</u>:

Mayor Pro Tem McCormick said:  "I would like to make a motion to appoint Jimmy Vasquez as our Acting Interim Chief with a salary of $40,000.00."  Mayor Abrego said:  "We have a motion.  Is there a second to that motion?  No second.  I'll entertain another motion."

Alderman Garcia said:  "I make a motion to appoint Adrian Cabrera as Acting Chief and set salary at $40,000.00 a year."  Mayor Abrego then reiterated:  "That's for Acting, until the position is filled?"  Alderman Garcia replied:  "Right, right."  Alderman Sierra said:  "I will second that motion."  Mayor Abrego said:  "Has he been asked?"  Alderman Garcia replied:  "Um, it's been mentioned."  I think he's here."  Mayor Abrego replied:  "I think it's only fair that we ask him.  Mr. Cabrera can you step forward?"

Mayor Abrego continued:  "There's a motion made for you to be appointed acting Chief of Police and it's been seconded, are you willing to serve as acting at the salary of $40,000.00?"  Mr. Cabrera indicated yes.  Mayor Abrego said:  "Thank you sir.  Mayor Abrego said:  "Discussion on the motion?  I think Mr. Cabrera is very capable.  He has many years of experience and is a local man.  And he's a ... Sergeant, Lieutenant, on our force right now is that....?  Your employed as what Adrian?"  Mr. Cabrera replied:  "Sergeant".  Mayor Abrego replied:  "There's probably going to be some changes from within the department because I understand that he works at the school, but I'll leave that up to Ms. Denny to make the internal changes.  Anymore discussion on the motion?  Is there a time frame on when you want this position filled?  Do you want to advertise right away?"  Alderman Mendoza answered:  "I would say so sir.  Yes."  Mayor Abrego replied:  Right away advertise for the position?"  Alderman Mendoza said:  "Right."  Mayor Abrego then asked again:  "Any more discussion?  All those in favor of the motion signify by raising your right hand.  It is unanimous."

There being no further business Mayor Abrego adjourned the meeting at 8:30 p.m.

MAYOR                                    CITY SECRETARY

Manuel Abrego                            Pam Denny

CVISPDF – www.fastio.com

CVISPDF – www.fastio.com

BROWNSVILLE

# The Herald

BORN ON THE FOURTH OF JULY 1892

MONDAY, OCTOBER 16, 2000

50 CENTS



# Los Fresnos Mayor wants apology from alderman

## Allegations: Mayor Abrego says police department is not guilty of wrongdoing.

BY BRAD PIERCE
THE BROWNSVILLE HERALD

LOS FRESNOS — Attempting to dispell any notions that corruption has tainted his police department or that there has been a conspiracy to hide wrongdoing, Mayor Manuel Abrego is asking for an apology from Alderman Juan Carlos Sierra.

"I want him to apologize to the police department," Abrego said for making any wrongdoing, Cameron

comments last week about the existence of criminal activity among officers.

Last week Sierra made statements alleging corruption within the city and that he, along with Aldermen Gonzalo Acevedo, Miguel Mendoza and Ida Garcia, were just trying to resolve the problem when they fired Police Chief Ricardo Perez last month.

While not only the mayor and Perez strenuously deny police officer in Los

County District Attorney Yolanda de Leon said Perez has not been suspected of any crime.

"This office is not conducting into an investigation into the chief of police in Los Fresnos, Mr. Perez," de Leon said, explaining that her prosecutors have been asked to review the legality of a "particular incident" involving another fact that the council fired a Rodriguez in his resignation letter.

Describing Sierra's motives a "smoke screen," friends with Perez as well as "a good officer and a competent and much-liked

looking into," she said, but declined to elaborate.

Sierra, the mayor said, should also apologize to him, interim City Manager Pam Denny and Alderman Melanie McCormick for making allegations regarding a conspiracy to suppress evidence.

"We didn't cover up anything," Abrego said. "They're just trying to come up with something."

The mayor said the long-time lieutenant, who is close simply trying to divert attention away from the fact that the council fired a Rodriguez in his resignation letter.

police chief for either political or personal reasons without even bothering to give him an explanation.

Additionally, Lt. Jimmy Vasquez — Perez's natural successor who was overstepped for the job by the four aldermen who ultimately chose Sgt. Adrian Cabrera — resigned on Friday, according to Abrego.

Denny fired him the day after Perez was terminated — a move many residents, including the four aldermen, suggest as retaliation for ousting the chief.

He was subsequently rehired by Acevedo, Mendoza, Sierra and Garcia last week.

Rodriguez, a 10-year veteran of the police department who is currently under investigation by the FBI for possible civil rights violations, was recommended for termination by Perez last summer based on several complaints received from residents concerning violations of departmental policy.

THE STATE OF TEXAS        §

COUNTY OF CAMERON        §

       BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the
__22nd__ Day of __June____, 20$\underline{00}$, A.D., did personally appear: _Luis De La Rosa_, who after being by
me duly sworn, did depose and say:


  My name is Luis De Las Rosa and I currently reside at 510 West 8th Street in Los Fresnos
Cameron County, Texas 78566.  My phone number is 956-233-4257.

    On June 22, 2000 at approximately 11:00AM, I was asleep in my home.  My common law wife,
Claudia Cisneros, woke me up and told me that Ramiro Sanchez was on the phone and wanted to talk
to me.  I got on the phone.  Ramiro asked me what I was doing.  He told me that Juan Mendoza was
there and he wanted to talk to me.  I could hear Juan Mendoza in the back ground.  Ramiro went on
to say that he wanted to know what was the deal with Jimmy Vasquez.  He wanted to know if Jimmy
had gone over to my house and forced me to sign some papers.  Ramiro wanted me to tell him that
Jimmy forced me to signs some forms.  I told him no that it was me who went by the police station
and signed a the forms.  He said if I was going to be a "paido" ( a snitch ).  I to ld him that I was tired
of all the talk about the matter and that I was going to go to the police station to see what was going
on.  He said you want to be a "paido"  I told him that I was tire of it and that I was going to go to the
police station.  Ramiro stated that Juan Mendoza wanted to talk to me.  I hung up the phone.  My
uncle, Jose De La Rosa, was present and was pissed.  He told me to pass on the phone to Ramiro tht
he would take care of him.  My grandmother was also present.  I went to the police station and spoke
to Jimmy Vasquez.  I told him what had happened.  He then called the Chief and I told him what had
happened.  He then took me to Officer Cabrera who took my report.  I want to be left alone and want
a report to be on file.

  The above is a true and correct statement to the best of my knowledge and ability.


                                      _[signature]_


**Sworn and subscribed to before me on this the __22nd__ day of __June____, 2000, A.D.**

_[signature]_

```
★★★★★★★★★★★★★★★★★★★★★
    ADRIAN CABRERA
  Notary Public, State of Texas
  My Commission Expires 12-14-2...
```

Notary Public for Cameron County, Texas

CVISPDF – www.faxisx.com



BROWNSVILLE

BORN ON THE FOURTH OF JULY 1897

# Los Fresnos police chief gets the ax

**Firing:** Council members give no explanation for dismissal.

BY BRAD PIERCE
THE BROWNSVILLE HERALD

LOS FRESNOS — Police Chief Ricardo Perez was fired without explanation Tuesday before a packed house of angry citizens demanding to know what's going on.

Allegations of abuse of power and corruption erupted at the Los Fresnos Community Center during the long-awaited City Council meeting that brought down a 20-year veteran of law enforcement.

"You're ruining my life," Perez told the council, stressing what he has said for more than a month: that he has done nothing wrong.

In a 4-1 vote, Aldermen Gonzalo Acevedo, Miguel Mendoza, Juan Carlos Sierra and Ida Garcia were successful in ousting the chief despite opposition from a mayor trying to keep his city together, a petition bearing 200 signatures in support of Perez and advice from the city attorney not to proceed.

Alderman Melanie McCormick, who cast the lone dissenting vote, said she even hasn't been told why the chief is under fire and that in the 3½ years she's been on the council, she's never been surrounded by such a group of people who blatantly abuse their office.

"You wish me to vote on something that I know nothing about," she told the four aldermen, pleading with them to reconsider. She described

PLEASE SEE **CHIEF, A12**

CNVPDF – www.fasilo.com

Case 1:00-cv-00161   Document 34   Filed in TXSD on 06/29/2001   Page 179 of 198

## CHIEF
FROM PAGE A1

their actions as "immoral, unethical and flat out wrong."

"As a councilman, it's unbelievable," she said. "I don't put it on the table. If there is something that he's done, lets..."

However, the four aldermen refused the four reasons for explanation for Perez, which called to fire of one, which gathered some 80 residents who came to the crowd...

"I'm in support of the chief, power has been conceived that a plan, someone has been conceived for George Morrison Alderman...

council is represent by people, who have a hidden agenda, not the community," he said.

Mayor Manuel Abrego said he's convinced that Perez's investigation is an attempt that Perez's investigation. He gave resignation by FBI. He immediately gave mayoral order. Perez was removed from office after Acting City Manager Danny to make sure the termination does not interfere with the investigation...

The mayor, when asked what confirmed he was referring to, said a case to federal authorities, begun by his predecessor, Tony Lopez, that involved possible civil rights violations by Cpl. David Rodriguez of the Los Fresnos Police Department who is a very close friend of Mendoza.

Perez's attorney, Ted Rodriguez, said the council should follow its own constitutional requirement of due process. Perez was kept in the dark about the council's motives for several weeks, despite

than a month unsure about his future and guessing what he did and wrong...

Perez, cautioned by Rodriguez for going into too much detail on his next move, said he would take "appropriate legal action" against the city.

Mendoza, wanting to give the public an explanation for the late August meeting from late August until they rescind the August meeting minutes before the aldermen received the two phone calls that threatened those in the meeting, he felt in the best interest of those involved to rescind the meeting.

In response, Alderman strategically placed around the community center on keeping watchful eye on the alleged threats, armed officers were around the passionate Tuesday night's crowd.

That made by Mendoza and seconded by Acevedo called Perez, who spoke to the large crowd before the electoral took their support, he said for the outcome he said no matter. I've done nothing wrong from taking a short break.

Alderman Cabrera moved to hire Lt. McCormick moved to the meeting, Jimmy Vasquez as interim from the position.

Los Fresnos Interim Police Chief Ricardo Perez, left, consults attorney Ted Rodriguez during Tuesday's 5 p.m. Meeting. Council members Carlos Sierra and Gonzalo Acevedo, Miguel Mendoza, Juan voted to terminate Chief Perez, who did not...

police chief. It died for lack of a second and Garcia subsequently made a motion to hire Sgt. Adrian Cabrera, a security officer at the high school, which passed by 4-1. The council will immediately begin advertising for the position.

Perez took over the department in February, replacing acting Terry Vinson, who served as acting police chief after the council fired former chief Tony Lopez in 1999. Vinson is the Republican candidate for Cameron County Sheriff in November.

## CITY
FROM PAGE A1

to leave ... Lambert dent in the ...

The Abilene resident said he is leaving because of his ...

was part of "an unwritten code" of city managers taking responsibility when ... jobs don't work out. Lambert gave thumbs-up sign ... wife was in agreement when ... Commissioner Harry McNair said.

"Nobody had to be sold ... Lambert said.

"I talked to my wife Debbie. And she's jokingly referred to ... 'Yes.'"

As a city, Lambert said he's an open ... away-door policy ... keeping ... from police ... works for the taxpayers

FRIDAY SEPTEMBER 29, 2000

# The Herald

## BROWNSVILLE

BORN ON THE FOURTH OF JULY 1892

# Los Fresnos may have violated meetings law

## BY BRAD PIERCE
THE BROWNSVILLE HERALD

LOS FRESNOS — The four aldermen who voted to fire Police Chief Ricardo Perez may have violated the state open meetings law, an attorney who specializes in media law said.

If Perez's termination was never discussed in a public meeting or executive session, yet the four aldermen came to an agreement on the subject, then it is "beyond question that state laws were violated," said Houston attorney Joe Larsen, who works with the Freedom on Information Foundation of Texas and has represented the Houston Chronicle.

Even if they did not meet privately as a group, but discussed the firing in individual conversations, Larsen said that could constitute an intent to circumvent open meetings laws, which is also a violation.

"There can be no question that there were discussions on this among the four of them," Larsen said, "and the district attorney ought to be very interested in this."

Perez was terminated without explanation Tuesday by Aldermen Gonzalo Acevedo, Miguel Mendoza, Juan Carlos Sierra and Ida Garcia against the advice of city attorneys.

PLEASE SEE LAW, A12

CibPDF - www.fenlea.com

Case 1:00-cv-00161 Document 34 Filed in TXSD on 06/29/2001 Page 181 of 198

# LAW

FROM PAGE A1

Alderman Melanie McCormick voted against the motion, saying that she knew of no allegations of misconduct and that the other members of the council had never discussed the matter with her.

Larsen said the Texas Public Information Act contains provisions written specifically to avoid this type of behavior among elected officials.

Mayor Manuel Abrego agreed that it's easy to assume that the four aldermen got together somewhere and formed their decision. "Obviously they have, because they're all on the same page," he said.

A Los Fresnos resident filed a complaint with police alleging that Mendoza, Garcia and Sierra met illegally when they gathered at a local restaurant just minutes after an Aug. 29 council meeting — which was where they were expected to release their reasons for wanting to fire the chief. They declined to give those reasons, citing alleged threats against them.

"How can you go to a foot-

ball game without a game plan?" Perez asked, adding that two days after he was fired he still has no idea why.

"I would be the first to resign if I had done anything wrong, but in this case, there is no just cause." Still, many ask why the council members would go against the advice of their attorneys and risk an inevitable lawsuit to fire Perez.

"I don't know what their motivation is but I wouldn't be surprised if it had something to do with money," Larsen said, adding that another reason could be that they want to put their own man in the office. Former alderman Juan Muñoz said Tuesday that Constable Juan Mendoza and Deputy Constable Ramiro Sanchez had told him that they wanted

to see Deputy Constable Johnny Cavazos hired as police chief.

Sanchez on Thursday insisted that he never said anything to Muñoz about wanting to see Cavazos become police chief.

"He's a liar. I never have talked to him in two years," Sanchez said, adding that Wednesday's termination of Cpl. David Rodriguez, who is

under investigation by the FBI for possible civil rights violations, has more to do with a retaliation attempt for Perez's termination than any allegations of misconduct.

However, the mayor explained that Rodriguez was fired because of an on-going internal investigation concerning issues unrelated to the FBI probe and that Perez was more than likely fired

because of his attempts to obtain federal assistance in investigating alleged misconduct within his department.

Muñoz, Sierra, Acevedo, a representative from the district attorney's office and the FBI could not be reached for comment. The four aldermen have continued to keep quiet about their motives despite residents' demands for an explanation.

CMPDF - www.fesio.com

CVISPDF – www.fastio.com

# LAW OFFICE OF ALFRED T. DENHAM

**Alfred T. Denham**      3700 N. 10th Street, Suite 105     Telephone (956) 994-8800
**Ted Rodriguez, Jr.**           McAllen, Texas 78501       Facsimile  (956) 994-8808

December 11, 2000

<u>VIA FAX #686-6109</u>
Honorable David E. Girault
ATLAS & HALL, L.L.P.
P.O. Box 3725
McAllen, Texas 78502-3725

Re:    Civil Action No. B-00161; Ricardo Perez, Jr. vs. City of Los Fresnos, Texas, Juan C. Sierra, Sr., Gonzalo Acevedo, Ida Garcia, Miguel Mendoza, Individually and In Their Official Capacities and Juan Mendoza, Jr.

Dear Mr. Girault:

I appreciate your letter of December 7, 2000. However, my client and I share several concerns. The first question is what benefit would be allowed to Mr. Perez by attending this meeting. Secondly, the allegations provided are still vague and non-specific. We require dates, locations and names of persons involved and cited in your individual paragraphs. Without this information, it would be impossible for my client to properly address these grievances and be merely another example of the kangaroo court which the City of Los Fresnos has put on thus far.

As an example, in your paragraph 3, you state "a concern was later raised about the confiscated evidence and an issue arose as to whether the substance was cocaine or some other substance." Who raised the concern? When was the drug bust? What were the names of the arrestees? These type of non-specific factual allegations in no way enable us to prepare a proper response to the grievances. You as an attorney are aware of that. My client is only asking for a fair opportunity to respond. Please provide the more factual, specific grievances to us by December 14, 2000 so that my client can determine what type of hearing he will want.

If you have any questions or comments, please feel free to contact me.

Sincerely yours,

Ted Rodriguez, Jr.

TRJ.mp

CVISPDF – www.faxiso.com

Case 1:00-cv-00161   Document 34   Filed in TXSD on 06/29/2001   Page 185 of 198

# BROWNSVILLE

## and the Rio Grande Valley

# Fired police chief to get 'due-process' hearing

### BY BRAD PIERCE
THE BROWNSVILLE HERALD

LOS FRESNOS — Former Police Chief Ricardo Perez will get a chance today to confront the four members of the City Council who relieved him of his duties.

But Perez and his attorney, Ted Rodriguez, are preparing for an ambush.

"They're just playing games," Rodriguez said. "I think things are going to start heating up."

Aldermen Gonzalo Acevedo, Miguel Mendoza, Juan Carlos Sierra and Ida Garcia notified the former chief of their reasons for firing him last week, three months after they voted to oust him without explanation.

"Chief Perez has been notified of why he was terminated in writing," Mayor Manuel Abrego confirmed Monday, calling today's meeting "a due-process hearing" designed at the urging of the city's attorneys to allow Perez to address the council's concerns.

Rodriguez said Monday that the council's reasons were entirely vague and seemed more personal than professional.

"Who knows what's going to come out," Rodriguez said. "It's going to be difficult for us to respond to anything."

Rodriguez contended that the City Council will be "prepared to launch all kinds of blame" on Perez. He suggested the hearing might more resemble "a kangaroo court" than a true due-process hearing.

"They're going to ambush this guy," Rodriguez said. "I suspect they're doing this more for litigation purposes and not to give my guy a fair shake."

Rodriguez said the hearing is simply a "legal maneuver" designed to be used down the road during litigation over Perez's lawsuit with the city, which alleges that the four aldermen violated the Texas Whistleblowers Act and the chief's constitutional right to due process when they conspired to fire him.

Abrego said that while Perez could be reinstated Tuesday, it will ultimately be up to the council to make a decision.

He declined to comment further on the matter.

CibPDF - www.fastio.com

CVISPDF – www.fwsio.com

(4)



LOS FRESNOS POLICE DEPARTMENT
INTERNAL AFFAIRS
MANUAL

As of:  April 1986

Copy _ _ _ of . . _ _ _

CutePDF - www.fasiio.com

often easier to prove a case in a disciplinary hearing
than in a criminal court.  Therefore, a criminal acquittal
would not bar any administrative action.

## DELAY OF ADMINISTRATIVE ACTION

An issue regarding simulataneous criminal and adminis-
trative charges is delay of the administrative action pending
the outcome of the criminal trial.  This is not a legal, but
rather a tactical concern, because the material gathered by
an Internal Affairs Investigation once presented by the
department in a disciplinary action, are normally a matter of
public record that a Defense Attorney, in a criminal action
would have easy access to a great deal of the prosecutor's
evidence, which may be a disadvantage to the State.  Disciplinary
action delayed for too long loses it's deterrent effect on the
remainder of the department and for these reasons the City
and Department will proceed as far as possible on internal
affairs cases without delay.

## DRAFTING CHARGES

The officer assigned by the Chief of Police, whenever
he completes a case and arrives at the conclusion that the
allegation against the accused employee is sustained, will
draft charges of the specific violation of departmental rules
and regulations.  The charges should be provable by a pre-
ponderence of the evidence.  Once the case is complete, a
copy of the case shall be given to the accused employee
sufficiently early to have a reasonable time to prepare an
answer or defense to the charges.  Niazy v. Utica Civil
Service Comm. 206 N.W. 2d 468 (Mich. CT. app. 1973).

## PROBATIONARY EMPLOYEES

Probationary employees do not have a right to a hearing
and provisions for a period of probation for new employees
specify that a probationer may be discharged from the depart-
ment at any time, for any reason.  Therefore, an employee on
probation has no expection of job security, and no property
interest in the job.  Since discharge does not infringe on
any property right, there is no need for a due process
hearing.  There are three exceptions.  A probationer may be
entitled to a hearing if:

1.  The discipline is for exercise of a constitutional right
such as free speech.  Perry v. Sindermann 408 U.S. 593 (1972).

- 6 -

2.  The discipline is for any reason which would put in doubt the officer's good name, reputation, honor or integrity. Board of Regents v. Roth, 408 U.S. 564 (1972).

3.  The disciplinary action would bar the officer's re-employment by other Government employers.

## STANDARD OF PROOF, BURDEN OF PROOF

The "Presumption of Innocence" applicable in a criminal prosecution is not applicable in an administrative hearing. Heidebur v. Parker, 505 S.W. 2d. 440 (Mo. 1974).  The burden is still on the department to prove guilt, and the officer need respond only after a prima facie case has been established. The usual standard in criminal cases is that guilt must be proved "Beyond a reasonable doubt".  In Internal Administrative cases the standard is "Substantial evidence" or a "Preponderance of the evidence" as the standard of proof in civil cases.  Cruz v. San Antonio, 440 S.W. 2d 924 (Tex. Civ. App. 1969).  This difference in the standard of proof is one reason why internal charges may be brought even though a criminal prosecution may have been unsuccessful.

## DISCOVERY OF PERSONNEL AND INTERNAL AFFAIRS FILES

It is essential to the proper functioning of the discipline process that Internal Affairs files be confidential and not available in criminal court cases and nondiscipline civil cases.

## CRIMINAL CASES

It has been successfully argued that police personnel records are confidential.  Routine exposure to such files to public inspection would undermine the police department's ability to fully and accurately record officers performances. The U.S. Supreme court held in U.S. v. Reynolds, 345 U.S.1 (1951), that a court may not automatically grant an examination of confidential governmental files without a prior showing, by the one demanding the records, that they were necessary to the litigation before the court.  In the City of Los Fresnos, once the internal administrative case has been completed, the employee will be furnished a complete copy of the case unless the city attorney, upon proper reason, desires to withhold part of the record.  In this city, internal affairs records are segregated from personnel records, so that the chilling effect of discovery on internal investigations, rather than upon all personnel records will be a compelling argument to the judiciary.

- 7 -

CVISPDF – www.fesiva.com

# behind police chief's termination

**BY BRAD PIERCE**
*THE BROWNSVILLE HERALD*

LOS FRESNOS — Alderman Juan Carlos Sierra said alleged corruption in the police department was behind the firing of Police Chief Ricardo Perez, although he would not elaborate due to a pending investigation by the district attorney.

He said residents may be upset at the City Council right now, but soon everyone will understand its actions.

Mayor Manuel Abrego, however, said he was offended by Sierra's remarks.

"I have no idea what he's talking about, but if the DA's investigating, then fine. Nobody's manipulating anybody. We have one of the finest police forces around," Abrego said, challenging Sierra to prove the charges.

Aldermen Gonzalo Acevedo, Miguel Mendoza, Ida Garcia and Sierra have been publicly criticized since they terminated Perez without giving any reason last month.

They have been accused of breaking state laws and walking over city policy for political or personal gain. However, Sierra said nothing could be farther from the truth.

First, he said, "there's a lot of corruption" within the police department and that the council — fueled by complaints from citizens — launched an investigation months ago.

"We're trying to correct these things," he said, and firing Perez was just the first measure in dealing with the situation. He declined to say to what extent Perez was involved.

Perez has denied any wrongdoing while he was chief and said he did nothing but duties required of him as the city's head law enforcement officer.

"I've been an officer 18 years and never once has my integrity been questioned," Perez said, adding that Sierra is obviously not aware of the constitutional requirement that someone is innocent until proven guilty.

Perez said the aldermen are basing their information on statements provided by Cpl. David Rodriguez, who was fired by Denny several weeks ago then rehired by the four aldermen on Tuesday.

Rodriguez, Perez said, is a patrolman who "has no internal knowledge of the management of the department."

"If you're going to say something about somebody, you better have some facts," Perez said. "He needs to be careful," he added, saying that Sierra is bordering on defamation of character.

Perez said he would even take a lie detector test to prove he has done nothing wrong.

Sierra said he couldn't go into detail about the crimes he believes have been committed, but said they are of the nature that would be punishable by immediate dismissal, not jail time.

"It's mainly an effort of manipulation," he said, refusing to elaborate.

Sierra added that he blames interim City Manager Pam Denny, Mayor Abrego and Alderman Melanie McCormick for trying to "cover up" allegations of wrongdoing and criminal activity.

Denny said, at the city attorney's advice, she could not discuss the issue. However, McCormick has repeatedly said she does not know the reasons why her fellow aldermen chose to fire the police chief and condemned them for doing so without giving an explanation to Perez and the public.

However, Sierra said the council's motives were revealed in an executive session earlier this summer, and even though McCormick claims she has no idea, "she's knows exactly what's going on."

"She's just trying to cover up something that she's made a mistake for," he said. McCormick could not be reached for comment.

The four aldermen, Sierra said, also never discussed this issue outside of meetings and Constable Juan Mendoza has absolutely no influence over the council. Accusations that he's running the show from a back room are completely false, Sierra said.

"I know there's a lot of upset people," Sierra said, but "soon we'll be able to give an explanation."

Case 1:00-cv-00161    Document 34    Filed in TXSD on 06/29/2001    Page 192 of 198




Friday, September 29, 2000

## Los Fresnos aldermen may have violated open meetings law

Send this frie...

By BRAD PIERCE
The Brownsville Herald

LOS FRESNOS — The four aldermen who voted to fire Police Chief Ricardo Perez may have violated the state open meetings law, an attorney who specializes in media law said.

If Perez's termination was never discussed in a public meeting or executive session, yet the four aldermen came to an agreement on the subject, then it is "beyond question that state laws were violated," said Houston attorney Joe Larsen, who works with the Freedom on Information Foundation of Texas and has represented the Houston Chronicle.

Even if they did not meet privately as a group, but discussed the firing in individual conversations, Laresen said that could constitute an intent to circumvent open meetings laws, which is also a violation.

"There can be no question that there were discussions on this among the four of them," Larsen said, "and the district attorney ought to be very interested in this "

Perez was terminated without explanation Tuesday by Aldermen Gonzalo Acevedo, Miguel Mendoza, Juan Carlos Sierra and Ida Garcia against the advice of their attorneys  Alderman Melanie McCormick voted against the motion, saying that she knew of no allegations of misconduct and that the other members of the council had never discussed the matter with her.

Larsen said the Texas Public Information Act contains provisions written specifically to avoid this type of behavior among elected officials

Mayor Manuel Abrego agreed that it's easy to assume that the four aldermen got together somewhere and formed their decision

"Obviously they have, because they're all on the same page," he said

A Los Fresnos resident filed a complaint with police alleging that Mendoza, Garcia and Sierra met illegally when they gathered at a local restaurant just minutes after an Aug. 29 council meeting — which was where they were expected to release their reasons for wanting to fire the chief. They declined to give those reasons, citing alleged threats against them.

"How can you go to a football game without a game plan?" Perez asked, adding that two days after he was fired he still has no idea why. "I would be the first to resign if I had done anything wrong, but in this case there is no just cause "

Still, many ask why the council members would go against the advice of their

http://www.brownsvilleherald.com/sections/archive/topstoryjmp.shtml

9/29/00

Case 1:00-cv-00161   Document 34   Filed in TXSD on 06/29/2001   Page 193 of 198

attorneys and risk an inevitable lawsuit to fire Perez.

"I don't know what their motivation is but I wouldn't be surprised if it had something to do with money," Larsen said, adding that another reason could be that they want to put their own man in the office.

Former alderman Juan Munoz said Tuesday that Constable Juan Mendoza and Deputy Constable Ramiro Sanchez had told him that they wanted to see Deputy Constable Johnny Cavazos hired as police chief

Sanchez on Thursday insisted that he never said anything to Munoz about wanting to see Cavazos become police chief

"He's a liar. I never have talked to him in two years," Sanchez said, adding that Wednesday's termination of Cpl. David Rodriguez, who is under investigation by the FBI for possible civil rights violations, has more to do with a retaliation attempt for Perez's termination than any allegations of misconduct.

However, the mayor explained that Rodriguez was fired because of an on-going internal investigation concerning issues unrelated to the FBI probe and that Perez was more than likely fired because of his attempts to obtain federal assistance in investigating alleged misconduct within his department.

Munoz, Sierra, Acevedo, a representative from the district attorney's office and the FBI could not be reached for comment. The four aldermen have continued to keep quiet about their motives despite residents' demands for an explanation

CutePDF - www.tevia.com

CVISPDF – www.fastio.com

THE STATE OF TEXAS        §

COUNTY OF CAMERON        §

      BEFORE ME, the undersigned authority in and for Cameron County, Texas, on this the
__22nd__ Day of __June___, 20<u>00</u>, A.D., did personally appear: <u>Luis De La Rosa</u>, who after being by
me duly sworn, did depose and say:

      My name is Luis De Las Rosa and I currently reside at 510 West 8th Street in Los Fresnos
Cameron County, Texas 78566.  My phone number is 956-233-4257.

      On June 22, 2000 at approximately 11:00AM, I was asleep in my home.  My common law wife,
Claudia Cisneros, woke me up and told me that Ramiro Sanchez was on the phone and wanted to talk
to me.  I got on the phone.  Ramiro asked me what I was doing.  He told me that Juan Mendoza was
there and he wanted to talk to me.  I could hear Juan Mendoza in the back ground. Ramiro went on
to say that he wanted to know what was the deal with Jimmy Vasquez.  He wanted to know if Jimmy
had gone over to my house and forced me to sign some papers.  Ramiro wanted me to tell him that
Jimmy forced me to signs some forms.  I told him no that it was me who went by the police station
and signed a the forms.  He said if I was going to be a "paido" ( a snitch ).  I to ld him that I was tired
of all the talk about the matter and that I was going to go to the police station to see what was going
on. He said you want to be a "paido"  I told him that I was tire of it and that I was going to go to the
police station.  Ramiro stated that Juan Mendoza wanted to talk to me.  I hung up the phone. My
uncle, Jose De La Rosa, was present and was pissed.  He told me to pass on the phone to Ramiro tht
he would take care of him.  My grandmother was also present. I went to the police station and spoke
to Jimmy Vasquez. I told him what had happened.  He then called the Chief and I told him what had
happened.  He then took me to Officer Cabrera who took my report.  I want to be left alone and want
a report to be on file.

    The above is a true and correct statement to the best of my knowledge and ability.


**Sworn and subscribed to before me on this the __22nd__ day of __June___, 2000, A.D.**

ADRIAN CABRERA
Notary Public, State of Texas
My Commission Expires 12-4-2

Notary Public for Cameron County Texas

CVISPDF – www.fenrio.com

MONDAY, OCTOBER 16

BROWNSVILLE

# The Herald

# Los Fresnos Mayor wants apology from alderman

## Allegations: Mayor Abrego says police department is not guilty of wrongdoing.

BY BRAD PIERCE
THE BROWNSVILLE HERALD

LOS FRESNOS — Attempting to dispell any notions that corruption has tainted his police department or that there has been a conspiracy to hide wrongdoing, Mayor Manuel Abrego is asking for an apology from Alderman Juan Carlos Sierra.

"I want him to apologize to the police department," Abrego said for making any wrongdoing, Cameron comments last week about the existence of criminal activity among officers.

Last week Sierra made statements alleging corruption within the city and that he, along with Aldermen Gonzalo Acevedo, Miguel Mendoza and Ida Garcia, were just trying to resolve the problem when they fired Police Chief Ricardo Perez last month.

While not only the mayor and Perez strenuously deny any wrongdoing, Cameron County District Attorney Yolanda de Leon said Perez has not been suspected of any crime.

"This office is not conducting into an investigation into the chief of police in Los Fresnos," de Leon said, explaining that her prosecutors have been asked to review the legality of a "particular incident" involving another police officer in Los Fresnos.

"That is an issue we are looking into," she said, but declined to elaborate.

Sierra, the mayor said, should also apologize to him, interim City Manager Pam Denny and Alderman Melanie McCormick for making allegations regarding a conspiracy to suppress evidence.

"We didn't cover up anything," Abrego said. "They're just trying to come up with something."

Describing Sierra's motives as a "smoke screen," Abrego said the aldermen simply trying to divert attention away from the fact that he and other members of the council fired a competent and much-liked police chief for either political or personal reasons without even bothering to give him an explanation.

Additionally, Lt. Jimmy Vasquez — Perez's natural successor, who was overstepped for the job by the last summer based on several complaints received from residents concerning violations of departmental policy.

Denny fired him the day after Perez was terminated — a move many residents, including the four aldermen, suggest as retaliation for ousting the chief.

He was subsequently rehired by Acevedo, Mendoza, Sierra and Garcia last week.

Rodriguez, a 10-year veteran of the police department who is currently under investigation by the FBI for possible civil rights violations, was recommended for termination by Perez last summer based on several complaints received from residents concerning violations of departmental policy.

Melanie McCormick for making allegations regarding a conspiracy to suppress evidence.

Cabrera — resigned on Friday, according to Abrego.

The mayor said the long time lieutenant, who is close friends with Perez as well as "a good officer and good investigator," referred to concerns he has about the re-hiring of Cpl. David Rodriguez in his resignation letter.

P. 1.

CVISPDF – www.fastio.com