

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO PEREZ, JR. | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| CITY OF LOS FRESNOS, TEXAS, | § | B - 00 - 161 |
| JUAN C. SIERRA, SR., GONZALO | S | |
| ACEVEDO, IDA GARCIA, MIGUEL | § | |
| MENDOZA, Individually and in their | § | |
| Official Capacities and | § | |
| JUAN MENDOZA, JR. | § | |
| Defendants | § | JURY REQUESTED |

*United States District*
*Southern District of*
**FILED**

**MAR 0 1 2002**

**Michael N. Milby**
**Clerk of Court**

---

# DEFENDANT CITY OF LOS FRESNOS'
# MOTION FOR PARTIAL SUMMARY JUDGMENT

---

TO THE HONORABLE JUDGE:

COMES NOW **CITY OF LOS FRESNOS, TEXAS,** Defendant in the above styled and numbered cause and files this its Motion for Partial Summary Judgment and for cause would respectfully show the Court the following:

## I.

## SUMMARY OF THE ARGUMENT

Plaintiff was an at-will employee of Defendant City of Los Fresnos, Texas. He alleges that he was terminated in violation of his First Amendment right to free speech, and that he had a Fourteenth protected due process property interest in his continued employment, for which he was not given a due process hearing before or after his termination. He also claims that

Defendant City of Los Fresnos violated the Texas Whistleblower's Act in terminating him and conspired against him, and that he is somehow entitled to punitive damages. Defendant will show, however, that each of these claims fail as a matter of law.

Plaintiff cannot prevail on his First Amendment Freedom of Speech claim because Plaintiff has provided no evidence of any protected speech that was actually made, or which actually motivated any Defendant to terminate him. Rather, Plaintiff was an at will employee, who was terminated because of the City's needs and because of Plaintiff's inadequate performance of his duties. Likewise, Plaintiff cannot prevail on his Fourteenth Amendment Due Process claims because he was an at-will employee without any property right to his continued employment, and he received all process he was due. In addition, because Plaintiff was afforded multiple opportunities to rebut any allegedly false accusations in a public forum, both prior to and after his termination, his Fourteenth Amendment liberty interest claim must also fail.

Plaintiff also cannot prevail on his 42 U.S.C. § 1985 conspiracy claim because he cannot establish that he was part of a particular class against whom any discrimination was directed. Plaintiff similarly cannot prevail on his state law Whistleblower's Act claim because he has presented no evidence that he actually made a good faith report of a public employee to an appropriate law enforcement authority, and he cannot establish that he would not have been terminated but for such alleged report, rather than because of the multiple nondiscriminatory reasons for his termination. Finally, Plaintiff cannot establish any legal basis for the recovery of punitive or exemplary damages from Defendant.

## II.

## **FACTUAL BACKGROUND**

Plaintiff Ricardo Perez, Jr. is the former Chief of Police for the City of Los Fresnos, Texas. *See* **Exhibit "A,"** Affidavit of J. Arnold Aguilar with attached deposition excerpts of Plaintiff Ricardo Perez, Jr., designated **A-1** [hereinafter Perez Depo.], at p. 72:20-22, attached and incorporated into this motion. At the February 22, 2000 City Council meeting, Plaintiff was hired by a majority of the City Alderpersons after Defendant Ida Garcia seconded a motion to hire Plaintiff for the position of Police Chief. *See* **Exhibit B**, February 22, 2000 minutes of Regular City Council Meeting. Prior to the vote to hire Plaintiff, the Alderpersons, including the individual Co-Defendants, voted to enact Ordinance Number 297, which repealed Ordinance Number 41[1] (the ordinance creating the office of Police Chief), and redefined the office of Chief of Police. *See* **Exhibit C**, Ordinance No. 41 of the City of Los Fresnos; *see also* **Exhibit B**, February 22, 2000 minutes of Regular City Council Meeting (vote to enact Ordinance 297); **Exhibit D**, Ordinance 297. The new ordinance provided that as of February 22, 2000, the Chief of Police would hold the office at the will of the Board of Aldermen and would not be considered a municipal officer under Subchapter C of Chapter 22 of the Texas Local Government Code (§ 22.071 et seq.). **Exhibit B**, February 22, 2000 minutes of Regular City Council Meeting (vote to enact Ordinance 297); **Exhibit D**, Ordinance 297. Plaintiff was also subject to the City's personnel policies, which stated that he was an at-will employee. **Exhibit A-1,** Perez Depo. at pp. 133:25; 134:1-12. *See also* **Exhibit E,** City of Los Fresnos Personnel Policies Manual, attached and incorporated herein, at § 1-03 & Chapter 3.

---

[1] Ordinance Number 41 was enacted on June 5, 1956 by the City of Los Fresnos. The City had previously abolished the office of City Marshall on October 5, 1950. *See* **Exhibit L**, Ordinance No. 19 of the City of Los Fresnos.

Ordinance 297 specifically required the Chief of Police "to reside within the corporate limits of the City of Los Fresnos, or within 15 miles of its corporate limits" and "shall be required to relocate his or her primary residence to a location within the prescribed limits within the time specified by the Board of Alderman at the time of Appointment." *See* **Exhibit D;** *see also* Perez Depo. at p. 93:15-25. This residency requirement for the Office of Chief of Police is also reflected in section 2-10 of the City of Los Fresnos Personnel Policies Manual. *See* **Exhibit E.** From the time Plaintiff was hired, he was aware of the residency requirement. *See* **Exhibit A-1**, Perez Depo. at p. 405:1-14. One of the concerns of the Defendant City of Los Fresnos was that Plaintiff Perez did not meet the residency requirement. *See* **Exhibit A-2,** Deposition of Miguel Mendoza [hereinafter M. Mendoza Depo.] at pp. 141:20-25; 142:1-18. *See also* **Exhibit F,** Miguel Mendoza's list of concerns regarding Plaintiff, which was attached to M. Mendoza's deposition as exhibit 8 and authenticated in M. Mendoza's Depo. at p. 140. *See also* **Exhibit A-3,** Deposition of Ida Garcia [hereinafter Garcia Depo.] at p. 101:5-25; *see also* **Exhibit G**, Ida Garcia's list of concerns regarding Plaintiff, which was attached to Ida Garcia's deposition as exhibit 2 and authenticated in Garcia Depo. at pp. 99:23-25; 100:1-25. *See also* **Exhibit A-4**, deposition of Juan C. Sierra, Sr. [hereinafter Sierra Depo.] at p. 45:11-25; *see also* **Exhibit H**, Juan C. Sierra, Sr.'s list of concerns regarding Plaintiff, which was attached to Sierra's deposition as Exhibit 2 and authenticated in Sierra Depo. at p. 36:3-23. Plaintiff admitted, however, that his primary residence was in Edinburg, Texas, and when he did find an apartment in Los Fresnos five (5) months after his employment, he spent a maximum of seven (7) nights in that apartment during his entire approximately seven month tenure. *See* **Exhibit A-1,** Perez Depo. at pp. 102:23-25; 103:1 (at all other times while employed as Chief, Plaintiff resided in Edinburg, Texas); at pp. 96:17-23; 102:4-9 (rented apartment at end of July 2000); at p. 102:10-

13 (spent 2 or 3 nights in July); at p. 102:14-18 (3 or 4 nights in August); at p. 102:19-20 (no

time in September). *See also* **Exhibit A-3,** Garcia Depo. at pp. 101:5-25; 102:1 (no evidence of

habitation in Plaintiff's apartment at night).

The Defendant City of Los Fresnos had other concerns as well, in addition to their

concerns with Plaintiff's residency. *See* **Exhibit F,** Miguel Mendoza's list of concerns; **Exhibit**

**G,** Garcia's list of concerns; **Exhibit H,** Sierra's list of concerns; **Exhibit I,** Acevedo's list of

concerns; **Exhibit A-5,** Deposition of Gonzalo Acevedo [hereinafter Acevedo Depo.] at pp.

39:14-25; 40:1-20 (authenticating list of concerns);   *See also* **Exhibit A-1,** Perez Depo. at p.

419:19-25 (Plaintiff's lack of residency); at p. 420:1-23 (Plaintiff's failure to have a local land

phone line);  at p. 423:3-7 (Plaintiff's failure to show up at a large drug bust on 10th Street); at p.

423:11-13 (Plaintiff's failure to establish a policy regarding confiscated evidence); at p. 423:16-

20 (Plaintiff's failure to show up at a major traffic accident); at p. 423:21-25 (Plaintiff's failure

to assure the annual firearms qualification of Police Officers); at p. 424:11-15 (Plaintiff's attempt

to hire his brother); at p. 424:16-19 (Plaintiff's ignorance or minimization of  graffiti problems);

at p. 424:20-25 (Plaintiff's overly frequent rides with Lt. Vasquez);  425:2-4 (decreased morale

of police department); at p. 425:14-17 (Plaintiff's failure to establish working relationship with

local Constable); at p. 425 :18-21 (Plaintiff's misrepresentations about condition of jail fence); at

pp. 425:22-25; 426:1-25 (Lt. Vasquez' possible coercion of citizen to file complaint against a

Police Officer); and at p. 427:17-20 (Plaintiff's poor communication with officers and public).

Plaintiff's employment was discussed at the August 29, 2000 City Council Meeting, at

which Plaintiff and his attorney were present and had an opportunity to address the Council. *See*

**Exhibit J,** August 29, 2000 Special Council Meeting minutes; **Exhibit A-1,** Perez Depo. at pp.

216; 217; 218 (admits had opportunity to respond at August 29, 2000 meeting). The following

month, Plaintiff was terminated at the September 26, 2000 council meeting; Plaintiff and his attorney were present and were again afforded the opportunity to address the Council at that meeting. **Exhibit A-1,** Perez Depo. at pp. 408:16-25; 409:1-11 (admits that both he and his attorney had opportunity to say everything that needed to be said at September 26, 2000 meeting); *see also* **Exhibit K**, minutes of the September 26, 2000 City of Los Fresnos Meeting. Relying on the at-will provisions of Plaintiff's employment, the individual Council members, including the Defendant Alderpersons, did not state their concerns or identify their particular reasons for their decision to terminate Plaintiff's employment at the September 26, 2000 meeting. S*ee* **Exhibit K**, minutes of the September 26, 2000 City of Los Fresnos Meeting.  Eight days after his termination, Plaintiff began working as a police officer with the City of Mission, Hidalgo County, Texas.  *See* **Exhibit A-1,** Perez Depo. at p. 435:17-25.

A subsequent meeting was held on December 19, 2000, after Plaintiff had received a summary of the individual Defendants lists of concerns.   Prior to the December 19 Council meeting, Plaintiff and his attorney were provided with a summary of the Alderpersons concerns, identifying the Plaintiff's particular deficiencies described above.  *See* **Exhibit A-1,** Perez Depo. at pp. 415:12-25; 416:1-8.  Plaintiff and his attorney were thereafter again afforded a chance to address the City Council at its December 19, 2000 meeting.  *See* **Exhibit A-1,** Perez Depo. at pp. 421:1-17; 429:13-25; 430 to 431.

Plaintiff claims he was only terminated because he referred complaints and allegations of abuse and civil rights violations by an officer to the FBI, although he does not identify the facts surrounding the complaint, the allegations, or the date when such complaint was allegedly made. He alleges that sometime after he filed this complaint, Defendant Garcia began inquiring about his work history and performance, that Defendant Sierra allegedly stated he did not have a

problem with Plaintiff, but that he had some issues with which he was concerned, and that

Defendant Acevedo stated that Plaintiff was doing a good job and that he wanted to know what

was wrong. Plaintiff alleges that the purpose of the Commission meeting scheduled for August

29, 2000, was to deliberate Plaintiff's employment, at which time he requested that he be

provided the reasons for any discipline or termination, and that no response was given. That

meeting was instead reconvened to a special meeting on September 26, 2000. *See* **Exhibit K,**

minutes of Special City Council Meeting of February 26, 2000. Plaintiff alleges that because of

the media attention attracted to his employment situation, the individual Defendant council

members were humiliated and angered. Plaintiff again requested that he be provided notice of

the complaints against him regarding his potential termination, but again no reasons were ever

given. On September 26, 2000, the Los Fresnos Board of Aldermen voted to terminate Plaintiff's

employment, without providing him with an explanation for its actions. *See* **Exhibit K,** minutes

of Special City Council Meeting of February 26, 2000. Plaintiff alleges a meeting of the minds

between the individual Defendant Alderpersons to terminate him, although he does not identify

any allegedly improper agreement. Plaintiff alleges he invoked the City's procedures requiring

explanation or reasons for his termination, although he failed to identify any such alleged

procedures, how such procedures would apply to him, or how he timely requested their

implementation.

### III.

### STANDARD OF REVIEW

1. **Standard for Summary Judgment**.

Summary Judgment is proper when there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. ***Indest v. Freeman Decorating, Inc.,***

164 F.3d 258, 261 (5th Cir. 1999). The movant must "demonstrate the absence of a genuine issue of material fact." *Id.; citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the movant meets its burden, the non-movant must then go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id*. The non-movant's burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). Even if the evidence is more than a scintilla, some evidence may exist to support a position, which is yet so overwhelmed by contrary proof as to yield to a summary judgment. *See Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996).

Furthermore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported Motion for Summary Judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2508, 91 L.Ed.2d 202 (1986) *(emphasis in original)*. An issue is "material" if it involves a fact that might affect the outcome of the suit under the governing law. *Merritt-Campell, Inc., v. RxP Products, Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Factual disputes that are irrelevant or unnecessary are not counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-8, 106 S. Ct. at 2508, 91 L.Ed.2d at 211.

## IV.

## LEGAL ANALYSIS

**A.**    **42 U.S.C. § 1983 Claims**

The United States Supreme Court has held that a municipality may not be held liable under § 1983 solely because it employs a tortfeasor. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 58, 689, 98 S. Ct. 2018, 2035 (1978); *Board of County Commissioners of Bryant County v. Brown Commissioners*, 520 U.S. 397, 403-11, 117 S. Ct. 1382, 1388 (1997). The Court has also "consistently refused to hold municipalities liable under a theory of *respondeat superior*." *Board of County Commissioners of Bryant County v. Brown*, 520 U.S. at 403, 117 S. Ct. at 1388. The Supreme Court has instructed that to hold the City of Los Fresnos liable, Plaintiff must establish the state-of-mind of the municipality's legislative body or an authorized decision-maker to prove the underlying violation. *Brown*, 520 U.S. at 405, 117 S. Ct. at 1389. That state-of-mind is the deliberate indifference standard. *Brown*, 520 U.S. at 407, 117 S. Ct. at 1390.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence to his action." *Brown*, 520 U.S. at 410, 117 S. Ct. at 1391. The Fifth Circuit equated the deliberate indifference standard to a criminal law *mens rea* recklessness standard where a person disregards a risk of harm of which he is aware. *Hare v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996) (en banc). Neither negligence nor gross negligence is sufficient to prove that an official acted or failed to act with deliberate indifference. *Brown*, 520 U.S. at 397, 407, 117 S. Ct. 1382, 1390; *Hare,* 74 F.3d at 648-49. The standard is higher. *Hare*, 74 F.3d at 648. Under this strict standard, no Defendant violated any alleged constitutional right to Plaintiffs.

The termination of Plaintiff's employment with the City of Los Fresnos was a legal act,

substantiated with legitimate, non-discriminatory reasons for the termination. No action that can

be attributable to the City of Los Fresnos was taken with deliberate indifference to any known or

obviously harmful consequences of those acts. Simply alleging that Plaintiff has suffered a

deprivation of federal rights will not alone permit an inference of municipal culpability and

causation. *Brown*, 520 U.S. at 408, 117 S. Ct. 1390.

Further, there is no evidence of any custom or policy of the City of Los Fresnos that was

the moving force that caused Plaintiff's injury. *Monell v. New York City Dep't of Social Servs.*,

436 U.S. at 694, 98 S. Ct. 2027. Plaintiff's termination was one act. Plaintiff has no evidence

of any custom or policy of the City of Los Fresnos to intentionally deprive him or anyone else

any colorable constitutional right. Simply identifying an act of a municipal decision-maker is

insufficient to hold a municipality liable for its own conduct. *Brown*, 520 U.S. at 404, 117 S. Ct.

1388. Likewise"[w]here a claim of municipal liability rests on a single decision, not itself

representing a violation of federal right and not directing such violation, the danger that a

municipality will be held liable without fault is high." *Brown*, 520 U.S. at 408, 117 S. Ct. at

1390.

Further, although Plaintiff has filed suit against Juan Sierra, Sr., Gonzalo Acevedo, Ida

Garcia, and Miguel Mendoza, in their official capacities as Alderpersons for the City of Los Fresnos

(Pl.'s First Am. Original Compl. preamble), he cannot pursue § 1983 claims against individuals in

their official capacities, rather than directly against the City. *Will v. Michigan Dep't of State*

*Police*, 491 U.S. 58, 71, 109 S. Ct. 2304 (1989)(holding that officials sued in official capacity are

outside class of persons subject to § 1983 liability); *Texas Dep't of Pub. Safety v. Petta*, 44

S.W.3d 575, 581-82 (Tex. 2001).

1.   **First Amendment Right to Free Speech.**

Plaintiff contends that he was terminated in retaliation for exercising his right to free speech. There are four elements to an employee's First Amendment free speech retaliation claim against his employer:

> First, the Plaintiff must suffer an adverse employment decision.  Second, the Plaintiff's speech must involve a matter of public concern.   Third, the Plaintiff's interest in commenting on matters of public concern must outweigh the Defendants' interest in promoting efficiency.  Fourth, the Plaintiff's speech must have motivated the Defendants' action.

*Teague v. City of Flower Mound, Texas*, 179 F.3d 377, 380 (5th Cir. 1999)(internal citations omitted).   Initially, the Plaintiff must prove that he actually spoke or otherwise engaged in speech activities recognized by First Amendment jurisprudence. *Steadman v. Texas Rangers*, 179 F.3d 360, 366 (5th Cir. 1999).   Plaintiff must also demonstrate that his speech was a "substantial" or "motivating" factor behind the Defendants' action.   *Brady v. Houston Independent School Dist.*, 113 F.3d 1419, 1423 (5th Cir. 1997), *citing Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-87, 97 S. Ct. 568, 574-76, 50 L.Ed.2d 471 (1997).   In order to establish a causal link between his alleged speech and his termination, Plaintiff must also show that Defendants had knowledge of the speech for which he contends he was terminated. *See Lukan v. North Forest ISD*, 183 F.3d 342, 346 (5th Cir. 1999).

Although a public employee may not be discharged for exercising his or her right to free speech under the First Amendment, it is clear that only certain speech is protected. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1050 (5th Cir. 1996).   Whether a Plaintiff's alleged speech pertains to a matter of public concern is determined by the content, form, and context of the speech. *Wallace v. Texas Tech Univ.*, 80 F.3d at 1050.  When a public employee speaks not as a citizen but instead as an employee upon a matter only of personal interest, absent the most unusual

circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. *Brady v. Fort Bend County*, 145 F.3d at 706 (quoting *Connick v. Myers*, 461 U.S. 138, 146-47, 103 S. Ct. 1684 (1983)). Therefore, if the Plaintiff's alleged speech cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for a Court to scrutinize the reasons for the Plaintiff's termination. *Id.* A public employee may speak in his or her role as an employee and still speak out on a matter of public concern, but only in limited circumstances: those cases involving the report of corruption or wrongdoing to higher authorities. *Wallace v. Texas Tech Univ.*, 80 F.3d at 1050-51. *See McPherson v. Rankin*, 786 F.2d 1233, 1239, N. 2, (5th Cir. 1986). Plaintiff has not yet provided any evidence that any alleged speech was actually made or protected, however.

Additionally, the Plaintiff has not alleged how any of his alleged speech *actually* motivated any Defendant to vote to terminate him, rather than because of their actual, legitimate concerns about the performance of his duties. Plaintiff cannot establish that his allegedly protected speech was actually a *motivating factor* in any actions taken by the Defendant City of Los Fresnos, or that the Defendant City of Los Fresnos would not have reached the same decision in the absence of any protected conduct by Plaintiff Perez. *Crawford-El v. Britton*, 523 U.S. 574, 593, 118 S. Ct. 1584, 1594, 140 L.Ed.2d 759 (1998). The burden on Plaintiff Perez is not to establish simply that the Defendant City of Los Fresnos or any other Defendant may have had some animus directed at him; rather, he must establish some larger, more general animus. "When intent is an element of a constitutional violation, the primary focus is not on any possible animus directed at the Plaintiff; rather, it is more specific, such as an intent to disadvantage all members of a class that includes the Plaintiff ...." *Id.,* 523 U.S. at 592, 108 S. Ct. at 1594.

Contrary to Plaintiff's assertions, Defendant's motion for summary judgment evidence attached hereto conclusively proves that the Defendant Alderpersons had multiple, legitimate concerns with Plaintiff's performance of his duties as Police Chief and with his intransigence regarding, and lack of compliance with, the residency requirement. *See* **Exhibit F**, Miguel Mendoza's concerns; **Exhibit G**, Garcia's concerns; **Exhibit H**, Sierra's concerns; **Exhibit I**, Acevedo's concerns.  Plaintiff admitted that it took him at least three months to rent an apartment in Los Fresnos and that he spent only a maximum of 7 days in that apartment during his entire nine-month tenure. *See* **Exhibit A-1,** Perez Depo. at pp. 96:17-23; 102:4-103:1. The Alderpersons had numerous other concerns with Plaintiff's performance as well. *See* **Exhibit A-1,** Perez Depo. at p. 420:1-23 (Plaintiff's failure to have a local land phone line); at p. 423: 3-7 (Plaintiff's failure to show up at a large drug bust on 10th Street); at p. 423:11-13 (Plaintiff's failure to establish a policy regarding confiscated evidence); at p. 423:16-20 (Plaintiff's failure to show up at a major traffic accident); at p. 423:21-25 (Plaintiff's failure to assure the annual firearms qualification of Police Officers); at p. 424:11-15 (Plaintiff's attempt to hire his brother); at p. 424:16-19 (Plaintiff's ignorance or minimization of  graffiti problems); at p. 424:20-25 (Plaintiff's overly frequent rides with Lt. Vasquez); 425:2-4 (decreased morale of police department); at p. 425:14-17 (Plaintiff's failure to establish working relationship with local Constable); at p. 425 :18-21 (Plaintiff's misrepresentations about condition of jail fence); at pp. 425:22-25; 426:1-25 (Lt. Vasquez' possible coercion of citizen to file complaint against a Police Officer); and at p. 427:17-20 (Plaintiff's poor communication with officers and public).

Defendant's actions were objectively reasonable, even if they may have "infringed upon" Plaintiff's constitutional rights. *See **Wagner v. Bay City, Texas**,* 227 F.3d 316, 321 (5th Cir. 2000); ***Gutierrez v. City of San Antonio***, 139 F.3d 441, 445 (5th Cir. 1998).  Even "when a public

employee shows that protected speech was a 'motivating factor' in an adverse employment decision, the employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct." *Crawford-El v. Britton*, 523 U.S. 574, 593, 118 S. Ct. 1584, 1594, 140 L.Ed.2d 759 (1998), *citing Mt. Healthy City Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L.Ed.2d 471 (1977).  Without any evidence that the Defendant City of Los Fresnos or any other Defendant had any general animus, or that their actions violated Plaintiff's *clearly established* constitutional rights, or that their actions were objectively unreasonable, Defendants City of Los Fresnos is entitled to entry of summary judgment herein.

## 2.    <u>Fourteenth Amendment Due Process</u>

Plaintiff does not specify in what manner he is claiming a pre- or post-termination due process violation; instead, he only alleges generally that his due process rights were violated when he was given neither.  In order to have a right to due process in an employment setting, the employee must establish that he has a property interest in his employment, which is a legitimate right to continued employment.  *See McDonald v. City of Corinth*, 102 F.3d 152, 155 (5th Cir. 1996).  State law determines whether a Plaintiff has a property interest in employment.  *Id.*  In Texas, an at-will employment state, an employee must demonstrate the existence of some form of an employment contract in order to establish a property right in his employment.  *See Shultea v. Wood*, 47 F.3d 1427, 29 (5th Cir. 1995).  Plaintiff, however, had no contract of employment, **Exhibit A-1,** Perez Depo. at pp. 133:16-24; 432:3-5, and he did not ever sign the policies and procedures of the City of Los Fresnos as though they were a contract, **Exhibit A-1,** Perez Depo. at p. 134:4-6.

After the office of Marshall for the City of Los Fresnos was abolished in 1950, the office of Chief of Police for the City of Los Fresnos was created in 1956. *See* **Exhibit L**, Ordinance 19; *see also* **Exhibit C**, Ordinance No. 41 of the City of Los Fresnos. Prior to Plaintiff Perez's appointment to the office of Chief of Police, the City of Los Fresnos enacted Ordinance Number 297, which repealed Ordinance Number 41, and redefined the office of Chief of Police. *See* **Exhibit C**, Ordinance No. 41 of the City of Los Fresnos; *see also* **Exhibit B**, February 22, 2000 minutes of Regular City Council Meeting; *see also* **Exhibit A-1**, Perez Depo at p. 72:20-22 (indicating start of employment on March 13, 2000). Therefore, as of February 22, 2000, the Chief of Police held office at the will of the Board of Aldermen and would not be considered a municipal officer under Subchapter C of Chapter 22 of the Texas Local Government Code (§ 22.071 et seq.).

Plaintiff understood that the City of Los Fresnos' policies and procedures, including the policy stating that he was an at-will employee, applied to him. **Exhibit A-1**, Perez Depo. at pp. 133:25; 134:1-12. Plaintiff also agreed he was not hired for a definite period of time. **Exhibit A-1**, Perez Depo. at pp. 133:25; 134:1-12; 136:1-16. As set out in the City of Los Fresnos Personnel Policies Manual, Plaintiff was a probationary employee at the time of his termination. "As prescribed by state law, a person appointed to a beginning position in the Police Department must serve a probationary period of one (1) year, beginning on that person's date of employment." **Exhibit E,** City of Los Fresnos Personnel Policies Manual § 3-01. The Personnel Policies Manual further specifically provides

> [n]othing in this manual shall be considered to create a property right in employment. It should be understood that employment is for an indefinite period and is at-will for both employer and employee. These policies are not intended to constitute an employment contract or entitlement to continued employment with the City.

**Exhibit E,** City of Los Fresnos Personnel Policies Manual.  § 1-03 (emphasis in original).  A probationary employee "has no reasonable expectation of continued employment while in the probationary status," and therefore he has "no property interest in his or her continued employment sufficient to call forth procedural due process when that employment is terminated." *Evans v. City of Dallas*, 861 F.2d 846, 848 (5th Cir. 1988); *Burnley v. Thompson*, 524 F.2d 1233, 1240 (5th Cir. 1975).

"To succeed with a claim based on substantive due process in the public employment context, the Plaintiff must show two things: (1) that he had a property interest/right in his employment, and (2) that the public employer's termination of that interest was arbitrary or capricious." *Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993).  "[P]rocedural due process is a positivist notion, designed to protect property interests, existing not by force of the due process clause itself, but established by reference to some independent source, such as state law or contract." *Martin v. Memorial Hosp. at Gulfport*, 130 F.3d 1143, 1147 (5th Cir. 1997), *citing Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S. Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

As set out above, Plaintiff has not alleged the existence of any employment contract, and no such contract exists.  Pursuant to the City's Personnel Policies, Plaintiff was an at-will employee, with no property right to his continued employment.  Without any such property right, Plaintiff was not entitled to any due process hearing prior to or after the termination of his employment.  Because Defendants have proven with admissible and competent summary judgment evidence that Plaintiff had no property interest in his continued employment, summary judgment is proper on Plaintiff's

claim for violation of his procedural and substantive due process rights asserted against the City of Los Fresnos.

Plaintiff also appears to allege that Co-Defendant Juan Mendoza, Jr., "in collusion and conspiracy with the other Defendant Alderpersons, denied the Plaintiffs' due process for his protected liberty interest." The only legal basis for asserting a claim of deprivation of a liberty interest would necessarily have to arise in the denial of an opportunity to rebut allegedly false charges against him. To the extent that Plaintiff is alleging such a claim against the City of Los Fresnos, however, he must first establish that the:

> charges against him were raised to such a level that they created a 'badge of infamy' which destroys the claimant's ability to take advantage of other employment opportunities. Additionally, the claims must be false and the claimant must show that damage to his reputation and employment opportunities has in fact occurred.

***Farias v. Bexar County Bd. of Trustees for Mental Health Mental Retardation Services***, 925 F.2d 866, 877-78 (5th Cir. 1991) (quoting ***Evans v. City of Dallas***, 861 F.2d at 851). Even though Plaintiff has filed his First Amended Original Complaint in response to this Court's February 13, 2001 Order, Plaintiff has yet to identify how any of the Defendants asserted any charges against him, how the charges against him created a "badge of infamy," how the charges against him were false, how his reputation was damaged, or how any employment opportunities have been denied. To the contrary, Plaintiff admitted in his deposition testimony that he was able to find employment as a police officer for the City of Mission, Texas within 8 days after his termination from the City of Los Fresnos. *See* **Exhibit A-1**, Perez Depo. at p. 72:11-17. While working for the City of Mission, he has applied for only one Police Chief position. *See* **Exhibit A-1,** Perez Depo. at pp. 74:13-25; 75:1-15. In addition, Plaintiff's primary complaint appears to be not that Defendants charged him with false allegations, but rather that they refused to identify their reasons for terminating his employment. *See* Pl.'s First Am. Orig. Compl. at ¶¶ 3.20-3.21;

**Exhibit A-1,** Perez Depo. at p. 436:1-19. In other words, Plaintiff appears to complain that Defendants *did not* tell him how he did his job badly.

"Moreover, the process due such an individual is merely a hearing providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee." *Rosenstein v. City of Dallas, Tex.*, 876 F.2d 392, 395 (5th Cir. 1989), modified on other grounds, *Rosenstein v. City of Dallas, Tex.*, 901 F.2d 61 (5th Cir. 1990)(en banc) (*citing Board of Regents of State Colleges v. Roth*, 408 U.S. at 573 n.12, 92 S. Ct. at 2707 n.12). Plaintiff alleges in his Complaint and in his deposition testimony that he actually was provided a hearing in a public forum at the August 29th and September 26th meetings, at which he could clear his name of any allegedly false accusations. *See* Pl.'s First Am. Orig. Compl. at ¶ 3.10 & 3.15; **Exhibit A-1,** Perez Depo. at pp. 216; 217; 218 (admits had opportunity to respond at August 29, 2000 meeting) and at pp. 408:16-25 to 409:1-11 (admits that both he and his attorney had opportunity to say everything that needed to be said at September 26, 2000 meeting); *see also* **Exhibit K,** minutes of the September 26, 2000 City of Los Fresnos Meeting. Further, even after Plaintiff was provided with a summary of the Alderpersons' concerns, both Plaintiff and his attorney were present at the December 19, 2000 Council meeting and were again given the opportunity to say whatever they wanted to say to the Council and the public in open session. **Exhibit A-1,** Perez Depo. at pp. 446:21-25; 447 to 450. Accordingly, Plaintiff was given more than one opportunity to take whatever actions he felt were necessary or appropriate to clear his name in a public forum. Therefore, he cannot prevail on his claim for the denial of any liberty interest, or any right to due process. Defendant City of Los Fresnos has provided competent summary judgment evidence that conclusively proves that Plaintiff was afforded more process than was required and that he cannot prove an essential element of his cause of action against the City for any form of deprivation of process. Such claims should therefore be dismissed with prejudice.

Because none of the Defendant Alderpersons were deliberately indifferent to Plaintiff's constitutional rights, and because Plaintiff has presented no evidence of any custom or policy of the City of Los Fresnos that was the moving force behind any alleged deprivation, summary judgment on all of Plaintiff's § 1983 claims should be granted.

**B.**      **42 U.S.C. § 1985 Claims**

Although the Court previously dismissed Plaintiff's claim for civil conspiracy against the City, Plaintiff's First Amended Original Complaint maintains a general claim of conspiracy to violate civil rights under 42 U.S.C. § 1985. (Pl.'s First Am. Original Compl. ¶ 4.4.)  Before the City of Los Fresnos and the Individual Defendants can be held liable under § 1985, however, Plaintiff must show that he was a victim of class-based discrimination.  *See **McLellan      v. Mississippi Power & Light Co.,*** 545 F.2d 919, 928-29 (5th Cir. 1997)(en banc).  Plaintiff has failed to allege, however, that he was discriminated against because he belonged to a particular class and he has not alleged to which class he belonged.  Additionally, Plaintiff's conspiracy claim is not actionable without a violation of 42 U.S.C. § 1983.  ***Pfannstiel v. City of Marion***, 918 F.2d 1178 (5th Cir. 1990).  As shown section A. above, Plaintiff's § 1983 claims fail. Therefore, Plaintiffs' claims under 42 U.S.C. § 1985 must also fail and summary judgment should be granted for those claims against the City of Los Fresnos and the Individual Defendants.

**C.**      **Texas Whistleblower Act**

The Texas Whistleblower Act authorizes suits by a public employee against his employing state or local governmental entity for violation of the Act. TEX. GOV'T CODE § 554.03. The Whistleblower Act prohibits the suspension or termination of employment of a public employee

who in good faith reports a violation of law by his employer or a public employee "to an appropriate law enforcement authority." TEX. GOV'T CODE § 554.002(a) (Vernon 1994).   Plaintiff, however, has presented no evidence he made a good faith report of a violation of law by a public employee to an appropriate law enforcement authority.   He does not identify the facts surrounding any complaint, the allegations, or the date when such complaint was allegedly made. Plaintiff has also not identified how any action was allegedly taken against him because of such alleged report. Without any claim that he was suspended "because" he reported a violation of law in good faith to an appropriate law enforcement authority, as opposed to because of his numerous other deficiencies, he may not maintain any Whistleblower Act claim.  *See Texas Dept. of Human Services of State of Texas v. Hinds*, 904 S.W. 2d 629, 633 (Tex. 1995).

Simply alleging that Plaintiff reported a violation to the proper authority and was then terminated is insufficient to hold the City of Los Fresnos liable under the Act, even if the allegations prove true.  *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000).   To show causation, Plaintiff must prove that after he reported the alleged violation, he suffered discriminatory conduct that would not have occurred when it did if he had not reported the illegal conduct.   There is, however, no connection between any alleged report and his termination.

Plaintiff makes amorphous and global accusations of a negative attitude demonstrated by each of the Defendant Alderpersons that he claims is a conspiracy.  Evidence that an adverse employment action was preceded by a superior's negative attitude – even a negative attitude towards an employee's report of illegal conduct - is not enough to show a causal connection between the two events.  *Texas Dep't of Mental Health & Mental Retardation v. Rodriguez*, 63 S.W.3d 475, 481 (Tex. App.--San Antonio 2001, no pet.).  Plaintiff's negative attitude rests on speculation and innuendo, which is insufficient.  *Id*.

Further, as Defendant's summary judgment evidence referenced above proves, the City of Los Fresnos had many legitimate reasons to terminate Plaintiff's employment. Each reason taken singularly and collectively conclusively proves that the City had legitimate, non-discriminatory reasons to terminate Plaintiff's employment. Thus, Defendant's summary judgment evidence conclusively proves that Plaintiff cannot prevail on two essential elements of his Whistleblower cause of action and summary judgment should be granted.

**D.** **Punitive Damages**

Plaintiff makes a claim for punitive damages under the Whistleblower Act. This Court has previously dismissed Plaintiff's punitive damage claim against the City under § 1983. Notwithstanding, Plaintiff's First Amended Original Petition still asserts a claim for punitive damages. In addition, although the Texas Whistleblower Act previously authorized punitive damages against public employers, the Act was amended in 1995 to preclude recovery of punitive damages. Acts 1995, 74th Leg., Ch. 721, § 3, eff. June 15, 1995. Similarly, 42 U.S.C. § 1983 also does not authorized the recovery of punitive damages against the City. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S. Ct. 2748, 69 l. Ed 2d 611 (1981). Other state law also precludes punitive damages against a city. Tex. Civ. Prac. & Rem. Code § 101.024 (Vernon 1997). Therefore, summary judgment on Plaintiff's punitive damage claim should be granted.

WHEREFORE, PREMISES CONSIDERED, Defendant **CITY OF LOS FRESNOS** prays that this Court grant its Motion and dismiss Plaintiff's claims against it, with prejudice, and that Defendant be granted such other and further relief, whether general or special, at law and in equity, to which Defendant may show itself to be justly entitled.

Signed on this the 1st day of March, 2002.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas  78520
Telephone      :  (956) 504-1100
Facsimile      :  (956) 504-1408

By: _____

J. Arnold Aguilar
Federal Bar No. 6822
State No.  00936270

John J. Jordan
Federal Bar No. 21304
State No. 00796852

Attorneys for Defendants,
CITY OF LOS FRESNOS, TEXAS, JUAN C.
SIERRA, GONZALO ACEVEDO, IDA GARCIA
AND MIGUEL MENDOZA

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **DEFENDANTS CITY OF LOS FRESNOS' MOTION FOR PARTIAL SUMMARY JUDGMENT** has on this the 1ˢᵗ day of March, 2002, been forwarded via certified mail, return receipt requested to:

Mr. Miguel Salinas
LAW OFFICE OF MIGUEL SALINAS
803 Old Port Isabel Road
Brownsville, TX 78521

      *and via Regular Mail to*:

Mr. Albert Villegas
VILLEGAS LAW FIRM
1324 E. 7th Street
Brownsville, TX 78520

J. Arnold Aguilar
John J. Jordan

v:\sc\motions\202-00.MSJ-City                                    PAGE 23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO PEREZ, JR. | § | |
| Plaintiff | § | |
| | § | |
| VS.                    . | § | CIVIL ACTION NO. |
| | § | |
| CITY OF LOS FRESNOS, TEXAS, | § | B - 00 - 161 |
| JUAN C. SIERRA, SR., GONZALO | S | |
| ACEVEDO, IDA GARCIA, MIGUEL | § | |
| MENDOZA, Individually and in their | § | |
| Official Capacities and | § | |
| JUAN MENDOZA, JR. | § | |
| Defendants | § | JURY REQUESTED |

## ORDER ON DEFENDANT CITY OF LOS FRESNOS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

On the _____ day of _____, 2002, this cause came for hearing on
*Defendant City of Los Fresnos' Motion for Partial Summary Judgment.*

After examining the evidence and hearing the argument of the parties, the Court is of the
opinion that Defendant City of Los Fresnos' Motion for Partial Summary Judgment should be
**GRANTED.**

**IT IS THEREFORE ORDERED, ADJUDGED and DECREED** that Defendant City
of Los Fresnos' Motion for Partial Summary Judgment be in all things Granted, and that all of
Plaintiff Ricardo Perez's claims against Defendant City of Los Fresnos are hereby DISMISSED
WITH PREJUDICE in their entirety.

SIGNED on this the _____ day of _____, 2002.


_____
UNITED STATES DISTRICT JUDGE

**COPIES SENT TO:**
Mr. Miguel Salinas, 803 Old Port Isabel, Road, Brownsville, TX 78521
Mr. J. Arnold Aguilar, 1200 Central Blvd., Suite H-2, Brownsville, TX 78520
Mr. Albert Villegas, 1324 E. 7th St., Brownsville, TX 78520

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO PEREZ, JR. | § | |
|     Plaintiff | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| CITY OF LOS FRESNOS, TEXAS, | § | B - 00 - 161 |
| JUAN C. SIERRA, SR., GONZALO | S | |
| ACEVEDO, IDA GARCIA, MIGUEL | § | |
| MENDOZA, Individually and in their | § | |
| Official Capacities and | § | |
| JUAN MENDOZA, JR. | § | |
|     Defendants | § | JURY REQUESTED |

---

# ORDER SETTING HEARING

---

On this _____ day of _____, 2002, came for consideration *Defendant City of Los Fresnos' Motion for Partial Summary Judgment* in the above styled and numbered cause. The Court finds that this matter should be set for hearing.

IT IS ACCORDINGLY ORDERED that said Defendant City of Los Fresnos' Motion for Partial Summary Judgment be, and it is hereby, set for hearing on the _____ day of _____, 2002, at _____ o'clock ___.m.

SIGNED FOR ENTRY this _____ day of _____, 2002.

_____
UNITED STATES DISTRICT JUDGE

COPIES SENT TO:
Mr. Miguel Salinas, 803 Old Port Isabel, Road, Brownsville, TX 78521
Mr. J. Arnold Aguilar, 1200 Central Blvd., Suite H-2, Brownsville, TX 78520
Mr. Albert Villegas, 1324 E. 7th St., Brownsville, TX 78520

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO PEREZ, JR. | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| CITY OF LOS FRESNOS, TEXAS, | § | B - 00 - 161 |
| JUAN C. SIERRA, SR., GONZALO | S | |
| ACEVEDO, IDA GARCIA, MIGUEL | § | |
| MENDOZA, Individually and in their | § | |
| Official Capacities and | § | |
| JUAN MENDOZA, JR. | § | |
| Defendants | § | JURY REQUESTED |

# AFFIDAVIT OF J. ARNOLD AGUILAR

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned official, on this day appeared **J. ARNOLD AGUILAR**, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

"My name is J. Arnold Aguilar, I am over 21 years of age, and I am fully competent to make this affidavit. I am the attorney of record for Defendants City of Los Fresnos, Juan C. Sierra, Ida Garcia, Gonzalo Acevedo, and Miguel Mendoza in the above styled cause, and as such I am able to make this affidavit on behalf of those Defendants.

As the attorney for these Defendants in Cause No. B-00-161, pending in the United States District Court for the Southern District of Texas, Brownsville Division, I attended the depositions of:

| | |
|---|---|
| (A-1) | Plaintiff Ricardo Perez, Jr. on June 18 and August 24, 2001; |
| (A-2) | Defendant on Miguel Mendoza April 23, 2001; |
| (A-3) | Defendant Ida Garcia Cortez on June 2, 2001 |
| (A-4) | Defendant Juan C. Sierra on April 23, 2001; |
| (A-5) | Defendant Gonzalo Acevedo on April 23, 2001 |

The deposition excerpts attached hereto and incorporated herein were taken from the transcripts of the above deposition testimony and are true and correct copies of the records of the testimony provided by Plaintiff Ricardo Perez, Jr., and Defendants Juan C. Sierra, Ida Garcia, Gonzalo Acevedo, and Miguel Mendoza.

The facts stated in this affidavit are true and correct and based on my personal knowledge.

Further Affiant Sayeth Naught."

J. ARNOLD AGUILAR

SUBSCRIBED AND SWORN TO BEFORE ME on the 1st day of March, 2002, to certify which witness my hand and official seal.

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My commission Expires:

7-26 — 05

# EXHIBIT A-1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.            ) (
        Plaintiff             ) (
                              ) (
VS.                           ) (    CIVIL ACTION NO. B-00-161
                              ) (
CITY OF LOS FRESNOS,          ) (
TEXAS, JUAN C. SIERRA,        ) (
SR., GONZALO ACEVEDO,         ) (
IDA GARCIA, MIGUEL            ) (
MENDOZA, INDIVIDUALLY         ) (
AND IN THEIR OFFICIAL         ) (
CAPACITIES, AND JUAN          ) (
MENDOZA, JR.                  ) (
        Defendants            ) (

_____

ORAL DEPOSITION OF
RICARDO PEREZ, JR.
JUNE 18, 2001

_____

        ORAL DEPOSITION OF RICARDO PEREZ, JR., produced

as a witness at the instance of the DEFENDANTS, taken

in the above styled and numbered cause on JUNE 18,

2001, from 9:51 a.m. to 1:37 p.m. and 2:07 p.m. to 5:34

p.m., before LOU ZUNIGA, Certified Court Reporter

No. 2198, in and for the State of Texas, at the offices

of Hill & Romero, 5415 North McColl, McAllen, Texas,

pursuant to the Federal Rules of Civil Procedure.

**COPY**

HILL & ROMERO
CERTIFIED COURT REPORTERS

2

APPEARANCES

FOR THE PLAINTIFF:

        TED RODRIGUEZ, JR.
        LAW OFFICES OF TED RODRIGUEZ, JR.
        2316 North Bryan Road
        Mission, Texas  78572


FOR THE DEFENDANTS CITY OF LOS FRESNOS, TEXAS, JUAN C.
SIERRA, SR., GONZALO ACEVEDO, IDA GARCIA, MIGUEL
MENDOZA, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES:

        J. ARNOLD AGUILAR
        LAW OFFICES OF J. ARNOLD AGUILAR
        Artemis Square, Suite H-2
        1200 Central Boulevard
        Brownsville, Texas  78520


FOR THE DEFENDANT JUAN MENDOZA, JR.:

        ALBERT VILLEGAS
        VILLEGAS LAW FIRM
        1324 East 7th Street
        Brownsville, Texas  78520

11:15  1        A.  Exactly.

11:15  2        Q.  Any other reasons why you wanted to leave the

11:15  3   ISD police department to work as the Los Fresnos chief?

11:15  4        A.  No, sir.

11:15  5        Q.  40,000 was the same rate of pay you were making

11:15  6   when you stopped working for Los Fresnos, correct?

11:15  7        A.  Yes, sir.

11:15  8        Q.  Okay.  After leaving Los Fresnos -- while there

11:16  9   you were chief, correct?

11:16 10        A.  Yes, sir.

11:16 11        Q.  After leaving Los Fresnos, where is the next

11:16 12   position you held?

11:16 13        A.  I went back to Mission PD.

11:16 14        Q.  What date did you start working at Mission PD?

11:16 15        A.  October 4th, 2000.

11:16 16        Q.  October 4th, 2000?

11:16 17        A.  2000.

11:16 18        Q.  I'm sorry.  When did you start as Los Fresnos

11:16 19   chief?

11:16 20        A.  March 13th, '99.

11:16 21        Q.  '99?

11:16 22        A.  No.  2000.

11:17 23        Q.  Do you remember when you actually got hired?

11:17 24        A.  The exact date, no, sir.

11:17 25        Q.  Do you remember the month?

11:18  1     Q.  Did you try to get work anywhere else after

11:18  2  leaving Los Fresnos other than Mission PD?

11:18  3     A.  While employed by Mission or --

11:18  4     Q.  Well, after leaving Los Fresnos at anytime up

11:18  5  to the present day, did you try getting a job anywhere

11:18  6  else other than Mission PD?

11:18  7     A.  No, sir.

11:18  8     Q.  You never even applied?

11:18  9     A.  I went straight back to Mission.

11:18 10     Q.  I understand that.  I'm just asking if you --

11:18 11         MR. RODRIGUEZ:  He's asking up to the

11:18 12  current time.

11:18 13     Q.  Up to the current time have you ever even

11:19 14  applied to work anywhere else other than at Mission?

11:19 15  You told me you applied and returned to Mission.  I

11:19 16  understand that.  I'm asking about any other cities,

11:19 17  any other school district.  Up to the present date have

11:19 18  you ever applied to work anywhere else?

11:19 19     A.  Up to today?

11:19 20     Q.  Up to today.

11:19 21     A.  I applied for the La Joya ISD police chief job.

11:19 22     Q.  La Joya ISD?

11:19 23     A.  La Joya.

11:19 24     Q.  ISD?

11:19 25     A.  ISD.

11:19  1        Q.   Where else?

11:19  2        A.   While working for Mission.

11:19  3        Q.   Okay.  Where else?

11:19  4        A.   That's it.

11:19  5        Q.   Did you get hired at La Joya?

11:19  6        A.   No, sir.

11:19  7        Q.   Do you know who did?

11:19  8        A.   Yes, sir.

11:19  9        Q.   Who?

11:19  10       A.   Raul Gonzalez.

11:19  11       Q.   And was Mr. Gonzalez a former officer at La

11:19  12  Joya ISD?

11:19  13       A.   No, sir.

11:19  14       Q.   Where did you come from?

11:19  15       A.   Mission Police Department.

11:19  16       Q.   Did you ever talk to the city -- I'm sorry, to

11:19  17  the -- who is the one that made the decision to hire

11:19  18  Mr. Gonzalez?

11:20  19            MR. RODRIGUEZ:  Objection; speculation.

11:20  20       A.   I don't know, sir.

11:20  21       Q.   Did you ever talk to -- what was your

11:20  22  understanding as to who would be making that decision?

11:20  23  Who did you apply with?

11:20  24       A.   The human resources department.

11:20  25       Q.   Okay.  You just submitted an application?

11:49  1    understand that?

11:49  2        A.   If it was explained to me, yes.

11:49  3        Q.   Okay.  And if it wasn't explained to you, you

11:49  4    thought, hey, it wasn't explained to me.  I'm not bound

11:49  5    by it.  Is that what you thought?

11:49  6             MR. RODRIGUEZ:  Objection; argumentative.

11:49  7        A.   I would have no reason to violate any policy.

11:49  8        Q.   That's not my question.

11:49  9        A.   Can you rephrase your question?

11:49 10        Q.   Sure.  When you started working at the City of

11:49 11    Los Fresnos, you expected you were going to have to

11:49 12    abide by all of their policies and procedures, didn't

11:49 13    you?

11:49 14        A.   Yes, sir.

11:49 15        Q.   Okay.  Continuing on with Exhibit No. 2, if you

11:50 16    will look at it.  You can pick it up if you'd like.

11:50 17    That one.  On Item 4 of Ordinance No. 297 it provides

11:50 18    that the chief of police shall be required to reside in

11:50 19    the corporate limits of the city or within 15 miles of

11:50 20    its corporate limits provided that you will be required

11:50 21    to relocate your primary residence to a location within

11:50 22    the prescribed limits within the time specified by the

11:50 23    board of aldermen at the time of appointment.  Do you

11:50 24    remember the board of aldermen telling you when they

11:50 25    wanted you to move in?

11:52   1       Q.  How long did you live there?

11:52   2       A.  I first moved in in July, July 2000.

11:53   3       Q.  Okay.  You were hired in February 2000, right?

11:53   4       A.  Yes, sir.

11:53   5       Q.  But you didn't move in until July of 2000?

11:53   6       A.  Yes, sir.

11:53   7       Q.  Five months later?

11:53   8       A.  Yes, sir.

11:53   9       Q.  Okay.  When did you hook up electricity?

11:53  10       A.  It's already connected with part of the rental

11:53  11  agreement.

11:53  12       Q.  You don't even remember the route and box,

11:53  13  right?

11:53  14       A.  It was a corner store.  I know it was a route

11:53  15  box.  I don't know exactly the -- I don't remember the

11:53  16  address.

11:53  17       Q.  You lived there from July 2000 until when?

11:53  18       A.  Until I was fired from Los Fresnos.

11:53  19       Q.  Until when?  What was the date that you moved

11:53  20  out of this residence?

11:53  21       A.  I believe it was after September.

11:53  22       Q.  October?

11:53  23       A.  About October.

11:53  24       Q.  Who was your landlord?

11:53  25       A.  Harvey.

11:59   1          Q.   So after about the middle of the month you

11:59   2     stopped spending any nights there at all?

11:59   3          A.   Yes, sir.

11:59   4          Q.   Do you remember if you moved in at the

11:59   5     beginning of July or the end of July or the middle of

11:59   6     July?

11:59   7          A.   Towards the end of July.

11:59   8          Q.   So probably the last week of July or what?

11:59   9          A.   Somewhere around there.

11:59  10          Q.   So you spent about two or three nights in the

11:59  11     last week of July -- actually, it would be about two or

12:00  12     three nights in July, right?

12:00  13          A.   Yes, sir.

12:00  14          Q.   And then about four to six nights in August,

12:00  15     correct?

12:00  16          A.   Three or four.

12:00  17          Q.   Three or four nights in August?

12:00  18          A.   Yes.

12:00  19          Q.   And then nothing in September?

12:00  20          A.   Right.

12:00  21          Q.   And nothing before July?

12:00  22          A.   Yes, sir.

12:00  23          Q.   The rest of the time where were you staying?

12:00  24          A.   Edinburg.

12:00  25          Q.   At your mother's house?

| | | |
|---|---|---|
| 12:00 | 1 | A.   Yes, sir. |
| 12:00 | 2 | Q.   Most of your clothes, were they in Edinburg or |
| 12:00 | 3 | in Los Fresnos? |
| 12:01 | 4 | A.   I had some clothes with me, but not all of |
| 12:01 | 5 | them. |
| 12:01 | 6 | Q.   I understand.  Where did you have more, in |
| 12:01 | 7 | Edinburg or Los Fresnos? |
| 12:01 | 8 | A.   Probably Los Fresnos. |
| 12:01 | 9 | Q.   You had more of your clothes in Los Fresnos |
| 12:01 | 10 | than Edinburg? |
| 12:01 | 11 | A.   My regular working clothes. |
| 12:01 | 12 | Q.   I'm talking about all your clothes.  I'm |
| 12:01 | 13 | talking about your go-out-partying clothes, I'm talking |
| 12:01 | 14 | about your work-in-the-garden clothes, I'm talking |
| 12:01 | 15 | about the dirty t-shirts that you sit around drinking |
| 12:01 | 16 | beer in clothes.  I'm talking about all the clothes |
| 12:01 | 17 | that you have. |
| 12:01 | 18 | MR. RODRIGUEZ:  Objection; assumes facts |
| 12:01 | 19 | not in evidence. |
| 12:01 | 20 | Q.   All the clothes that you have. |
| 12:01 | 21 | MR. RODRIGUEZ:  And multifarious. |
| 12:01 | 22 | Q.   Did you have more clothes in Edinburg or more |
| 12:01 | 23 | clothes in Los Fresnos? |
| 12:01 | 24 | A.   I don't have very many clothes, and the clothes |
| 12:01 | 25 | that I had I had with me in Los Fresnos. |

12:41  1          A.   That's what it says.

12:41  2          Q.   Okay.  Do you have any reason to disagree with

12:41  3     that?

12:41  4               MR. RODRIGUEZ:  Object; calls for

12:41  5     speculation.

12:41  6          A.   It's written there.

12:41  7          Q.   Did you understand that you were an at-will

12:41  8     employee when you were with the City of Los Fresnos?

12:41  9               MR. RODRIGUEZ:  Objection; asked for a

12:41 10     legal conclusion.

12:41 11          Q.   I'm asking for your understanding.

12:41 12          A.   At the time, no.

12:41 13          Q.   At the time what?

12:41 14          A.   That I was first employed?

12:41 15          Q.   Uh-huh.

12:41 16          A.   I was not aware that I was an at-will employee.

12:41 17          Q.   Okay.  Did you have a contract, a written

12:42 18     contract?

12:42 19          A.   No, sir.

12:42 20          Q.   You didn't sign any written contract, right?

12:42 21          A.   No, sir.

12:42 22          Q.   And you're not aware that the city ever signed

12:42 23     any written contract, right?

12:42 24          A.   No, sir.

12:42 25          Q.   And you understand that you were subject to the

12:42  1    city's policies and procedures, whatever they were,

12:42  2    correct?

12:42  3         A.  Yes, sir.

12:42  4         Q.  You didn't sign these policies as though they

12:42  5    were a contract, right?

12:42  6         A.  No, sir.

12:42  7         Q.  And the policies actually do provide that you

12:42  8    were an at-will employee, correct?

12:42  9              MR. RODRIGUEZ:  Objection; asks for a

12:42 10    legal conclusion.

12:42 11         Q.  That's what I just read, correct?

12:42 12         A.  That's what you read, yes, sir.

12:42 13         Q.  The policies also provided that you didn't have

12:42 14    any property right.  Did you have any other reason to

12:42 15    believe you had a property right?

12:42 16              MR. RODRIGUEZ:  Objection; asks for a

12:42 17    legal conclusion.

12:42 18         A.  I'm not a lawyer, and I don't know how to

12:42 19    answer that question.

12:42 20         Q.  Actually, let me back up a little bit on that.

12:42 21    You are not a lawyer, right?

12:42 22         A.  Right.

12:42 23         Q.  You have never gone to law school?

12:42 24         A.  No.

12:42 25         Q.  You never received any legal training other

HILL & ROMERO
CERTIFIED COURT REPORTERS

136

12:43  1       Q.  You understood that when you were hired, they

12:43  2   did not say you were hired for a specific period of

12:43  3   time, correct?

12:43  4       A.  No, sir.

12:43  5       Q.  No, you didn't understand that?

12:43  6       A.  I wasn't informed that I was hired for a

12:43  7   specific --

12:43  8       Q.  In other words, that's correct what I said,

12:43  9   right?  In other words, they didn't tell you, you are

12:43  10  going to work exactly six months, you are going to work

12:44  11  exactly one year, five years, ten years.  They didn't

12:44  12  say anything like that, correct?

12:44  13      A.  That's correct.

12:44  14      Q.  It was not for any -- it was for an indefinite

12:44  15  period of time?

12:44  16      A.  That's correct.

12:44  17      Q.  Turn the page, if you would, to Page 7.  Do you

12:44  18  see Section 1-06 there?

12:44  19      A.  Yes, sir.

12:44  20      Q.  That provides that, although adherence to this

12:44  21  policy is considered a condition of continued

12:44  22  employment, nothing in this policy alters an employee's

12:44  23  status.  This policy shall not constitute nor be deemed

12:44  24  a contract or promise of employment.  Employees remain

12:44  25  free to resign their employment at any time for any

216

14:47 1    it's already after the fact.  I will deal with it and

14:48 2    talk about it in the morning.

14:48 3         Q.  Now, in your lawsuit you said, before plaintiff

14:48 4    was given an opportunity to respond, the four

14:48 5    alderpersons who petitioned the special meeting moved

14:48 6    to reconvene.  That's not true.  It's like you said a

14:48 7    while ago, what happened is that the mayor is the one

14:48 8    that told you not to respond and then it was called to

14:48 9    an end.  It wasn't a defendant alderperson who stopped

14:48 10   the meeting.  It was the mayor who told you not to

14:48 11   respond, isn't that correct, what happened first?

14:48 12        A.  The mayor never told me directly not to

14:48 13   respond.

14:48 14        Q.  I'm saying, this is not correct what you are

14:48 15   alleging here.  It says, before plaintiff was given an

14:48 16   opportunity to respond.  You did respond to what Mr.

14:48 17   Sanchez said; isn't that correct?

14:48 18        A.  No, I didn't.

14:48 19        Q.  You didn't?

14:48 20        A.  No.

14:48 21        Q.  You don't recall making a response there?

14:48 22             MR. RODRIGUEZ:  He couldn't because there

14:48 23   was an ongoing criminal investigation.

14:49 24        Q.  You did make some statements -- you did make

14:49 25   the statement -- let me finish.  You did respond to Mr.

HILL & ROMERO
CERTIFIED COURT REPORTERS

14:49  1    Sanchez and state that what he was saying was not true;

14:49  2    isn't that correct?

14:49  3         A.   I mentioned that -- I believe I mentioned, if I

14:49  4    can remember correctly, that the case was still under

14:49  5    investigation.

14:49  6         Q.   So you did respond, regardless of the type of

14:49  7    response, because you state in your lawsuit, before

14:49  8    plaintiff was given an opportunity to respond.  But you

14:49  9    did respond, right?  Maybe not as fully as you would

14:49 10    liked to, but you did respond?

14:49 11         A.   If you call that a response.  It's very

14:49 12    limited.

14:49 13         Q.   And you made the choice to limit that response,

14:49 14    didn't you?

14:50 15              MR. RODRIGUEZ:  Objection; asks for a

14:50 16    legal conclusion.

14:50 17         A.   When I was talking, I know that the city

14:50 18    council at any time, either of the members, could have

14:50 19    asked for me to continue, but the mayor said, no, let's

14:50 20    move on to the next agenda item.

14:50 21         Q.   So it was the mayor that cut you off, then, not

14:50 22    those four city aldermen that you sued, right?

14:50 23         A.   He's part of the commission.

14:50 24         Q.   That's not what you said in your lawsuit.  It

14:50 25    was the mayor that cut you off from responding, not the

14:50  1    four specific aldermen that you sued, right?

14:50  2        A.  He's the only one that talked, yes.

14:50  3        Q.  Okay.  So it is not true what you're saying in

14:50  4    your lawsuit that the four defendant alderpersons who

14:50  5    petitioned for the special meeting moved to reconvene

14:50  6    the special meeting with agenda items of September

14:50  7    26th.  They didn't do that until after the mayor had

14:50  8    cut you off, right?

14:51  9        A.  As far as I can remember, the mayor was the

14:51  10   only one that said anything in that meeting.

14:51  11       Q.  And he cut you off when you were starting to

14:51  12   talk, and then afterwards the mayor called a meeting

14:51  13   and -- to the September 26th, correct?

14:51  14       A.  Yes, sir.

14:51  15       Q.  So the statement in here that you are now

14:51  16   making that you were not able to respond, that's not

14:51  17   correct.  You were able to respond?

14:51  18            MR. RODRIGUEZ:  Objection; argumentative.

14:51  19       Q.  You chose to limit your response, correct?

14:51  20       A.  I made an effort to say as much as I could.

14:51  21       Q.  Did you know that Defendant Alderwoman Garcia

14:51  22   had received a death threat right before the meeting?

14:51  23       A.  I wasn't informed until Mr. -- council member

14:51  24   Mendoza stated it.

14:52  25       Q.  You said that Mendoza bragged to members of the

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.      ) (
     Plaintiff        ) (
                      ) (
VS.               ) (  CIVIL ACTION NO. B-00-161
                      ) (
CITY OF LOS FRESNOS,  ) (
TEXAS, JUAN C. SIERRA,  ) (
SR., GONZALO ACEVEDO,  ) (
IDA GARCIA, MIGUEL     ) (
MENDOZA, INDIVIDUALLY  ) (
AND IN THEIR OFFICIAL  ) (
CAPACITIES, AND JUAN   ) (
MENDOZA, JR.          ) (
     Defendants      ) (

REPORTER'S CERTIFICATE

I, LOU ZUNIGA, Certified Court Reporter, certify that the witness, RICARDO PEREZ, JR., was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on JUNE 18, 2001; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

333

WITNESS MY HAND on this the _25th_ day of
_June_ , 2001.


_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-01
Hill & Romero
Certified Court Reporters
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.              ) (
        Plaintiff              ) (
                               ) (
VS.                            ) (   CIVIL ACTION NO. B-00-161
                               ) (
CITY OF LOS FRESNOS,           ) (
TEXAS, JUAN C. SIERRA,         ) (
SR., GONZALO ACEVEDO,          ) (
IDA GARCIA, MIGUEL             ) (
MENDOZA, INDIVIDUALLY          ) (
AND IN THEIR OFFICIAL          ) (
CAPACITIES, AND JUAN           ) (
MENDOZA, JR.                   ) (
        Defendants            ) (

---

ORAL DEPOSITION OF
RICARDO PEREZ, JR.
AUGUST 24, 2001
VOLUME 2

---

        ORAL DEPOSITION OF RICARDO PEREZ, JR., produced

as a witness at the instance of the DEFENDANTS, taken

in the above styled and numbered cause on AUGUST 24,

2001, from 10:25 a.m. to 1:03 p.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the offices of Hill & Romero, 5415 North

McColl, McAllen, Texas, pursuant to the Federal Rules

of Civil Procedure.



APPEARANCES

FOR THE PLAINTIFF:

        TED RODRIGUEZ, JR.
        LAW OFFICES OF TED RODRIGUEZ, JR.
        5415 North McColl
        McAllen, Texas  78504


FOR THE DEFENDANTS CITY OF LOS FRESNOS, TEXAS, JUAN C.
SIERRA, SR., GONZALO ACEVEDO, IDA GARCIA, MIGUEL
MENDOZA, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES:

        J. ARNOLD AGUILAR
        LAW OFFICES OF J. ARNOLD AGUILAR
        Artemis Square, Suite H-2
        1200 Central Boulevard
        Brownsville, Texas  78520

INDEX

|                                                  | PAGE |
| ------------------------------------------------ | ---- |
| Appearances ...................................  | 335  |

RICARDO PEREZ, JR.
Examination by Mr. Aguilar .....................  338

Changes and Signature Page ....................  459

Reporter's Certificate ........................  461

Attached to the end of the transcript:  Stipulations


EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
| ------ | ----------- | ---------- |
| 12 | Complaint of Juan Mendoza | 4 |
| 13 | Memo from Pam Denny | 4 |
| 14 | Complaint of Juan Mendoza | 4 |
| 15 | September 7, 2000 memo from Mayor Abrego | 4 |
| 16 | September 26, 2000 meeting minutes | 4 |
| 17 | Report of separation of license holder | 4 |
| 18 | Letter from Mr. Girault to Mr. Rodriguez dated December 7, 2000 | 4 |
| 19 | Document listing concerns with Mr. Perez | 4 |
| 20 | Document listing concerns with Mr. Perez (Miguel Mendoza) | 4 |
| 21 | Document listing concerns with Mr. Perez (Gonzalo Acevedo) | 4 |
| 22 | Document listing concerns with Mr. Perez (Juan Sierra) | 4 |
| 23 | Letter from Mr. Rodriguez to Mr. Girault dated December 11, 2000 | 4 |

337

## EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|--------|-------------|------------|
| 24 | Letter from Mr. Girault to Mr. Rodriguez dated December 12, 2000 | 4 |
| 25 | Letter from Mr. Rodriguez to Mr. Girault dated December 13, 2000 | 4 |
| 26 | Letter from Mr. Rodriguez to Mr. Girault dated December 119, 2000 | 4 |
| 27 | December 19, 2000 meeting minutes | 4 |
| 28 | August 8, 2000 meeting minutes | 264 |

## REQUESTED DOCUMENTS/INFORMATION

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1 | Copies of income tax returns for past two years | 415 |
| 2 | Copy of documentation on turning over investigation to FBI | 440 |

.

11:50  1     Q.  Okay.  You're aware -- now that we've gone over

11:50  2  this, you're aware that the city requirements are in

11:50  3  different places that the police chief is supposed to

11:50  4  live at least within 15 miles of the city limits?

11:50  5           MR. RODRIGUEZ:  Objection; asked and

11:50  6  answered.

11:50  7     A.  I answered that question.

11:50  8     Q.  And what was your answer?

11:50  9     A.  Yeah, I'm aware of it.

11:50 10     Q.  And you were aware from the very beginning?  I

11:50 11  think we have talked about this already.

11:50 12     A.  We talked about this.

11:50 13     Q.  You were aware from the very beginning, right?

11:50 14     A.  Right.

11:51 15     Q.  As of September 7th you still had not made your

11:51 16  permanent residence in the City of Los Fresnos,

11:51 17  correct?

11:51 18     A.  I had an apartment.

11:51 19     Q.  Okay.  Where was your wife living?

11:51 20     A.  I'm divorced.

11:51 21     Q.  You are divorced.  You had an apartment here

11:51 22  and you had your main residence in Edinburg, correct?

11:51 23     A.  My mom's home.

11:51 24     Q.  Your mom's home.  All your furniture was over

11:51 25  in Edinburg, you had minor pieces of furniture here,

11:53 1    about maybe get an order from the court.

11:53 2    MR. AGUILAR: Okay. I'm not getting into

11:53 3    the specifics on that. I'm just trying to get a

11:54 4    timing, the dates.

11:54 5    MR. RODRIGUEZ: I'm going to advise my

11:54 6    client not to answer any personnel matters that involve

11:54 7    Officer Rodriguez.

11:54 8    Q.   And are you going to refuse to answer the

11:54 9    question under the advice of --

11:54 10   A.   Under the advice of my attorney, I do not wish

11:54 11   to answer that question.

11:54 12   Q.   And you will not?

11:54 13   A.   Under the advice of my attorney.

11:54 14   MR. RODRIGUEZ: Until we get an order by

11:54 15   the court.

11:54 16   Q.   Let me hand you what's marked Perez Exhibit 16.

11:54 17   Do you recognize that document?

11:54 18   A.   Yes, sir.

11:55 19   Q.   This is the meeting at which you were dismissed

11:56 20   from your position as chief of police with the City of

11:56 21   Los Fresnos, correct?

11:56 22   A.   Yes, sir.

11:56 23   Q.   Turn to Page -- I think it's the page that's

11:56 24   marked 2023 at the top left corner. At this meeting

11:56 25   your attorney, Mr. Rodriguez, Ted Rodriguez, who is

HILL & ROMERO
CERTIFIED COURT REPORTERS

11:56  1    sitting with you now, made some comments, correct?

11:56  2         A.  Yes, sir.

11:56  3         Q.  And after that you made some comments, correct?

11:56  4         A.  Yes, sir.

11:56  5         Q.  Nobody prevented you or your attorney from

11:56  6    saying everything that you felt needed to be said at

11:56  7    that time, correct?

11:56  8         A.  No, sir.

11:56  9         Q.  No one prevented either of you from speaking or

11:56  10   limited the time you were able to speak, correct?

11:56  11        A.  That's correct.

11:56  12        Q.  As of this time nobody had accused you of doing

11:56  13   anything wrong, correct?

11:57  14                MR. RODRIGUEZ:  Objection; vague.

11:57  15        Q.  I'm sorry.  No commission member had accused

11:57  16   you of doing anything wrong, correct?

11:57  17                MR. RODRIGUEZ:  Objection; vague.

11:57  18        A.  When?

11:57  19        Q.  At any time.

11:57  20        A.  I don't remember.

11:57  21        Q.  Nothing that you are aware of that you can

11:57  22   recall at this time, right?

11:57  23        A.  Not that I can recall at this time.

11:57  24        Q.  And, actually, that was one of your concerns

11:57  25   and the concern of your attorney is that they weren't

12:03  1        Q.  And it's still about 28,000?

12:03  2        A.  Yes, sir.

12:03  3        Q.  I will need to get copies of your income tax

12:03  4   returns for the past year or two or whatever financial

12:03  5   records you have so I can get a more specific number

12:03  6   than just roughly 28,000.  Can you get those for us?

12:03  7             MR. RODRIGUEZ:  Are you asking in a

12:03  8   Request for Production?

12:03  9             MR. AGUILAR:  We can do it in a Request

12:03  10  for Production.  I will do that through a Request for

12:03  11  Production.

12:03  12       Q.  Start looking for records relating to your

12:03  13  salary so that I can get those.  I'm handing you what's

12:04  14  marked Exhibit 18.  Do you recognize that?

12:04  15       A.  Yes, sir.

12:04  16       Q.  That's a letter from Mr. Girault to you dated

12:04  17  December 7th, correct, 2000?

12:04  18       A.  Yes, sir.

12:04  19       Q.  In this letter basically Mr. Girault is setting

12:04  20  out each of the concerns had by each of the city

12:04  21  commission members, correct?

12:04  22       A.  Yes, sir.

12:04  23       Q.  And you received this document on or about

12:04  24  December 7th, correct?

12:04  25       A.  Yes, sir.

12:04  1      Q.  This is the information you had been requesting

12:04  2  previously when you had been saying, tell me the

12:04  3  reasons or the concerns you have with me before letting

12:04  4  me go, right?

12:04  5      A.  Yes, sir.

12:04  6      Q.  And this reflects each of the commission

12:05  7  member's concerns as far as you were aware, right?

12:05  8      A.  Yes, sir.

12:05  9      Q.  And I'm handing you what's been marked Perez

12:05 10  Exhibits 19, 20, 21 and 22.  You previously had a

12:05 11  chance to review those documents as well, right?

12:05 12      A.  This is the first time I see this one.  I have

12:05 13  not seen this one before.

12:05 14      Q.  Have you seen the others?  You were referring

12:05 15  to 19?

12:05 16      A.  This is the first time I see 20, and this is

12:05 17  the first time I see 21 and 22.

12:05 18      Q.  So this is the first time you have seen each of

12:05 19  these four documents?

12:06 20      A.  Yes, sir, this is the first time.

12:06 21      Q.  Were you aware that we had previously provided

12:06 22  these to your attorney for you to review?

12:06 23         MR. RODRIGUEZ:  Objection.  They weren't

12:06 24  provided to me.

12:06 25      A.  No, I didn't know.

12:10  1      Q.  You were familiar with everything we talked

12:10  2   about, though, right?

12:10  3      A.  Yes.

12:10  4      Q.  So you shouldn't have needed any more

12:10  5   explanation for any of the items listed --

12:10  6           MR. RODRIGUEZ:  Objection.

12:10  7      Q.  -- in Exhibit 18, right?

12:10  8           MR. RODRIGUEZ:  Objection; misstates the

12:10  9   testimony.  My client answered all of counsel's

12:10 10   questions.

12:10 11           MR. AGUILAR:  That's not my question.

12:10 12      Q.  Do you understand my question?  I'll ask it

12:10 13   again because I don't know what he was objecting to.

12:10 14   My question is, you were able -- you were familiar with

12:10 15   each of the items in Exhibit 18 that we have been

12:11 16   talking about in your deposition here, right?

12:11 17           MR. RODRIGUEZ:  Objection; misstates the

12:11 18   testimony.

12:11 19      Q.  When I refer to Item No. -- for example, Item

12:11 20   No. 1 in No. 18, Exhibit 18, we are talking your

12:11 21   residency requirement or your living here within the

12:11 22   city.  We talked about that today some and we talked

12:11 23   about it on June 16th -- June 18th, right?

12:11 24      A.  Right.

12:11 25      Q.  In other words, you were familiar with what we

12:11  1    were talking about, right?

12:11  2        A.  Right.

12:11  3        Q.  And that's the same thing for each one of these

12:11  4    items, right?

12:11  5                MR. RODRIGUEZ:  Objection; misstates the

12:11  6    testimony.

12:11  7        Q.  You were familiar with what I was talking

12:11  8    about?  No. 2, maintain a local land line telephone,

12:11  9    right?

12:11  10               MR. RODRIGUEZ:  Objection; misstates the

12:11  11   testimony.

12:11  12       A.  I'm reading to see if I can answer your

12:11  13   question.

12:11  14       Q.  That's okay.

12:12  15               MR. RODRIGUEZ:  I will also object.  It's

12:12  16   argumentative.

12:12  17       A.  I know you covered --

12:12  18       Q.  I covered them all, right?

12:12  19       A.  -- some items.  I don't know if all of them

12:12  20   were covered.

12:12  21       Q.  You are familiar with every item we're talking

12:12  22   about, 1 through 16 in there, right?

12:12  23       A.  In reading them, yes.

12:12  24       Q.  Okay.  I'm handing you what's marked Exhibit

12:12  25   24.  It's a memo going back now from Mr. Girault to Mr.

12:12  1    Rodriguez basically saying it's a courtesy for allowing

12:12  2    you to attend the hearing and -- I'm sorry, explaining

12:12  3    that -- let me start over.  Let me refer you to

12:12  4    Plaintiff's Exhibit 24, a letter from Girault to Mr.

12:13  5    Rodriguez, your lawyer, dated December 12th of 2000

12:13  6    indicating that his prior letter is not a grievance

12:13  7    hearing or does not make reference to grievances and

12:13  8    that the hearing scheduled for December 19th was simply

12:13  9    an opportunity to give you -- simply allowing you the

12:13  10   opportunity to attend the hearing and comment on any of

12:13  11   the concerns if you so choose.  That's what it says,

12:13  12   right?

12:13  13       A.  That's what it says.

12:13  14       Q.  And you remember getting that, right?  You

12:13  15   remember receiving this letter on or about December 12,

12:13  16   2000, correct?

12:13  17       A.  Yes.

12:14  18       Q.  I'm handing you what's been marked Exhibit 25.

12:14  19   And let me represent to you that's a letter from your

12:14  20   attorney to Mr. Girault dated December 13, 2000

12:14  21   indicating unless we give him more information he

12:14  22   doesn't know how to decide how to proceed with the

12:14  23   hearing, whether it be open or closed.  You understand

12:14  24   that, right?

12:14  25       A.  Yes.

12:15  1       Q.  I'm handing you what's been marked Plaintiff's

12:15  2   Exhibit 26 -- I'm sorry, Perez Exhibit 26, which is

12:15  3   another letter from your attorney to Mr. Girault

12:15  4   talking about due process hearings and meaningful

12:15  5   hearings and things like that, right?

12:15  6       A.  Uh-huh.

12:15  7       Q.  Again asking for further clarification of the

12:15  8   concerns against you, right?

12:15  9       A.  Yes.

12:15  10      Q.  As of this point you were at least familiar

12:15  11  with each of the allegations, right, the ones that are

12:15  12  listed in Exhibit --

12:15  13           MR. RODRIGUEZ:  As of December 19?

12:15  14      Q.  The ones that are listed in Exhibit 18?

12:15  15      A.  They were vague.

12:15  16      Q.  You were at least familiar with the

12:15  17  allegations, right?  You knew on each one of those what

12:15  18  they were talking about?  For example, you were

12:15  19  familiar that No. 1 was talking about you not living in

12:16  20  town, right?

12:16  21      A.  Yes.

12:16  22      Q.  And No. 2 was talking about you not having a

12:16  23  local land line phone?

12:16  24      A.  Yes.

12:16  25      Q.  You were familiar with each one of those along

12:16  1    the same manner, right?

12:16  2       A.  I wasn't familiar with all of them.

12:16  3       Q.  You were familiar with the topics in each one

12:16  4    of them?  For example, you told us about 1 and 2

12:16  5    already.  No. 3, the large drug bust on 10th Street.

12:16  6    You were familiar with the drug bust, right?

12:16  7       A.  Yes.

12:16  8       Q.  Okay.  And what had happened there and those

12:16  9    sorts of things, right?

12:16  10       A.  Yes.

12:16  11       Q.  And No. 4, your policy regarding confiscated

12:16  12    evidence, you were familiar with your policy, right?

12:16  13       A.  Yes.

12:16  14       Q.  No. 5, major traffic accident at the

12:16  15    intersection of Paredes Line Road, you were familiar

12:16  16    with that one, right?

12:16  17       A.  Yes.

12:16  18       Q.  You were familiar with that accident, weren't

12:16  19    you?

12:16  20       A.  Yes.

12:16  21       Q.  No. 6, annual qualification of police officers,

12:17  22    you either were familiar or you agree you should have

12:17  23    been familiar with whatever those firearms

12:17  24    proficiencies were for each officer, right?

12:17  25       A.  Right.

12:17  1              MR. RODRIGUEZ:  Are you asking him about

12:17  2      the specific --

12:17  3              MR. AGUILAR:  I'm just asking --

12:17  4              MR. RODRIGUEZ:  It doesn't just talk about

12:17  5      policies in there, so I'm going to object that you are

12:17  6      misstating --

12:17  7              MR. AGUILAR:  You can do that.

12:17  8              MR. RODRIGUEZ:  -- and you are overly

12:17  9      broad in your question.

12:17 10              MR. AGUILAR:  You can do that.

12:17 11          Q.  And then No. 7, the situation in which you

12:17 12      tried to hire your brother to be the city's

12:17 13      representative on the task force, you were familiar

12:17 14      with that, right, that circumstance?

12:17 15          A.  I'm familiar with that.

12:17 16          Q.  And No. 8, the gang or graffiti problems, you

12:17 17      remember attending that meeting, right, over at the

12:17 18      school?

12:17 19          A.  I'm familiar with it.

12:17 20          Q.  We talked about that already.  You are familiar

12:17 21      with that.  Your riding with Lieutenant Jimmy Vasquez,

12:17 22      you were familiar with that concern, right?

12:17 23          A.  I'm familiar with it.

12:17 24          Q.  And you were familiar at this time, back in

12:17 25      December 19th of 2000, right?

12:17  1    A.   Yes.

12:17  2    Q.   And No. 10, you're familiar with what morale

12:18  3    is, right?

12:18  4    A.   Yes.

12:18  5    Q.   And whether it had dropped or not, you're

12:18  6    familiar with a concern when morale drops, right?   You

12:18  7    know what that means, right?

12:18  8    A.   Yes.

12:18  9    Q.   And No. 11, the reference to some officers as

12:18 10    true blue and others as the other side, you are

12:18 11    familiar with that, right?   You had used that term

12:18 12    before, right?

12:18 13    A.   Yes.

12:18 14    Q.   No. 12, a reference to your working

12:18 15    relationship with Constable Mendoza's office, you were

12:18 16    familiar with that, right?

12:18 17    A.   Yes.

12:18 18    Q.   And No. 13, concerns about representations made

12:18 19    by you, specifically the fence outside the city jail,

12:18 20    you are familiar with that?

12:18 21    A.   Yes.

12:18 22    Q.   And No. 14, a concern about whether you or

12:18 23    Lieutenant Vasquez may have coerced a citizen to file a

12:18 24    complaint against an officer in exchange for police

12:18 25    protection, you knew they were talking about de la

12:19  1    Rosa, right?

12:19  2        A.   No.   This one I didn't know what they were

12:19  3    talking about.

12:19  4        Q.   That one you didn't know what they were talking

12:19  5    about?

12:19  6        A.   Coerced a citizen to --

12:19  7        Q.   You didn't know which --

12:19  8        A.   They didn't make a mention to any names.

12:19  9        Q.   Okay.   And you weren't familiar with any

12:19 10    statement that was taken after the incident allegedly

12:19 11    occurred while the person was under custodial arrest?

12:19 12    You didn't know which one they were talking about?

12:19 13        A.   No, they didn't mention a name.

12:19 14        Q.   When did you find out it was de la Rosa they

12:19 15    were talking about?   When did you find that out?

12:19 16        A.   I don't remember when I found out.

12:19 17        Q.   Was it before December 19th or after?

12:19 18        A.   I believe it was after this came up.

12:19 19        Q.   It was sometime after --

12:20 20        A.   After --

12:20 21        Q.   -- after December 7th.

12:20 22        A.   I'm trying to decipher what they're talking

12:20 23    about.

12:20 24        Q.   After December 7 but before when?   Was if after

12:20 25    December 19?

12:20  1          MR. RODRIGUEZ:  I'm going to object.  He's

12:20  2   pointing to the December 19th letter.

12:20  3     A.   That's what I'm talking about.

12:20  4     Q.   That's the December 7th --

12:20  5          MR. RODRIGUEZ:  Is that 7th?  Objection

12:20  6   withdrawn.

12:20  7     Q.   Is it before December 19 or after December 19?

12:20  8   19 was the day of the hearing -- I'm sorry, the day of

12:20  9   the commission meeting.

12:20 10     A.   No, we didn't even talk about anything once we

12:20 11   got to the hearing.

12:20 12     Q.   I'm talking about when did you find out about

12:20 13   de la Rosa -- that it was de la Rosa they were

12:20 14   referring to in here?  Was it after December 19 or

12:20 15   before December 19?

12:20 16     A.   After the 19th.

12:20 17     Q.   Okay.  And No. 15, the concern about your poor

12:20 18   communication, again relating to the jail fence.  You

12:20 19   were aware of that from before, right?

12:21 20     A.   I was aware of that.

12:21 21     Q.   Okay.  And No. 16 is basically just a final

12:21 22   concern of whether you continuing was in the best

12:21 23   interest of the City.  That's not anything on

12:21 24   specifics.  That's just a general concern.  That's

12:21 25   about the extent of that one.  So other than No. 14, at

12:22  1    -- I'm sorry, the meeting at the city commission on

12:22  2    December 19th where you and your attorney appeared,

12:22  3    correct?

12:23  4        A.  Yes, I think so.

12:23  5        Q.  And the way the meeting was set up is it would

12:23  6    be either in closed session or in open session

12:23  7    depending on what you guys decided on, right?

12:24  8        A.  Right.

12:24  9        Q.  During that meeting --

12:24  10               THE WITNESS:  Can we take a short break?

12:29  11               MR. AGUILAR:  Sure.

12:29  12               (Brief recess).

12:29  13       Q.  We were talking about Exhibit 27, city

12:29  14    commission meeting of December 19.  You had a chance to

12:29  15    review the city commission meeting minutes, correct?

12:29  16       A.  December 19, 2000?  Yes.

12:29  17       Q.  Okay.  Basically what they indicate is that you

12:29  18    and your attorney had showed up to the hearing -- to

12:29  19    the meeting, they asked you whether you wanted it to be

12:30  20    in open or closed session, your attorney asked for

12:30  21    clarification, whether it was a due process hearing,

12:30  22    and the city attorney stated that basically you just

12:30  23    needed to decide whether you wanted it in open or

12:30  24    closed session.  Your attorney said you couldn't answer

12:30  25    until he knew whether this was a due process hearing,

12:30  1   and therefore since nothing further was being said by

12:30  2   your attorney, the city attorney said that the mayor

12:30  3   needed to go into closed session since you would not

12:30  4   state what your client wanted -- your attorney would

12:30  5   not say what you had wanted.  Do you recall if that is

12:30  6   what happened at that meeting?

12:30  7       A.   That's what happened, yes.

12:30  8       Q.   You never said, I don't care what is this.  I

12:30  9   want this meeting in open session?  You never demanded

12:31  10  it be in open session, right?

12:31  11      A.   No.

12:31  12      Q.   During that statement by your attorney, nobody

12:31  13  tried cutting off your attorney, right?  He was able to

12:31  14  say everything he wanted to say, right?

12:31  15              MR. RODRIGUEZ:  Objection; vague,

12:31  16  ambiguous.

12:31  17      Q.   You don't remember anybody ever saying, stop

12:31  18  talking.  We don't want to hear you anymore, right?

12:31  19      A.   No.

12:31  20      Q.   You didn't attempt to talk during that hearing,

12:31  21  right -- meeting, right?

12:31  22      A.   No.

12:31  23      Q.   But that's not because somebody from the city

12:31  24  commission told you you could not speak, correct?

12:31  25      A.   Right.

                        HILL & ROMERO
                   CERTIFIED COURT REPORTERS

12:31  1      Q.  In other words, you just chose not to say

12:31  2  anything at that point because you had your attorney

12:31  3  there?

12:31  4      A.  That's correct.

12:32  5      Q.  And from what you could tell, your attorney was

12:32  6  given a full chance to say whatever he felt was

12:32  7  necessary, right, full opportunity?

12:32  8          MR. RODRIGUEZ:  Objection; speculation.

12:32  9      Q.  From what you could see?

12:32 10          MR. RODRIGUEZ:  Vague.

12:32 11      A.  That's up to him.

12:32 12      Q.  But all I'm asking about is, from what you

12:32 13  could see, he was given whatever opportunity he felt

12:32 14  was appropriate to say whatever he felt was appropriate

12:32 15  during that open session part, right?  In other words,

12:32 16  nobody tried to prevent him from talking any further,

12:32 17  right?

12:32 18          MR. RODRIGUEZ:  You mean by not answering

12:32 19  the question?

12:32 20      Q.  You didn't see anybody say anything to him to

12:32 21  say, okay, stop talking, or anything like that, right?

12:32 22      A.  No, but they wouldn't answer his question.

12:32 23      Q.  But they didn't prevent him from saying

12:32 24  whatever he wanted to say, right?

12:32 25      A.  No.

12:32  1        Q.  That's correct, right?

12:32  2        A.  Right.

12:32  3        Q.  Okay.  You don't have -- you never had a

12:32  4   written contract of employment with the city, right?

12:32  5        A.  No.

12:33  6        Q.  And you're not aware of anything in the city's

12:33  7   personnel policy that guarantees you a job, right?

12:33  8               MR. RODRIGUEZ:  Objection; asks for a

12:33  9   legal conclusion.

12:33 10        A.  Excuse me?

12:33 11        Q.  I will say it again.  And if you could put the

12:33 12   paper down while I'm asking you questions, it might be

12:33 13   easier to focus on what I'm asking.  What I'm asking

12:33 14   is, you don't have anything -- you're not aware of

12:33 15   anything in the city's personnel policies that

12:33 16   guarantees you a job in any way, right?

12:33 17        A.  No.

12:33 18        Q.  Are you familiar with what the term "employment

12:33 19   at will" means?

12:33 20        A.  Yes.

12:33 21        Q.  What do you understand it to mean?

12:33 22        A.  We're at will.

12:33 23        Q.  Meaning you can be fired or you can quit at any

12:33 24   time for any reason or for no reason, it's up to you

12:33 25   and up to them, right?

12:36  1     they can terminate you.

12:36  2          A.   Well, as far as I can remember, there are

12:36  3     procedures that are in place regarding grievances.

12:36  4          Q.   If you file a grievance, there's certain things

12:36  5     that you'd be entitled to under certain circumstances

12:36  6     as a regular employee, right --

12:36  7          A.   Right.

12:37  8          Q.   -- if you are a probationary employee; however

12:37  9     you can't follow through on most of those procedures

12:37 10     unless there is a constitutional issue involved?

12:37 11          A.   Exactly.

12:37 12          Q.   Okay.  If there's not, other than that, there's

12:37 13     not any real procedures that you're aware of that need

12:37 14     to be followed for your termination, right, or for any

12:37 15     termination?  Nothing else that you are aware of?

12:37 16          A.   Not that I'm aware of.

12:38 17          Q.   And as far as your termination, it didn't

12:38 18     prevent you from getting re-employed by other

12:38 19     government employers because you were hired by the City

12:38 20     of Mission within eight days, right?

12:38 21          A.   I didn't apply anywhere else but Mission.

12:38 22          Q.   But it didn't prevent you from getting hired at

12:38 23     Mission, right, because you got hired there?

12:38 24          A.   Right.

12:38 25          Q.   Okay.  And the problem you had -- the concern

12:38  1    you had was that they didn't tell you what you were

12:38  2    doing wrong, right?  When you were let go in September,

12:38  3    you were upset that they weren't telling you what you

12:38  4    had done wrong to justify getting fired, right?

12:39  5                MR. RODRIGUEZ:  Objection; argumentative.

12:39  6         A.  I wasn't upset.  I was --

12:39  7         Q.  You weren't upset?

12:39  8         A.  I was not upset.

12:39  9         Q.  You got let go and you weren't upset?

12:39 10         A.  No, I wasn't upset.  The word that I want here

12:39 11    is that I was --

12:39 12         Q.  Concerned?

12:39 13         A.  No.  I wanted to know why.  Why?  That was my

12:39 14    question, why.

12:39 15         Q.  Because they had not told you why they were not

12:39 16    satisfied with your performance; is that correct?

12:39 17         A.  Right.

12:39 18         Q.  Did you say "right"?

12:39 19         A.  Yes.

12:39 20         Q.  So the fact that they weren't telling you what

12:39 21    you had done couldn't affect your reputation in any way

12:40 22    because nobody had said you had done something wrong

12:40 23    yet, right?

12:40 24                MR. RODRIGUEZ:  Objection.

12:40 25         Q.  Is that correct?  Is that your understanding?

12:40  1          MR. RODRIGUEZ:  Objection; calls for
12:40  2   speculation.
12:40  3      Q.  In other words, while people are not saying
12:40  4   that you did something wrong, that didn't make people
12:40  5   say that you did do something wrong, did it?
12:40  6      A.  That's a hard question to answer because I
12:40  7   don't know what people think or what they are thinking
12:40  8   when those people made that decision.
12:40  9      Q.  You had no reason to believe, though, that --
12:40 10   or as far as you could tell, nobody else had any reason
12:40 11   to believe that they were calling you bad names in any
12:40 12   way because they weren't calling you anything, they
12:40 13   weren't telling you.  Do you understand?
12:40 14          MR. RODRIGUEZ:  Objection; vague.
12:40 15      Q.  Do you understand my question?
12:41 16      A.  I understand your question, but I cannot answer
12:41 17   it because there's a lot of things that were being said
12:41 18   in the community that were not said out in a public --
12:41 19   or in a commission meeting.
12:41 20      Q.  Rumors floating in the community?
12:41 21      A.  Correct.
12:41 22      Q.  But nothing that you are aware of that was ever
12:41 23   said by the particular commissioners because they
12:41 24   weren't telling you.  That was your concern?  That was
12:41 25   your complaint?

HILL & ROMERO
CERTIFIED COURT REPORTERS

12:41  1    A.   They didn't say anything.

12:41  2    Q.   Okay.  And the only speech you're talking about

12:41  3    that you might have made that would have been protected

12:41  4    would have been your report of Mr. Rodriguez -- your

12:41  5    submission of the report of Mr. Rodriguez to the FBI,

12:41  6    right?

12:41  7    A.   I don't understand what you are trying to ask

12:41  8    me.

12:41  9    Q.   Okay.  You're complaining that you think part

12:41  10   of the reason you were terminated was because of your

12:42  11   report to the FBI, or did you make that report or did

12:42  12   somebody else?

12:42  13   A.   I did.

12:42  14   Q.   Okay.  How did you do it?

12:42  15   A.   Like I just explained to you, how it all came

12:42  16   about.  We talked about that.

12:42  17   Q.   No.  But how did you actually physically submit

12:42  18   the report to the FBI?

12:42  19   A.   I took it over there and dropped it off.

12:42  20   Q.   You walked over -- you drove over there to

12:42  21   where?

12:42  22   A.   McAllen.

12:42  23   Q.   To where in McAllen?

12:42  24   A.   Bentson Tower.

12:42  25   Q.   You went over and talked to the FBI agent?

12:49  1        Q.   They weren't happy with your handling of daily
12:50  2    personnel matters?
12:50  3        A.   Pretty much, yes.
12:50  4        Q.   Why else?
12:50  5        A.   At this time that's all I can recall.
12:50  6        Q.   So the only bases you can think of for -- that
12:50  7    you are aware of for your termination was because of
12:50  8    the -- you reported the Rodriguez investigation over to
12:50  9    the FBI and because they were not satisfied with your
12:50 10    handling of the daily police matters?
12:50 11        A.   Right.
12:50 12        Q.   Those are the only two bases you can think of
12:50 13    that you are aware of for your termination, correct?
12:50 14        A.   As far as I can remember, yes.
12:51 15        Q.   You ultimately were given an opportunity to
12:51 16    respond to -- at the December 19 meeting you were given
12:51 17    an opportunity to respond to each of the allegations
12:51 18    that had been -- I'm sorry, each of the concerns that
12:51 19    had been made by the commissioners, correct?
12:51 20        A.   No.
12:51 21        Q.   During the open session of the December 19th
12:51 22    meeting, Exhibit 27 that we have showed you, during the
12:51 23    open session portion, your attorney was given a chance
12:51 24    to say whatever he wanted, right?
12:51 25        A.   Yes.

```
12:51  1        Q.  He had already been given a copy of Exhibit No.
12:51  2   18, the letter from Girault to him, to your attorney,
12:51  3   the December 7th letter from Girault to your attorney
12:51  4   setting out all the commissioners' concerns, right?
12:51  5        A.  Right.
12:51  6        Q.  And if he had wanted to, he had the opportunity
12:52  7   at least to respond to whatever he wanted to in there,
12:52  8   correct?
12:52  9             MR. RODRIGUEZ:  Objection; asks for
12:52 10   speculating as to what his attorney was thinking.
12:52 11        Q.  I'm just asking what opportunities were
12:52 12   available.  I'm not asking what your attorney was
12:52 13   thinking.  In other words, he could have said whatever
12:52 14   he wanted.  He could have said, we disagree with -- I
12:52 15   got this letter from Girault dated December 7th.  I
12:52 16   disagree with No. 1, No. 2, No. 3.  He could have said
12:52 17   all that stuff if he had wanted to, right?
12:52 18        A.  I don't know.
12:52 19        Q.  You could have said all that stuff if you
12:52 20   wanted to, right?  The opportunity was there for you to
12:52 21   do that, right?
12:52 22        A.  A meeting was made.  I don't know if the
12:52 23   opportunity was given to respond to anything.
12:52 24        Q.  Okay.  At that meeting, the December 19th
12:52 25   meeting, both of you were present, right?
```

12:52  1          A.  Right.

12:52  2          Q.  Mr. Girault was saying, do you want to have

12:52  3    this in open session or closed session, right?

12:52  4          A.  Right.

12:52  5          Q.  Your attorney wanted to know whether it was a

12:52  6    due process hearing before he would make that decision,

12:52  7    right?

12:52  8          A.  Right.

12:52  9          Q.  Mr. Girault was just telling him, look, I can't

12:52  10   say anything until -- you just tell me whether you want

12:52  11   this in open or closed session, right?

12:52  12         A.  Right.

12:53  13         Q.  You did not give him any indication one way or

12:53  14   the other, right?  You did not make a decision at that

12:53  15   point, right?

12:53  16         A.  No.

12:53  17         Q.  Okay.  And so at that point Mr. Girault said,

12:53  18   very well, then.  We are going into closed session,

12:53  19   right?

12:53  20         A.  Right.

12:53  21         Q.  Both of you followed into closed session,

12:53  22   right?

12:53  23         A.  Right.

12:53  24         Q.  We won't talk about the specifics that were

12:53  25   discussed in closed session, but in terms of when you

12:53  1    were in closed session, did you have an -- do you feel

12:53  2    you had an opportunity -- you and your attorney had an

12:53  3    opportunity to say whatever it was you felt you needed

12:53  4    to say?

12:53  5              MR. RODRIGUEZ:  Objection; argumentative.

12:53  6        A.   We can't discuss what we talked about in

12:53  7    executive session.

12:53  8        Q.   I'm not asking you to discuss what was

12:53  9    discussed in executive session.  I'm just asking

12:53 10    whether you feel you had the opportunity to say

12:53 11    whatever you wanted to say in executive session.

12:53 12        A.   No.

12:53 13        Q.   Why not?  Why didn't you feel you had that

12:53 14    opportunity?

12:53 15              MR. RODRIGUEZ:  Objection.  I'm going to

12:53 16    advise my client not to answer the questions because

12:53 17    he's asking matters that occurred in executive session

12:54 18    and he's asking him to discuss those.  And so I'm going

12:54 19    to advise him not to answer those questions.

12:54 20        Q.   Okay.  Are you going to refuse to answer based

12:54 21    on the advice of your counsel?

12:54 22        A.   That's correct.

12:54 23        Q.   Okay.  During the open session while you were

12:54 24    still in open session, you could -- you had the

12:54 25    opportunity to say whatever you wanted to say in

12:54  1    response to Exhibit 18, correct?

12:54  2              MR. RODRIGUEZ:  Objection; asked and

12:54  3    answered.

12:54  4         A.  I already answered that question.

12:54  5         Q.  And the answer is yes, correct?

12:54  6         A.  If that's what I answered, yes.

12:54  7         Q.  That is your answer, right?

12:54  8         A.  Yes.

12:54  9         Q.  And at the end of the open session and the

12:54  10   closed session, the commission came back out and had

12:54  11   three options, either to reinstate you with back pay,

12:54  12   not to reinstate you but pay you back wages or to take

12:54  13   no further action with no reinstatement and no back

12:55  14   pay.  Those were the three options that were presented

12:55  15   to the commission, right?  If you look at Page 2 it

12:55  16   sets that out.

12:55  17        A.  Yes, sir.

12:55  18        Q.  And after a motion to reinstate you died for

12:55  19   lack of a second, a motion was made which was adopted

12:55  20   to take no further action, basically not to reinstate

12:55  21   or to give you any back pay.  That motion carried,

12:55  22   correct?

12:55  23        A.  Right.

12:56  24        Q.  What statement did any particular individual

12:56  25   defendants make about you?  In other words, what did

12:56  1    any particular individual defendants say about you?

12:56  2          MR. RODRIGUEZ:  Objection; vague.

12:56  3    Q.   Did anyone call you any bad names?

12:56  4    A.   About what?

12:56  5    Q.   Did any of the individual defendants ever call

12:56  6    you any bad names -- that you felt were bad names?

12:56  7    A.   Not that I can remember.

12:56  8    Q.   Not that you can recall or you're aware of,

12:56  9    right?

12:56 10    A.   Not that I remember.

12:56 11    Q.   Actually, your complaint was that they were not

12:56 12    telling you -- they were not calling you bad names?

12:57 13    Actually, your complaint was that they weren't saying

12:57 14    what you were doing wrong, right?

12:57 15    A.   Right.

12:57 16    Q.   Kind of the opposite of that, right?  Do you

12:57 17    understand what I'm saying?

12:57 18    A.   No.

12:57 19    Q.   In other words, your complaint is that they

12:57 20    weren't telling you what you were doing wrong?

12:57 21          MR. RODRIGUEZ:  His complaint is that they

12:57 22    retaliated against him.

12:57 23          MR. AGUILAR:  Ted --

12:57 24          MR. RODRIGUEZ:  So my objection is you are

12:57 25    misstating everything we put in our pleadings.

```
12:58  1        Q.  Right.  And that's kind of the opposite of
12:58  2   saying, you called me names, right?
12:58  3        A.  No, it's not opposite because that's another
12:58  4   issue.
12:58  5        Q.  Okay.  Nobody ever called you any names,
12:58  6   though?
12:58  7        A.  That I'm aware of.
12:58  8        Q.  And they never said anything bad about you as
12:58  9   far as you're aware of?
12:58 10        A.  They said plenty.
12:58 11        Q.  Okay.  Who said what?
12:58 12        A.  I thought we already discussed that.
12:58 13        Q.  Well, I need specifics.  I need who
12:58 14   specifically said something bad about you.
12:58 15        A.  I don't remember at this time.
12:58 16        Q.  You're not aware of anything?
12:58 17        A.  I know we talked it.  We discussed it.  We
12:58 18   talked about it.
12:58 19        Q.  Okay.  Remind me because I don't remember you
12:58 20   ever saying anything that anybody ever said bad about
12:58 21   you, any of the defendants.
12:58 22            MR. RODRIGUEZ:  I will object as far as
12:58 23   it's been asked and answered.
12:58 24        Q.  Tell me.
12:59 25        A.  At this time I don't remember.  I know we
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

454

```
12:59   1    talked about it.
12:59   2         Q.  But you can't think of anything -- any
12:59   3    particular commissioner said bad about you?
12:59   4         A.  I don't remember.
12:59   5              MR. RODRIGUEZ:  Objection; asked and
12:59   6    answered.
12:59   7         A.  I can't remember at this time.
12:59   8         Q.  Nothing you can think of?
12:59   9         A.  Right.
12:59  10         Q.  As a result of all this -- as a result of your
12:59  11    termination from the city, you were able to go get a
12:59  12    job over in Mission, correct?
12:59  13              MR. RODRIGUEZ:  Objection; asked and
12:59  14    answered.
12:59  15         A.  I already answered that question.
12:59  16         Q.  You were able to get your job, right?  Right?
12:59  17    You were able to get a job in Mission, right?
12:59  18         A.  Yes.
12:59  19         Q.  Okay.  And then after that you were able to
12:59  20    basically continue your life up here in Hidalgo County,
12:59  21    right?
12:59  22         A.  Right.
12:59  23         Q.  Did you catch any flack up here -- do you know
12:59  24    what I mean by that?
12:59  25         A.  Yes.
```

459

```
 1              CHANGES AND SIGNATURE PAGE

 2    PAGE LINE   CHANGE                        REASON

 3    392/18 They should have talked to me about it.  Correct facts

 4    405/14 I was given ab ordinance that said the city Correct facts
 5           would tell me a deadline when to move in.
              They never did until Mayor Abregotold me
              but they fired me before the deadline.
 6
 7    423/7 Yes, but I wasn't sure when I received the letter.
                                          Correct the fact

 8    425/1 Yes, but I was not sure that's what they   Correct the fac
 9           were talking about.

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25
```

HILL & ROMERO
CERTIFIED COURT REPORTERS

460

1     I, RICARDO PEREZ, JR., have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

4                RICARDO PEREZ, JR.

5

6

7

8  THE STATE OF TEXAS

9  COUNTY OF HIDALGO

10    BEFORE ME, _____, on this day
personally appeared RICARDO PEREZ, JR., known to me or
11  proved to me to be the person whose name is subscribed
to the foregoing instrument and acknowledged to me that
12  said witness executed the same for the purposes and
consideration therein expressed.

13
    Given under my hand and seal of office this 26th
14  day of September , 2001.

15
             Notary Public in and for the State of Texas
16

17              IRENE TAGLE
                Notary Public
18             STATE OF TEXAS
             Comm. Exp. 08-14-2004

19

20

21

22

23

24

25

HILL & ROMERO
CERTIFIED COURT REPORTERS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.          )(
          Plaintiff         )(
                            )(
VS.                         )(     CIVIL ACTION NO. B-00-161
                            )(
CITY OF LOS FRESNOS,        )(
TEXAS, JUAN C. SIERRA,      )(
SR., GONZALO ACEVEDO,       )(
IDA GARCIA, MIGUEL          )(
MENDOZA, INDIVIDUALLY       )(
AND IN THEIR OFFICIAL       )(
CAPACITIES, AND JUAN        )(
MENDOZA, JR.                )(
          Defendants        )(

REPORTER'S CERTIFICATE
VOLUME 2

          I, LOU ZUNIGA, Certified Court Reporter,

certify that the witness, RICARDO PEREZ, JR., was duly

sworn by me, and that the deposition is a true and

correct record of the testimony given by the witness on

AUGUST 24, 2001; that the deposition was reported by me

in stenograph and was subsequently transcribed under my

supervision.

          I FURTHER CERTIFY that I am not a relative,

employee, attorney or counsel of any of the parties,

nor a relative or employee of such attorney or counsel,

nor am I financially interested in the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

462

WITNESS MY HAND on this the ___4th___ day of

___September___ , 2001.


LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-01
Hill & Romero
Certified Court Reporters
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

.

# EXHIBIT A-2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR. )(
  Plaintiff )(
   )(
VS.  )( CIVIL ACTION NO. B-00-161
  )(
CITY OF LOS FRESNOS, )(
TEXAS, JUAN C. SIERRA, )(
SR., GONZALO ACEVEDO, )(
IDA GARCIA, MIGUEL )(
MENDOZA, INDIVIDUALLY )(
AND IN THEIR OFFICIAL )(
CAPACITIES, AND JUAN )(
MENDOZA, JR. )(
  Defendants )(

---

ORAL DEPOSITION OF
MIGUEL MENDOZA
APRIL 23, 2001

---

  ORAL DEPOSITION OF MIGUEL MENDOZA, produced as

a witness at the instance of the PLAINTIFF, taken in

the above styled and numbered cause on APRIL 23, 2001,

from 9:35 a.m. to 2:16 p.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the offices of J. Arnold Aguilar, Artemis

Square, Suite H-2, 1200 Central Boulevard, Brownsville,

Texas, pursuant to the Texas Rules of Civil Procedure

and the provisions stated on the record or attached

therein.



12:32  1          (M. Mendoza Exhibit No. 8 was marked).

12:32  2      Q.  I have marked here as M. Mendoza Exhibit No. 8

12:32  3  four pages of handwritten notes that say Miguel Mendoza

12:33  4  at the top.  Are those your notes, sir?

12:33  5      A.  Yes.

12:33  6      Q.  All four pages?

12:33  7      A.  Yes.

12:33  8      Q.  Okay.  When was this Exhibit 8 written up by

12:33  9  you?

12:33 10      A.  I don't recall the date.

12:33 11      Q.  Was it after the date the chief was terminated?

12:33 12      A.  Yes.

12:33 13      Q.  Was it done at the request of the city attorney

12:33 14  or any attorney?

12:33 15          MR. AGUILAR:  Objection to the extent that

12:33 16  it involves any attorney/client privileged discussions,

12:33 17  and I would instruct the witness not to answer.

12:33 18      A.  I don't want to answer that question.

12:33 19      Q.  Okay.  Are you refusing to answer the question

12:33 20  based on the advice of your attorney, Arnold Aguilar?

12:33 21      A.  Yes.

12:33 22      Q.  Okay.  Who requested that you write this

12:34 23  letter?

12:34 24          MR. AGUILAR:  Objection to the extent that

12:34 25  that may involve attorney/client privileged

12:34  1    information.  It's just an end run around the last

12:34  2    question, so I would again instruct the witness not to

12:34  3    answer regardless of what the answer would be.

12:34  4        A.  I refuse to answer that question.

12:34  5            MR. RODRIGUEZ:  If it wasn't by the

12:34  6    attorney, I'm entitled to know that.

12:34  7            MR. AGUILAR:  Yes, but it's just an end

12:34  8    run around the first question to try to get the

12:34  9    information of whether it was written -- whether it was

12:34  10   written -- I'm sorry, whether it was written at the

12:34  11   request of an attorney or not is privileged.

12:34  12       Q.  Was this letter written at the request of

12:34  13   someone other than the attorney for the city?

12:34  14           MR. AGUILAR:  Same objection and instruct

12:34  15   the witness not to answer.

12:34  16       A.  I refuse to answer that question.

12:34  17       Q.  Are you refusing to answer the question based

12:34  18   on the advice of your attorney, Arnold Aguilar?

12:34  19       A.  Yes.

12:34  20       Q.  Okay.  It has here, concerns with Chief Ricardo

12:34  21   Perez' performance and concern that, No. 1, he never

12:34  22   actually lived in Los Fresnos.  That was a concern of

12:34  23   yours?

12:34  24       A.  Yes.

12:34  25       Q.  Okay.  And was that a reason to fire him?

12:35   1       A.   Again, that was a concern along with the drug

12:35   2   case that I based my decision on.  He had, in my

12:35   3   opinion, ample time to move to our city or within the

12:35   4   prescribed distance, which was, I believe, ten to 15

12:35   5   minutes away from our city.

12:35   6       Q.   Okay.

12:35   7       A.   So he could actually live in Rancho Viejo and

12:35   8   still be within the time frame.

12:35   9       Q.   And he was terminated on September 26th,

12:35  10   correct?

12:35  11       A.   Correct.

12:35  12       Q.   Okay.  Would this have been one of the big

12:35  13   reasons you wanted to terminate the chief?

12:35  14           MR. AGUILAR:  Objection; vague.

12:36  15       Q.   Was this one of the major considerations you

12:36  16   had or concerns you had?

12:36  17       A.   Yes.

12:36  18       Q.   Okay.  You wrote it as No. 1.

12:36  19       A.   Yes.  The numeration, there's no bearing.

12:36  20       Q.   Okay.

12:36  21       A.   It's the way I was remembering.

12:36  22       Q.   We are going to go through this, and I want you

12:36  23   to tell me what was real important to you in your

12:36  24   consideration.

12:36  25       A.   Okay.

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                  BROWNSVILLE DIVISION

RICARDO PEREZ, JR.          ) (
        Plaintiff           ) (
                            ) (
VS.                         ) (    CIVIL ACTION NO. B-00-161
                            ) (
CITY OF LOS FRESNOS,        ) (
TEXAS, JUAN C. SIERRA,      ) (
SR., GONZALO ACEVEDO,       ) (
IDA GARCIA, MIGUEL          ) (
MENDOZA, INDIVIDUALLY       ) (
AND IN THEIR OFFICIAL       ) (
CAPACITIES, AND JUAN        ) (
MENDOZA, JR.                ) (
        Defendants          ) (
```

REPORTER'S CERTIFICATE


I, LOU ZUNIGA, Certified Court Reporter,

certify that the witness, MIGUEL MENDOZA, was duly

sworn by me, and that the deposition is a true and

correct record of the testimony given by the witness on

APRIL 23, 2001; that the deposition was reported by me

in stenograph and was subsequently transcribed under my

supervision.

I FURTHER CERTIFY that I am not a relative,

employee, attorney or counsel of any of the parties,

nor a relative or employee of such attorney or counsel,

nor am I financially interested in the action.

223

WITNESS MY HAND on this the _____3rd_____ day of
_____May_____, 2001.


_____
LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-01
Hill & Romero
Certified Court Reporters
5415 North McColl, Suite 107
McAllen, Texas   78504
(956) 994-8898

# EXHIBIT A-3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO PEREZ, JR. | ) ( | |
| Plaintiff | ) ( | |
| | ) ( | |
| VS. | ) ( | CIVIL ACTION NO. B-00-161 |
| | ) ( | |
| CITY OF LOS FRESNOS, | ) ( | |
| TEXAS, JUAN C. SIERRA, | ) ( | |
| SR., GONZALO ACEVEDO, | ) ( | |
| IDA GARCIA, MIGUEL | ) ( | |
| MENDOZA, INDIVIDUALLY | ) ( | |
| AND IN THEIR OFFICIAL | ) ( | |
| CAPACITIES, AND JUAN | ) ( | |
| MENDOZA, JR. | ) ( | |
| Defendants | ) ( | |

_____

ORAL DEPOSITION OF
IDA GARCIA CORTEZ
JUNE 2, 2001

_____

ORAL DEPOSITION OF IDA GARCIA CORTEZ, produced

as a witness at the instance of the PLAINTIFF, taken in

the above styled and numbered cause on JUNE 2, 2001,

from 1:09 p.m. to 4:26 p.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the offices of Los Fresnos City Hall, 209

North Arroyo, Los Fresnos, Texas, pursuant to the

Federal Rules of Civil Procedure.



HILL & ROMERO
CERTIFIED COURT REPORTERS

15:13  1    happened when they were on vacation, correct?

15:13  2         A.  Correct.

15:13  3         Q.  Okay.  Sometimes police officers get sent off

15:13  4    to seminars or conferences and things like that?

15:13  5         A.  Correct.

15:13  6         Q.  And if they are not there because they are

15:13  7    attending to those other duties, do you fault them for

15:13  8    that as well?

15:13  9         A.  Not if they are away on business and they are

15:13 10    on vacation.  If they are on vacation, they are not on

15:13 11    duty, right?

15:13 12         Q.  Okay.  And you understand there's a chain of

15:13 13    command within the police department --

15:13 14         A.  Correct.

15:13 15         Q.  -- with the most senior officer there is

15:13 16    responsible for the crime scene?

15:13 17         A.  Right.

15:14 18         Q.  Okay.  And you understand that this drug bust,

15:14 19    the most senior officer there at the time was David

15:14 20    Rodriguez?

15:14 21         A.  Correct.

15:14 22              (Garcia Exhibit No. 2 was marked).

15:14 23         Q.  We have marked as Garcia Exhibit No. 2 a

15:14 24    three-page document that says, concerns with Ricardo

15:14 25    Perez.  Have you seen that before, ma'am?

15:14  1    A.  Yes.

15:14  2    Q.  What is that document, please?

15:14  3    A.  It's my list of concerns with Perez.

15:14  4    Q.  Okay.  And this is a document generated by you?

15:14  5    A.  Yes.

15:14  6    Q.  And when did you generate this document?

15:14  7    A.  I don't recall.

15:14  8    Q.  Was it after Chief Perez was terminated?

15:14  9    A.  Yes.  That I put it together?

15:14 10    Q.  Right.

15:14 11    A.  That I typed it, yes.

15:14 12    Q.  Okay.  Did you ever have any notes or anything

15:14 13  like that that you used to put this together?

15:14 14    A.  Yes.

15:14 15    Q.  Where are those notes?

15:14 16    A.  I might have thrown them.

15:14 17    Q.  You don't have those now?

15:14 18    A.  Probably not because I put it all in here.

15:14 19    Q.  Okay.  So this list of concerns with Ricardo

15:14 20  Perez we have marked as Garcia Exhibit No. 2, these

15:14 21  would be all the concerns you ever had with Ricardo

15:15 22  Perez?

15:15 23    A.  Ever?

15:15 24    Q.  Yes.

15:15 25    A.  Probably.  I think so.

15:15  1      Q.  Okay.  Because you generated this about a month
15:15  2  and a half or two months after he was terminated,
15:15  3  correct?
15:15  4      A.  That I typed it up -- it was afterwards.
15:15  5      Q.  Okay.  Let's go over No. 1.  Did he meet the
15:15  6  residency requirements in our personnel policy handbook
15:15  7  -- let's see.  You understand that Rick Perez did rent
15:15  8  a small apartment right outside of the city limits of
15:15  9  Los Fresnos, correct?
15:15 10      A.  Right, he did rent one.
15:15 11      Q.  Okay.  How do you know he did not reside there?
15:15 12      A.  Because I would pass by there at night and I
15:15 13  would ask.
15:15 14      Q.  Ask who?
15:15 15      A.  The owners of the place.
15:15 16      Q.  And what would they tell you?
15:15 17      A.  That they don't see him there at nighttime.
15:16 18      Q.  Okay.  Did you want him to live there at
15:16 19  nighttime?
15:16 20      A.  Yes.
15:16 21      Q.  Why?
15:16 22      A.  Because residency requires -- residency means
15:16 23  you live there.
15:16 24      Q.  Okay.
15:16 25      A.  What is the use of renting a place if you are

15:16  1    not going to live there?

15:16  2        Q.   Do you know when he started renting that place?

15:16  3        A.   In June, I think.

15:16  4        Q.   Okay.  And who were the owners that complex?

15:16  5        A.   The owner of Harvey's?  I don't know who the

15:16  6    actual owner is.

15:16  7        Q.   Who are the people you talked to?

15:16  8        A.   It's a family.  The people who worked at the

15:16  9    store, Alfredo.

15:16 10        Q.   Alfredo who?

15:16 11        A.   Escalante.

15:16 12        Q.   So he told you he never saw Rick Perez there,

15:16 13    right?

15:16 14        A.   At night.

15:16 15        Q.   Okay.  And it said, this led to other problems

15:17 16    or incidents which happened after hours that required

15:17 17    his direction and/or supervision during his tenure as

15:17 18    chief.  And it says, listed below.  So those other

15:17 19    problems will be further in this paper, correct?

15:17 20        A.   Right.

15:17 21        Q.   Let me show you what's been marked as Ricardo

15:17 22    -- I mean Miguel Mendoza Exhibit No. 9.  Have you ever

15:17 23    seen that before, ma'am?

15:17 24        A.   No.

15:17 25        Q.   Okay.  And basically what Exhibit 9 is, it's a

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.          ) (
      Plaintiff          ) (
                         ) (
VS.          ·          ) (    CIVIL ACTION NO. B-00-161
                         ) (
CITY OF LOS FRESNOS,          ) (
TEXAS, JUAN C. SIERRA,          ) (
SR., GONZALO ACEVEDO,          ) (
IDA GARCIA, MIGUEL          ) (
MENDOZA, INDIVIDUALLY          ) (
AND IN THEIR OFFICIAL          ) (
CAPACITIES, AND JUAN          ) (
MENDOZA, JR.          ) (
      Defendants          ) (


REPORTER'S CERTIFICATE


      I, LOU ZUNIGA, Certified Court Reporter,
certify that the witness, IDA GARCIA CORTEZ, was duly
sworn by me, and that the deposition is a true and
correct record of the testimony given by the witness on
JUNE 2, 2001; that the deposition was reported by me in
stenograph and was subsequently transcribed under my
supervision.

      I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

HILL & ROMERO
CERTIFIED COURT REPORTERS

WITNESS MY HAND on this the _____ day of

_____, 2001.


LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-01
Hill & Romero
Certified Court Reporters
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.  ) (
  Plaintiff   ) (
         ) (
VS.    .  ) ( CIVIL ACTION NO. B-00-161
         ) (
CITY OF LOS FRESNOS, ) (
TEXAS, JUAN C. SIERRA, ) (
SR., GONZALO ACEVEDO, ) (
IDA GARCIA, MIGUEL  ) (
MENDOZA, INDIVIDUALLY ) (
AND IN THEIR OFFICIAL ) (
CAPACITIES, AND JUAN  ) (
MENDOZA, JR.    ) (
  Defendants  ) (

---

ORAL DEPOSITION OF
JUAN SIERRA
APRIL 23, 2001

---

   ORAL DEPOSITION OF JUAN SIERRA, produced as a

witness at the instance of the PLAINTIFF, taken in the

above styled and numbered cause on APRIL 23, 2001, from

4:58 p.m. to 6:37 p.m., before LOU ZUNIGA, Certified

Court Reporter No. 2198, in and for the State of Texas,

at the offices of J. Arnold Aguilar, Artemis Square,

Suite H-2, 1200 Central Boulevard, Brownsville, Texas,

pursuant to the Texas Rules of Civil Procedure and the

provisions stated on the record or attached therein.



17:37  1      A.   Again, it must have been in August.

17:37  2      Q.   Okay.

17:37  3           (Sierra Exhibit No. 2 was marked).

17:37  4      Q.   I have marked here as Sierra Exhibit No. 2 a

17:37  5  handwritten note on the letterhand from Darling-Mouser

17:37  6  Funeral Home.  Let me ask you, have you seen that

17:37  7  before, sir?

17:37  8      A.   Yes, sir.  I wrote it out.

17:37  9      Q.   Okay.  Do you know when you wrote that out?

17:37 10      A.   Well, not exactly.

17:37 11      Q.   Was it after Chief Perez was terminated?

17:37 12      A.   Yes.  Yes, it was.

17:37 13      Q.   Okay.  And why did you decide to write this

17:37 14  note?

17:37 15      A.   I believe, if I'm not mistaken, we needed to

17:38 16  give our attorney an idea as to what reasons we had --

17:38 17  or what reasons I had.

17:38 18      Q.   It was done at the request of the attorney?

17:38 19      A.   Yes.

17:38 20      Q.   Okay.  And was this requested of all the

17:38 21  council members, I guess, that voted against the chief?

17:38 22      A.   Yes, that's what I understand, provide a

17:38 23  reason.

17:38 24      Q.   Did you consult with the other council members

17:38 25  or anyone else when you wrote this note?

                          HILL & ROMERO
                    CERTIFIED COURT REPORTERS

17:45 1    into it.  I'm going to ask the questions.

17:45 2                MR. AGUILAR:  Let him ask whatever

17:45 3    questions he wants to and try to answer them the best

17:45 4    you can.

17:45 5        Q.  Have you told me everything about No. 1 that

17:45 6    you were concerned with?

17:45 7        A.  Yes, sir.

17:45 8        Q.  Okay.  Everything about No. 2 that you were

17:45 9    concerned with?

17:45 10       A.  Yes, sir.

17:45 11       Q.  And No. 3, why did he not move into Los Fresnos

17:45 12   after being given such a long time to do it?

17:45 13       A.  Right.

17:46 14       Q.  Why was that such a big concern of yours?

17:46 15       A.  Well, as chief of police, I mean, we would want

17:46 16   him to respond immediately or as soon as possible.

17:46 17       Q.  Okay.  And so --

17:46 18       A.  And I was under the understanding that he was

17:46 19   still living in Edinburg.

17:46 20       Q.  Did you understand that he also had an

17:46 21   apartment right outside Los Fresnos?

17:46 22       A.  Yes.

17:46 23       Q.  Okay.  Was there a problem with him having that

17:46 24   apartment there?

17:46 25       A.  I understand he never moved in.  And, again, I

HILL & ROMERO
                CERTIFIED COURT REPORTERS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.  ) (
   Plaintiff  ) (
        ) (
VS.      ) ( CIVIL ACTION NO. B-00-161
        ) (
CITY OF LOS FRESNOS, ) (
TEXAS, JUAN C. SIERRA, ) (
SR., GONZALO ACEVEDO, ) (
IDA GARCIA, MIGUEL  ) (
MENDOZA, INDIVIDUALLY ) (
AND IN THEIR OFFICIAL ) (
CAPACITIES, AND JUAN ) (
MENDOZA, JR.   ) (
   Defendants ) (

REPORTER'S CERTIFICATE


   I, LOU ZUNIGA, Certified Court Reporter,
certify that the witness, JUAN SIERRA, was duly sworn
by me, and that the deposition is a true and correct
record of the testimony given by the witness on APRIL
23, 2001; that the deposition was reported by me in
stenograph and was subsequently transcribed under my
supervision.

   I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

WITNESS MY HAND on this the 3rd _____ day of

_____ May _____, 2001.


LOU ZUNIGA, Texas CSR 2199
Expiration Date: 12-31-01
Hill & Romero
Certified Court Reporters
5415 North McColl, Suite 107
McAllen, Texas  78504
(956) 994-8898

# EXHIBIT A-5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.          ) (
        Plaintiff           ) (
                            ) (
VS.                         ) (    CIVIL ACTION NO. B-00-161
                            ) (
CITY OF LOS FRESNOS,        ) (
TEXAS, JUAN C. SIERRA,      ) (
SR., GONZALO ACEVEDO,       ) (
IDA GARCIA, MIGUEL          ) (
MENDOZA, INDIVIDUALLY       ) (
AND IN THEIR OFFICIAL       ) (
CAPACITIES, AND JUAN        ) (
MENDOZA, JR.                ) (
        Defendants          ) (

---

ORAL DEPOSITION OF
GONZALO ACEVEDO
APRIL 23, 2001

---

ORAL DEPOSITION OF GONZALO ACEVEDO, produced as

a witness at the instance of the PLAINTIFF, taken in

the above styled and numbered cause on APRIL 23, 2001,

from 2:30 p.m. to 4:48 p.m., before LOU ZUNIGA,

Certified Court Reporter No. 2198, in and for the State

of Texas, at the offices of J. Arnold Aguilar, Artemis

Square, Suite H-2, 1200 Central Boulevard, Brownsville,

Texas, pursuant to the Texas Rules of Civil Procedure

and the provisions stated on the record or attached

therein.

HILL & ROMERO
CERTIFIED COURT REPORTERS



15:13  1   makes some mistakes and that he was going to be

15:14  2   reported to the FBI.  I said, if he makes mistakes, all

15:14  3   right, that's the best thing to do.  We have to get rid

15:14  4   of the officer who was wrongdoing.  That was my answer

15:14  5   to the mayor.

15:14  6      Q.  Okay.  And then later on you found out that was

15:14  7   David Rodriguez that was being reported?

15:14  8      A.  Yeah, that was David Rodriguez.  That was all.

15:14  9         MR. AGUILAR:  Do you want to take a quick

15:14 10   five-minute break?

15:14 11         MR. RODRIGUEZ:  Okay.

15:36 12         (Lunch recess).

15:36 13         (Acevedo Exhibit No. 2 was marked).

15:36 14      Q.  Mr. Acevedo, we took a short break, and we

15:36 15   appreciate your patience on that.  I have marked here

15:36 16   as Exhibit G. Acevedo 2 a one-page document entitled

15:36 17   Gonzalo Acevedo, and it's dated October 23rd, 2000; is

15:36 18   that correct, sir?

15:36 19      A.  Yes.

15:36 20      Q.  Okay.  And when -- did you type this document

15:37 21   up on October 23rd, 2000?

15:37 22      A.  Excuse me?

15:37 23      Q.  Did you type this document up that's in your

15:37 24   hands right now, Exhibit 2?

15:37 25      A.  I didn't type it.

15:37  1      Q.   Who typed it?

15:37  2      A.   I cannot recall.

15:37  3      Q.   Was it done in your presence?

15:37  4      A.   Yes.

15:37  5      Q.   Was it done at City Hall?

15:37  6      A.   No, I don't think it was in the City Hall, but

15:37  7  I don't recall -- where was this?  I cannot recall.

15:37  8      Q.   Okay.  Who else was present when you were

15:37  9  deciding to do this document?

15:38  10     A.   Nobody was.

15:38  11     Q.   Nobody else?

15:38  12     A.   No.

15:38  13     Q.   Just you and the typist?

15:38  14     A.   Huh?

15:38  15     Q.   Just you and the typist?

15:38  16     A.   Yes.

15:38  17     Q.   Okay.  And prior to you doing it, did you

15:38  18  consult with any of the other council members about

15:38  19  what you were going to put in this letter?

15:38  20     A.   No.

15:38  21     Q.   No?  Okay.  Why did you decide to do this

15:38  22  letter on or about October 23rd, 2000?

15:38  23     A.   Because we were talking about -- everybody was

15:38  24  talking about why I take the position to the lieutenant

15:38  25  -- excuse me, to the chief of police, so I decided to

HILL & ROMERO
CERTIFIED COURT REPORTERS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO PEREZ, JR.                )(
          Plaintiff               )(
                                  )(
VS.                               )(    CIVIL ACTION NO. B-00-161
                                  )(
CITY OF LOS FRESNOS,              )(
TEXAS, JUAN C. SIERRA,            )(
SR., GONZALO ACEVEDO,             )(
IDA GARCIA, MIGUEL                )(
MENDOZA, INDIVIDUALLY             )(
AND IN THEIR OFFICIAL             )(
CAPACITIES, AND JUAN              )(
MENDOZA, JR.                      )(
          Defendants              )(


REPORTER'S CERTIFICATE


        I, LOU ZUNIGA, Certified Court Reporter,

certify that the witness, GONZALO ACEVEDO, was duly

sworn by me, and that the deposition is a true and

correct record of the testimony given by the witness on

APRIL 23, 2001; that the deposition was reported by me

in stenograph and was subsequently transcribed under my

supervision.

        I FURTHER CERTIFY that I am not a relative,

employee, attorney or counsel of any of the parties,

nor a relative or employee of such attorney or counsel,

nor am I financially interested in the action.

WITNESS MY HAND on this the _*3rd*_ day of
_*May*_ , 2001.


LOU ZUNIGA, Texas CSR 2198
Expiration Date: 12-31-01
Hill & Romero
Certified Court Reporters
5415 North McColl, Suite 107
McAllen, Texas   78504
(956) 994-8898

# EXHIBIT B

REGULAR CITY COUNCIL MEETING
FEBRUARY 22, 2000

The Los Fresnos City Council convened in a Regular Meeting on Tuesday, February 22, 2000 at 7:30 p.m. Present were Mayor Roberto Cepeda, Mayor Pro-tem Melanie McCormick, Aldermen Juan Munoz, Ida Garcia, Miguel Mendoza and Tom Jones, and City Secretary Pam Denny.

Mayor Cepeda called the meeting to order with a quorum present and led the audience in the Pledge of Allegiance; the Texas Pledge and he gave the invocation.

Presentation and acceptance of audit for fiscal year 1998/1999 as presented by Long, Chilton, Payte and Hardin

Quentin Anderson from Long, Chilton, Payte, Hardin explained the fiscal year audit to the council and public.

Mr. Anderson stated that he would highlight areas of the audit and if the council had any questions he would be glad to answer them. The fund balance in General Fund was down from $243,000 to $106,000 and he realizes that there were some unexpected expenses this year. Another area of concern was the fixed assets and he would discuss that later in the presentation. There was an adjustment made to receivable due to ambulance receivables had not been recorded on the City's books. The other largest asset category on the balance sheet is general fixed assets and fixed assets in waterworks, they total nearly 12 million dollars. He found that the reason is due to the subsidiary records need to be updated.   Water and Sewer Fund is in good shape.   Mr. Anderson stated that they did find what they considered as weaknesses in internal control and they are reported in the Schedule of Findings and Questioned Costs on page 83. Most of this was what was found in the fixed assets. The existence of fixed assets cannot be adequately tracked and thus control is not maintained. The City should complete a physical inventory of fixed assets and the inventory listing should then be updated each September. Another area of concern was of subsidiary listings for property taxes, ambulance receivable and utility service receivables. He recommends that they be reconciled on a monthly basis. Mr. Anderson stated that he had issued a comment and observation letter to council for suggested changes. The cash box is not opened and closed with a set amount, it varies from day to day. If there is a difference then the City should hold the employees handling the cash responsible. The city has been banking with the only bank in town for numerous years but there is not a depository contract and the City's funds could be at risk. Mr. Anderson answered questions from the council.

Ms. Denny stated that she had made contact with a company that specializes in doing inventory and they will be giving her a proposal.

Alderman Jones made a motion to approve the audit as presented, seconded by Munoz and the vote for approval was unanimous.

Consent Agenda

A.     Approval of Minutes from February 8, 2000 regular meeting.
B.     Acknowledgement of bills paid from February 11-18, 2000.
C.     Order of Election for May 6, 2000.
D.     Consider approval of a new ordinance creating the office of Chief of Police, appointment, term, qualifications and salary.

Alderman Jones made a motion to approve the consent agenda, seconded by Munoz and the vote for approval was unanimous.

2020

Citizen's forum

Tracy Larimore stated that he had concerns about the hiring of a new Police Chief. He stated that he would like to see that the council do a pre-employment background security check, have standard minimum requirements for the position and for the council to stick to the requirements and he would like for the council to table this item and re-advertise.

Consider approval or rejection of preliminary and final plats for Ash-Tree Business Center Subdivision, and take action as may be appropriate

Ms. Denny stated that the Planning and Zoning Commission had approved the plats at their meeting on Monday with exceptions that new plat be drawn and presented to the Council, that at 4 to 1 ratio be met and a 50 foot utility easement Mr. Jones ask if Manuel Flores, City Engineer, had looked at the new plat and Ms. Denny stated no but he had approved the old plat and Planning and Zoning would not accept it. Alderperson McCormick made a motion to approve the preliminary and final plats for Ash-Tree Business Center Subdivision, seconded by Mendoza and the vote for approval was unanimous.

Mr. Ramirez stated that he would like to tie into the lift station that is owned by Zarsky Lumber and to a 2-inch water line. Ms. Denny stated that neither line would be sufficient to take care of the entire area. The Mayor stated that this should be worked out between the developers and City Administrator.

Closed Session – The Board of Aldermen may convene in closed session pursuant to Section 551.074, Texas Local Government Code to discuss the following:
      A.  Personnel: To discuss the hiring of a Chief of Police and a Finance Director.

Mayor Cepeda recessed the meeting for a closed session at 8:08 p.m.

Open Session – The Board of Aldermen will convene in open session for further discussion and possible action regarding the above item

Mayor Cepeda called the meeting back to order at 9:25 p.m.

Alderman Munoz made a motion to hire Terry Vinson as Chief of Police and to let the City Administrator select a Finance Director, seconded by McCormick and vote was Munoz and McCormick in favor and Garcia, Mendoza and Jones opposed, motion failed.

Alderman Jones made a motion to hire Ricardo Perez, Jr. as Chief of Police, seconded by Garcia and the vote was Jones, Garcia, Mendoza, and McCormick in favor and Munoz opposed, motion carried.

Alderman McCormick made a motion to have the City Administrator select the Finance Director, seconded by Mendoza and the vote for approval was unanimous.

Appointment of four members to the Community Development Corporation Board and appointment of a President, and take action as may be appropriate

Mayor Cepeda stated that he would recommend that the reappointment of Jackie Kyger as President and the reappointment of Ernie Castillo as a board member and the appointment of Gonzalo Acevedo and Bill Sterling as new members to the board. Alderman McCormick made a motion to approve the recommendations of the Mayor, seconded by Munoz and the vote for approval was unanimous.

Comments by Mayor and Council members

Alderman Jones thank Terry Vinson for everything he has done for the Police Dept. during his tenure and that he had done a wonderful job.

Mayor Pro-tem McCormick expressed her gratitude to Terry Vinson for the outstanding job and not enough can be said for the job that was done by him. She wishes him the best in his campaign for Sheriff.

Alderman Munoz also gave his thanks to Terry Vinson for a job well done.

Alderman Garcia reminded the council about the pictures next week at 6:00 p.m.

Mayor Cepeda stated he would also like to thank Terry Vinson for doing an outstanding job as the Interim Chief of Police. The City went through a threat of a hurricane, the school went through a terrorist threat and our department was in shambles and now our department is very respectful.

Mayor Cepeda stated that he would not be a candidate for re-election that graduate school and other priorities compel him to pass the duties of Mayor to some other brave sole. He wishes the best of luck to the other candidates that will be announcing their intentions very shortly and he challenges them to a clean race and the one that has the best interest of Los Fresnos to heart.

Adjournment

Mayor Cepeda adjourned the meeting at 9:33 p.m.


MAYOR                                              CITY SECRETARY

Roberto Cepeda                                     Pam Denny

# CERTIFICATION

This is to certify that the above and foregoing is a true and correct copy of the Regular City Council Meeting minutes of February 22, 2000.

To certify which witness my hand and seal of office this 28th day of February, 2002.

Pam Denny, City Secretary
City of Los Fresnos, Texas

# EXHIBIT C

*Y 10, 41*

## AN ORDINANCE

CREATING THE OFFICE OF CHIEF OF POLICE,
PROVIDING FOR THE APPOINTMENT, TERM OF
OFFICE AND QUALIFICATIONS OF SUCH OFFICER
AND THE SALARY AND BOND THEREOF.

BE IT ORDAINED BY THE BOARD OF COMMISSIONERS
OF THE CITY OF LOS FRESNOS, TEXAS:

SECTION 1.  THAT the office of Chief of Police of the City of Los
Fresnos, Texas, is hereby created.

SECTION 2.  THAT such office shall be filled by appointment by
the Mayor, by and with the consent of the City Council, within
ten days after this ordinance shall take effect, and such
officer so appointed shall hold office at the will of the City
Council, and shall receive such salary or fees of office as may
be fixed by the City Council from time to time.

SECTION 3.  THAT such officer shall be a resident qualified voter
of the City of Los Fresnos, Texas, and shall make bond in the
amount of $3,000 for the faithful performance of his duties.

SECTION 4.  THAT all ordinances or parts of ordinances in conflict
herewith are hereby repealed.

PASSED AND APPROVED this __5__ day of June, 1956.

APPROVED:

W. B. Speer, Mayor

ATTEST:

City Secretary

W. J. Galyean

George Nixon

Aldermen

# CERTIFICATION

This is to certify that the above and foregoing is a true and correct copy of Ordinance 41 approved and adopted by the City Council of the City of Los Fresnos, Texas, at a duly convened regular meeting on June 5, 1956.

To certify which witness my hand and seal of office this the 8th day of May, 2001.

Pam Denny, City Secretary
City of Los Fresnos, Texas

# EXHIBIT D

STATE OF TEXAS

COUNTY OF CAMERON

CITY OF LOS FRESNOS

ORDINANCE NO. 297

AN ORDINANCE REPEALING CERTAIN PROVISIONS OF "ORDINANCE
NO. 41 CREATING THE OFFICE OF CHIEF OF POLICE, PROVIDING FOR
THE APPOINTMENT, TERM OF OFFICE AND QUALIFICATIONS OF
SUCH OFFICER, AND THE SALARY AND BOND THEREOF," PROVIDING
FOR THE APPOINTMENT, TERM OF OFFICE AND QUALIFICATIONS OF
THE CHIEF OF POLICE, ADOPTING A JOB DESCRIPTION FOR THE
OFFICE OF CHIEF OF POLICE, PROVIDING FOR THE SALARY AND
BOND OF SUCH OFFICER, REPEALING PRIOR ORDINANCES INCONSISTENT
HEREWITH, AND PROVIDING FOR AN EFFECTIVE DATE.

BE IT ORDAINED BY THE BOARD OF ALDERMEN OF THE CITY OF LOS FRESNOS, TEXAS:

1. Section 2 and 3 or "Ordinance No. 41 Creating the office of Chief of Police, Providing for the
   Appointment, Term of Office and Qualifications of such officer, and the Salary and Bond thereof"
   are hereby repealed.

2. The Office of Chief of Police shall be filled by appointment by majority vote of the Board of
   Aldermen, and such officer so appointed shall hold office at the will of the Board of Aldermen,
   and shall receive such salary or fees of office as may be fixed by the Board of Aldermen from time
   to time. The Office of Chief of Police shall not be considered a municipal office for purposes of
   Subchapter C of Chapter 22, Texas Local Government Code (22.071, et.seq.). The Chief of Police
   shall, for administrative purposes, report to and be supervised by, the City Administrator.

3. The duties of the Chief of Police shall be as provided in the job description for the Office as
   attached hereto as Exhibit "A" and incorporated herein by reference, and as herein after amended,
   from time to time, by majority vote of the Board of Aldermen. The Chief of Police shall be
   subject to all City personnel policies and Police Department policies, as now existing or
   hereinafter adopted. To the extent of any conflict between such policies and this Ordinance, the
   provisions of this Ordinance shall control.

4. The Chief of Police shall be required to reside in the corporate limits of the City of Los Fresnos, or
   within 15 miles of its corporate limits; provided, however, that a person who does not reside
   within the prescribed limits may be appointed to the office of Chief of Police, and shall be
   required to relocate his or her primary residence to a location within the prescribed limits within
   the time specified by the Board of Aldermen at the time of appointment.

5. The Chief of Police shall post a bond for the faithful performance of his duties in an amount
   prescribed by the Board of Aldermen at the time of his or her appointment, the cost of which shall
   be paid from the general fund of the City.

6. The provisions of this Ordinance are severable, and if any word, phrase, clause, sentence,
   paragraph, section or other part of this Ordinance or the application thereof to any person or
   circumstances shall ever be held by any court of competent jurisdiction to be invalid or

unconstitution 'or any reason, the remainder of this Ordinanc  'nd the application of such word, phrase, clause,  .itence, paragraph, section or other part of thi_  .dinance to other persons or circumstances shall not be affected thereby, unless the provision(s) so invalidated renders this Ordinance unenforceable and/or frustrates the purpose of this Ordinance.

7.   All ordinances, resolutions or parts of ordinance or resolutions in conflict herewith, to the extent of such conflict, and all ordinances, resolution or parts of ordinances or resolutions relating to or in any way affecting the appointment or designation of persons to occupy the office of chief of police, are hereby repealed.

8.   This Ordinance shall be and remain in full force and effect from and after its passage by the Board of Aldermen.

CONSIDERED PASSED AND APPROVED THIS _22nd_ DAY OF _February_, 2000, at a regular meeting of the Board of Aldermen of the City of Los Fresnos at which a quorum was present and which was held in accordance with Chapter 551 of the Texas Government Code.

Signed this _22nd_ day of _February_, 2000.

CITY OF LOS FRESNOS

_Roberto Cepeda_
Roberto Cepeda, Mayor

ATTEST:

_Pam Denny_
Pam Denny, City Secretary

# CERTIFICATION

This is to certify that the above and foregoing is a true and correct copy of the City of Los Fresnos Ordinance Number 297, repealing Ordinance Number 41 and creating the Office of Chief of Police, adopted at the Regular Meeting of the Board of Alderman of the City of Los Fresnos on February 22, 2000.

To certify which witness my hand and seal of office this 28th day of February, 2002.

Pam Denny, City Secretary
City of Los Fresnos, Texas

# EXHIBIT E

THE STATE OF TEXAS                    §
                                      §
COUNTY OF CAMERON                     §
                                      §
CITY OF LOS FRESNOS                   §

BEFORE ME, the undersigned authority personally appeared **PAM DENNY,** who, being duly sworn, deposed and said:

"My name is Pam Denny, I am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts stated herein. The facts stated herein are true and correct. I am employed by the City of Los Fresnos as City Secretary. As such, I am a Custodian of Records for the City of Los Fresnos and am capable of making this affidavit on its behalf.

I am the person in charge of the records for the City of Los Fresnos. Attached to this affidavit as an *Exhibit,* is the City of Los Fresnos Personnel Polices Manual adopted by Resolution Number 17-99 on December 14, 1999.

The attached City of Los Fresnos Personnel Policies Manual is kept by me in the regular course of business of the City of Los Fresnos. The records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; the records were kept in the course of the regular conducted business of the City of Los Fresnos; and the records were made by the regularly conducted activity as a regular practice of the City of Los Fresnos. The City of Los Fresnos Personnel Policies Manual is an exact duplicate of the original.

In testimony whereof, witness my hand and seal of the said City of Los Fresnos, Texas, on this the 28 day of February, 2002.


PAM DENNY, City Secretary
City of Los Fresnos, Texas


NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My commission Expires:

April 9, 2005

YOLANDA PEREZ
MY COMMISSION EXPIRES
April 9, 2005

# CITY OF LOS FRESNOS

# PERSONNEL POLICIES MANUAL

ROBERTO CEPEDA ............. MAYOR

MELANIE McCORMICK ..... MAYOR PRO TEM

IDA GARCIA ........................ ALDERWOMAN

TOM JONES ......................... ALDERMAN

MIGUEL MENDOZA ............ ALDERMAN

JUAN MUNOZ ...................... ALDERMAN

ADOPTED BY RESOLUTION NO. _17-99_ ON _Dec. 14____, 1999

CITY OF LOS FRESNOS, TEXAS

PERSONNEL POLICIES MANUAL

TABLE OF CONTENTS

CHAPTER 1 ~ INTRODUCTION                                                          Page

&sect; 1-01.      Objectives of Policies                                   6
&sect; 1-02.      Equal Opportunity Policy                                 6
&sect; 1-03.      Applicability and Scope                                  6
&sect; 1-04.      Dissemination and Familiarity of Policies                7
&sect; 1-05.      Administrative Authority                                 7
&sect; 1-06.      Reservation of Rights                                    7
&sect; 1-07.      Other Laws and Regulations                               7

CHAPTER 2 ~ EMPLOYEE HIRING AND APPOINTMENT

&sect; 2-01.      Vacancies                                                8
&sect; 2-02.      Announcement of Vacancies                                8
&sect; 2-03.      Applications                                             8
&sect; 2-04.      Evaluation                                               8
&sect; 2-05.      Disqualification                                         8
&sect; 2-06.      Referral and Selection                                   9
&sect; 2-07.      Authority for Appointment                                9
&sect; 2-08.      Types of Appointments                                    9
&sect; 2-09.      Nepotism                                                 9
&sect; 2-10.      Residency Requirements                                   9
&sect; 2-11.      Medical Examinations                                     9
&sect; 2-12.      Emergency Temporary Appointments                         9
&sect; 2-13.      Promotion Policy                                        10
&sect; 2-14.      Temporary Promotion                                     10
&sect; 2-15.      Transfers                                               10
&sect; 2-16.      Demotions                                               10
&sect; 2-17.      Reemployment                                            10
&sect; 2-18.      Employee Orientation                                    10
&sect; 2-19.      Reasonable Accommodation for Disabilities               11

CHAPTER 3 ~ PROBATION

&sect; 3-01.      Probationary Period                                     12
&sect; 3-02.      Benefit Eligibility                                     12
&sect; 3-03.      Purpose of Probationary Period                          12
&sect; 3-04.      No Fault Separation                                     12
&sect; 3-05.      Right of Appeal                                         12

CHAPTER 4 ~ PERFORMANCE EVALUATION AND COMPENSATION

&sect; 4-01.      Salary and Wage Plan                                    13
&sect; 4-02.      Employee Pay Schedule                                   13
&sect; 4-03.      Emergency Duty Pay                                      13

Chapter 4 continued ...                                                     Page

| | | |
|---|---|---|
| § 4-04. | Overtime and Compensatory Time | 13 |
| § 4-05. | Employee Performance Evaluation | 13 |
| § 4-06. | Termination Pay | 14 |

CHAPTER 5 ~ ABSENCES AND LEAVES

| | | |
|---|---|---|
| § 5-01. | Holidays | 15 |
| § 5-02. | Vacation | 15 |
| § 5-03. | Sick Leave | 16 |
| § 5-04. | Bereavement Leave | 17 |
| § 5-05. | Military Leave | 17 |
| § 5-06. | Administrative Leave with Pay | 17 |
| § 5-07. | Family and Medical Leave Act | 18 |
| § 5-08. | Authorized Leave Without Pay | 19 |
| § 5-09. | Absence without Leave | 19 |

CHAPTER 6 ~ EMPLOYEE CONDUCT

| | | |
|---|---|---|
| § 6-01. | Attendance | 20 |
| § 6-02. | Work Standards | 20 |
| § 6-03. | Political Activities | 20 |
| § 6-04. | Solicitation | 20 |
| § 6-05. | Outside Employment | 21 |
| § 6-06. | Personal Appearance | 21 |
| § 6-07. | Conflict of Interest, Solicitation, and Gifts | 21 |
| § 6-08. | General Deportment | 21 |
| § 6-09. | Sexual Harassment and Discrimination | 21 |
| § 6-10. | Definition of Sexual Harassment | 22 |
| § 6-11. | Reporting a Complaint | 22 |
| § 6-12. | Resolving the Complaint | 24 |
| § 6-13. | Grounds for Disciplinary Action | 24 |

CHAPTER 7 ~ DISCIPLINE, APPEALS, AND GRIEVANCES

| | | |
|---|---|---|
| § 7-01. | Work Ethic and Disciplinary Policy | 26 |
| § 7-02. | Grounds for Disciplinary Action | 26 |
| § 7-03. | Types of Disciplinary Action | 26 |
| § 7-04. | Written Reprimand | 26 |
| § 7-05. | Suspension | 27 |
| § 7-06. | Disciplinary Demotion and Dismissal | 27 |
| § 7-07. | Voluntary Grievance Procedure | 27 |

CHAPTER 8 ~ NONDISCIPLINARY TERMINATION

| | | |
|---|---|---|
| § 8-01. | Resignation | 28 |
| § 8-02. | Layoff | 28 |
| § 8-03. | Administrative Termination | 28 |
| § 8-04. | Retirement | 28 |

CHAPTER 9 ~ PERSONNEL RECORDS                                               Page

    § 9-01.      Personnel Files and Records                          29
    § 9-02.      Personnel Reports                                    29

CHAPTER 10 ~ EMPLOYEE BENEFITS

    § 10-01.     Medical/Dental Benefits                             30
    § 10-02.     Workers' Compensation Insurance                     30
    § 10-03.     Social Security                                     30
    § 10-04.     Unemployment Insurance                              30

CHAPTER 11 ~ TRAVEL POLICY

    § 11-01.     Applicability of Travel Policy                      31
    § 11-02.     Authorization Required                              31
    § 11-03.     Transportation Expenses                             31
    § 11-04.     Food and Lodging                                    31
    § 11-05.     Entertainment                                       32
    § 11-06.     Travel Advances and Reports                         32

CHAPTER 12 ~ VEHICLE POLICY

    § 12-01.     Purpose of Vehicle Policy                           33
    § 12-02.     Applicability                                       33
    § 12-03.     Use of City Vehicles                                33
    § 12-04.     Operation and Ridership                             33
    § 12-05.     Safety, Maintenance and Care                        33
    § 12-06.     Vehicle Log                                         33

CHAPTER 13 ~ DRUG AND ALCOHOL POLICY

    § 13-01      Statement of Purpose and Scope                      34
    § 13-02.     Statement of Policy                                 34
    § 13-03.     Definition of Drug                                  34
    § 13-04.     Consequences of Violating the Drug and Abuse Policy 34
    § 13-05.     Possession and Use of and Search for Illegal and Unauthorized Items 34
    § 13-06.     Violations                                          35
    § 13-07.     Applicant Testing                                   35
    § 13-08.     Employee Testing                                    35
    § 13-09.     Disciplinary Action                                 36
    § 13-10.     Coordination with Law Enforcement Agencies          36

CHAPTER 14 ~ MISCELLANEOUS PROVISIONS

    § 14-01.     Safety                                              37
    § 14-02.     Coffee Breaks                                       37
    § 14-03.     News Releases                                       37
    § 14-04.     Lunch Periods                                       37
    § 14-05.     Unauthorized or Improper Use of Official Badge or Uniform 37
    § 14-06.     Smoking in the Workplace                            37
    § 14-07      Aids in the Workplace                               38

# CHAPTER 1

## INTRODUCTION

### § 1-01.  OBJECTIVES OF POLICIES

The purpose of these policies is to bring into the service of the City of Los Fresnos a high degree of understanding, cooperation, efficiency, and unity which comes through a systematic application of good procedures in personnel administration, and to provide a uniform policy for all employees, with all of the benefits that such a program insures. The basic objectives of these policies are:

    (a)  To promote and increase efficiency and economy in the service of the City.

    (b)  To provide fair and equal opportunity to all qualified applicants to enter City employment on the basis of demonstrated qualifications, merit and fitness as ascertained through fair and practical methods of recruitment and selection.

    (c)  To develop a program of recruitment, advancement, and tenure which will make employment with the City attractive as a career and encourage each employee to render his/her best services to the City.

    (d)  To establish and promote high morale among City employees by providing a good working environment, uniform personnel policies, opportunity for advancement, and consideration for employee needs and desires.

### § 1-02.  EQUAL OPPORTUNITY POLICY

Discrimination against any person in recruitment, examination, appointment, training, promotion, discipline, termination, or any other aspect of personnel administration because of political or religious opinions or affiliations; because of membership in employee organizations; because that person reports a violation of the law; or because of race, color, creed/religion, national origin, sex, age, disability, veteran status, or any other legally protected status, or other non-merit factors is prohibited.  Discrimination on the basis of age, sex, physical handicap or disability is prohibited except where specific age, sex, or physical requirements constitute a bona fide occupational qualification necessary to proper and efficient administration.

### §1-03.  APPLICABILITY AND SCOPE

These policies apply to all City employees, including employees of the Los Fresnos Police Department, unless specified otherwise by state law, ordinance, resolution, or policy approved by the City Council.  A person on retainer or under contract is not considered to be a City employee in the absence of a specific agreement to that effect.  These policies are not applicable to volunteer firefighters or reserve police officers.

Nothing in this manual shall be considered to create a property right in employment.  It should be understood that employment is for an indefinite period and is at-will for both employer and employee.  These policies are not intended to constitute an employment contract or entitlement to continued employment with the city. The City Council reserves the right to amend these policies unilaterally and without notice.

## §1-04.  DISSEMINATION AND FAMILIARITY OF POLICIES

All City employees shall be informed of the existence of these policies and each department head shall keep a copy available for reference by his/her employees.  Employee manuals outlining the general personnel policies of the City will be furnished to all employees for their personal use and reference.  The City Administrator shall require that all employees sign a statement stating that they have been furnished a copy of the employee manual outlining these policies.  It shall be the employee's responsibility to become thoroughly familiar with such policies.

## § 1-05.  ADMINISTRATIVE AUTHORITY

The City Council shall be responsible for establishing the policies under which personnel matters are to be administered.  With the exception of matters reserved to the City Council by statute, or these policies, the general and final authority for personnel management rests with the City Administrator who shall develop, administer, and interpret the personnel policies and procedures as they apply to all departments and employees.

Each department head is responsible within the scope of his/her authority for enforcing the provisions of these policies and related rules and procedures in regard to matters involving his/her department.  Department heads may prepare and enforce additional personnel policies within their department provided they are not inconsistent with these policies and have been approved by the City Administrator.

## § 1-06.  RESERVATION OF RIGHTS

Although adherence to this policy is considered a condition of continued employment, nothing in this policy alters an employee's status.  This policy shall not constitute nor be deemed a contract or promise of employment.  Employees remain free to resign their employment at any time, for any or no reason, without notice, and the City retains the right to terminate any employee at any time, for any or no reason, without notice.

## § 1-07.  OTHER LAWS AND REGULATIONS

The provisions of this policy shall apply in addition to, and shall be subordinated to, any requirements imposed by applicable federal, state, or local laws, regulations or judicial decision.  Unenforceable provisions of this policy shall be deemed to be deleted.

# CHAPTER 2

## EMPLOYEE HIRING AND APPOINTMENT

### § 2-01.  VACANCIES

Department heads shall notify the City Administrator immediately when job vacancies occur in their department.  Only those vacancies allocated in the annual budget, or new positions authorized by the City Council, shall be filled.  Vacancies may be filled through public announcement, promotions, transfers, demotions, or reinstatement.

### § 2-02.  ANNOUNCEMENT OF VACANCIES

The Personnel Department shall publicly announce, by appropriate means, all job vacancies.  Each job announcement, insofar as practicable, shall specify the title, salary, and nature of the job, the required qualifications, whether competition is open to the general public or restricted to City employees, and the application deadline.  Each announcement shall also contain a statement affirming the City's commitment to a policy of equal employment opportunity.  An adequate period of time shall be allowed in the selection process to insure fair and open competition for the vacant position.

### § 2-03.  APPLICATIONS

Applications for employment or reinstatement shall be submitted on forms as prescribed by the City Administrator.  Only applications officially received in the prescribed manner shall be considered.  All information submitted in connection with applying for City positions is subject to verification.  All applications received shall be kept on active file for a period of one (1) year.

### § 2-04.  EVALUATION

The primary goal of the City is to fill vacancies with the most qualified applicants available.  The City Administrator or the department head shall determine the most appropriate means of evaluating applicants against job requirements to identify the best persons qualified.  Reference checks, interviews, verification of citizenship or employment eligibility, skills tests, written tests, driver's license checks, drug screening, and/or other screening procedures may be used as deemed appropriate and, in all cases, shall be consistent with applicable employment laws and regulations.  Applicants for police department positions may be subject to medical/psychological examinations and criminal history checks where relevant.  Applicants may be required to provide any work experience and qualifications information necessary to demonstrate compliance with the prescribed qualification requirements or proficiency.

### § 2-05.  DISQUALIFICATION

An applicant shall be disqualified from consideration if he/she:

    (a)  does not meet the qualifications necessary for performance of the duties of the position involved;

    (b)  has made any false statement of fact on the application, depending upon the seriousness, willfulness and applicability of the false information to the position as determined by the City Administrator;

    (c)  is an alien not lawfully authorized to work in the United States; or

    (d)  would be in violation of the Citys' nepotism policy or laws.

An applicant may also be disqualified from consideration upon other reasonable grounds relating to the job requirements.

-8-

## § 2-06.  REFERRAL AND SELECTION

The referral of applicants to department heads for selection shall be in accordance with procedures developed by the City Administrator.  All department heads shall make a written report as to the disposition of all referred applicants to the Personnel Department for record keeping purposes.

## § 2-07.  AUTHORITY FOR APPOINTMENT

Except as otherwise provided by state law or City ordinance, the appointing authority for all appointive positions shall rest with the City Council.  The City Council may delegate hiring authority to the City Administrator.

Appointments shall be made based on the qualifications of applicants as ascertained through fair and practical selection methods.  It shall be the goal of the City to appoint the most qualified applicant to the position.

## § 2-08.  TYPES OF APPOINTMENTS

An appointment is ordinarily of indefinite duration and may be made to a full time or part time position.  A full time position is one where an employee works at least forty (40) hours in a regular work week schedule, and receives full benefits as provided by the City.  A part time position is one where an employee works less than forty (40) hours in a regular work week schedule, and does not receive full benefits offered by the City.  An appointment may be made for a limited term in unusual circumstances.  Temporary appointments are ordinarily limited to six (6) months or less and may be made to full time or part time positions requiring continuous, seasonal, or intermittent performance.

## § 2-09.  NEPOTISM

No person related within the second degree of either affinity (marriage) or third degree consanguinity (blood) to the Mayor, or any member of the City Council or City Administrator, shall be appointed to any office, position, or other services of the City.  This prohibition shall not apply to police officers or employees who have been employed by the City continuously for more than six (6) months prior to the election of such member of the City Council or Mayor.  In addition, the City Administrator shall not approve for appointment to any supervisor's work group any person who is related within the second degree of affinity or consanguinity to that supervisor.

## § 2-10.  RESIDENCY REQUIREMENTS

There shall be no absolute residency requirements for a City employee except that those employees likely to be called to work in cases of emergency may be required to reside within reasonable commuting ranges of their places of work.  For these purposes, a reasonable commuting distance shall be within ten (10) minutes of the City.

## § 2-11.  MEDICAL EXAMINATIONS

A person who has been offered employment by the Los Fresnos Police Department may be required to take a medical and physical examination at the City's expense, given by a doctor designated by the City.  The offer of employment will be conditional upon the results of the examination; however, these results will not be used to discriminate on the basis of a qualified disability.  The information obtained regarding a medical condition or history, will be collected and maintained in separate medical files and shall be treated as confidential medical information.  The Chief of Police, acting upon information provide by medical personnel, shall be the final authority in determining medical suitability for employment.

## § 2-12.  EMERGENCY TEMPORARY APPOINTMENTS

The City Administrator is authorized to hire temporary or part-time employees in cases of emergencies or unusual or extraordinary circumstances which impose demands that exceed the manpower capabilities of the City.  Emergency

temporary appointments shall not be used to circumvent the normal appointment procedures. The employees involved shall not acquire any status or rights in the position to which they are temporarily appointed.

## § 2-13. PROMOTION POLICY

A promotion is the assignment of an employee from one position to another job which is at a higher salary. It shall be the City policy to provide promotional opportunities whenever possible and practical. The selection process may be limited to qualified City employees or such other employees that may be given preference in the application and/or consideration process. Opportunities for promotion across organizational lines shall be maximized, with approval from the City Administrator being necessary prior to such promotion.

## § 2-14. TEMPORARY PROMOTION

The City Administrator may authorize a temporary promotion to insure the proper performance of City functions if a position is vacant, or its' regular employee is absent. Employees so promoted shall be additionally compensated for the duration of their temporary assignments, in amounts to be determined by the City Administrator. However, temporary promotions shall not be used to circumvent normal selection procedures, and those employees involved shall not acquire any status or rights in the position to which temporarily promoted.

Nothing herein shall be construed to prevent the assignment of additional or a higher level of duties to an employee without additional compensation.

## § 2-15. TRANSFERS

A transfer is the reassignment of an employee from one position to another, involving no change of pay or salary. A transfer not involving promotion or demotion may be effected at any time for administrative convenience or necessity, or upon request of the employee to the department head, or if interdepartmental, to the City Administrator, provided that the employee is qualified to perform the duties of the position to which a transfer is contemplated. Transfers may be made administratively or in conjunction with an announced selection process. Transfers between classes or between departments shall become effective following approval of the City Council.

## § 2-16. DEMOTIONS

A demotion is the assignment of an employee from one position to another position which is at a lower salary. A demotion may be effected for disciplinary action. Upon recommendation of the employee's department head, and with the approval of the City Administrator, and if qualified to perform the duties of the lower level position, an employee may be administratively demoted at his/her own request, or as an alternative to layoff. Such demotions shall not be considered as disciplinary actions or to disqualify the employee involved from consideration for later advancement. Demotions when used as an alternative to layoff, may be fully or partially rescinded at any time.

## § 2-17. REEMPLOYMENT

Former employees who have not been terminated for cause, may be eligible for reemployment, and may be given preference over other job applicants provided they meet the minimum requirements and qualifications of the position, and it is in the best interest of the City.

## § 2-18. EMPLOYEE ORIENTATION

All new employees shall be given an orientation about the nature of the job, the benefits, obligations, and responsibilities of the position, and the general policies and procedures, of both of the City and the department in which he/she is to be employed. In addition, the City will obtain such information needed for insurance programs, determining citizenship status, etc., that was not provided in the application for employment. The employee shall also

be furnished with a copy of the City Personnel Policy for their personal use and reference at this time, and the employee, by signature, shall acknowledge its' receipt.

## § 2-19.  REASONABLE ACCOMMODATION FOR DISABILITIES

When an otherwise qualified employee is determined by medical authority to possess a physical or mental limitation, the department head and/or City Administrator will review the case and decide whether reasonable accommodation is available, as required by law.  Applicants with known physical or mental limitations will be provided with reasonable accommodations to City facilities.  Any employee or applicant with known physical or mental limitations who believes reasonable accommodation is not being provided, may submit a written grievance according to the voluntary grievance procedures found in § 7-06 hereof.

# CHAPTER 3

## PROBATION

### § 3-01. PROBATIONARY PERIOD

Every newly employed person or promoted employee, shall be required to successfully complete a probationary period of six (6) months. Whenever a license or certification is required for a non-civil service position, the probationary period may be extended for a period of time permitted by state or federal law, to obtain such license or certification.

As prescribed by state law, a person appointed to a beginning position in the Police Department must serve a probationary period of one (1) year, beginning on that person's date of employment.

During or before the end of the probationary period, the supervisor may discharge or discipline any employee, and such disciplinary action or discharge, shall not be subject to any grievance or arbitration.

### § 3-02. BENEFIT ELIGIBILITY

During the probationary period, a new employee shall be eligible for benefits in accordance with the eligibility requirements stated with each policy describing a benefit.

### § 3-03. PURPOSE OF PROBATIONARY PERIOD

The department heads shall use the probationary period to closely observe and evaluate, the work and fitness of employees, and to encourage adjustment to their jobs. Only those employees who meet acceptable standards and minimum job qualifications during their probationary periods, shall be retained. Department heads shall submit an evaluation report on each probationary employee to the City Administrator prior to the completion of the probation. In the cause of appointing or promoting department heads, the performance during probationary period shall be evaluated by the City Administrator.

### § 3-04. NO FAULT SEPARATION

During the probationary period, if the department head decides that the new employee is not suited for the job, or that the employee's continued employment may not be in the best interest of the City, the department head shall recommend to the City Administrator an immediate "no fault" separation, which will not reflect negatively in the employee's records.

The City Administrator shall review the employee's performance record, and have the final decision concerning the employee's "no fault" separation.

### § 3-05. RIGHT OF APPEAL

A new employee who receives a "no fault" separation under the provisions of this policy shall have no right to appeal the separation, except on the grounds of discrimination prohibited by law.

# CHAPTER 4

## PERFORMANCE EVALUATION & COMPENSATION

### § 4-01. SALARY AND WAGE PLAN

Subject to approval by the City Council, the City Administrator shall prepare and administer a written compensation plan for City employees. This compensation plan shall be prepared annually, and submitted to the City Council for approval at the time of adoption of the annual City budget. City employees shall be paid salaries of wages in accordance with the compensation plan.

### § 4-02. EMPLOYEE PAY SCHEDULE

All employees will be paid weekly on Friday. Pay dates falling on a recognized holidays will be scheduled for the preceding workday.

When an employee is on authorized leave, the employee may pick up his/her paycheck from the Finance Department, or have an authorized representative pick it up.

### § 4-03. EMERGENCY DUTY PAY

Employees called back to work in emergencies, shall be compensated in accordance with established overtime policies.

### § 4-04. OVERTIME AND COMPENSATORY TIME

All non-exempt employees are eligible to receive overtime in accordance with the Fair Labor Standards Act. Overtime, when ordered for the maintenance of essential City functions, shall be allocated as evenly as possible among all employees qualified to perform the work. For all scheduled and approved time worked in excess of a regular work week, compensation will be at the rate of one and one-half (1½) times the employee's regular base pay. Overtime will be allocated for all time worked over forty (40) hours per week, unless such employees are exempt from overtime pay. No sick time, vacation time, holiday time, or time taken for jury duty, or for traveling to and from schools, conferences, or seminars, shall be considered when determining overtime pay. All overtime work must be clearly reflected on the employee's time record before it is approved.

A non-exempt employee who works overtime during a workweek shall, at City's discretion, either:

(1) Be compensated at a rate of one and one-half (1½) times his/her regular rate for all overtime hours worked; or

(2) with the mutual agreement of the employee and department head be given compensatory time at a rate of one and one-half (1½) hours compensatory time for each overtime hour worked.

An exempt employee who works overtime during a workweek, may be given compensatory time at a rate of one and one-half (1½) hours compensatory time for each overtime hour worked.

### § 4-05. EMPLOYEE PERFORMANCE EVALUATION

The work performance of each regular employee shall be evaluated in accordance with appraisal procedures developed and approved by the City Council. An employee shall be evaluated at least annually. Special evaluations may be conducted if requested by the department head, and approved by the City Administrator. Performance evaluation

reports shall be on forms provided by the City Administrator through the Personnel Office. All performance evaluation reports shall be signed by the employee, and permanently placed in the employee's personnel file. Employees shall be provided copies of their performance evaluation reports if requested.

The performance evaluation is designed to help supervisors and employees measure how well work is being performed, and to provide a tool for management decisions regarding pay increase, promotions, and retention of employees.

Evaluators shall discuss the evaluation results with the individual employees, and shall counsel them regarding their careers, and any improvement in performance which appear desirable or necessary. Employees dissatisfied with their performance evaluation may seek reconsideration by using the established Voluntary Grievance Procedures found in § 7-07 hereof.

## § 4-06.  TERMINATION PAY

Employees who leave the service of the City shall receive all pay which may be due to them in accordance as follows:

(a)  A non-exempt employee will be paid for any hours worked, and for any overtime compensation due to him or her, or compensatory time off. Exempt employees will be paid for hours worked only.

(b)  Only employees who have successfully completed their probationary period shall be paid for unused vacation time earned.

(c)  Any indebtedness to the City which the employee might have incurred, shall be deducted from his/her final paycheck.

(d)  If an employee dies while employed by the City, the City shall pay his/her designated beneficiary any unpaid pay, unused vacation time, and accumulated benefits.

(e)  Terminated employees are required to turn in all records and other property of the City to their department head or another authorized person.

-14-

# CHAPTER 5

## ABSENCES AND LEAVES

### § 5-01.  HOLIDAYS

In addition to any days as may be declared by the City Council, the following days shall be observed as official holidays: New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and the day after, Christmas Eve and Christmas Day.  Said official holidays shall be administered in accordance with the following rules:

(a)  All full time employees shall be entitled to all paid holidays

(b)  All part time employees who would normally have worked on a day of the week observed as a holiday, shall be entitled to holidays with pay for the number of hours they would have worked on that day if the holiday had not occurred.

(c)  As many employees as possible shall be given each holiday off, consistent with the maintenance of essential City functions.  All department heads shall insure that employees working unusual schedules, or on shifts, receive benefits for the full number of official holidays.

(d)  Employees required to work on a scheduled holiday shall be granted another day of paid leave or receive compensation in its place.  In the event that another day of paid leave is selected, it must be taken within thirty (30) days, or the employee will automatically receive compensation in its place.

(e)  If the holiday falls on Saturday, the preceding Friday shall be observed; if a holiday falls on Sunday, the following Monday shall be observed.

(f)  To receive pay for a holiday, an employee must be scheduled to work on the holiday, or be on authorized leave.

(g)  Employees desiring to observe religious holidays not coinciding with official holidays, may be given time off without pay, or may be authorized to use accrued vacation leave.

### § 5-02.  VACATION

Vacation accrual for permanent employees begins on their date of appointment.  Vacation time is accumulated as reflected below.  Vacation time may not be accrued to exceed a total of two years authorized vacation leave.  On January 1 of each year, all accrued vacation time in excess of the amount authorized will be dropped from the vacation leave roster.  The number of days vacation authorized, will be as prescribed by the City Council, but not less than the following schedule:

Paid vacations may be taken according to the following schedule:

| Length of Service | Vacation Allowed | Maximum Accruable Vacation Leave |
|---|---|---|
| 1 year | 5 days | 10 days |
| 2 through 3 years | 10 days | 20 days |
| 4 through 5 years | 12 days | 24 days |
| 6 through 10 years | 15 days | 30 days |
| 11 years & over | 20 days | 40 days |

Vacation leave shall be administered according to the following rules:

    (a)  Vacation leave shall accrue from the date of employment, including the probationary period.

    (b)  Employees shall not be eligible to take vacation leave until completion of one year.

    (c)  After the employee's first year of service, employees shall be encouraged to use their full vacation allowance before the end of each fiscal year. Unused vacation leave may be carried over into the following fiscal year, see vacation schedule. All unused vacation time in excess of the maximum accrual allowable shall be forfeited.

    (d)  When a regularly scheduled holiday occurs during the period of an employee's vacation, an additional day of leave shall be granted.

    (e)  Vacation leave shall be charged only for time during which the employee would ordinarily have worked.

    (f)  Employees being laterally transferred, promoted, or demoted shall retain any accrued vacation leave.

    (g)  Vacation leave credits are not transferable between employees.

    (h)  Before going on unpaid leave, employees are encouraged to exhaust accrued vacation when a Family Medical Leave Act (FMLA) qualifying event occurs.

## § 5-03. SICK LEAVE

All full time employees shall earn sick leave at the rate of eight (8) hours per month, for a total of ninety-six (96) hours of sick leave per year, after the (thirty) 30 day waiting period. Part time, temporary, and seasonal employees shall not earn sick leave.

Sick leave is granted by the City for the purpose of permitting an employee to be relieved of his/her duties during his/her actual illness or injury, or when an employee is required to attend to his/her spouse or minor children who are ill or incapacitated, and who also reside in the same household as the employee. Sick leave may also be used for dental and ocular appointments. Employees who use their sick leave without just cause may be dismissed.

Supervisors may require a doctor's statement from any employee who uses any sick leave credit if deemed warranted. Also, employees missing more than three (3) consecutive workdays due to illness or injury shall provide a statement from his/her doctor regarding the illness. Failure to do so, may result in dismissal, suspension, and/or forfeiture of such pay.

Non-civil service employees may accumulate sick leave benefits up to a maximum of nine hundred and sixty (960) hours [one hundred and twenty (120) days] and shall be administered according to the followings rules:

    (a)  Sick leave shall accrue from the date of employment, including the probationary period, after a (thirty) 30 day waiting period.

    (b)  Sick leave may not be taken in advance of its being earned.

    (c)  If an employee becomes ill and cannot report for work, the employee must report his/her absence to his/her immediate supervisor on or before his/her regular reporting time, so that such absence be charged to sick leave. Failure to report in, will cause an employee's absence to be charged to leave without pay.

(d) An employee who becomes ill or injured during a vacation may request that the vacation be terminated and the time of illness be charged to sick leave. Such requests must be made immediately to the department head, or no later than the first regularly scheduled work day following vacation. A doctor's statement will normally be required in such instances.

(e) After an employee's accumulated sick leave has been exhausted, accrued vacation may be used as sick leave. When absence due to illness exceeds the amount of paid leave earned and authorized, the pay of an employee shall be discontinued until he/she returns to work.

(f) An employee who is pregnant may use accrued sick leave for maternity purposes prior to delivery and for a reasonable time following delivery, as may be deemed necessary by her physician.

(g) An employee terminating from employment with the City, must submit certification of illness from a doctor before being eligible to use sick leave in the last two (2) calendar weeks of employment.

(h) Accumulated sick leave will not be compensated for in any way, at the time of termination, whether by resignation, retirement, or dismissal, for non-civil service employees.

(i) An employee may use accrued sick leave to attend funerals and handle any necessary funeral details.

(j) Before going on unpaid leave, employees are encouraged to exhaust accrued sick leave when a Family Medical Leave Act (FMLA) qualifying event occurs.

## § 5-04. BEREAVEMENT LEAVE

Bereavement leave shall be taken in accordance with section § 5-03, subsection (i).

## § 5-05. MILITARY LEAVE

Full time employees of the City who are members of the State Military Forces, or members of any of the Reserve Components of the Armed Forces of the United States, are entitled to leave of absence from their duties for up to fifteen (15) days in any one calendar year, without loss of vacation time or salary. Said leave may be used for all days during which they are engaged in authorized training or duty. Requests for approval of military leave must be accompanied by copies of the relevant military orders. Military leave in excess of fifteen (15) days will be charged to vacation leave or leave without pay.

Full time employees of the City who enter active duty with the State Military Forces, or with the Armed Forces of the United States, are entitled to be restored to employed subject to the provisions of the law upon honorable release from active duty, provided an appropriate position is available. Reemployment of such individuals are subject to the approval of the City Administrator.

## § 5-06. ADMINISTRATIVE LEAVE WITH PAY

Administrative leave with pay will be granted by the City Administrator according to the following guidelines:

(a) Employees on duty on the date of any national, state, or local election, and who are eligible to vote in such elections, shall be granted time off without loss of pay or benefits, to exercise this right if they cannot reach their polling place outside of working hours before they close. Evidence of voter registration and voting may be required by the supervisor.

(b) Employees shall be granted sufficient leave with pay when called for jury service or court duty. The employee shall provide his/her supervisor a copy of the jury or court summons. Employees excused or

-17-

released from jury service or court duty shall immediately report to their work station for the remainder of their shift.

(c) Employees who make donations of blood without receiving compensation for it, will be excused from duty without loss of pay or benefits. Employees will be excused for such times as it is necessary to make blood donations and to recuperate, if needed. The excused absence will not exceed four (4) hours and will be authorized for only the day of the donation.

(d) The City Administrator may grant an employee administrative leave with pay for purposes of attending a professional conference, convention, training activity, legislative proceeding, civic function or meeting, or for purposes of coordinating with governmental and private agencies and entities in the interest of the City.

## § 5-07. FAMILY AND MEDICAL LEAVE ACT

Under the Family Medical Leave Act of 1993 (FMLA), any employee who has been employed for at least twelve (12) months and who has a minimum of 1,250 hours of service during the previous twelve month period, prior to the beginning of the leave, is entitled to twelve weeks of unpaid leave for the following:

(a) the birth of the employee's son or daughter, and care of the infant;

(b) the placement of a son or daughter with the employee for adoption or foster care;

(c) the care of a spouse, son, daughter or parent of the employee, if the spouse, son, daughter or parent has a serious health condition; or

(d) the employee's own serious health condition, which makes the employee unable to perform the functions of his or her job.

Additional provisions made by FMLA are the following:

(a) **Intermittent Leave** - Leave taken for the care of a sick spouse or other family members, or for a serious health condition of the employee, may be taken intermittently or on a reduced leave schedule. Leave taken for the birth, adoption, or foster care of a child, may not be taken intermittently, unless the employee's request for such is approved by the City Administrator.

(b) **Deduction of Leave Time** - In order to lessen the impact of the loss of wages due to family and medical leaves, the City will recommend that the employee substitute for any portion of the family and medical leave, any or all, vacation and/or sick leave accrued by the employee.

(c) **Medical Certification** - The City will require that the employee submit a certified medical statement and reasonable intermittent statement of medical care as the leave continues. The City reserves the right to challenge the medical certification, at the City's expense, and require the employee to submit to a complete examination by a doctor designated by the City.

(d) **Employment Status** - When an employee returns from such leave, he/she will be restored to the position at the same pay. With the exception of civil service personnel, during the leave the employee does not accrue seniority or leave benefits.

(e) **Health Benefits** - The City will maintain coverage under the group health plans for the employee during the leave; however, employee contributions for dependent coverage will continue to be the responsibility of the employee, in accordance with the current rates established by the City.

-18-

## § 5-08.  AUTHORIZED LEAVE WITHOUT PAY

In circumstances not falling within other provisions of these rules, the City Administrator may authorize an employee to take leave without pay under mutually agreeable terms and conditions.   Employees taking leave without pay shall not lose or gain seniority.  All employee benefits will remain in effect during period of authorized leave without pay, for a period up to twelve (12) weeks.  Any employee who fails to return to work at the end of the authorized leave without pay, shall be administratively terminated.

## § 5-09.  ABSENCE WITHOUT LEAVE

An employee failing to report for duty, or remain at work as scheduled, without proper notification, authorization, or excuse, shall be considered absent without leave, and shall not be paid for the period involved.

Absence without leave for three (3) consecutive days in an employee's schedule, constitutes abandonment of duties, which shall result in dismissal.

CHAPTER 6

## EMPLOYEE CONDUCT

### § 6-01.  ATTENDANCE

All employees are expected to report to work as scheduled, and to work their scheduled hours, and overtime, if necessary.  Employees shall be at their place of work in accordance with City and departmental policies and regulations.  Department heads shall establish work schedules and maintain daily employee attendance records.  The Personnel Office will maintain annual employee attendance records.

### § 6-02.  WORK STANDARDS

It shall be the duty of each employee to maintain high standards of cooperation, proficiency, and economy in his/her work for the City.  Department heads shall organize and direct the work of their departments to achieve these objectives.  If work habits, attitude, production and/or personal conduct of an employee becomes a problem, supervisors should point out the deficiencies at the time they are observed, and take appropriate action.  Counseling and warning the employee in sufficient time for improvement should ordinarily precede formal disciplinary action, but nothing herein shall prevent immediate formal action as provided elsewhere in these policies whenever the interest of the City requires it.

### § 6-03.  POLITICAL ACTIVITIES

Except as may be otherwise provided by law, the following restrictions on political activity shall apply to City employees:

    (a)  Employees shall refrain from publicly using their positions, for or against, any candidate for public office in any jurisdiction.

    (b)  No employee, while on duty, shall take an active part in any political campaign of another person for an elective position of the City.  The term "active part" means making political speeches, passing out cards or other political literature, writing letters, signing petitions, actively and openly soliciting votes, and making public remarks about the candidates.

In compliance with the Texas Election Code, electioneering is prohibited during the voting period and within one hundred (100) feet of an outside door, through which a voter may enter the building in, which a polling place is located.  During the time that absentee voting is being conducted, the distance is reduced to thirty (30) feet.

    (c)  Employees may not be required to contribute money, labor, time, or any other valuable thing to any person for City election purposes.

    (d)  No employee may hold, with or without remuneration, an appointive or elective City office of public trust, partisan office in any jurisdiction, or any other office, where service would constitute a direct conflict of interest with City employment.

### § 6-04.  SOLICITATION

Solicitation of contributions, or anything of value, for any purpose whatsoever, shall be permitted of or by City employees on the job only with the expressed approval of the City Administrator.  No employee may be required to make any contribution or may be penalized or rewarded in any way, in connection with his/her employment according to his/her response to the solicitation.

-20-

## § 6-05.  OUTSIDE EMPLOYMENT

Although outside employment is not expressly prohibited by the City, employees who work other jobs on their own time must remember that their first responsibility is to the City.  If a second job leads to excessive absenteeism, tardiness, or poor performance, the employee may be asked to choose between the two jobs.  Any employee subject to recall or emergency duty, must receive written permission from the City Administrator or department head to work a second job.  The City Administrator and department head may establish certain conditions before granting this permission, e.g., work must be located within the City, or within a reasonable commuting distance; the outside employer may be required to excuse employee to answer emergency calls, employment would not create any conflict or embarrassment to the City, etc.  City Administrator must have permission from City Council before seeking outside employment.  Therefore, no employee may hold a position with any other local governmental entity, the nature of which places that employee in a position of title.  Title, as used here, shall mean a position which gives the employee overall or final authority for the work he or she performs.  Violation of this policy section may be grounds for dismissal or disciplinary action.

## § 6-06.  PERSONAL APPEARANCE

All employees, regardless of work location and degree of public contact, are expected to maintain a good personal appearance, and an acceptable standard of cleanliness and personal hygiene at all times.

## § 6-07.  CONFLICT OF INTEREST, SOLICITATION, AND GIFTS

No officer or employee of the City shall solicit or accept, directly or indirectly, any gift, favor, privilege, or employment having a monetary value in excess of twenty-five dollars ($25.00) from any person, firm, or corporation doing business with, or seeking to do business with the City, during the term of office of such officer, or during the employment of such employee of the City, and in connection with such office or employment, except as may be authorized by ordinance or on behalf of the City and for its benefit.  Under no circumstance shall cash or any instrument of cash having monetary value be accepted.  No officer or employee of the City who is employed, directly or indirectly, by any person, firm, or corporation doing business with, or seeking to do business with the City, shall in any manner participate in any discussion or decision of any agency, board, commission, or instrumentality of the City, having to do with the business done, or sought, to be done with the City by such person, firm or corporation, without first declaring publicly such employment.

## § 6-08.  GENERAL DEPORTMENT

The attitude and deportment of a City employee, whether in public or private, should at all times be such, as to promote the good will and favorable attitude of the public toward the City administration, and its programs and policies.

## § 6-09.  SEXUAL HARASSMENT AND DISCRIMINATION

The City of Los Fresnos is committed to providing a work environment that is free of discrimination and unlawful harassment.  Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age, religion, disability or any other legally protected characteristic will not be tolerated.  The City of Los Fresnos is also committed to a work environment free of inappropriate and disrespectful conduct, illustrations, and communications of a sexual nature.  Consequently, and in an effort to avoid even the appearance of impropriety, this policy against sexual harassment in some respects, may exceed the requirements of applicable law.  The City of Los Fresnos strongly opposes sexual harassment in any form.  It does not matter whether the victims is male or female.  Sexual harassment is against company policy and is a violation of Title VII of the Civil Rights Act of 1964, as well as the applicable laws of the state.

-21-

## § 6-10.  DEFINITION OF SEXUAL HARASSMENT

For purposes of this policy, sexual harassment is defined as unwelcome or unwanted sexual advances, requests for sexual favors, or other verbal, non-verbal or physical conduct of a sexual nature when: (1) submission to or rejection of this conduct by an individual, is used explicitly or implicitly, as a factor in decisions affecting hiring, evaluation, promotion, or other aspects of employment; or (2) this conduct substantially interferes with an individual's employment or creates an intimidating, hostile or offensive work environment.

Examples of sexual harassment include, but are not limited to, unwanted sexual advances; demands for sexual favors in exchange for favorable treatment or continued employment; repeated sexual jokes, flirtations, advances or propositions; verbal abuse of a sexual nature; graphic, verbal commentary about an individual's body, sexual prowess or sexual deficiencies; leering; whistling; touching; pinching; assault; coerced sexual acts; suggestive insulting, obscene comments or gestures; and display in the workplace of sexually suggestive objects or pictures.

This behavior is unacceptable in the workplace itself, and by any owner, partner or employee in any business-related setting outside the workplace, including but not limited to other work-related settings such as business trips, court appearances and business-related social events.

## § 6-11.  REPORTING A COMPLAINT

### A.  Informal Procedure

The City of Los Fresnos encourages individuals who believe they are being harassed to clearly and promptly notify the offender that his or her behavior is unwelcome.  If for any reason an individual does not wish to approach the offender directly, or if such discussion does not successfully end the harassment, the individual should notify a member of the Committee [as described below] who may talk to the alleged harasser, or arrange for mediation between the individual and the alleged harasser, with a third person acceptable to both.  This informal procedure is not a required first step for the reporting individual.

### B.  Formal Procedure

In the event that the reporting individual does not wish to pursue the informal procedure, or in the event that the informal procedure does not produce a result satisfactory to the reporting individual, the following steps should be followed to report the sexual harassment complaint and to initiate a formal procedure:

#### 1.  Notification of a Member of the Staff

An individual who believes he or she has been subjected to sexual harassment should report the incident to any member of the Committee.  The current members of the committee are the department head or City Administrator.

#### 2.  Description of Misconduct

An accurate record of objectionable behavior is necessary to resolve a formal complaint of sexual harassment. All complaints of sexual harassment must be reduced to writing by either the reporting individual or the individual(s) designated to receive complaints.

#### 3.  Time for Reporting a Complaint

Prompt reporting of complaints is strongly encouraged, as it allows for rapid response and resolution of objectionable behavior or conditions for the reporting individual and any other affected employees.

The City has chosen not to impose a limited time frame for the reporting of sexual harassment complaints. However, the reporting individual should be aware that applicable statutes of limitations do constrain the time for instituting outside legal action.

### 4. Protection Against Retaliation

The City of Los Fresnos will not retaliate against an individual who makes a report of sexual harassment, nor permit any employee to do so. Retaliation is a very serious violation of this policy, and should be reported immediately. Any individual found to have retaliated against an individual for reporting sexual harassment, or against anyone participating in the investigation of a complaint, will be subject to appropriate disciplinary procedures as described below. (See "Resolving the Complaint.")

## C. Confidentiality

Any allegation of sexual harassment brought to the attention of the department head or City Administrator, will be promptly investigated. Confidentiality will be maintained throughout the investigatory process to the extent practical and appropriate under the circumstance.

## D. Identification of Investigators

Complaints will be initially investigated by the department head or City Administrator to whom it was reported, unless they determine another person should be the investigator.

## E. Investigator Process

The investigation process may include any or all of the following:

(a) Confirm name and position of the reporting individual.

(b) Identify the alleged harasser.

(c) Thoroughly ascertain all facts in connection with the alleged incident, beginning by interviewing the reporting individual and the alleged harasser. Questions of all parties should be asked in a non-judgmental manner.

(d) Determine the frequency/type of alleged harassment and, if possible, the dates and locations where alleged harassment occurred.

(e) Find out if any witness observed the alleged harassment. If the reporting individual and the alleged harasser present conflicting versions of the facts, interview any witnesses.

(f) Ask how the reporting individual responded to the alleged harassment, and determine what efforts, if any, at informal resolution, of the matter were made.

(g) Determine whether the reporting individual consulted anyone else about the alleged harassment, and take note of who else knows, and their response to the disclosure.

(h) Develop a thorough understanding of the professional relationship, degree of control, and amount of interaction, between the alleged harasser and reporting individual.

-23-

(i)  Determine whether the reporting individual knows of, or suspects, that there are other individuals who have been harassed by the alleged harasser.

(j)  Determine whether the reporting individual informed other partners or supervisors of the situation, and what response, if any, the reporting individual received from these individuals.

(k)  During the first interview with the alleged harasser, remind the alleged harasser of the City's policy against retaliation for making a complaint of sexual harassment.

In pursuing the investigation, the investigator will try to take the wishes of the reporting individual into consideration, but should thoroughly investigate the matter, keeping both parties informed as to the status of the investigation.

## § 6-12.  RESOLVING THE COMPLAINT

Upon completing the investigation, the City Council will review the investigation, make findings, and will decide upon appropriate action to be taken, and will communicate its findings and intended actions, to the reporting individual and alleged harasser.  If the City Council finds that harassment occurred, the harasser will be subject to appropriate disciplinary procedures.

### A.  Sanctions for harassment

Individuals found to have engaged in misconduct constituting sexual harassment shall be disciplined.  Appropriate sanctions will be determined by the City Council.  In addressing incidents of sexual harassment, the City's response at a minimum, will include reprimanding the offender and preparing a written record.  Additional action may include: referral to counseling, withholding of a promotion, reassignment, temporary suspension without pay, reduction in allocation, discharge, or removal or expulsion from the City.

## § 6-13.  RULES OF CONDUCT

The City Administrator or department head may take disciplinary action against an employee for the following:

(a)  Illegal, unethical, abusive, or unsafe acts.

(b)  Violation of City rules, regulations, policies or procedures.

(c)  Insubordination.

(d)  Leave under false pretenses.

(e)  Incompetence.

(f)  Neglect of duties.

(g)  Theft.

(h)  Participation in prohibited political activities.

(i)  Unauthorized soliciting while on duty.

(j)  Excessive or unauthorized absenteeism and tardiness.

(k)  Failure to conduct himself/herself in a courteous and proper manner while on duty.

-24-

CHAPTER 7

DISCIPLINE, APPEALS, & GRIEVANCES

## § 7-01.  WORK ETHIC AND DISCIPLINARY POLICY

The City expects its employees to accept reasonable and appropriate work assignments willingly, and to perform them in a satisfactory manner.  Employees are also expected to comply with all rules, regulations, and policies pertaining to job performance standards, and personal conduct on the job.  If an employee fails to perform satisfactorily, or if his/her personal conduct is unacceptable, disciplinary action may be taken.

All reasonable efforts will be made insure due process to the employee.  The City will attempt to review and resolve all employee problems as promptly and equitable as possible, and at the lowest possible organization/supervisory level.  All employees will be provided with a fair, expedient, objective, and consistent means of resolving work related problems.

## § 7-02.  GROUNDS FOR DISCIPLINARY ACTION

The City Administrator or department head may take disciplinary action against an employee for any Rules of Conduct listed in Chapter § 6.14

## § 7-03.  TYPES OF DISCIPLINARY ACTION

Formal disciplinary action taken, shall be consistent with the nature of the deficiency, or infraction involved, and the record of the employee.  Formal disciplinary action shall include written reprimand, suspension, reduction in pay, demotion and dismissal.  Any of the foregoing types of formal disciplinary action may be invoked for a particular deficiency or infraction, depending upon the circumstances.  An employee may be formally warned at any time, that he/she may be dismissed or otherwise disciplined, for further unsatisfactory performance and/or conduct.  Nothing herein shall prohibit the administration of informal disciplinary action, such as oral reprimands.  Informal disciplinary action may be documented in the employee's official personnel file at the discretion of the department head.

Supervisory personnel are encouraged to consider the following as normal disciplinary transitional steps in situations requiring disciplinary action:

> **Verbal Warnings** with records of each warning being noted in the employee's official personnel file;

> **Written Reprimands** a copy of which the department head must provide to the employee, and deliver to the City Administrator before placement in the employee's official personnel file;

> **Suspension with or without Pay** or **Reduction in Pay** with prior written approval by the City Administrator.

> **Demotion** and/or **Dismissal** by the City Administrator, Department Head, or City Council.

Nothing herein is intended to negate the authority and responsibilities of a supervisor to take the disciplinary action they believe appropriate, based upon the relevant circumstances, nor prohibit the supervisor from immediately discharging an employee for the first instance of misconduct, depending upon the circumstances.

## §7-04.  WRITTEN REPRIMAND

In the interest of good discipline, an employee may be formally reprimanded in writing.  The reprimand shall describe the deficiency or infraction involved, the corrective action, and the likely consequence of further unsatisfactory

-26-

performance and/or conduct. The employee will be informed the written reprimand shall be kept in the employee's official personnel file.

## § 7-05.  SUSPENSION

In the interest of good discipline, an employee may be suspended without pay for up to thirty (30) calendar days in any one (1) calendar year.

A notice of suspension must be given to the employee, and must describe the deficiency or infraction involved, the corrective action offered to the employee, and the likely consequences of further unsatisfactory performance and/or conduct. The suspension shall be permanently noted in the employee's official personnel file.

When an employee is under investigation for a crime or official misconduct, or is awaiting hearing or trial in a criminal matter, he/she may be suspended, with or without pay, for the duration of the proceedings, when such suspension would be in the best interest of the City and the public. If the investigation or proceedings clear the employee, he/she shall be eligible for reinstatement with back pay, and full benefits restored.

## §7-06.  DISCIPLINARY DEMOTION AND DISMISSAL

In the interest of good discipline, an employee may be demoted. A notice of demotion must be given to the employee which describes the deficiency or infraction involved, and which states the likely consequences of further unsatisfactory performance and/or conduct. The demotion shall be permanently noted in the employee's official personnel file, but the employee shall not be disqualified from consideration for later advancement.

An employee may also be dismissed from the City employment in the interest of good discipline. A notice of dismissal must be given to the employee, which describes the deficiency or infraction involved.

## §7-07.  VOLUNTARY GRIEVANCE PROCEDURE

A grievance is defined as a complaint about a condition of the work place, which the supervisor has the authority to correct. An employee may submit a grievance in writing, to his/her immediate supervisor within fifteen (15) days after the cause of the grievance arises or becomes known to the employee. If the grievance is ignored, or not satisfactorily resolved by the supervisor within ten (10) days of the time the grievance was submitted, the employee may present the grievance to the next higher supervisory level, and so on. If the subject matter of the grievance pertains to actions or omissions of the employee's immediate supervisor, the employee may present the cause of the grievance directly to the next higher supervisory level. The City Council constitutes the highest level of appeal for grievance purposes.

It is the responsibility of the immediate supervisor to evaluate a grievance, and, if he/she cannot resolve the situation directly, to submit the grievance with comments and recommendations, to the next higher level and so on. However, supervisors shall answer in writing or dispose of employee grievances as expeditiously as possible, conducting any investigations if necessary. Both supervisor and employee should make every effort to resolve grievances at the lowest level possible. Employees should be kept informed of the status of their grievances. Punitive action shall not be taken against any employee for submitting a grievance in good faith.

Nothing herein shall alter the at-will status of City employees.

# CHAPTER 8

## NONDISCIPLINARY TERMINATION

### § 8-01.  RESIGNATION

An employee may leave the employment with the City in "good standing" by giving two (2) weeks notice.  The City Administrator may waive any portion of the notice period.  The personnel records of any employee who resigned by giving proper notice, shall show that the employee resigned of his/her own accord.

### § 8-02.  LAYOFF

An employee may be laid off because of changes in duties, organizational changes, lack of work, or budget cutbacks. Whenever possible, an employee laid off from one City department, shall be transferred to a suitable position elsewhere, provided said employee has the appropriate qualifications and job skills.  Whenever possible, at least two (2) weeks notice shall be given to an employee prior to layoff.  Layoffs shall be carried out on the basis of demonstrated job performance and efficiency, with the most proficient employees being retained the longest.  Seniority within City service shall be used to determine the order of layoff among employees with substantially equivalent records of job performance and efficiency, with the most senior employees being retained the longest.  Temporary employees shall be laid off before regular employees performing similar duties.  A layoff shall not be considered a disciplinary action.

Employees laid off, may be recalled back to their job or another similar job, for which they meet the minimum job requirements, and qualifications, in the reverse order of the layoff.  Employees being recalled, shall have precedence over other job applicants.  Employees recalled back to work shall report to work as instructed.   An employee failing to report back to work shall be considered as having forfeited his/her right to reemployment.

### § 8-03.  ADMINISTRATIVE TERMINATION

Any employee who does not return to work after the expiration of authorized leave without pay, will be administratively terminated.

### § 8-04.  RETIREMENT

Eligible employees may elect to retire from the City service in accordance with applicable retirement programs, if any.

-28-

CHAPTER 9

## PERSONNEL RECORDS

### § 9-01.  PERSONNEL FILES AND RECORDS

The Personnel Department shall maintain the official personnel files and records for all City employees.  Unless otherwise provided by law, personnel files shall be confidential, and may not be used or divulged for purposes unconnected with the City personnel management, except with the permission of the employee(s) involved.  Nothing herein shall prevent the dissemination of impersonal statistical information.  An employee shall have a right of reasonable inspection of his/her official personnel files and records under appropriate supervision.

### § 9-02.  CHANGE OF PERSONNEL STATUS OR NEW HIRING

Department heads shall submit in writing to the City Administrator recommended changes in the personnel status of their employees or requests to hire new employees prior to making any commitments to either existing employees or prospective new hires.

### § 9-03.  PERSONNEL REPORTS

Department heads shall be responsible for providing the Personnel Department with all necessary employee reports and records associated with good personnel management for their department.  Such records and reports shall include, but not be limited to, employee sick leave, vacation leave, attendance and overtime records, performance reports, counseling records, and all types of disciplinary action.  Failure to do so may result in formal disciplinary action.

The Personnel Department or Department Heads shall prepare such narrative reports, statistical summaries, and other personnel reports as are necessary, or desirable, to provide useful information to the City Administrator and City Council.

# CHAPTER 10

# EMPLOYEE BENEFITS

## § 10-01.    MEDICAL/DENTAL BENEFITS

During their employment on a full time basis, all full time employees are provided with medical and dental insurance. Coverage shall begin immediately upon acceptance of the employee by the insurance underwriter. This insurance provides for payment of hospitalization and major medical expenses up to the limits of the policy, for illness and accidental injuries off the job. Coverage for other family members is available at the option of, and payable by, the employee through payroll deductions at the prevailing rates.

According to the Consolidated Omnibus Reconciliation Act of 1985 (COBRA), certain individuals are allowed the option of continuing their group health insurance under specified conditions. Any employee receiving a reduction in hours worked or terminated by the City, except in cases of gross misconduct, will be allowed to continue the insurance coverage up to a maximum of eighteen (18) months. Upon the occurrence of certain events, coverage for family members may be continued for up to thirty-six (36) months. Continuation of group health insurance will be discussed with the separating employee during the employee's separation briefing described in section § 7-05. Employees or family members that elect to continue coverage after being laid off or terminated, will be required to pay the entire cost of the premiums.

## § 10-02. WORKERS' COMPENSATION INSURANCE

Any City employee injured as a result of duties performed in the course of his/her job, shall be eligible to receive workers' compensation benefits from the City's insurance carrier, at no expense to the employee. Workers' compensation benefits are intended to compensate workers with job related injuries or illnesses, by reimbursing them for income losses, and paying for medical and rehabilitation treatment. All injuries must be reported to the department head immediately, and the department head is responsible to notify the City Secretary.

## § 10-03. SOCIAL SECURITY

All employees of the City are covered under the Federal Insurance Contributions Act (FICA). This type of government insurance, known as the "Federal Old Age, Survivors, and Disability Insurance" provides for benefits for retirement, disability, or upon death. This insurance is financed by social security taxes which are paid through payroll deductions by the employee. The City contributes a matching amount on behalf of the employee.

## § 10-04. UNEMPLOYMENT INSURANCE

All employees of the City are covered under the Texas Unemployment Compensation Insurance Program and the Federal Unemployment Tax Act (FUTA). This program provides payments for unemployed workers in certain circumstances as provided by law.

# CHAPTER 11

## TRAVEL POLICY

### § 11-01.  APPLICABILITY OF TRAVEL POLICY

This policy is applicable to all City employees and applies to all travel on City business outside the City limits, subject to budget limitations and authenticated expenses.

### § 11-02.  AUTHORIZATION REQUIRED

The City Administrator may authorize travel leave and expenses for City business outside the City.  All travel requests must be approved by the department head and City Administrator prior to its occurrence.  Any employee traveling on official City business, shall leave word with their supervisor as to where they can be reached while out of the City.  All travel requests must be submitted on forms provided for that purpose, as required by the City Administrator.

### § 11-03.  TRANSPORTATION EXPENSES

Normally, when travel is required for City business, a City or personal vehicle may be used when such travel distances are within a fifty (50) mile radius.  For travel beyond two hundred fifty (250) mile radius of the City, air transportation or the use of a City, or personal, vehicle may be authorized by the City Administrator.

All approved transportation expenses will be reimbursed as follows:

   (a)  When employees use their personal vehicles, all travel mileage shall be paid at the rate of 29¢ per mile plus any parking fees.  A mileage report, and receipts for parking fees, shall be required.

   (b)  When City vehicles are used, all expenses incidental to the use of such vehicle (parking, gasoline, oil, repairs, etc.) shall be reimbursed.  Receipts shall be required.

   (c)  When air travel is permitted, the cost of such airfare shall be reimbursed or paid by the City in advance.  Additionally, reimbursement will be made for the use of rental cars, taxi or bus fares, provided such expenses are necessary and reasonable.  Receipts shall be required.

Alternate routes which are desirable because of personal affairs of the traveler can be used, but only on the traveler's time, and with the traveler bearing the additional cost of the alternate route.  Mileage and related expenses incurred on alternate routes must be reflected in the mileage report.

### § 11-04.  FOOD AND LODGING

Whenever authorized by the City Council or City Administrator, food and lodging expenses associated with official City business travel, shall be paid on a *per diem* basis when overnight stay is required.  The rate shall be paid in advance and not to exceed forty dollars ($40.00) per day.  Lodging will be reimbursed at single rates, unless two or more employees occupy a single room, or otherwise approved by the City Administrator.  It shall be the policy of the City to reimburse for only lodging that is economical and practical.  Exceptions to this may be granted when cheaper hotel rooms are unavailable, or where conferences are held in, or nearby the hotel.

Whenever authorized by the City Administrator, food expenses associated with official City business, or continuing education not requiring overnight stay may be paid in advance and will not exceed ten dollars ($10.00) per meal.  In addition, eligibility for said *per diem* when overnight stay is not required, is conditional in that the employee must have successfully completed the required probationary period as prescribed in Section § 3.01.

Reimbursement will not be made for personal telephone calls, alcoholic beverages, entertainment expenses, or other sundry items not relevant to the public purpose of the travel, except as provided in Section § 11.05. hereafter.

## § 11-05.  ENTERTAINMENT

The City Council realizes that from time to time, it is necessary to entertain dignitaries, and state, federal, and business representatives, whenever it may be deemed in the best interest of the City.  Such expenses may be reimbursed at the discretion of the City Administrator.  Receipts will be required before reimbursement can be made.  Whenever practical, prior authorization should be obtained from the City Administrator.

## § 11-06.  TRAVEL ADVANCES AND REPORTS

Minimum, but sufficient cash advances may be drawn from the City treasury by employees traveling on City business. All unused, unauthorized, or unapproved travel advances, shall be returned immediately upon return of the business trip.  An expenditure report shall be filed with the finance department within two (2) working days following the trip. Failure to submit an expense report will subject the employee to a payroll deduction for any funds to advanced.  All cash advance and expenditure reports, shall be submitted on forms provided for the purposes as required by the City Administrator.

CHAPTER 12

## VEHICLE POLICY

### § 12-01. PURPOSE OF VEHICLE POLICY

The purpose of this vehicle policy is to provide for the safe and effective utilization of the City vehicle fleet through rules, regulations, and procedures.

### § 12-02. APPLICABILITY

These policies shall apply to all City owned vehicles and all persons assigned a vehicle, inclusive of operators and passengers.

### § 12-03. USE OF CITY VEHICLES

All City equipment and vehicles are intended for official City business use only. The City Administrator may extend said use, according to need and circumstance, to another public agency, or for uses beneficial to the general public. Use of City equipment and vehicles is limited to the Hidalgo, Willacy, and Cameron County area unless otherwise approved by the City Administrator.

### § 12-04. OPERATION AND RIDERSHIP

Except for maintenance, service and repair, only City officials and employees are allowed to operate City vehicles. Ridership should be limited to employees or persons on official City business. Due to the nature of certain employees being required to be on call and take a vehicle home, the City Administrator may exercise limited discretion in situations wherein the ridership policy might cause transportation difficulties to an employee required to be on standby and use a City vehicle.

Employees allowed to operate City vehicles between their places of residence and work shall be required to reside within a fifteen (15) minute drive to the City.

### § 12-05. SAFETY, MAINTENANCE AND CARE

Personnel assigned the use of a vehicle, or piece of equipment, will be responsible for the maintenance and care of said vehicle/equipment. Damage arising from misuse or neglect attributable to operator negligence is subject to review by the City Administrator, and subsequent repair at the expense of employee held responsible of same.

No one shall operate a City vehicle or piece of equipment that is unsafe; the operator will be responsible for exercising good judgment and performing a cursory inspection prior to operating said vehicle or equipment. All operator and passengers will be individually accountable for abiding with all laws pertaining to vehicles and their operation. No one is allowed to operate a City vehicle or piece of equipment while under the influence of alcohol, medication or drugs, that may alter judgment or reflex. No person with corrective devices or appliances shall be allowed to operate City equipment or vehicles without said corrective devices or appliances being in place and in good repair.

### § 12-06. VEHICLE LOG

It will be the responsibility of each operator of a City vehicle or piece of equipment, to properly fill out any paperwork associated with the use, mileage, gas/lubricant applications, or any other documentation, which may be required from time to time.

-33-

## CHAPTER 13

## DRUG AND ALCOHOL POLICY

### § 13-01. STATEMENT OF PURPOSE AND SCOPE

The City of Los Fresnos recognizes that alcohol and drug abuse in the work place, has become a major concern. We believe that by reducing drug and alcohol abuse, we will improve the safety, health, and productivity of employees. The objects of our drug abuse policy are to provide a safe and healthy work place for all employees, prevent accidents, and comply with Section 411.091 of the Texas Labor Code.

### § 13-02. STATEMENT OF POLICY

The use, possession, sale, transfer, purchase, or being under the influence of drugs or alcohol, while on the City of Los Fresnos property, or using company equipment, is prohibited. Employees may not report to work, with, under the influence of, or use of prescription drugs, if such drugs might affect the ability of an average person to operate or work around equipment, unless the employee has obtained the management's consent.

### § 13-03. DEFINITION OF DRUG

(a) For the purposes of this section, the term "drug" whenever it appears, includes illegal drugs, alcoholic beverages, illegal inhalants, other intoxicants, and prescription drugs, if the prescription drugs might affect the ability of an average person to work, unless the employee has informed the office coordinator or his immediate supervisor.

(b) While the City of Los Fresnos does not sponsor or endorse any specific drug treatment programs, such programs are available through public and private health care facilities in our area. Affected employees are encouraged to seek assistance for themselves and their dependents. The group health insurance offered to employees and their dependents, provides limited coverage for expenses related to drug treatment programs. See the office coordinator or refer to the plan description for details.

(c) The City of Los Fresnos does not offer, nor require participation in, drug and alcohol abuse education and training programs. However, various public and private facilities in our area offer such programs, and affected employees are encouraged to seek assistance.

(d) The City of Los Fresnos requires drug testing as a condition for employment.

### § 13-04. CONSEQUENCES OF VIOLATING THE DRUG AND ABUSE POLICY

Any employee violating this drug abuse policy, will be subject to disciplinary action and possible termination.

### § 13-05. POSSESSION AND USE OF AND SEARCH FOR ILLEGAL AND UNAUTHORIZED ITEMS

No employee of the City of Los Fresnos, or any employee of any contractor, sales company, or vendor, shall possess or bring onto City property any illegal drugs, firearms, or other weapons. This prohibition against firearms applies notwithstanding Texas legislation allowing a resident to carry a concealed handgun. Any City employee who is found in possession of any such illegal or unauthorized items, or who brings such items onto City property, will be subject to disciplinary action. Any employee or representative of a contractor, sales company, or vendor, who is found in possession of any such illegal or unauthorized items, or who brings any such items onto City property, will not be permitted future entry, and is subject to criminal prosecution.

The City of Los Fresnos reserves the right to require individual employees and/or persons on its property to submit to inspection of their person and their personal property. These inspections may be random and periodic. All employees and persons must submit to such immediately upon request. Employees refusing are subject to disciplinary action. Everyone's person, as well as their purses, bags, packages, containers, personal possessions, desks, City facilities, equipment, and automobiles parked at or about City property, are subject to inspections.

## § 13-06. VIOLATIONS

Any of the following actions constitutes a violation of this policy and may subject an employee to disciplinary action to include immediate termination.

(a) Using, selling, purchasing, transferring, possessing, manufacturing, or storing an illegal drug or drug paraphernalia , or attempting or assisting another to do so, while in the course of employment or engaged in a City sponsored activity, on premises, in owned, leased or rented vehicles, or on business.

(b) Working or reporting to work, conducting City business or being on City premises or in a City-owned, leased or rented vehicle, while under the influence of an illegal drug, alcohol, or in a mentally impaired condition.

(c) Switching, adulterating, or attempting to temper with any sample submitted for medical testing, or otherwise interfering or attempting to interfere with the testing process.

## § 13-07. APPLICANT TESTING

Refusal to give written consent for a drug screening test will disqualify the candidate from consideration for employment.

(a) **Objectives** - To maintain the high professional standards of the City's workforce, it is imperative that individuals who use illegal drugs be screened out during the initial employment process before they are placed on the employment rolls of the City. This procedure will have a positive effect by reducing instances of illegal drug use by employees working for the City, and will provide for a safer work environment. For these reasons, drug testing shall be required of all prospective employees.

(b) **Vacancy Announcements** - Every vacancy announcement for positions designated for applicant testing shall include a statement stating that applicants tentatively selected for this position will be required to submit to pre-employment drug and alcohol testing to screen for illegal drug use prior to employment with the City. In addition, each applicant will be notified that employment in the position will be contingent upon a negative drug test result. Failure of the vacancy announcement to contain this statement notice will not preclude applicant testing, if advance written notice is provided to applicants in some other manner.

(c) **Consequences** - The City will decline to extend a final offer of employment to any applicant with a verified positive test result, and such applicant will not be considered for employment by the City for a period of one year. The City Administrator shall be directed to object to the applicant on the basis of failure to pass the drug test.

## § 13-08. EMPLOYEE TESTING

Refusal by an employee to submit to screen testing will be considered cause for discharge.

(a) **Objective** - The City's objective is to provide a safe, drug free environment for employees.

-35-

(b) **When Required** -

1. Testing may be required during routine physical examinations, such as annual physicals or return-to-work physicals.

2. Any employee suspected of having caused, or contributed to an on-the-job accident, will be tested.

3. Any employee involved in an on-the-job accident may be tested.

4. Individual testing may be required when there is reasonable suspicion that drugs or alcohol is affecting job performance and conduct in the work place.

5. Any employee may randomly be selected for drug testing on a quarterly basis.


## § 13-09.  DISCIPLINARY ACTION

Any employee suspected of violating this Policy may be immediately suspended without pay pending completion of an investigation.  During the course of an investigation, the suspected employee shall have the opportunity to provide an explanation.  In the event that a determination is made by the City that the employee violated the Policy, the employee shall be terminated.  Should the determination be made that no violation occurred, the employee will be reinstated without penalty and will be paid any lost wages.

## § 13-10.  COORDINATION WITH LAW ENFORCEMENT AGENCIES

The sale, use, purchase, transfer or possession of an illegal drug or drug paraphernalia is a violation of the law.  The supervisor will report information concerning possession, distribution, or use of any illegal drugs to law enforcement officials and will turn over to the custody of law enforcement officials any such substances found during a search of an individual or property.  Searches will only be conducted of individuals based on reasonable cause; and only of their vehicles, lockers, desks, closets, when based on reasonable suspicion.  The City will cooperate fully in the prosecution and/or conviction of any violation of the law.

# CHAPTER 14

## MISCELLANEOUS PROVISIONS

### § 14-01.  SAFETY

Each employee is required to adhere to all safety procedures set forth by the City, the state, and/or federal agencies. It is the obligation of all employees to report any unsafe conditions to the appropriate department heads and to inform their supervisor of any-on-the-job injury or accident.

### § 14-02.  COFFEE BREAKS

It is the policy of the City to allow one (1) fifteen (15) minute coffee break at the discretion of the department head and the City Administrator for every four (4) hours shift of work.  It shall be understood that coffee breaks are a privilege, not a right.  At such, the abuse of said privilege may lead to the revocation of said privilege.  At no time will coffee breaks accumulate for later use, or take precedence over the work situation on any given day.  All breaks shall be taken in a designated break area away from the work area.

### § 14-03.  NEWS RELEASES

All news releases regarding extraordinary events that may attract media attention, must be approved by the City Administrator prior to their release.

### § 14-04.  LUNCH PERIODS

The scheduling of employee lunch periods will be determined by the department head and/or City Administrator to facilitate serving the public and permitting efficient department operations.  Lunch periods shall not exceed one (1) hour in length except for business lunches, in which case the employee shall return to work within a reasonable time upon completion of the business lunch.

### § 14-05.  UNAUTHORIZED OR IMPROPER USE OF OFFICIAL BADGE OR UNIFORM

No official or employee whose duties involve the use of a badge, card, uniform or clothing insignia as evidence of authority, or for identification purposes, shall permit such badge, card, uniform or insignia to be used or worn by another person who is not authorized to use or wear of same, nor permit same to be out of his/her possession without good cause or approval of the City Administrator.   Such badge, card, uniform or insignia shall be used only in the performance of the official duties of the position to which they relate, or as may be otherwise approved by the City Administrator.

### § 14-06.  SMOKING IN THE WORKPLACE

Smoke or smoking shall be defined as the carrying or holding of a lighted pipe, cigar or cigarette of any kind, or any other lighted smoking equipment or device, and the lighting of, emitting or exhaling the smoke of a pipe, cigar or cigarette of any kind.

The City of Los Fresnos prohibits smoking in all buildings owned and occupied by the City for the purpose of public use.

-37-

## § 14-07.  AIDS IN THE WORKPLACE

The City recognizes that many employees with life-threatening illnesses desire to lead normal lives, which includes working as long as their health permits.  Employees with AIDS or other life-threatening illnesses, are entitled to the same employment benefits as are other City employees, who have had medical problems, and the City will make reasonable job accommodations where necessary.  Employees with AIDS will be allowed to work as long as they are able to perform their job duties, and their illness presents no threat to themselves, other employees, or the general public.  The City will reserve the right to require an employee to undergo a medical examination by a doctor chosen by the City, whenever there is a question of an employee's fitness to work.  Every effort will be made by the City to counsel both the employee with AIDS and his/her co-workers.

## CONSENT AND RELEASE FORM

The City of Los Fresnos, Texas ("City") has a policy against drug and alcohol abuse and reserves the right to screen its employees and applicants for employment as an enforcement measure in providing a safe, healthy and productive working environment.

1. By my signature below, I am freely and voluntarily agreeing and consenting to submit a personal specimen of urine and/or blood for chemical analysis and testing to determine or rule on the presence of illegal, abused or prohibited drugs/alcohol, or substances, in my body fluids.

2. I hereby authorize the City's duly appointed collection facility, or testing laboratory, and their personnel, to obtain, process and test the specimen and to release and discuss the results of the analysis and test to the City Administrator of the City for employment purposes. This information will be handled as confidentially as is reasonably possible, shared only an a "need to know" basis.

3. In understand a documented chain of custody exists to insure the identity and integrity of my specimen throughout the collection and testing process.

4. As an applicant, I understand that if I have a positive test or refuse to submit to this drug/alcohol screening analysis and test, this will constitute voluntary withdrawal of my application for employment and no further consideration will be given. As a City employee, I understand that if I have a positive test or refuse to submit to this drug/alcohol screening analysis and test, this will constitute a violation of City policy and I will be subject to disciplinary action up to, and including termination, of employment. The non-prescription legal drugs and drugs for which I have a prescription that I take routinely, or have taken or ingested within the past thirty (30) days, are listed on the confidential questionnaire submitted to the testing facility. I understand that the information listed will be viewed only by the testing laboratory in the event the initial screening test is positive. The information will only be used to determine whether a false positive has occurred, to select the type of confirmation test to use, or to request an additional sample for other testing.

5. I hereby release, forever discharge and hold harmless, the City, any physician, any technician, any medical facility and any laboratory facility and all of their respective officers, directors, employees, representatives, attorneys, and agents from any and all claims of whatever nature arising out of or in connection with any act of omission relating to any (i) examination, (ii) test, (iii) collection, (iv) procedure, (v) chain of custody, (vi) disclosure, (vii) analysis, (viii) diagnosis, (ix) inaccuracy, (x) report, or (xi) action performed. This paragraph applies to any negligence, sole negligence, comparative negligence, concurrent negligence, gross negligence, recklessness, wantonness, willfulness, error, act or omission of any of the individuals or entities covered hereby.

6. I understand that like all other City forms, this form does not alter the employment at will relationship. I may terminate my employment at any time without cause and the City retains the same right.

_____

**Witness**

Printed Name: _____

Date: _____     Social Security #: _____

City of Los Fresnos, Texas          Drug, Alcohol and Prohibited Items Policy Consent and Release Form          December 30, 1999

# EXHIBIT F

---

**Miguel Mendoza**

Concerns w/ Chief Ricardo Perez Performance

1. Concerned that: He never actually lived in Los Fresnos.

2. He mishandled the Drug Case @ 10th St.
   - who handled the cocaine after Officer D. Rodriguez placed it in evidence locker.
   - Why was this evidence never sent to DPS Lab (Austin/McAllen) for confirmation. (Is the Chief a chemist)
   - Why did he order the release of the def's in said case w/out even arraigning them or bringing them before a judge.

   - Why did he not go to the scene of the crime when he was advised/notified of it. (Chief Perez claimed he had not been notified of the situation until several hours had elapsed).

   ← On a Meeting the following day after the postponed meeting in Sept.

   - Why did Chief Perez show me, Mayor Abrego, and Pam Denny only two "Digital" Pictures of the cocaine where one showed the small baggy w/ a positive (Pink) Drug Kit beside it and the other picture showing a bigger bag

ot a substance w/ a neg. (Blue) drug kit. ⟹ When in fact, there were no digital pictures taken at the scene, as the police units are not equiped w/ Digital Cameras!!

↳ The pictures that were taken at the scene of th crime were taken by a polaroid camera.

* ↳ So why did the chief fail to mention those pictures which show that the substance found at the scene was indeed cocaine.
— What is he trying to hide.

* ⟹ What ultimately happened to the consfiscated drugs.

⟹

— How many officers have a key to the evidence lockers. — Or who is the "evidence custodian?"

— Why did the Chief minimize the findings of the U.S. Border Patrol agents that were present at this drug case.
⟨Findings ⟶ A Border patrol K-9 unit was called out to the scene and the K-9 detected the same bag of cocaine found by our Officers (LFPD) confirming that it was a drug.
⟹ Sworn statements from border patrol agents

③. Why was there friction/tension between ~~GGGG~~ him (Chief Perez) and ~~Constable~~ Constable Mendoza, when he (Chief Perez) assured the council (at his interview) that he ~~would~~ would welcome other L.E. agencies ~~and~~ work/establish a good relationship.

④ Why were the officers not given adequate/updating firearms training when he (Chief Perez) was aware that the officers were past due for firearms qualifications. — The Chief again, boasted about being very strict on training his officers and keeping them abreast w/ any updated training. (He assured this at his interview.)

⑤ Why was the moral down again when he had also assured that ~~he took~~ he took pride in keeping the moral in positive standings. And that he had an open ~~door~~ policy.

* ⑥ Did he and Jimmy Vasquez cohersu the victim in the FBI case, to give a statement in return for a favor!! ⟹ IF this occurred, ~~How~~ can we entrust the Chief with the safeguard of our citizens.

After discovering these concerns, I
lost confidence in the Chief, wondered
if he's doing these things now, what
will occur in the future.
How can he be trusted when
he has deliberately ~~failed~~ failed to
give the concil a true evaluation
of his department.

# EXHIBIT G

# Concerns with Ricardo Perez

1.  Did he meet the residency requirement in our personnel policy handbook 2.10, Police policy 2.09, Chief of Police job description, police Rules and Regulations #68?  These policies state that as Chief of police and department head, one is required to live and establish primary residence within a 10-15 min. drive of the City.  This policy was never adhered to by Mr. Rick Perez.  It is my understanding that Mr. Perez rented a small apartment just outside the city limits of Los Fresnos, but did not actually reside there.  This led to other problems or incidents which happened after hours that required his direction and/or supervision during his tenure as chief.  Listed below.

2.  Why was he not available at a drug bust on tenth street?  Did he confirm and insure that field patrol officers had adequate supervision, direction and support?  It is the responsibilty and duty of the Chief of Police to insure that his supervisory staff is adequately trained in following department policies, procedures, protocols or common sense guidelines to insure adequate management support.  Is this a violation of Police Policy 5.13? *** He has stated that the raid was not "conducted properly".  If this is the case, did he violate Police Policy 1.07?  This is one of the several instances where by the lack of adequate verbal communication skills and poor management tactics have caused a sinking department morale to sink even deeper.

3.  Failed to appear at a major accident on Paredes and 8th involving a stolen vehicle.

4.  Under Rick Perez's administration, one or more of the officers were not brought up to mandatory standards in firearms proficiency.  Isn't this a violation of our Police Policy 5.61?  Mr. Perez failed in his responsibility as a department head to insure that the department and/or city policies dealing with firearms were followed.  This in-turn placed the city and it's citizens at great unnecessary risk of potential civil and/or criminal liability not to mention the concern for general public safety.

5.  He tried to hire his brother on to the Cameron County Task Force, which his brother would of had to be commissioned through him.  This would of been a violation of City Personnel Policy 2.09.

6.  Did Mr. Perez know our city streets?  Mr. Perez publicly denied that the city of Los Fresnos had a gang or graffiti problem.  Mr. Perez went on to say that there was no "graffiti" in our city and if anything, all we had was "gang wanabe's" that did not pose a real threat to our city.  Had Mr. Perez actually been more involved with our city youth during his administration, the graffiti around our city would have been much more apparent.  There have been several serious disorderly and disruptive cases involving minor criminal incidents at our local high school over the last few months.  It is my understanding that some of these involve rival factions of local and area gangs.  Wanabe or not, to deny their existence poses a real threat to the citizens of Los Fresnos.  It not only creates an unsafe euphoric effect, it is also very irresponsible and most importantly, false.

7. Why did he ride around daily with Lt. Jimmy Vasquez? Is this another violation of police Policy 5.13? Taxpayers money was being spent on two officers performing one job. From the onset of the appointment of Mr. Perez as Police Chief, he solicited the services of Lt. Jimmy Vasquez as his personal driver while on city time. The issue was verbally brought to his attention on more than one occassion. Lt. Jimmy Vasquez was in charge of follow ups on criminal cases as well as being charged with case preparation duties for timely disposal to the district attorneys office. Keeping Lt. Jimmy Vasquez from his official duties and having him chauffeur Mr. Perez around on a daily basis not only is unfair to the rest of the officers but more importantly deprives the citizens of Los Fresnos from an investigator working to clear their criminal cases.

8. Did Mr. Perez harrass several subordinate officers? One Officer has made a statement that on at least one occassion`Mr. Perez harrassed him on a petition that was circulated in the Police department regarding confidence in the Chief. He states that he felt harrassed and intimidated by his questions and that he was told by Mr. Perez that he(Perez) would know who his soldiers`were`by whoever signed or didn't sign. What ever happened to this petition? Did the person who started the petition lose confidence? Why did he resign?
Another officer has also made a statement that he felt harrassed and intimidated by a statment that Perez made that he (Perez) was out to fire him.
On one occassion, in executive session, Mr. perez was asked if he had ever emarrased a subordinate officer in front of another law enforcement agent. Mr. Perez responded that he had not. He infact had, which led to another contributing factor in the low moral of the department. The lifting and maintaining of good and positive moral of **all** officers in the department is one of the many duties of the Police Chief.

9. Did two dispatchers quit because they were uncomfortable working with Mr. Perez and Lt. Jimmy Vasquez? Mr. Perez has stated that the dispatchers quit because they obtained better jobs somewhere else. It is his job to make sure that the moral in his department is in good standing.

10. Was there low moral in the department? Officers have made statements that when they were in a room together with Mr. Perez, he would not acknowledge their presence. This creates friction, uncertainty, job stress, distrust, forced loyalty, hostility, and polarization among fellow officers and support staff. The Chief as a department head, is responsible for the morale in the department (Police Policy 1.07 & Rules and Regulations #3).

11. Did Perez have a good working relationship with all area law enforcement agencies? The Chief of Police is charged with maintaining a good working relationship with all brother law enforcement agencies. Mr. Perez failed in this expectation due to the fact that he made no attempt to work with the Cameron County Constables even after repeated requests and subtle reminders to do so by members of this council and others. The Constables are the department that have historically been the closest to the Los Fresnos Police Department. The Constables are the law enforcement agency that our city depends

on`for assistance on a daily basis.  Not having them to assist puts an added burden on an

[*p600Xalre

representative from the Marshall's office come in to inspect the fencing.  Three things

12.  Did Perez have a local (local to Los Fresnos) line telephone?  I personally called the telephone company and asked for a number listed or unlisted for Mr. Perez.  There was none.  It is a requirement in the Chief's job description that he have a land line telephone in his primary residence and that it be readily accessible to personnel.

13.  Did all officers have confidence and trust in Mr. Lopez?  There is a letter from Los Fresnos Police Personnel that stated that they had "no confidence" in Mr. Perez.

14.  Did Perez interfere in case #00-05064?  Why did he have this person released from custody?

15.  Did Perez have his own group in the Police department which he referred to as the "True Blue"?  Statements have been made that Perez identified his friends as 'True Blue" and the others as "the other side".  This is yet another reason why the Police departments morale was so low.  This totally uncalled-for behavior created friction, uncertainty, job stress, distrust, forced loyalty, and hostility among fellow officers and support staff.

16.  Why was there on several occasions only one officer on duty at night on graveyard shift and over six during the morning shift?  On several documented occasions the night weekend shift was scheduled in such a way that it was in total disregard to public safety not to mention officer safety.

17.  Perez failed to aquire and mainntain safe and adequate prisoner outdoor fencing.  In one meeting he said that the fence was up to standards, and two weeks later he had a

were required with a date to comply.

18.  Misled the Council to believe there were no complaints on the outdoor fencing.  When asked if there had been citizen complaints about the outdoor fencing, Mr. Perez said there were none, but after he was confronted by an individual at the meeting he changed his story.

19.  Did Perez know that Lt. Vasquez allegedly illegally coerced citizens to make complaints on two officers?  It is the responsibility of the Chief of Police to know and guide the actions of his subordinate staff.  There is a subject that has come forward to give`a sworn statement that Lt. Vasquez did infact offer police protection in exchange for complaints against two officers.  It is the responsibility of the Chief to know or inquire about a complaint that led to a FBI investigation.

# EXHIBIT H



**DARLING-MOUSER**
·FUNERAL·HOME·

945 Palm Boulevard at Monroe
Brownsville, Texas 78520

1. The drugs that were confiscated on 10th St.
Where at is the evidence?
Why were the offenders released + charges
dropped?

2. the case of the marijuana, what happened
to that marijuana?

3. Why did he not move into Los Fresnos
after being given such a long time to
do it.?

4. Concerned citizens questioned his
presence w/ Jimmy Vazquez always to-
gether + constantly seen at Tapids
Restaurant in a city vehicle + on city
time.

*"Our Family Bringing Comfort To Yours"*

956-546-7111
Fax 956-542-7242

# EXHIBIT I

**GONZALO ACEVEDO**
107 East Resaca Drive
LOS FRESNOS, TX 78566
USA

October 23, 2000

Poor Administrator:

- Divided the law enforcement officers into two groups:

    - They were afraid to speak out for possible retaliation.
    - Creates favoritism in the ranks.

- Creates a relationship with Lt.. Vazquez that everybody in town criticizes.

- Poor communication with the citizens.

- He did not accept criticism
  (example)  the truth about prisoners behaviors.

- Creates antagonism with the constable office.

-The drug case creates doubts about the way he handles the case.

- In the meeting in which we discussed the way he was handling his department, he lies to Garcia and Mendoza.

    -The firearms qualifications
    -The working officers during the night-shift.

- Lt.. Vazquez was the investigator but he was always with the chief as his personal driver.

# EXHIBIT J

SPECIAL CITY COUNCIL MEETING
7:30 P.M., TUESDAY, AUGUST 29, 2000

Call Special Meeting to Order.

Mayor Abrego asked Ms. Denny if the agenda had been posted, meeting all the requirements under the law, and Ms. Denny replied yes.

Invocation and Pledge of Allegiance.

Mayor Pro Tem McCormick led the audience in the Invocation and Mayor Abrego led them in the Pledge of Allegiance.

Closed Session – The Board of Alderman may convene in closed session pursuant to Section 551.074, Texas Government Code for discussion regarding the following:

> Personnel:   To deliberate the employment, evaluation, reassignment, duties, discipline or dismissal of the Chief of Police.

Mayor Pro Tem McCormick made a motion to maintain the status of the position of the Chief of Police as Ricardo Perez.  Motion died to lack of a second.

Mayor Abrego stated he has been petitioned by Chief Perez that the hearing be public, and that is why they are not going into executive session.  And under State law, he has that right.

Mayor Abrego said at this time he will entertain a motion.  Alderman Mendoza made a motion to reschedule the meeting until one month from today.  Mayor Abrego replied a motion is on the floor, and asked Mr. Mendoza if he had a date?  Ms. Denny replied the next regular meeting is on September 26.  Alderman Sierra seconded the motion.

Mayor Pro Tem McCormick asked if it is open for discussion, to which Mayor Abrego replied yes.

Mayor Pro Tem McCormick stated she does not believe in tabling this, and she doesn't understand why it was put on the agenda to begin with.  In consideration of the citizen's who have come before them tonight, obviously very concerned about the situation at hand, she thinks it is wrong for them not to stand by the meeting.  They need to discuss it here and now, otherwise they don't need to make a special meeting.  They've all taken time from their jobs and home-life to come and discuss the items at hand.  If there are

2102

issues to be discussed, she beseeches the council to discuss them now. Alderman Mendoza and Sierra replied they had no comments.

Mayor Abrego said for the record, he called this special meeting. He was petitioned by four council members, and this is why this is on the agenda.

Mayor Abrego then asked all those in favor of rescheduling the meeting for September 26, 2000, to raise their right hand. Aldermen Acevedo, Mendoza, Sierra and Garcia voted in favor. Mayor Pro Tem McCormick opposed.

Mr. Robert Cepeda, a former city mayor, said he knows there's nothing on the agenda for public comments but asked if the chair would entertain comments? Mayor Abrego replied yes.

Mr. Cepeda began by congratulating the person who made the fliers. Addressing the Council and Mayor, he said he would like to echo the quote that was in the paper: "The Chief is the best thing that has happened to this City." Mr. Cepeda said Chief Perez is an honest man, hardworking, and of impeccable integrity. And he thinks to do this kind of thing, damages our community just when it's starting to come together. He added our police department is one we can be proud of, and it's sad to him there are officers in the department who are meeting with city alderman, and stirring up trouble within the department. Our commitment from the last council, and Mr. Mendoza and Ms. Garcia were members of that council, was they'd support the Chief and not step into his office a day or two after he takes over and begin to harass him. Mr. Cepeda said the Chief needs to be allowed to do his job, and to continue in his position until he decides he wants to move on.

Mayor Abrego thanked Mr. Cepeda for his comments and the citizen's applauded.

Mr. Ramiro Sanchez, a citizen of Los Fresnos asked to speak next, to which Mayor Abrego replied yes. Mr. Sanchez begin by saying about a month ago that he (Mr. Sanchez) worked on a case which he referred to two agencies, and although he has not spoken to him (Mayor Abrego) about it, he wants him to take this into consideration. It was a drug case, ok? There were two people arrested, there were six other people, illegal aliens, arrested. Something was found there that was illegal. Whether it was legal or it was illegal, our kids are receiving this drug. Whether it is a drug or not, can you imagine what it is doing to our kids minds? What is happening to this town? Why did they let this person go? I did that case, and I got burned at it. Our children, one of these days, is going to be receiving that crack, or whatever it is. Whatever it is, if it's detergent, they have done nothing about it. He added he is an upset citizen. Can you imagine what they are selling out in that street as a drug? The other thing Mr. Sanchez would like to let them know, is that this happened on 10th Street, in our backyard. Another thing we've

got, is crime prevention where we don't need it. We don't need it on Whipple Road, we need it 9th, 10th, and 8th Streets. He then asked if he is correct, is that not where they have most of their kids? They have more problems. We got patrol. He's tired. Mr. Sanchez said he walked this community to get these people elected, and he wanted to tell these people, he represents the people who got these people elected. Every single one of them got elected because he walked, and he heard every complaint of every citizen, in our area, that they were tired of being harassed by the police department, that this is not a town that is a speed trap. We've always had a speed trap in this town. Do we want to get back to the speed trap and forget the drugs? Is this what we want? We need to make a decision. He doesn't know, he's just tired. Mr. Sanchez said he has put his life on the line, and went out there and got these people elected. He walked and heard every complaint, of every person in this town, and talked to them. And yet, this is one of the main concerns in our community, was the drugs. What's happening? They are letting them go, two guys were let go. Mr. Sanchez does not know for what reason. They are back on the street. This is Los Fresnos, this is not Brownsville. Mr. Sanchez then said their kids, and his kids, are receiving this drug. There are a lot of things that need to be taken into consideration.

Mayor Abrego thanked Mr. Sanchez and said that is enough. Mr. Sanchez replied oh, it is? Again Mayor Abrego replied yes. Mr. Sanchez said if the newspapers need to get hold of him, or the media, he'll let them know.

Ms. Mercedes Cantu, also a former mayor, then spoke. She said she has always been a strong supporter of the police force and she is very proud of Chief Perez. She feels he has done a wonderful job and has represented the city well. As Mr. Sanchez said, there are drugs, but they are everywhere. A few weeks ago, she read in the paper where this same council approved to allow alcohol in one of the city parks, and it is a drug, and we should have been cautious about allowing alcohol. She added she thinks the Chief is doing a terrific job, and she thinks the city has come forward. She then commended Chief Perez on doing a good job. She said that as a citizen, she feels very proud to have him in our city. She said if they were to walk the streets, 10th Street and wherever Mr. Sanchez mentioned, she thinks they would find very few complaints. She lives on 5th Street and sees the cars patrolling. How this came about, she does not know. She stated she works with law enforcement and many cases have not gone forward because of the lack of evidence. She again commended the Chief on his job and she said she wished this was not happening to our City, and told the Council she wished they would think about what their job to do, for the community is. She then asked if we are going to be changing Chiefs every six months? Nobody will want to come serve the City of Los Fresnos in any capacity, because we are acquiring a record of not being stable. She ended by asking the Council to please reconsider what they are doing.

Mayor Abrego thanked Ms. Cantu and the citizen's applauded.

2104

Mayor Abrego then addressed Mr. Ted Rodriguez, Chief Perez's attorney.   Mr. Rodriguez said there is one point, and if this matter is reconvened, that according to the City's own policies, Section 7.06, if he is going to be considered for dismissal, he must receive a notice of dismissal which describes the deficiency or infraction involved. He stated they came today, not prepared for any particular specific factual allegation against him, because they do not know what is being complained against Chief Perez. And if the city intends to dismiss Chief Perez, he hopes they will get something in writing setting out the factual basis or complaints against him, so he has an opportunity under due process to address those.

Pastor George Morrison, a former council member, then asked to speak.  He began by asking did not four Alderpersons request, against maybe what the Mayor desires, for this to be on the agenda?  Mayor Abrego replied that is correct.  Mr. Morrison then asked where's the lack of courage?  Where is the representation for our community?  He said quite honestly, he cannot say he voted for all the people on the council, but he expects them to represent him, and expects them to consider his feelings, and not consider a special interest group.  He asked where were his feelings considered?  He sees such a change in this Chief.  He comes to him when he calls.  That wasn't always the case in the past with previous Chiefs.  He understands they've flip-flopped on the decision about alcohol in the park when the Alderman that believed otherwise, was not present.  He thinks it's a good idea they require security at those functions, and he's decided to use the police department for security at their own events.  He said he believes we have a group of men and women that are people of integrity, and he thinks the council is being very foolish in what they are considering to do.  He said he does not think they are considering the best interests of our community, and he hopes they have put a lot of prayer to it, and they start listening to the community, and if they have a God, he wishes they would listen to him, instead of whoever they are listening to.

Again the citizen's applauded.

Mayor Abrego then adjourned the meeting.


MAYOR

CITY SECRETARY

*Mayor Manuel Abrego*

Manuel Abrego

*Pam Denny*

Pam Denny

# CERTIFICATION

This is to certify that the above and foregoing is a true and correct copy of the Minutes of August 29, 2000 Special Council Meeting of the City of Los Fresnos.

To certify which witness my hand and seal of office this 28th day of February, 2002.

Pam Denny, City Secretary
City of Los Fresnos, Texas

# EXHIBIT K

AGENDA
CITY OF LOS FRESNOS, TEXAS
CITY COUNCIL REGULAR MEETING
7:30 P.M., TUESDAY, SEPTEMBER 26, 2000
COMMUNITY CENTER – 204 N. BRAZIL STREET

The Los Fresnos City Council convened in a Regular Meeting on Tuesday, September 26, 2000, at 7:30 p.m. Mayor Manuel Abrego, Mayor Pro Tem McCormick, Aldermen Juan Sierra, Gonzalo Acevedo, Miguel Mendoza, Ida Garcia, and Interim City Administrator/ City Secretary Pam Denny were present.

Mayor Abrego called the meeting to order at 7:35 p.m. and Mayor Pro Tem McCormick led the audience in the Invocation and a moment of silence for the family of Mr. Fidencio Solis. Mayor Abrego led the audience in the Pledge of Allegiance.

Consent Agenda:

A.    Approval of Minutes from September 12 and September 19, 2000 Meetings.

B.    Acknowledgement of bills paid from September 15 through 22, 2000.

C.    Approval to amend Ordinance 249B to increase garbage rates by $1.50 per month.

D.    Approval to amend Ordinance 276 to increase penalty from 10% to 15% and to increase reconnection fees from $10.00 to $20.00 and $20.00 to $30.00.

Mayor Pro Tem McCormick made a motion to approve the consent agenda as listed. Seconded by Alderman Acevedo. Motion carried.

Consider approval or rejection of a resolution amending fiscal year 1999/2000 budget and to adopt the 2000/2001 fiscal year budget, and take action as may be appropriate.

Mayor Pro Tem McCormick made a motion to approve the resolution amending fiscal year 1999/2000 budget and to adopt the 2000/2001 fiscal year budget. Seconded by Alderman Mendoza. Motion carried.

Consider approval or rejection of an ordinance approving the tax roll for the year 2000 and levying municipal ad valorem taxes, and take action as may be appropriate.

he has been approved he will receive the crown of life which the Lord has promised to those who love him."

Pastor Morrison continued by stating: "And then I wanted to read my thoughts. I'm afraid a plan for power has been conceived by someone. I wonder, over the last, I'd say four years, we've heard about someone in our community that has taken and encouraged, and pushed, and threatened people to vote certain ways. I wonder if it would be possible, even this evening, for that person if they're in this room, to reveal themselves so that we won't hear about it anymore but will know who the true leader of our town is. Who is controlling our town and what they expect of us? Because we feel like we've been handcuffed and like we're under someone's power, and I think that's totally unfair. I'm concerned that for years the council, even the council I was on, has been someone's puppet. The council or citizenry has been, as a businessman in this town told me, been mushrooms. We've been kept in the dark, and we've been, to put it nicely, been fed refuse. Often well meaning power becomes corrupted. I believe the power that has put this council in office has put this community at risk. Because of ill-conceived plans, the council may be leading the larger community into a financial responsibility we'll be unable to bear. Remember we'll all be held accountable for the decisions that are made. Not just this council but this entire citizenry. I also believe that the present council is not a representation of the community as a whole. But of one or more individuals that have their own private agenda. Present attitudes do not well represent the conservative leadership that brought Los Fresnos to the desirable community it is. I want you to remember this my fellow citizens ... sin or rebellion takes you farther than you intended to go, let's you stay longer than you intended to stay, and makes you pay more than you intended to pay. Thank you."

Mayor Abrego thanked Pastor Morrison for his comments and the audience applauded.

Ms. Florence Caslow spoke next and said: "I'd like to speak out on behalf of our Police Chief. He's doing a wonderful job. I can't understand. Before I moved to Los Fresnos, we never heard anything except it's a speed trap. Anything else was good. Since I've moved to Los Fresnos it's been one firing right after the other. Some of 'em I couldn't understand why, they were doing good jobs. Now it seems like we're getting the reputation of – if somebody don't' like 'em, fire 'em. And it shouldn't be like that. This gentleman here, he has the police going around every night. We can sleep in our beds knowing good well that we're taken of. If you need anything, all you have to do is come and talk to him. He's right there. I'm handicapped, you all may have seen me riding around on my electric cart, up and down the highway. All of our policemen, if they're around, they help me get across the streets and everything. And it's all due to this gentleman here. We have one of the best police forces, I would say, in the State of Texas. The same with our EMS, and our Fire Department. And I think myself, he's doing a wonderful job. I've been in plenty of towns that didn't have what we have. And I for one, would like to keep it this way. And he does, he makes sure that everybody can

Case 1:00-cv-00161   Document 43   Filed in TXSD on 03/01/2002   Page 185 of 195

go to bed every night and be safe without somebody breaking in your house. So that's all I've got to say. Thank you."

Mayor Abrego thanked Ms. Caslow for her comments and the audience applauded.

Mr. Luis Cavazos spoke next. He began by saying: "I'm Luis Cavazos. I'm a taxpayer and I've got some acreage in Olmito. I used to work for the Los Fresnos School District about 30 years ago, and I just don't want the same situation happened to me, happen to the Chief. I don't even know the Police Chief, but I am in support and I hope that y'all give him due process, because if not, the courts will take care of it. And I'm here in his support."

Mayor Abrego and Mayor Pro Tem McCormick both thanked Mr. Cavazos for his comments and again the audience applauded.

Mayor Abrego said: "That concludes the open forum. There's no more is there? Paul, is there anymore?" Mr. Paul Chavez replied: "No sir." Alderman Mendoza said: "Mayor, I have a comment to make before we make motions, or, can I do it now?" Mayor Abrego replied: "Yes." Alderman Mendoza said: "Will you allow me to?" Mayor Abrego again replied "Yes." Alderman Mendoza said: "Ok. Before we begin discussion further this matter, I believe we owe the members of this community an explanation as to why we postponed our meeting last time. Two of the commissioners received a threatening call immediately before our meeting. Because this matter under investigation I cannot comment any further on the details of those telephone calls. But as a result of those calls however, I was concerned for the safety of all persons involved. We had not been provided sufficient law enforcement protection for this special meeting, therefore we felt that for our safety it was best to reset the meeting to a later date when we could adequately provide for the safeguard of the officials and the public alike." He continued by saying: "And basically I just want to say that we will not be persuaded or prevented from doing the job we were elected to do by any threats, or any other form of intimidation. Thank you mayor."

Mayor Abrego stated: "For the record we do have Jimmy Vasquez as Sergeant of Arms here tonight."

<u>Closed session – The Board of Aldermen may convene in closed session pursuant to Section 551.074. Texas Government Code for the following</u>:

    A. Personnel:
       To deliberate the employment, evaluation, reassignment, duties, discipline or dismissal of the Chief of Police.

Mayor Abrego said: "I do have a request/petition by Mr. Rodriguez that this not be a closed session, and they do have that right and therefore this session will be open."

Mayor Pro Tem McCormick said: "Mayor, I'd like to make a motion to keep/remain the Chief of Police employment as is currently."

Mayor Abrego said: "We have a motion on the floor. Is there a second to that motion? Motion dies."

Alderman Mendoza said: Mayor, I make a motion to dismiss Chief of Police Ricardo Perez effective immediately". Mayor Abrego said: "We have a motion on the floor. Is there a second on that motion?" Alderman Acevedo said: "I second the motion." Mayor Abrego said: "We have a second. Discussion."

Mayor Pro Tem McCormick said: "This is the second time that members of this council have requested this to be on the agenda. It was with great disappointment that we had no other choice but to put it on the agenda because we had to follow the law. However, as a voting member of this council, I have sat on this council for three and half years and never in my three and a half years, have I ever been with a group of people who would try to do something by virtue of their position on this council, with not revealing to the other members, at appropriate times, what the charges are. I have been sitting here wondering what exactly are we doing here? Our Chief and his lawyer have made request to find out what is the problem. I have asked in open session. I have begged and pleaded with the members of this council who have brought this, to please reveal to me and to the Mayor, what exactly is the purpose? If there are charges, what are the charges? You wish me to vote on something that I know nothing about except that what is in his records, and what he has done for this community. And as far as I am aware of, there is no reason whatsoever to even consider termination. But to ask me to make a decision with no information is completely and totally immoral, unethical, and flat out wrong. And I ask you, if there is something that needs to be considered, if it's as serious as a termination, that the other council members please give me the opportunity to make an educated decision based on information! I cannot make a decision when I do not know what I'm making a decision on. The Chief has been here for a little less than eight months I believe. I have heard nothing but wonderful, wonderful things from everyone in the community. I have not so much as heard one complaint from anybody. Since this issue was brought up, a month or more ago, I have had phone calls, I have had people stop me at football games, at the mud races, at every place, at grocery stores, gas stations – what's going on, what are y'all doing? And I can't answer that, because I do not know. And as a council member it's unbelievable that I don't know. I can't give any guidance from my experience. I can't give the citizens any information that they have the right to know. They pay the taxes. They pay his salary. There are people that want to know some answers. I am included in that and I think that we all deserve those answers. I think the Chief deserves those answers. If there is something that he has done, put it on

the table. Let's look at it. By all means, if it's serious, I am in this position to do what's best for this community. But I can't do it unless I know. If it's something that he can correct, if anything was done, then by all means let him know! Give him the opportunity to make those corrections. I am begging you once again, to please reveal what information you apparently have, so that we can all make an educated and informed decision. And that we can offer what we need to, to this community and to the Chief of Police." Again the audience applauded.

Mayor Abrego asked: "Are there are any more comments? This is a very serious matter and I agree with Ms. McCormick. I think that you guys really need to think about it. The liability for the city is tremendous. And not only that, this man has done a good job for the city. He's represented the city well and I think he deserves to know why he's being let go! We're damaging his reputation. He's has livelihood. He's got a family he's got to support. And without a reason, it's not right! You put yourself in his shoes. We all work. How would you like to be fired without being told why? That's all we ask! Again, I ask if you have a reason or you have a comment. There's four of you that signed this to be put on the agenda. I think that you need to state your comments why. We have a petition here of over two hundred signatures from the community that are concerned and supporting the Chief. And I have them here if you would like to see their names."

Mayor Pro Tem McCormick then said: "I would also like to remind my fellow council members that we do have legal advice on this matter, and it has been addressed to you in three separate letters. And I would like you to be looking at that."

Mayor Abrego, addressing the council, asked: "Do you have any comments?" Alderman Mendoza answered "no comments sir".

Mr. Rodriguez said: "Briefly, thank you for having us tonight. Chief Perez has put his life on the line for the City of Los Fresnos along with his fellow officers. All he's asked for, is for the council members, the city of Los Fresnos, to follow it's own written policies and give him a reason why he should be terminated. Two council members sitting here, Ida Garcia and Mr. Mendoza, signed off on this personnel policy that says he's entitled to notice as to why he's being dismissed. I have written this council three different times and made at least one oral request at the last specially called meeting, asking for reasons why Chief Perez would be terminated. To date we have not received any information as to why his termination should be considered. He served his probationary period. He got an outstanding evaluation, which is the top evaluation or appraisal a city employee can get. I would remind the council that your employers are sitting here in front of you! The Chief's employers are sitting here in front of you. He's entitled to the same procedures and the same notice that anybody that's sitting here would expect. And we're asking that four of you, who are asking for this meeting, who asked for the last meeting, who are asking to consider the Chief's termination. to explain to the

Case 1:00-cv-00161   Document 43   Filed in TXSD on 03/01/2002   Page 188 of 195

citizen's of Los Fresnos and citizen's of this State, because I think Texan's demand fairness, explain to them why this man should be let go from his position, when he's put his life on the line; when he's come in, he's tried to professionalize this department and bring it up to date, and do a good job for all of y'all. For all of y'all. Thank you ma'am."

Pastor Morrison asked: "Mr. Mayor can the citizenry speak?" Mayor Abrego replied: "I'll let you speak." Pastor Morrison said: "If I remember right, Los Fresnos is a Type A City and the Chief is an Officer of the City, and in conjunction to his being an Officer of the City, if I'm correct Ms. Denny, that he has to be given a 30 day notice with reasons for his termination? And if there not, it's sets the city up for a terrific liability, is that correct Ms. Denny?" Ms. Denny replied: "He is not a officer. We passed an ordinance after Chief Lopez left, that makes him not an officer." Pastor Morrison continued: "I just wonder, who is the council? Who do they owe? Who do these four people owe?" Again the audience applauded.

Chief Ricardo Perez spoke next and said: "I would like to thank everyone in my support for being here. I know I've done a good job. The department was set way back. The policies go back 1984-1986 and there were not many people working it, on the policies. Right now the department is in transition, and we're trying to play catch up. We're catching up; seven years or more the department is behind, starting with the policies. We even had policies that govern how officers do their job and a lot of them were outdated and needed to be modified. That's what we are working on right now. When I first got here, I was very excited to work for the city. I was police chief for a school district, at the Edinburg School District, when they had 21,000 students, 5,000 staff. I did a good job there as well, getting numerous awards. Never missed a day of work. My goal was to be Chief of Police for a city, and Los Fresnos was going to be my first city to work for. I tried my best to keep up with the demands of not only the department, but the citizens as well. In a small town, everybody has a complaint, and it is my job to hear them and try to do my best to somehow guide them. If I'm guilty of doing that, then charge me for doing my job. I try to do the best I can for the citizens. So once again, I ask of the council, think about what you are doing! You're ruining my life! I mean, all this is unneeded. And here, eighteen years of hard work, going through training and education, to become a certified police chief for the state. I'm not hired as somebody's friend, or somebody's co-pilot. I'm hired because of my experience and training and education. We need in the department to do the job they're hired for, for the citizen's for which you all pay for. And once again, I am asking to consider what y'all are doing. It's very serious what you are doing. Once again, thank y'all for supporting me, even though whatever the outcome is, I very positive that I've done nothing wrong and the Lord will see it through. Thank y'all very much." At this time, the audience gave Chief Ricardo Perez a standing ovation and applauded.

Mayor Abrego then said: "I got elected in May, and I was very fortunate meeting the Chief, and working with the Chief, and I'd like to say that he went way beyond. And, I'll

pick on him a little bit... but some of the things he did were really out of the ordinary! About a month ago we were threatened here on the coast with a hurricane. And this man, took it upon himself, showed up to work Monday morning and stayed all the way through, all night. He didn't tell anyone. He just worked all the way through, here at his office, and didn't go home till Tuesday afternoon! He was literally here for over 24 hours. And that says something about this man, that he's a leader. And it is true, he's brought us out of the dark ages. Our police department, the officers have been re-certified; new policies, new procedures; he's got more certificates than a lot of us put together. Very professional, working over 50, 60 hours a week! Though he doesn't get paid overtime. He's a leader in his own mind. And Chief, I just want you to know, that I really appreciate everything you've done for Los Fresnos. Working with our students at the High School, setting up new programs. The all night ?? was the first ever in Los Fresnos, and I just think that we were going in the right direction. And I appreciate everything you've done!" Chief Perez replied: "Thank you."

Mayor Abrego then said: "Then I'll ask the council, Mr. Acevedo do you have any comments?" Alderman Acevedo replied: "No I don't". Mayor Abrego then said: "Mr. Mendoza?" Alderman Mendoza replied: "No." Mayor Abrego then said: "Mr. Sierra? Alderman Sierra mumbled "no". Mayor Abrego then said: "Ida"? Alderman Garcia whispered: "No."

Mayor Pro Tem McCormick then said: "Please consider, council, the budget that you just passed. Please consider that not only are you taxpayers, and you're not the only taxpayers in this community. Those people sitting out in front of us, plus hundreds of others, pay taxes in this community. You need to consider very thoughtfully, and very seriously, your vote. How it will effect this budget, how it will effect these citizens, how it will effect our police department, and the morale, and our staff here at the city, how it will effect our protection as a police department without leadership, without some continuity, that we so badly needed. The mayor had said a couple of things that reminded me I had written out some things, and I lost it, and that's a teacher for you, isn't it? But he is very professional. Always. I have never seen him not be professional. His people are professional. Professional ... where I didn't see them professional before. I had a lot of complaints about our police department over the last three and half years! And most of you that know me, know that. And they have come so far, and so beyond, what I ever dreamed that one person could do in such a short amount of time. You know when people go yeah, it's a speed trap...I said you go to Los Fresnos, you look at our officers, you look how they stand, you look how they walk, you look how they ride around this community and patrol your neighborhoods, keep you safe, visit with your children! Police officers didn't stop and say hello to my children or the children down my street. They do now! They wave, their friendly! They patrol our community. They protect everything this community is about ... and he's the reason! He is the reason. His

2026

leadership style is that by doing, not by saying. He's shows them by his attitude and by what he does and by his commitment. And if any of you have been around any children, or even in a work force, you know that people learn best by seeing and doing. And he does that. Please consider … carefully … what the effect this will have financially, what this will have with the morale in this community before you make your decision. And again, I am asking you to please state what it is, what charge it is, you have against the Chief."

Mayor Abrego then said: "Ms. Denny, you've been the immediate supervisor of your department heads here in the city, do you have anything in his file?" Ms. Denny replied: "No sir, I sure don't." Mayor Abrego then asked: "Do you have a recommendation?" Ms Denny replied: "I recommend not to fire him."

Mayor Abrego said: "We have our legal counsel here Mr. Crane and Ms. Glass, do any comments?" Mr. Crane replied: "Mayor, board, we have sent to each of you, I believe, three different letters, three different dates, marked Attorney/Client Privilege. We have provided advice and recommendation in each of those three letters. And we have, at this point and time, have no reason that we know of at this point and time, to alter our advice and recommendation as pertained in those letters."

Mayor Abrego replied: "Thank you. And for the record, I have covered it with all five council members individually." Anymore discussion? If not, I'll ask, we have a motion on the floor, the motions still stands?" Alderman Mendoza replied: "Yes sir". Mayor Abrego asked: "The second still stands?" Alderman Acevedo replied: "Yes sir". Mayor Abrego then said: "I'll ask for a roll call vote. Mr. Gonzalo Acevedo, how do you vote on this motion?" Alderman Acevedo replied: "Motion to, to dismiss the Chief". Mayor Abrego replied: "Ok. Mr. Mendoza?" Alderman Mendoza replied: "Motion to dismiss."

At this point a citizen in the audience said: "We can't hear." Mr. Mendoza, repeated louder: "Motion to dismiss!" Another citizen interjected: "You need to give a reason!" Mayor Abrego then said: "Please! Ms. McCormick?" Mayor Pro Tem McCormick answered: "I vote no because I do not know any information on why these charges, or this motion…" at which point the audience began applauding. Mayor Abrego then asked: "Mr. Sierra?" Alderman Sierra replied: "I make the motion to dismiss as well." Mayor Abrego replied: "We have a motion, are you voting yes?" Alderman Sierra replied: "Yes". Mayor Abrego then said: "Ms. Garcia?" Alderman Garcia replied: "Dismiss."

Mayor Abrego said: "Motion carries. I respect the wishes of the council, I don't necessarily agree with it. Ms. Denny, I do want the office of the Police Chief secured. I want all investigations to continue. I want complete cooperation with the F.B.I, D.A.,

and all other agencies to continue. Any investigation that will stop, I want to be notified. That being said and done, we're going to recess for 15 minutes."

<u>Consideration and possible action on appointment of an Acting Chief of Police and setting salary</u>:

Mayor Pro Tem McCormick said: "I would like to make a motion to appoint Jimmy Vasquez as our Acting Interim Chief with a salary of $40,000.00." Mayor Abrego said: "We·have a motion. Is there a second to that motion? No second. I'll entertain another motion."

Alderman Garcia said: "I make a motion to appoint Adrian Cabrera as Acting Chief and set salary at $40,000.00 a year." Mayor Abrego then reiterated: "That's for Acting, until the position is filled?" Alderman Garcia replied: "Right, right." Alderman Sierra said: "I will second that motion." Mayor Abrego said: "Has he been asked?" Alderman Garcia replied: "Um, it's been mentioned." I think he's here." Mayor Abrego replied: "I think it's only fair that we ask him. Mr. Cabrera can you step forward?"

Mayor Abrego continued: "There's a motion made for you to be appointed acting Chief of Police and it's been seconded, are you willing to serve as acting at the salary of $40,000.00?" Mr. Cabrera indicated yes. Mayor Abrego said: "Thank you sir. Mayor Abrego said: "Discussion on the motion? I think Mr. Cabrera is very capable. He has many years of experience and is a local man. And he's a ... Sergeant, Lieutenant, on our force right now is that....? Your employed as what Adrian?" Mr. Cabrera replied: "Sergeant". Mayor Abrego replied: "There's probably going to be some changes from within the department because I understand that he works at the school, but I'll leave that up to Ms. Denny to make the internal changes. Anymore discussion on the motion? Is there a time frame on when you want this position filled? Do you want to advertise right away?" Alderman Mendoza answered: "I would say so sir. Yes." Mayor Abrego replied: Right away advertise for the position?" Alderman Mendoza said: "Right." Mayor Abrego then asked again: "Any more discussion? All those in favor of the motion signify by raising your right hand. It is unanimous."

There being no further business Mayor Abrego adjourned the meeting at 8:30 p.m.

MAYOR                                                    CITY SECRETARY

Manuel Abrego                                            Pam Denny

# CERTIFICATION

This is to certify that the above and foregoing is a true and correct copy of the Agenda and the Regular City Council Meeting Minutes of September 26, 2000.

To certify which witness my hand and seal of office this 28th day of February, 2002.



Pam Denny, City Secretary
City of Los Fresnos, Texas

# EXHIBIT L

ORDINANCE NO. _19_

AN ORDINANCE DISPENSING WITH THE OFFICE OF
MARSHAL OF THE CITY OF LOS FRESNOS, AND
CONFERRING THE DUTIES OF SAID OFFICE UPON
LARRY DAVIS, DEPUTY SHERIFF OF CAMERON
COUNTY, TEXAS, AND FIXING HIS SALARY FOR
THE PERFORMANCE OF SUCH DUTIES.

BE IT ORDAINED BY THE CITY OF LOS FRESNOS:

SECTION 1    That the office of Marshal of the City of Los Fresnos
be and the same is hereby dispensed with.

Section 2    That the duties of the office of Marshal of the City
of Los Fresnos, as prescribed by Article 999, Revised
Civil Statutes of Texas, be and the same are hereby conferred
upon Larry Davis, Deputy Sheriff of Cameron County, Texas.

Section 3    In consideration of the performance of said duties,
the City of Los Fresnos shall pay a monthly salary
of $25.00 _____ to the said Larry Davis, Deputy Sheriff.

Section 4    That all ordinances and parts of ordinances in
conflict herewith are hereby repealed.

Section 5    This ordinance shall be and remain in effect from
and after its passage and until repealed by
ordinance duly enacted by the Board of Commissioners of the
City of Los Fresnos.

PASSED, October 5, 1950.

_____
W. B. Speer, Mayor

ATTEST:

_E. A. Oliver_____
E. A. Oliver, Secretary

# CERTIFICATION

This is to certify that the above and foregoing is a true and correct copy of Ordinance 19 approved and adopted by the City Council of the City of Los Fresnos, Texas, at a duly convened regular meeting on October 5, 1950.

To certify which witness my hand and seal of office this the 8th day of May, 2001.

Pam Denny, City Secretary
City of Los Fresnos, Texas